**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ FEB 19 2010 ★

BROOKLYN OFFICE

-----------------------------------------------------------

T.K. and S.K., individually and on behalf of L.K.,

Plaintiffs-Appellants,

- against -

New York City Department of Education,

Defendant-Appellee.

**CV 10 -    0752**

**COMPLAINT**

**WEINSTEIN, J.**
**CARTER, M.J.**

-----------------------------------------------------------

Plaintiffs, T.K. and S.K., individually and on behalf of L.K., by their attorneys, Mayerson & Associates, as and for their Complaint, allege and state the following:

1.  Plaintiff L.K. is an eleven-year old female child currently classified as having an eligible learning disability.

2.  L.K. was at all relevant times a student within the New York City Department of Education's purview, entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to, the Individuals with Disabilities Education Improvement Act (hereinafter "IDEIA"), 20 U.S.C. § 1400 *et. seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education Law, and Part 200 of the Commissioner's Regulations.

3.  Plaintiffs T.K. and S.K., L.K.'s parents, are residents of the State of New York, residing at all relevant times at an address within the New York City Department of Education's purview, and currently residing at an address within the Eastern District of New York.

4.      Although well known to Defendant, Plaintiffs are not expressly named herein by their given names because of the privacy guarantees provided in the IDEIA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g), and 34 C.F.R. § 99.

5.      Defendant, the New York City Department of Education (hereinafter "DOE"), is a "local educational agency" and school district organized under the laws of the State of New York. Both procedurally and substantively, the DOE was and still is statutorily obligated under the IDEIA, as well as the laws of the State of New York, to provide L.K. with a "free appropriate public education" ("FAPE").

6.      Pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. §1331 and §1367, this Court has jurisdiction of this action without regard to the amount in controversy.

7.      Venue is proper in that Plaintiffs and Defendant all reside or are situated within this judicial district. Defendant maintains offices within this judicial district at 131 Livingston Street, Brooklyn, New York, and the underlying evidentiary hearing took place within this judicial district, also at 131 Livingston Street, Brooklyn, New York.

8.      This action is brought pursuant to the provisions of 20 U.S.C. § 1400, *et. seq.*, more commonly known as the IDEIA and, in particular, 20 U.S.C. § 1415(i)(2)(A), in order to seek:

(a)      a modified *de novo* review and reversal of the State of New York State Review Officer's (hereinafter "SRO") October 22, 2009 Decision (Exhibit A annexed hereto);

(b)      reversal of the Impartial Hearing Officer's ("IHO") Findings of Fact and Decision dated July 21, 2009 (Exhibit B annexed hereto);

(c)      a determination that Plaintiffs met the applicable standards for Burlington/Carter reimbursement relief relating to L.K.'s attendance at the Summit School, a New York State approved and funded special education placement, on notice to Defendant;

(d)    a declaration that the SRO, Paul Kelly, is biased, not impartial, with a serious conflict of interest, and perpetuates such lack of impartiality by applying different and unduly elevated standards to parents and their children, while ignoring or glossing over FAPE deprivations committed by the local educational agency; and

(e)    an order granting Plaintiffs leave to file a fee application pursuant to the fee-shifting provisions of the IDEIA.

9.    The FAPE required under the IDEIA necessarily will be different for each child, as IDEIA expressly rejects any "one size fits all" approach or restrictions that preclude the genuine individualization of a student's educational program.

10.    The underlying administrative "due process" proceeding was brought by Plaintiffs pursuant to the IDEIA to secure pendency, declaratory, and reimbursement relief pertaining to L.K.'s placement at the Summit School, with additional 1:1 home and community based related services during the 2008-2009 school year, upon proper notice duly given by Plaintiffs pursuant to the requirements of the IDEIA.

11.    Plaintiffs filed their demand for due process in the underlying administrative proceeding on or about June 20, 2008. In this filing, Plaintiffs invoked L.K.'s automatic and unconditional "pendency" entitlements, which were based upon the June 11, 2008 decision of the SRO. This decision, among other things, awarded L.K. three hours per week of 1:1 speech and language therapy. The IHO issued an "Interim Order" awarding Plaintiffs these pendency services (Exhibit C annexed hereto).

12.    The evidence adduced during the administrative hearing amply establishes that Defendant committed numerous substantive and procedural violations that deprived L.K. of a FAPE. Moreover, before the hearing, and even during the hearing itself, Defendant egregiously

violated the independent entitlements of Plaintiffs by withholding and concealing "incident reports" and other educational records that should have been disclosed to Plaintiffs prior to the IEP meeting. Winkelman v. Parma City School District, 127 S.Ct. 1994 (2007).

13.     Although Defendant professes to have a "zero tolerance" policy for bullying, the record shows that, in actuality, Defendant and its agents allowed and/or fostered a hostile environment where L.K. was regularly being teased, bullied, and demeaned as a person and human being.  When Plaintiffs sought to meet with Defendant's administrators to address the situation, Plaintiffs were then bullied by Defendant's administrators.  The IHO and SRO ignored or glossed over such conduct, but this Court has the power and discretion under the IDEIA, 20 U.S.C. § 1415, to hold Defendant accountable.

14.     In this action, Plaintiffs seek to conduct additional discovery, as permitted by the statute, so as to adduce "additional evidence" with respect to: (a) Defendant's withholding, concealing, and failure to timely disclose incident reports and other educational records; and (b) Defendant's repeated failures and refusals to meet and speak with Plaintiffs to discuss and resolve the ongoing serious, intense and stressful bullying problem that L.K. was experiencing.

15.     On June 4, 2008, an IEP (Individualized Education Program) meeting was convened for the ostensible purpose of developing an IEP for L.K. for the 2008-2009 school year.  The IEP team recommended that L.K. continue to attend P.S. 6 in a CTT (Collaborative Team Teaching) classroom for the fourth grade.

16.     On or about June 20, 2008, Plaintiffs, through their counsel, Mayerson & Associates, filed a demand for due process, asserting a variety of procedural and substantive challenges to the June 4, 2008 IEP, including, but not limited to the following:[1]

---

[1] It should be noted that Plaintiffs did not allege any procedural or substantive violation related to the *undisclosed* incident reports because Plaintiffs were unaware that such reports even *existed* at the time of filing.

a) Defendant's proposed placement at P.S. 6 is inappropriate because it will not accommodate L.K.'s special needs, including her speech and language needs;

b) Defendant unilaterally stated that "as a matter of policy" the subject of "private school" would not be considered at the meeting, nor would the matter be referred to the CBST (Central Based Support Team) for consideration, even though, at the IEP meeting, Plaintiffs mentioned a special education school approved by Defendant as an alternative option they had been exploring;

c) Defendant failed to provide any supporting documentation or reports to Plaintiffs despite their continued requests for the same in advance of, prior to, and at the meeting, other than an unsigned and undated one page typewritten document containing two paragraphs – for example, certain writings prepared by L.K. in class was referred to in the meeting, but Plaintiffs were never provided with copies of the same;

d) Defendant failed to provide Plaintiffs with either written or oral reports regarding the results of certain evaluations that were performed on L.K.;

e) Defendant failed to discuss L.K.'s Annual Goals and Short-Term Objectives at the IEP meeting with the active participation of Plaintiffs (with the sole exception of the speech and language goals), thereby depriving Plaintiffs of meaningful participation as equal members of the IEP team – this flies in the face of 34 C.F.R. §§ 300.533(a)(1)-(c)(iii), which has determined that parents must actively participate in the evaluation, eligibility, and educational placement of their child, as well as be considered in equal members of the IEP team every aspect of developing and reviewing their child's IEP;

f) Furthermore, even though the IEP team included Plaintiffs' recommended goals and objectives, Defendant failed to provide a copy of the goals prepared by the IEP team to Plaintiffs prior to them receiving the IEP;

g) The Annual Goals and Short-Term Objectives, at pages 6A-6AA of the IEP lack objective measures – some are vague and ambiguous and others are just plan inappropriate, and most significantly, they were not developed, drafted or even discussed individually at L.K.'s IEP meeting.

h) Defendant's recommendations, in large part, were driven by impermissible policy and "predetermination" that *precluded* the true individualization of L.K.'s IEP and which also deprived Plaintiffs of meaningful participation in the IEP process;

i) Defendant refused to discuss and meaningfully address the various submitted reports' recommendations for 60-minute related service sessions and for related services to be provided out of school, stating that again, "as a matter of

policy" Defendant would not consider out of school services and that Defendant did not "have the authority" to consider more than 30-minute sessions – the DOE-generated IEP calls for L.K. to be pulled-out of class *eleven* times per week, for a total of 5.5 hours out of 32.5 hours per week (nearly 20% of each school week);

j) Defendant failed to discuss provisions for appropriate program supervision, consultation, team meetings, teaching clinics, teacher and staff training, school observations, and parent training and counseling;

k) Defendant failed to adequately assess L.K.'s "present levels" of performance;

l) Defendant refused to allow L.K.'s SEITs (Special Education Itinerant Teacher) to speak or comment during the IEP meeting;

m) Defendant unilaterally, arbitrarily and without discussion terminated the behavioral management paraprofessional assigned to L.K.;

n) Defendant's Representative (Lauren Fontana, the P.S. 6 Principal) unilaterally deemed a speech and language based special education school to be "more restrictive" than a CTT class, and refused any discussion of the issue whatsoever – thus, no meaningful discussion was held as to whether placing L.K. in a special education school would be a less restrictive environment for L.K.;

o) Defendant's IEP team completely ignored the written recommendations of L.K.'s service providers and independent evaluations, all of which recommended L.K. be placed in a speech and language based special education school;

p) Defendant unilaterally refused to address the ongoing bullying of and negative effects on L.K. academically and socially in the P.S. 6 CTT classroom despite Plaintiffs' efforts to discuss this at the IEP meeting and in prior meetings and written communications – this is clearly indicative of Defendant's deliberate indifference to this problem;

q) Defendant failed to discuss at the IEP meeting the creation of either the attached Behavior Intervention Plan prior to Plaintiffs receiving the IEP, or a Functional Behavior Analysis (upon which a Behavior Intervention Plan is based), which has never been received;

r) Defendant's IEP fails to note the attendance by telephone of Mary Kutch;

s) Defendant failed to offer any team meetings or teaching clinics with teachers and interdisciplinary team members, or parent training and counseling;

t) Defendant failed to offer or even discuss transportation (i.e., busing) of any kind at L.K.'s IEP meeting; and

u) Defendant failed to make provision, or even discuss the provision, of services during the summer of 2008, nor was there any discussion of Defendant's unilateral and arbitrary determination to offer a "ten-month" school year, as opposed to a "twelve-month" school year.

17.     On notice to Defendant, Plaintiffs enrolled L.K. in the Summit School, a New York State approved and funded special education school, with a speech and language based program. Plaintiffs also unilaterally obtained home- and community based services for L.K., including 7.5 hours per week of 1:1 SEIT services, program supervision and parent training and counseling, three hours per week of 1:1 speech-language therapy, and three hours per week of 1:1 occupational therapy. The placement and program secured for L.K. was "reasonably calculated" to provide a student like L.K. with a meaningful educational benefits.

18.     There was ample evidence to establish at the administrative hearing that L.K. was continuously bullied and mistreated by her peers at P.S. 6. The testimony of L.K.'s three SEITs, Ms Faber, Ms. Maloney and Ms. Wiggins, all DOE employees, was *uncontroverted* concerning the repeated torment that L.K. endured and the negative impact this was having on her psyche and progress. There also was compelling testimony that Defendant, through its designated administrators, *repeatedly* failed and refused to meet with Plaintiffs to discuss this issue. Despite this testimony, the IHO nevertheless impermissibly glossed over this evidence and concluded that "the issue of bullying [was] a separate issue ... [and] does not go to the heart of whether the CTT program and the related services recommended on the IEP were appropriate." Ex. B, p. 27.

19.     Unfortunately, the IHO failed to address and adjudicate all of Plaintiffs' claims going to Prong I, including but not limited to the claim that Defendant withheld from Plaintiffs incident reports pertaining to the bullying L.K. had endured, and that Defendant had repeatedly failed and

refused to meet with Plaintiffs to even discuss the bullying problem. Ironically, when Plaintiffs tried to meet with Defendant's administrator in person, the administrator threatened to "call security," and she did so in L.K.'s presence, traumatizing her. Defendant's stonewalling continued during the IEP process, with Defendant again failing and refusing to address Plaintiffs' repeated requests to meaningfully discuss the bullying problem, and the related problem of Defendant not being forthcoming.

20.     The IHO's "Findings of Fact and Decision" denied Plaintiffs relief based upon a finding that Defendant offered L.K. a FAPE. *See* Ex. B. Plaintiffs prosecuted an appeal from the IHO's decision to the SRO.

21.     Upon information and belief, the SRO, Paul Kelly, has a demonstrable history of bias and lack of impartiality, and he also is beset with a serious conflict of interest. The existing record and statistics bear this out. While no federal court has yet gone so far as to recognize systemic bias on the part of the SRO, district courts have gone so far as to recognize that the SRO: (a) for Prong I purposes, improperly failed to accept and give deference to findings made by the IHO that were predicated upon credibility assessments; (b) imposed an unduly elevated standard upon parents for purposes of Prong II; and (c) imposed an unduly elevated standard upon parents for purposes of Prong III.

22.     The statistics reflect that if the school district has won below, more than 80% of the time, the SRO will affirm that result. On the other hand, if the student and his or her parents have won below, more than 80% of the time, the SRO will find one reason or another to *reverse*, and rule for the school district. While, in the past, there were multiple SRO's deciding these kinds of appeals, today, there is effectively only one SRO – Paul Kelly. Mr. Kelly conducts no

hearings to speak of and appeals are to be decided on an abbreviated 35-day appeal window upon even more abbreviated submissions (all submissions are limited to a maximum of twenty pages).

23.     On appeal, even the SRO found that Defendant's failure to "respond to the requests for incident reports *constitutes a procedural violation.*" Ex. A, p. 17. However, the SRO, by holding that this "procedural inadequacy" did not amount to the denial of a FAPE, failed to provide any remedy to Plaintiffs.

24.     By failing to provide any remedy, the SRO only encouraged such conduct to occur again in the future. Defendant should be held accountable for withholding incident reports and other educational records. This Court, pursuant to the IDEIA, 20 U.S.C. § 1415, has broad remedial powers to take appropriate action, and should do so here to enforce federal law and to ensure that children and their parents are treated in an honest and forthright manner by school districts where, as here, there are bullying incidents or other such incidents that warrant a report.

25.     The SRO's Decision (Ex. A) failed to take into consideration and/or give appropriate weight to the legal and factual circumstances of L.K.'s case. To the extent that the "due weight" standard is applicable in this action, we urge that the IHO's and SRO's findings are entitled to diminished weight where, as here, the IHO and SRO ignored or glossed over L.K.'s claims, and where, as here, the SRO has a history of bias and lack of impartiality.

26.     Plaintiffs had every good reason to seek the SRO's recusal. However, such request would have been a futile act because there now is only *a single* SRO, Paul Kelly, who decides *all* the SRO appeals in New York State. Had Mr. Kelly recused himself, there would have been no one in the Office of State Review with the power or position to decide the Defendant's appeal.[2]

---

[2] Upon information and belief, the SRO's office and decision-making authority was created in 1990, after a federal court ruled that it was an impermissible conflict of interest for the State Education Commissioner to be *adjudicating* appeals from IHO decisions.

27.     In the case at bar, this Court is entitled to apply a pure *de novo* approach to questions of law and mixed questions of law and fact, and to "findings" that the SRO never made i.e. claims that were never properly addressed and considered.  To the extent, if at all, that this Court concludes that it is constrained to apply a "due weight" standard to any of the fact-findings of the SRO, we ask that this Court apply such standard cautiously and sparingly, particularly since here, the SRO, sits in Albany without seeing or hearing a single witness. M.V. v. Shenendehowa Central School Dist., 2008 U.S. Dist. LEXIS 182 (N.D.N.Y. 2008).

28.     On this appeal, which is in the nature of a modified *de novo* review, this Court should independently review the record. Any questions of law and mixed questions of law and fact are subject to a pure *de novo* review standard.

29.     Plaintiffs have exhausted their administrative remedies.

30.     The IHO's and the SRO's Decisions are erroneous and contrary to law and statute as an aberrational and arbitrary result that goes against the clear weight of the evidence and the review standards set forth by the Second Circuit.

### Plaintiffs Seek "Additional Evidence"

31.     A district court may consider "additional evidence" beyond that found in the administrative record insomuch that it is, relevant useful in determining whether the parents chosen placement was appropriate. Gagliardo v. Arlington Central School Dist., 489 F.3d 105 (2d Cir. 2007); Frank G. v. Board of Educ., 459 F.3d 356 (2d Cir. 2006) *cert. denied*, 169 L.Ed.2d 325 (2007); Jordan S. v. Hewlett Woodmere Union Free School Dist., 2009 U.S. Dist. L.K.S 27460 (E.D.N.Y., March 31, 2009); *see also* Lillbask v. State of Conn. Dept. of Educ., 397 F.3d 77, 84 (2d Cir. 2005).

32.     Additional discovery as to, *inter alia*, Defendant's conduct in concealing or withholding incident reports and other records, as "additional evidence," is appropriate to complete the record on this modified *de novo* review.  While the SRO scratched the surface in acknowledging that Defendant had engaged in such misconduct, Plaintiffs seek to discover the full extent of such misconduct so that this Court can properly review the record, and take appropriate action.


        WHEREFORE, it is respectfully requested that this Court:

        (a)     reverse the October 22, 2009 Decision of the SRO and the July 21, 2009 Decision of the IHO;

        (b)     declare that Defendant failed to offer L.K. a FAPE for 2008-2009 (Prong I);

        (c)     declare that Defendant intentionally and improperly withheld and failed to disclose incident reports and other educational records;

        (d)     declare that the SRO failed to accord an adequate remedy for Defendant's misconduct in withholding and failing to timely disclose incident reports and other records;

        (e)     declare that Plaintiffs' unilateral placement at the Summit School and the additional home-based services listed herein were appropriate for L.K. to make meaningful progress (Prong II);

        (f)     declare that equities favor the Plaintiffs (Prong III);

        (g)     declare Plaintiffs to be the "substantially prevailing" parties;

        (h)     grant leave to Plaintiffs' to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs, both at the administrative level and for this action, pursuant to the express fee-shifting provisions of the federal IDEIA statute; and

(i)      grant Plaintiffs such other, further and different relief as may be just under the

circumstances.

Dated: February 19, 2010
       New York, New York

Gary S. Mayerson (GSM 8413)
Mayerson & Associates
*Attorneys for Plaintiffs*
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200
(212) 265-1735 (facsimile)
admin@mayerslaw.com
www.mayerslaw.com



# The University of the State of New York

### The State Education Department
#### State Review Officer
#### www.sro.nysed.gov

No. 09-097

**Application of a STUDENT WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Mayerson & Associates, attorneys for petitioners, Gary S. Mayerson, Esq., of counsel

Michael Best, Special Assistant Corporation Counsel, attorney for respondent, Tracy Siligmueller, Esq., of counsel

## DECISION

Petitioners (the parents) appeal from the decision of an impartial hearing officer which denied the parents' request to be reimbursed for the student's tuition costs at the Summit School (Summit) for the 2008-09 school year and denied the parents' request for reimbursement for additional home-based services. The appeal must be dismissed.

At the time the impartial hearing, the student was attending Summit after being unilaterally placed there by the parents (Tr. p. 42). Summit is a private school that has been approved by the Commissioner of Education as a school with which districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). Additionally, the student received unilaterally obtained home-based services consisting of 7.5 hours per week of 1:1 home and community-based special education itinerant teacher (SEIT) services, three hours per week of program supervision and parent training and counseling, three hours per week of both individual speech-language therapy and individual occupational therapy (OT), and one hour per week of individual

physical therapy (PT).[1]  According to the student's pediatric neurologist, the student had been offered a diagnosis of a pervasive developmental disorder – not otherwise specified (PDD-NOS)

---
[1]  The hearing record refers to the student's school-age educational support services as "SEIT" support.

(Parent Ex. PP. at p. 1). The hearing record reveals that at its June 4, 2008 meeting, the committee on special education (CSE) changed the student's classification from autism to a learning disability (Tr. p. 191). The student demonstrates delays in her receptive and expressive language skills, social skills, auditory processing, and gross and fine motor skills (Tr. p. 367; Parent Exs. D; P at p. 1). The student's eligibility for special education and related services as a student with a learning disability is not in dispute in this appeal (Parent Ex. D at p. 1; see 34 C.F.R. § 300.8[c][10][i]; 8 NYCRR 200.1[zz][6]).

The student's prior educational history is described in Application of a Child with a Disability, Appeal No. 06-004 and Application of a Child with a Disability, Appeal No. 08-019, and will not be repeated here in detail.

Briefly, the student attended the district's collaborative team teaching (CTT)[2] program in kindergarten, first, and second grades with a full-time 1:1 SEIT (Parent Ex. W at p. 1). The student attended the district's third grade CTT program for the 2007-08 school year with a full-time SEIT and received related services that included speech-language therapy, OT, and PT (Parent Exs. P at p. 1; NN at p. 1; W at p. 1).

On November 1, 2007, a private pediatric psychologist completed a psychological consultation with the student (Parent Ex. XX). The private psychologist reported that the student was "a social and engaging nine year old girl" with difficulties in receptive, expressive, and pragmatic language, and "regulation" (id. at p. 1). The psychologist further reported that the student had "made ongoing progress in all areas" (id.). The psychologist indicated that the student was able to keep up academically with her peers at her current public school, she had some close friends with whom she enjoyed play dates and other recreational activities, and she was able to comfortably participate in group and class discussions "with a great deal of supports" (id. at p. 3).

In a letter dated November 29, 2007, the parents wrote to the student's CTT teachers concerning an incident with the student wherein another student reportedly deliberately stepped on their daughter's toes (Parent Ex. WW). The parents asked that the "bullying" directed at the student be addressed immediately (id.).

---

However, the Education Law defines special education itinerant services (commonly referred to as "SEIT") as "an approved program provided by a certified special education teacher . . . , at a site . . . , including but not limited to an approved or licensed prekindergarten or head start program; the child's home; a hospital; a state facility; or a child care location as defined in [§ 4410(8)(a)]" (Educ. Law § 4410[1][k]). Although mischaracterized in the hearing record, I will continue to refer to the student's school-age educational support service providers as "SEITs" to remain consistent with the hearing record and to avoid confusion in this decision.

[2] "Collaborative team teaching," also referred to in State regulation as "integrated co-teaching services," means "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students" (8 NYCRR 200.6[g]). School personnel assigned to an integrated co-teaching class shall minimally include a special education teacher and a regular education teacher (8 NYCRR 200.6[g][2]). The Office of Vocational and Educational Services for Individuals with Disabilities issued an April 2008 guidance document entitled "Continuum of Special Education Services for School-Age Students with Disabilities," which further describes integrated co-teaching services (see http://www.vesid.nysed.gov/specialed/publications/policy/schoolagecontinuum.pdf).

The student's CTT teachers completed third grade progress reports in winter 2008 indicating that the student "me[t] grade standard" in social studies and "approache[d] grade standard" in reading, "word study," writing, and math, but indicated "additional work or development needed" for the majority of "learning goals" identified for each academic area and the area of work habits (Parent Ex. K at p. 1). The student's CTT teachers reported that the student exhibited consistent effort in word study, social studies, and with homework (id.).

The hearing record reflects that on November 29, 2007, January 28, February 4, and February 13, 2008, the student was the subject of four incident reports related to inappropriate behavior by the student, including two allegations that she had pulled the hair of other students, one allegation that she had pulled her teacher's hair, one allegation that she slapped a teacher, and one allegation that the student had made inappropriate remarks to two other students (Parent Ex. CCC at pp. 1, 4, 9, 12-13).

In a letter dated February 5, 2008 from the parents to the principal of the district school that the student was attending, the parents noted several behavioral incidents involving the student and the student's CTT teachers (Parent Ex. QQ). In the letter, the parents also requested copies of any testing or incident reports involving the student, and requested a meeting with the principal to discuss the incidents and to address the parents' concerns that the student was being "bullied" by classmates (id. at p. 3). Also on February 5, 2008, one of the student's CTT teachers wrote an incident report concerning what she believed was an inappropriate phone conversation that had occurred with the student's mother (Dist. Ex. 3).

A neurodevelopmental evaluation of the student was conducted on February 18, 2008, by a private neurologist who noted that the student reported that her "teachers are mean and so are some of the kids" and that the student "was a little more nervous than last year" (Parent Ex. PP at p. 1). The private neurologist also reported that the student had "some friends at school and enjoy[ed] working" (id.). The private neurologist administered portions of the Wide Range Achievement Test – Fourth Edition (WRAT-4) to the student, which yielded age-based standard scores of 102 in word reading and 99 in sentence completion (id. at p. 2). According to the private neurologist, the student exhibited "expressive, receptive and pragmatic language skills delays, auditory processing difficulties, learning disabilities, and fine and gross motor delays" (id. at p. 1). The private neurologist opined that the student had made progress in receptive, expressive, and pragmatic language skills and social skills (id. at p. 3). The private neurologist further reported that the student's "spontaneous language and conversational skills ha[d] improved and are quite normal sounding;" however the student continued to display expressive language errors in content, form, and use of language (id.). The private neurologist described the student's auditory processing as "problematic" because the neurologist observed that the student did not answer her direct questions, but instead paused and continued "to talk about the subject from her line of thought" (id.). The private neurologist reported that the student had previously been offered a diagnosis of a PDD–NOS, but recommended that the student's educational classification be changed from autism to a learning disability because the student now more clearly met the criteria for a learning disability due to her language deficits and auditory processing disorder, which negatively affected her learning (id. at pp. 1, 4). The private neurologist further recommended that the student attend a 10-month program in a special

education school that used a multisensory approach with a small class size, and provided individualized instruction to meet the needs of a student with a language-based learning disability, and that the student be grouped with peers with similar abilities (id. at p. 4). The private neurologist also recommended that the student receive related services in school as well as after school, including three 60-minute sessions of individual speech-language therapy weekly, three 60-minute sessions of individual OT weekly, and one 60-minute session of individual PT weekly for 52 weeks per year including weekends, vacations, and holidays (id.).

On March 21, 2008, the parents signed an enrollment contract with Summit for the 2008-09 school year and paid a non-refundable deposit of $2758.00 to "reserve a place for [the student]" (Parent Ex. UU).

On March 26, 2008, the district's school psychologist conducted an updated functional behavioral assessment (FBA) of the student utilizing data obtained by observation and teacher and parent interviews (Dist. Ex. 1). The school psychologist's description of the student's behavior included "staying on task," difficulty with processing language including receptive and expressive language delays, hanging her head, looking down, and being "underresponsive" (id. at p. 1). According to the FBA, the student's behavior occurred during novel instruction, less structured classroom activities, or in the yard/after lunch, and varied in frequency depending upon the setting (id.). The school psychologist reported that the student demonstrated anxiety and misinterpreted social cues, receiving negative attention (id. at p. 2). The school psychologist further reported that the student with the "correct support can function well academically" (id. at p. 1).

In April 2008, a private psychologist and physician reevaluated the student at a center for developmental pediatrics (Parent Ex. NN at p. 1). The resultant evaluation report reflected that the student and her mother reported that the student was being "critique[ed] and ostraciz[ed]" by some of her classmates and that the student's mother expressed that the student was "becoming increasingly sad, anxious and uncomfortable in school, and less available for learning"(id.). Administration of the Wechsler Intelligence Scale for Children - Fourth Edition (WISC-IV) yielded a full scale IQ score of 92 (percentile rank of 30), a verbal comprehension composite of 106 (percentile rank of 66), a perceptual reasoning composite of 100 (percentile rank of 50), a working memory of 83 (percentile rank of 13), and a processing speed composite of 80 (percentile rank of 9) (id. at p. 13). The student's WISC-IV composite scores were in the low average to average range with the private psychologist noting that the student's full scale IQ score "was not a good statistical representation of her performance on the assessment given the wide disparities within and between her composite scores" (id. at p. 4). Administration of selected subtests of the Wechsler Individual Achievement Test – Second Edition (WIAT-II) yielded standard (and percentile) scores of 116 (86) in word reading, 99 (47) in reading comprehension, 116 (86) in pseudoword decoding, 103 (58) in numerical operations, 94 (34) in math reasoning, 130 (98) in spelling, and 96 (39) in written expression (id. at p. 14). The WIAT-II scores were in the average to very superior range and the private psychologist reported that the student demonstrated stronger rote skills compared to applied skills (id. at pp. 6, 14). The private psychologist reported that overall the student's memory skills were in the low average range and that overall her attention skills were weak (id. at p. 7).

4

The evaluators further reported that testing results indicated that the student's executive functions were in the very low to high average range, her visual motor skills were in the low to average range, and that she presented with expressive language weaknesses (Parent Ex. NN at pp. 10, 16). The evaluation report also indicated that during testing the student's "attention was highly variable" and that she was "often drawn off task by her own thoughts" (id. at p. 4). The student's social presentation was also reported to be highly variable and the student responded to some task demands in an excited, playful fashion, but at other times her mood was far more subdued and somewhat anxious (id.). Based on the evaluation, the evaluators recommended that the student's educational classification be changed to a learning disability and that the student attend a 10-month special education school with a "consistent, supportive special education environment [to] allow [the student] to benefit from small classes, low student-teacher ratio, multiple teaching strategies and approaches and individualized attention to meet her learning needs" (id. at p. 11). Additional recommendations included a 12-month program of related services and SEIT teacher support after school, monthly interdisciplinary meetings with the student's after school providers and parents to review her progress and modify her program, social skills training in school, and 1:1 instruction in writing for content (id. at pp. 11-12).

In April and May 2008, a private speech-language pathologist conducted a "language evaluation" of the student (Parent Ex. KK at p. 1). The speech-language pathologist reported that the student demonstrated a moderate receptive and expressive language disorder and that the student's "difficulties with higher level aspects of language were noted during both formal standardized assessment and informal, more spontaneous discourse" (id. at p. 4). The speech-language pathologist opined that the student exhibited "higher language deficits that make her vulnerable to difficulties both socially and academically" (id. at p. 5). The speech-language pathologist recommended that the student receive three 60-minute sessions of speech-language therapy weekly at home, "at least" two sessions of speech-language therapy weekly in a small group at school to address social and pragmatic language needs, and that the student attend a small, structured classroom with a low student to teacher ratio (id. at pp. 5-6). The speech-language pathologist further recommended that the parents be provided with counseling on "ways to stimulate language behaviors at home" (id. at p. 6).

On May 5, 2008, the parents, together with the student and one of the student's SEITs, reportedly met with the district's principal to discuss an issue regarding the student (Parent Ex. GG). The hearing record reflects that when the parents attempted to raise the issue of alleged "bullying" of the student at the school, the principal ended the meeting because she did not believe that the issue should be discussed in front of the student (Tr. pp. 1482-84, 1698-1701).

The hearing record contains several letters between the district and the parents during May 2008 (Parent Exs. HH; II; JJ). In two of these letters, the parents expressed their belief that the teachers in the CTT class failed to "understand, support and nurture [the student], her special needs, learning style, and profile" (Parent Exs. HH; II). The parents further indicated in one of the letters their belief that the principal and the CTT teachers were failing to "appropriately address the underlying bullying and social issues" within the classroom (Parent Ex. HH at p. 2).

On May 15, 2008, the student's private neurologist conducted a one hour and fifteen minute observation of the student in her third grade CTT class (Parent Ex. FF at p. 1). The

5

neurologist reported that the student was in a class with two teachers and 26 students, of which approximately 54 percent were general education students (id.). The observation report reflected that the class was working on making "passports" as part of a social studies project on Japan (id.). During the private neurologist's observation, the student was sitting with four other students and was observed to have a positive interaction with one of them and a negative interaction with another (id.). When she observed that other students were coloring their passports, the student got a basket of colored pencils and markers and began to draw on her passport (id.). According to the observation report, at the completion of the activity, the student was able to follow a four-step directive from the teacher with prompting from her SEIT (id. at p. 2). The student was next observed during a math activity (id.). The observation report reflected that the student participated with prompts from her SEIT (id.). The private neurologist then reported observing the student during a writing assignment (id.). The private neurologist opined that in general, the student "seemed anxious, sad, and frustrated" (id.). The private neurologist reported that the student's "head was often down" and that she "had minimal interactions with her classmates," which were "mostly negative" and "clearly affected [the student's] academic performance" (id.). The private neurologist further reported that compared to last school year, the student volunteered less and that her SEIT needed to prompt the student "much more" to get started and continue an assignment (id.). According to the observation report, the private neurologist found that the student was "not well-integrated into the classroom and was "rejected, excluded or ignored by most of her classmates" and that "this stress has affected [the student's] academic performance" (id. at p. 3). The private neurologist indicated that the "[t]hird [g]rade CTT classroom [wa]s not an appropriate educational placement for [the student]" and recommended the student be placed in a "supportive and therapeutic special education school that meets the needs of a student with language-based learning disabilities" (id.).

On May 20, 2008, one of the student's classroom SEITs completed an educational progress report of the student (Parent Ex. EE). The classroom SEIT reported that the student demonstrated "the ability and potential to perform academically at and/or above grade level, except when her language deficits and delays challenge and adversely affect her understanding of the learning" (id. at p. 1). The SEIT further reported that the student participated extremely well in small groups but had difficulty "transferring" into larger groups (id. at p. 2). She reported that both the student's receptive and expressive language skills were variable, although the student was able to accurately express herself and communicate her wants and needs (id.). The SEIT indicated that the student strived to participate in group activities with her peers and that she "ha[d] a strong desire to be liked and accepted by her peers although negative social interactions within the classroom have made developing positive relationships difficult" (id.). The SEIT also indicated that the student demonstrated grade level to above grade level academic abilities with delays in higher level social skills and receptive, expressive and pragmatic language skills, and recommended that the student "be placed in a small, structured and supportive classroom with a low student to teacher ratio" in a special education environment (id.).

On May 21, 2008, the student's home-based physical therapist conducted a PT evaluation of the student (Parent Ex. AA). The home-based physical therapist reported that the student was independent in many of her activities of daily living (ADL)/self care but sometimes required prompting (id. at p. 1). Administration of the Movement Assessment Battery for Children

6

(Movement ABC), an assessment of fine and gross motor skills yielded a score below the first percentile for the student's age, which the home-based physical therapist determined indicated significant motor skill deficits (id. at p. 4). The home-based physical therapist reported that the student demonstrated "decreased coordination, balance, endurance strength, and age appropriate gross motor abilities" and recommended that the student participate in an adapted physical education class at least two times weekly, in addition to one 60-minute individual PT session weekly at home or in an outpatient setting to address motor planning, balance, coordination, cardiovascular and muscular endurance, and the practice of age appropriate gross motor skills (id.). The home-based physical therapist included five annual goals with 26 corresponding short-term objectives addressing the student's aforementioned deficit areas (id. at pp. 6-8).

Also on May 21, 2008, the student's home-based speech-language pathologist completed a speech-language progress report (Parent Ex. CC). The home-based speech-language pathologist stated that the student continued to make steady progress in all areas of speech-language throughout the 2007-08 school year (id. at p. 1). The speech-language pathologist reported that the student was able to attend for longer time periods when she was provided with redirection and that she demonstrated consistent improvement in following multi-step directions both orally and in written text (id.). She reported that although the student demonstrated improvement in her expressive language skills, she continued to exhibit a significant delay in the area of social language (id. at p. 2). The home-based speech-language pathologist indicated in the progress report that the student's speech-language delays adversely affected her academically and socially and recommended the student be placed "in a special education setting for 4th grade next year in small classes with a supportive and individualized approach to learning" (id.). The speech-language pathologist also recommended that the student receive speech-language therapy in school in a group of 2-3 students to improve her language, pragmatic, social and play skills, as well as three 60-minute sessions of home-based individual speech-language therapy weekly on a 12-month basis (id.).

On May 22, 2008, the student's home-based occupational therapist completed an OT progress note (Parent Ex. Y). The occupational therapist reported that the student demonstrated delays in fine motor, graphomotor, visual perceptual/motor and sensory processing (id. at p. 1). The occupational therapist further reported that the student was "independent in self-care tasks; however, at time [the student] needs verbal cues to stay on task" (id.). The occupational therapist recommended that the student's OT services be reduced to one 60-minute individual session weekly on a 12-month basis in addition to "any OT received in a supportive special education school" (id. at p. 2).

Also on May 22, 2008, the student's "program consultant" completed a progress report regarding the interventions provided by the student's SEITs (Parent Ex. W). The consultant reported that the student continued to demonstrate progress in all targeted areas in school, home, and community environments (id. at p. 1). Target areas included reading comprehension, writing fluency, social skills, staying on task, following multi-step directions, math word problems, multi-step math problems, higher level language processing skills, and auditory comprehension and processing (id. at pp. 1-2). The consultant indicated that the SEITs would continue to address these targeted areas with the student (id.). The program consultant recommended that the student attend a small class with a low student to teacher ratio in a 10-month special

education school and continue to receive 7 1/2 hours per week of SEIT instruction to promote generalization, address skills not addressed during the school day, and to maintain skills she acquired in school (id. at p. 2). The program consultant further recommended up to 10 hours per month of supervision/coordination/consultation from a private institute, monthly team meetings/teaching clinics, and services provided for 52 weeks per year (id.).

On May 23, 2008, the student's home-based SEIT completed an educational progress report (Parent Ex. V). The home-based SEIT reported that the student demonstrated delays in language/auditory processing, comprehension, pragmatic language skills, and social skills (id. at p. 4). The home-based SEIT described the student as a "cooperative, motivated and enthusiastic participant and partner in her learning activities and homework assignments" (id. at p. 2). The home-based SEIT indicated that the student had "strong decoding skills, however, she ha[d] a significantly large gap between her decoding and reading comprehension skills" (id. at p. 1). The home-based SEIT also indicated that the student demonstrated difficulty with "planning, organizing, formulating, expanding, elaborating, and detailing her written work" (id. at p. 2). The home-based SEIT reported that the student exhibited grade level rote computational, arithmetic math skills; however, the student demonstrated deficits with her math reasoning, word problems, and multi-step problem skills (id.). In the area of social/emotional skills, the home-based SEIT reported that the student had made progress initiating conversations and social interactions with peers, but at times she required teacher support to maintain them or join in (id.). The student appreciated her friends and looked forward to spending time with them (id.). The home-based SEIT reported that the student stated that she wanted "to be accepted and included by her peers in school, to have more friends in school and for her teachers to value her;" however, the home-based SEIT also reported that over the course of the academic year, the student had continuously expressed her sadness, frustration, anxiety and discomfort with "her being bullied by various children in her class in school" (id. at p. 3). The home-based SEIT indicated in the progress report that this had negatively affected the student's ability to initiate, concentrate, attend, and stay on task with her homework assignments and activities after school, which had affected her academic performance (id.). She recommended that the student attend a special education school that addressed language-based learning difficulties on a 10-month basis, and continue to receive 7 1/2 hours per week of "one to one home-based teacher support on a 12-month basis" (id.).

On May 23, 2008, the student's school-based classroom SEIT completed a progress report (Parent Ex. S). The progress report reflected that the student required prompts to transition and attend to classroom routines and during social and academic portions of the day (id.). The school-based classroom SEIT reported that this support was necessary to reassure the student and enhance her comfort level because of "negative social interactions" in her CTT class (id.). The progress report further indicated that the student exhibited difficulties in receptive, expressive, and pragmatic language (id.). The progress report reflected that the student demonstrated strengths in mathematical calculation, reading and decoding; however, she continued to need assistance in math word problems, math multi-step problems, higher level comprehension, and language processing involving reasoning and inferences (id.). The student's school-based classroom SEIT recommended that the student attend a "structured small class setting, with a low student to teacher ratio" in order to receive individualized attention for her "special needs and learning style" (id.).

8

By letter dated May 23, 2008, addressed to the district's CTT teachers, the district school psychologist and the district social worker; the parents requested that the district provide the parents with all "formal and informal" district evaluations, assessment, tests, reports, files, student work, and any other documentation that was to be considered at the annual review meeting scheduled for June 4, 2008 (Parent Ex. T at p. 1). The parents further indicated that they intended to audiotape the upcoming CSE annual review meeting (id. at p. 2).

By letter dated May 27, 2008, addressed to the student's CTT teachers, the parents provided copies of the private neurologist's evaluation and school observation reports; progress reports from the student's SEITs; a private speech-language evaluation report; progress reports with recommended individualized education program (IEP) goals/objectives from the student's home-based speech-language pathologist, home-based occupational therapist, home-based physical therapist, and program consultant; a third grade winter progress report; and a progress report from a private "[y]oung [a]rtists" program (Parent Ex. Q at pp. 1-2). The parents further indicated in their letter that they had not received as previously requested, "a copy of any and all District evaluations, assessments, reports, and any other document(s) the IEP team intends to consider during the CSE Annual review IEP Meeting" (id. at p. 2). The parents also indicated that they had not yet received the "Request for Physical Examination Form," the "Notice of Rights as a Parent with a Child with a Disability Booklet," and "A Parent's Guide to Special Education for Children 5-21," which they had previously requested (id.).

By letter dated May 28, 2008, addressed to the student's CTT teachers, the district school psychologist and district social worker; the parents informed the district that they had not yet received any of the documents requested in their letter of May 27, 2008, and provided the district with a SEIT progress report (Parent Ex. N at p.1). Additionally, the parents requested that the district confirm that a representative from the "District Level who has placement and related services decision making authority for summer 2008 and the 2008-09 school year" would be attending the student's scheduled CSE meeting (id.).

By letter dated May 28, 2008, the district informed the parents that the documents they had requested were attached and requested that the parents sign a letter confirming their previously stated intent to exercise their right to waive participation of the additional parent member at the CSE meeting (Parent Ex. O).[3]

On May 28, 2008, the student's home-based speech-language pathologist completed a speech-language progress note (Parent Ex. P). The home-based speech-language pathologist reported that the student had made "steady" progress in her speech-language therapy sessions (id. at p. 1). She noted that the student exhibited some improvement in her receptive, expressive and pragmatic language skills, but continued to demonstrate weaknesses in these areas (id.). The private speech-language pathologist noted that the student demonstrated the greatest difficulty with complex sentences such as "why" or "how," retelling/recalling main ideas, sequencing and summarizing stories, greeting familiar individuals, and initiating and maintaining the topic during conversational exchanges (id.). The home-based speech-language pathologist

---

[3] The hearing record does not reveal which documents, if any, were attached to the May 28, 2008 letter from the district to the parents (see Parent Ex. O).

recommended the continuation of individual, extended day speech-language services for three hours weekly on a 12-month basis (id. at p. 2).  The home-based speech-language pathologist also recommended that the student attend a language-based special education school that would support and integrate the student's speech-language throughout the school day (id.).

By letter dated May 29, 2008, addressed to the student's CTT teachers, the district school psychologist and district social worker; the parents provided the district with a private neurodevelopmental and psychological evaluation report (Parent Ex. M).  The parents indicated that they had not received the documents they requested in their letter dated May 27, 2008 and again requested that the documents be provided to them (id.).

An undated document reported that the student achieved a score of 668 on the 2008 New York State testing results for mathematics placing the student at "Level 3, Meeting the Learning Standard," described as "[s]tudent performance demonstrates an understanding of the mathematics content expected at this grade level" (Dist. Ex. 4).

The student's CTT teachers completed third grade progress reports for the student in spring 2008 noting that the student met "grade standard" in word study, math, and social studies and that she "approache[d] grade standard" in reading and writing (Parent Ex. L at p. 1).  The progress report indicated "additional work or development needed" for the majority of "learning goals" identified for writing and the area of work habits (id.).  The student's CTT teachers reported that the student exhibited consistent effort and progress in word study, math, social studies, organizational skills, and homework (id.).  The CTT teachers also indicated in narrative comments that the student had made academic progress throughout the school year, was reading on grade level, and was an enthusiastic participant when learning about topics of interest (id. at p. 3).  The CTT teachers further commented that the student needed to consistently choose books that were at her reading level, develop strategies when working with other students, and develop the ability to sustain a task over time to be successful in fourth grade (id.).

The CSE convened on June 4, 2008 for the student's annual review and to develop her IEP for the 2008-09 school year (Parent Ex. D).  Attendees included the parents, the principal from the student's school, the assistant principal who also served as the district representative, a district guidance counselor, a district occupational therapist, a district physical therapist, a district social worker, a district school psychologist, the district regular education and special education teachers who taught the student's CTT class, a private speech-language pathologist, a district speech-language therapist, the student's SEITs, a private neurologist, and a education supervisor (Tr. pp. 405, 406, 758; Parent Ex. D at pp. 2-3).[4]  The written transcript of the CSE meeting reflects that following discussion, the CSE changed the student's educational classification from autism to a learning disability based upon the recommendation of the student's private neurologist who informed the CSE that the student no longer met the criteria for a PDD and that the student had "outgrown that diagnosis this year" (Tr. p. 66; Parent Ex. J at pp. 37, 40; see Parent Exs. D. at p. 1; PP at p. 4).  The written transcript of the CSE meeting also

---

[4] The district physical therapist testified that she attended the June 4, 2008 CSE meeting by way of a teleconference (Tr. pp. 1109-1110).  The district physical therapist did not sign the June 2008 CSE meeting attendance sheet (see Parent Ex. D at pp. 2-3).

reflects that the parents attempted to raise the issue of what they believed was "bullying" of the student in the third grade CTT class, but that the principal stated that the topic was "not about the IEP" (Tr. pp. 875-876, 1560; Parent Ex. J at pp. 45-46). Although the parents stated to the CSE their belief that the student's private neurologist, private speech-language pathologist, home-based SEIT and school-based SEIT all recommended that the student be placed in a "language-based school with smaller classes," the CSE recommended that the student attend a 10-month CTT class with related services (Parent Exs. D pp. 1, 9; J at pp. 54-58). The transcript of the CSE meeting also reveals that the principal responded to the parents' assertion that they disagreed with the particular CTT class that the student was attending by stating that the student "could go to a CTT in another school," but the parents clarified that they believed the CTT program was not appropriate for the student "in general" (Parent Ex. J at pp. 57-58).

The resultant IEP dated June 4, 2008, provided the student with annual goals and short-term objectives in the areas of math, reading, writing, social/emotional skills, speech-language, and gross and fine motor skills (Parent Exs. D pp. 6A-6AA; F; G; H). Related service recommendations included counseling one time per week in a group of three for 30 minutes, OT three times per week individually for 30 minutes, PT one time per week individually for 30 minutes and one time per week in a group of two for 30 minutes, and speech-language therapy three times per week individually for 30 minutes and twice per week in a group of two for 30 minutes (Parent Ex. D at p. 9). Testing accommodations included extended time ("double" time), separate location ("max 12 students"), directions read and reread, "answers recorded in any manner," and "mask and markers" for placement (id.).

By due process complaint notice dated June 20, 2008 the parents, through their attorney, requested an impartial hearing (Parent Ex. A). The parents asserted both procedural and substantive arguments that they alleged resulted in a denial of a free appropriate public education (FAPE)[5] for the 2008-09 school year (id. at pp. 2-4). The parents argued, among other things, that the CSE should have referred the matter of the student's proposed placement to the district's central based support team (CBST) for a specific State-approved nonpublic school recommendation (id. at p. 2). The parents argued that the CSE failed to discuss the student's annual goals and short-term objectives at the CSE meeting, improperly predetermined the recommendations on the IEP, failed to provide the parents with requested documents prior to the CSE meeting, refused to allow the student's SEIT to speak during the CSE meeting, and refused to discuss "bullying" at the CSE meeting; all of which deprived the parents of meaningful participation in the IEP drafting process (id. at pp. 2-4). The parents also argued that the annual goals and short-term objectives on the IEP lacked "objective measures," were ambiguous, and that some were inappropriate (id. at p. 3). The parents argued that the CSE failed to adequately assess the student's present levels of performance (id. at pp. 3-4). The parents also argued that the district ignored the recommendations of the student's related service providers and

---

[5] The term "free appropriate public education" means special education and related services that--

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

(20 U.S.C. § 1401[9]; see 34 C.F.R. § 300.17).

independent evaluators, who recommended that the student be placed in a speech-language special education school (id.). The parents further argued that the CTT class recommended by the CSE was not appropriate for the student because it would not accommodate the student's speech-language needs (id. at p. 2). The parents argued that the IEP's recommended related services, which were all "pull out" services occurring during the school day, were inappropriate because the services should have been delivered out of school (id. at p. 3). The parents also argued that the IEP ought to have included transportation, an extended school year and parent training and counseling (id. at p. 4). Lastly, the parents asserted that Summit was an appropriate placement for the student and that the equities favored the parents. The parents sought a declaration by an impartial hearing officer that the recommended CTT fourth grade classroom and related services in the student's IEP were not "appropriate components" of the student's educational program and did not offer a FAPE to the student in the LRE (id.). The parents further sought, among other things, reimbursement for tuition at Summit, transportation to Summit, SEIT home program and after-school extended day services 7.5 hours per week, "consultation/supervision/coordination, program review and modification, school observations and ongoing parent training," and related services including speech-language therapy, OT, and PT (id.).

An impartial hearing convened on July 8, 2008, and concluded on March 13, 2009, after eight hearing dates (Tr. pp. 1, 16, 340, 578, 816, 1100, 1285, 1596). At the impartial hearing, the district called eight witnesses and entered six exhibits into the hearing record (Tr. pp. 125, 353, 526, 581, 746, 818, 1103, 1165; Dist. Exs. 1-6) and the parents called 16 witnesses and entered 55 exhibits into the hearing record (Tr. pp. 106, 261, 715, 804, 1156, 1165, 1208, 1222, 1291, 1354, 1420, 1467, 1549, 1597, 1644, 1657, 1688; Parent Exs. A-Z; AA-ZZ; AAA-CCC).

In a decision dated July 21, 2009, the impartial hearing officer denied the parents' request for tuition reimbursement for Summit for the 2008-09 school year and for reimbursement for additional home-based services (IHO Decision at p. 34). In her decision, the impartial hearing officer set out background information, summarized the positions of the parties, and then summarized the evidence presented at the impartial hearing (id. at pp. 3-25). The impartial hearing officer found that the district met its obligation to comply with the procedural requirements of the Individuals with Disabilities Act (IDEA) and that the CSE, in a "lengthy meeting," developed an IEP with the input of the parents and some of the outside service providers who provided goals for the IEP (id. at p. 26). The impartial hearing officer found that the parents' argument regarding the lack of discussion of the student's behavioral intervention plan (BIP) at the CSE meeting was not compelling because a lengthy meeting had been held on the topic in March 2008 at which the parents' concerns were discussed and the BIP was modified (id. at p. 27). She further found that the BIP was based on an appropriate FBA that had been developed prior and that the BIP was attached to the June 2008 IEP (id.). The impartial hearing officer found that although the parents were not given an opportunity to discuss the issue of "'bullying'" at the CSE meeting, it was appropriate for the district to defer the topic to a separate meeting because the issue did not go to the "heart of the whether the CTT program and the related services recommended on the IEP were appropriate" (id.). The impartial hearing officer found that the question of bullying "[a]t best...places in question the location of where such educational programs and related services should be provided," and noted that when given an opportunity to discuss that issue, the parents declined to discuss an alternative public school

placement (id.). The impartial hearing officer further found that the district did not withhold any documents from the parents that were relied upon by the CSE in formulating the student's IEP and that the district's witnesses had testified that they had reviewed the reports from the student's evaluators and providers (id. at pp. 27-28). The impartial hearing officer further noted that the district had not formally evaluated or observed the student because the parents "refused to consent" to it doing so (id.). Moreover, she found that if any documents were withheld, the failure to produce them was de minimus and not a denial of a FAPE (id.). The impartial hearing officer found that the district was not required to give the parents a copy of the proposed IEP at the close of the CSE meeting and that the parents had received the IEP the next day (id. at p. 26).

The impartial hearing officer also found that the district met its obligation to show that the IEP was reasonably calculated to enable the student to receive educational benefits (IHO Decision at p. 28). The impartial hearing officer found that the student had been doing well academically in the 10-month CTT program with related services that she had attended for several years previously and that placement in a special school would be more restrictive than the proposed CTT class (id. at p. 29). She further noted that none of the parents' witnesses had stated that the CTT program itself was inappropriate (id.) and found that the amount of related services recommended in the IEP were appropriate (id. at pp. 29-30). The impartial hearing officer found that the evidence did not show that the student required either in school or after school home-based SEIT services and that the district was not required to provide such services where the district offered an appropriate day program (id. at pp. 30-31). The impartial hearing officer also found that it was not clear that the amount of related services in the student's IEP would be disruptive to the student's school day (id. at p. 31). Regarding the parents' claim that the student required an extended school year, the impartial hearing officer found that there was no basis in the hearing record to show that the student would regress if she did not receive her related services over the summer (id. at p. 32).

Although she found that the district had met its burden to show that it had offered the student a FAPE, the impartial hearing officer went on to address the appropriateness of the parents' unilateral placement and found that although the student had made academic and social progress there, Summit's lack of sufficient speech-language, PT, OT, and counseling related services rendered it inappropriate (IHO Decision at pp. 32-33). The impartial hearing officer further found that the parents' choice to supplement the student's program at Summit by providing private related services outside of school did not make Summit an appropriate placement (id. at p. 32).

Lastly, the impartial hearing officer found that the parents had not shown that the equities supported reimbursement because the evidence showed that the parents intended to send the student to Summit before the CSE met to plan the student's program for the 2008-09 school year and the parents' refusal to consider alternate district CTT placements was unreasonable (IHO Decision at pp. 33-34).

On appeal, the parents request that the impartial hearing officer's decision be reversed and that a State Review Officer find that the district failed to offer the student a FAPE, that the parents' unilateral placement of the student at Summit with related services and home-based SEIT support was reasonably calculated to provide the student with meaningful educational

benefits, and that there were no equitable circumstances revealed in the hearing record that would preclude or diminish an award for reimbursement relief.

Specifically, the parents argue that the impartial hearing officer improperly found that the district's failure to timely provide documents to the parents, including the proposed IEP, was "de minimus." Documents that the parents contend were improperly withheld include a copy of the FBA used for creation of the student's BIP and incident reports written by teachers and other students about the student. Additionally, the parents argue that failing to give the parents a copy of the IEP at the close of the June 2008 CSE meeting because the IEP needed to be further modified, resulted in IEP drafting that occurred outside the presence of the parents which constituted a procedural violation. The parents also argue that the district's recommended program and placement were impermissibly predetermined by the CSE. The parents contend that the CSE failed to properly individualize the student's program because the CSE was constrained by district policies as evidenced by district witnesses who stated that they were not permitted to recommend out of school services, could only deliver related services in 30-minute sessions, and were not permitted to recommend a private school placement. The parents contend that the impartial hearing officer erred in concluding that the district's recommended placement was reasonably calculated to provide the student with meaningful educational benefits because the evidence showed that the "hostile, bullying environment" rendered that placement inappropriate as it was having a negative impact on the student's social/emotional and academic performance.

The parents next argue that the impartial hearing officer erred in finding that the unilateral program was inappropriate because it failed to provide counseling, PT, and sufficient speech-language therapy because the Summit program is language based, has an adaptive gym, and provided the student with counseling through an assigned social worker. Lastly, the parents argue that the impartial hearing officer erred in holding that the equities did not favor them because, contrary to the impartial hearing officer's finding, the parents were never offered any district CTT placement other than the school that the student was attending at the time of the CSE meeting, and because the district's actions toward the parents up to and at the CSE meeting weigh against the district. The parents further argue that the impartial hearing officer erred in finding that the parents never intended to send the student to the public school because the district had a history of refusing to address the "bullying" issue, including at the CSE meeting, and because the equities do not prevent a parent from entering into a contract with a private school before the CSE meeting.

In their answer, the district argues that the parents abandoned some of their claims that were raised in the due process complaint notice, but were not raised in the petition. The district asserts that the impartial hearing officer properly found that the district offered the student a FAPE, the alleged procedural violations do not rise to the level of a denial of a FAPE, the recommended program and related services were appropriate, and the recommended placement in the district's CTT program would have been appropriate. The district further contends that there was no evidence that the alleged bullying denied the student a FAPE, would have continued, or would not have been addressed by the district's school, and that the school has a "zero tolerance" policy toward bullying. The district also argues that the impartial hearing officer properly found that the parents' unilateral placement at Summit and the home-based

services were not appropriate because the evidence shows that the program at Summit does not address all of the student's needs and because the parents failed to enter sufficient evidence into the hearing record regarding the needs that the program did address. The district lastly argues that the impartial hearing officer properly found that the equities did not favor the parents because the parents had decided to enroll the student at Summit before the June 2008 CSE meeting and because the parents repeatedly failed to cooperate with the district and impeded the CSE process by, for example, refusing to allow the district to conduct evaluations of the student.

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove v. T.A., 129 S. Ct. 2484, 2491 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A district has an affirmative obligation to offer an eligible student a FAPE (20 U.S.C. § 1400[d][1][A]; Schaffer v. Weast, 546 U.S. 49, 51 [2005]; Rowley, 458 U.S. at 180-81). A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (A.C. v. Bd. of Educ., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; E.H. v. Bd. of Educ., 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at

15

132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). [6] The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

The federal and State statutes and regulations concerning the education of students with disabilities provide for a collaborative process between parents and school districts in planning and providing appropriate special education services (see Schaffer, 546 U.S. at 53; Cerra, 427 F.3d at 192-93). The "core of the statute" is the collaborative process between parents and schools, primarily through the IEP process (see Schaffer, 546 U.S. at 53).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs (34 C.F.R. § 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. Dep't of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008]), establishes annual goals related to those needs (34 C.F.R. § 300.320[a][2]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (34 C.F.R. § 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). Parents are to be afforded an opportunity to participate in the IEP formulation process (34 C.F.R. § 300.322; see Cerra, 427 F.3d at 192; Gavrity v. New Lebanon Sch. Dist., 2009 WL 3164435, at *29 [N.D.N.Y. Sept. 29, 2009]). Subsequent to its development, an IEP must be properly implemented (8 NYCRR 200.4[e][7]; Application of a Child with a Disability, Appeal No. 08-087).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192).

---

[6] Harassment of a student eligible for special education services may deny a student a FAPE (see United States Department of Education Dear Colleague letter dated July 25, 2000 entitled "Prohibited Disability Harassment"; see generally Child Suspected of Having a Disability, Appeal No. 07-086),

"Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148).

The New York State Legislature amended the Education Law to place the burden of production and persuasion upon the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of production and persuasion regarding the appropriateness of such placement (Educ. Law § 4404[1][c], as amended by Ch. 583 of the Laws of 2007). The amended law took effect for impartial hearings commenced on or after October 14, 2007, therefore it applies to the instant case (see Application of the Bd. of Educ., Appeal No. 08-016).

The parents raise a number of procedural arguments on appeal and allege that the district's procedural errors caused a denial of a FAPE. First, I will address the parents' argument that the impartial hearing officer improperly found that the district's failure to timely provide documents to the parents, including the proposed IEP, was "de minimus" and did not deny the student a FAPE. On appeal, the parents argue that under federal regulations, an agency must comply with a parent's request for a child's education records before an IEP meeting, citing 34 C.F.R. § 300.613(a). Documents that the parents contend were improperly withheld include a copy of an FBA used for creation of the student's BIP and incident reports written by teachers and other students about the student.

The hearing record reveals that the parents repeatedly requested documents in both specific and general terms prior to the CSE meeting (Parent Exs. M; N; Q; T; QQ). It appears that the district failed to provide the parents with a number of documents prior to the June 2008 CSE meeting, including a copy of an FBA used for creation of the student's BIP and incident reports written by teachers and other students about the student (Parent Ex. CCC). Ultimately, these documents were obtained pursuant to a subpoena during the impartial hearing (Tr. p. 932; Parent Ex. CCC). The district's failure to timely disclose the FBA and timely respond to the request for incident reports constitutes a procedural violation (see 34 CFR § 300.613[a]; 8 NYCRR 200.5[d][6]). However, I find that the parents have failed to show that this procedural inadequacy either: (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits. The parents appear to allege in their petition that the violation significantly impeded their opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, but beyond stating that the documents were "relevant" to the formulation of the IEP and that the parents were at a "disadvantage" because they were without complete information, the parents do not say how the withheld documents impacted their ability to participate. Specifically, as noted by the impartial hearing officer, the failure to disclose the FBA prior to the June 2008 CSE meeting was mitigated by the fact that the FBA was used in creating the student's BIP, which was drafted at a lengthy meeting held in March 2008 in which the parents took an active role (Tr. pp. 381, 509; IHO Decision at p. 27). The parents do not argue that the student's BIP attached to the June 2008 IEP was flawed in any way and they did not raise any issues regarding the FBA/BIP in their due process complaint notice. The parents also do not specify how having the incident reports prior to the June 2008 CSE meeting would have impacted the parents' participation at the CSE

17

meeting.  The hearing record shows, as discussed more fully below, that the parents took an active role at the June 2008 CSE meeting by asking questions and making multiple comments (Tr. pp. 1702, 1763; Parent Ex. J) and that they were significantly involved in the IEP formulation process (Cerra, 427 F.3d at 193).  The district is cautioned; however, to ensure future compliance with 34 CFR § 300.613(a) and 8 NYCRR 200.5(d)(6).

Additionally, the parents argue that failing to give them a copy of the IEP at the close of the June 2008 CSE meeting, because the IEP needed to be further modified to reflect the student's change in classification, resulted in IEP drafting that occurred outside the presence of the parents, which constituted a procedural violation.  However, I find no merit in this argument and concur with the impartial hearing officer's determination that it was not a procedural violation to deliver the completed IEP to the parents the day after the CSE meeting especially, where as a result of the CSE's discussion at the meeting, the draft IEP needed to be modified to change the student's classification from autism to learning disability (IHO decision at p. 26; see Parent Ex. D at p. 1; Answer ¶ 19).

Next, the parents argue that the district's recommended program and placement were impermissibly predetermined by the CSE.  The parents contend that the CSE failed to properly individualize the student's program because the CSE was constrained by district policies as evidenced by district witnesses who stated that they were not permitted to recommend out of school services, could only deliver related services in 30-minute sessions, and were not permitted to recommend a private school placement.  For the reasons discussed below, I find that the hearing record reflects that the recommendation for the student to attend a CTT class was not predetermined and thus did not significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student (see K.Y. v. New York City Dep't of Educ., 2009 WL 3233811 [2d Cir. Oct. 9, 2009]; T.P. v. Mamaroneck Union Free Sch. Dist., 554 F. 3d 247, 253 [2d Cir. 2009]; Nack v. Orange City Sch. Dist., 454 F.3d 604, 610-11 [6th Cir. 2006]; R.R. v Scarsdale Union Free Sch. Dist., 2009 WL 1360980, at *8-*9 [S.D.N.Y. May 15, 2009]; A.G. v. Frieden, 2009 WL 806832, at *7 [S.D.N.Y. Mar. 26, 2009]; E.G, 2009 WL 773960, at *3; P.K. v. Bedford Central Sch. Dist.,569 F. Supp. 2d 371, 382-83 [S.D.N.Y. Aug. 1, 2008]; Danielle G. v. New York City Dep't of Educ., 2008 WL 3286579, at *6-*7 [E.D.N.Y. Aug. 7, 2008]; M.M. v. New York City Dep't of Educ., 583 F. Supp. 2d 498, 507 [S.D.N.Y. Oct. 21, 2008]; W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 147-148 [S.D.N.Y. 2006]; 20 U.S.C. § 1415[f][3][E][ii][II]; 34 C.F.R. § 300.513[a][2][ii]; 8 NYCRR 200.5[j][4][ii]; but see Application of a Student with a Disability, Appeal No. 08-035 [finding that the hearing record supports a conclusion that a predetermination of program services rose to the level of a denial of a FAPE]).

The June 2008 IEP reflected that the CSE considered placing the student in two other programs a general education program with related services and a general education program with special education teacher support services (SETSS), but found that neither of these programs would adequately address the student's academic and social/emotional needs (Parent Ex. D at. p. 35).  The hearing record also reflects that at the June 2008 CSE meeting, the district principal suggested that if the parents did not like the CTT program at the school that the student currently attended, the student could attend a different CTT class at a different school (Parent Ex. J at pp. 56-58).  The hearing record reflects that the district personnel at the June 2008 CSE

18

meeting stated that they could not, as a matter of policy, recommend out of school services for the student (Parent Ex. J at p. 19). The student's mother stated at the CSE meeting that the parents had requested the presence of a "district representative" at the meeting who "had the authority" to recommend out of school services (id.).[7] Although the district personnel at the June 2008 CSE meeting did state that they "generally" did not provide 60-minute related services session in the school, there was also discussion about delivering the services in a flexible manner, such as by having two 30-minute sessions back to back so as to simulate a 60-minute session (id. at pp. 17-18). Also during the June 2008 CSE meeting, referring the student's placement recommendation to the district's CBST for a State-approved nonpublic school was discussed, but it was determined that it was not necessary because the CTT class recommendation was the recommendation that the committee felt was appropriate (id. at pp. 68-69, 75, 79). Lastly, during the June 2008 CSE meeting, the parents requested that the student's classification be changed from "autism" to "learning disability" (id. at p. 37). After an extended conversation that included the parents' private evaluators, the CSE agreed to the suggested change in classification (id. at pp. 37-51).

The June 4, 2008 CSE meeting transcript reveals that there was significant parent participation during the CSE meeting (Parent Ex. J). During the CSE meeting, the parents asked for clarification regarding the student's academic progress asking specific questions related to reading, math, and written expression which was provided to them by the student's CTT teachers (id. at pp. 7-9). The hearing record reflects that a private speech-language pathologist who had evaluated the student reviewed his evaluation report and that the CSE had considerable discussion regarding the annual goals provided by the home-based speech-language pathologist during which the student's mother had significant participation regarding why she felt the goals were appropriate (id. at pp. 9-10, 11-15). According to the CSE meeting transcript, the CSE discussed providing related service sessions back to back to create a therapy session lasting 60 minutes in response to the parents' concerns that their private evaluator had recommended 60-minute sessions (id. at pp. 17-18). The CSE meeting transcript also reflects that when the parents objected to the district physical therapist and occupational therapist offering their observations of the student because the parents wanted to rely on their private providers' recommendations, the CSE confined the district providers' input to a review of the private providers' reports (id. at pp. 24-30, 35-36) I note also that although the district's occupational therapist recommended more OT than the parents' private provider, the district acquiesced to the parents' wishes that only the private OT provider's recommendations be considered (id.).

The CSE meeting transcript further reflects that following a lengthy discussion, the CSE agreed to change the student's classification from autism to learning disability based on the recommendation of the student's private neurologist (Parent Ex. J at pp. 36, 45, 47-52, 64-69, 72). The CSE discussed placement of the student in the district's CTT class for the 2008-09 school year as well as the student's providers' recommendation of a special education setting with a "low student-to-teacher ratio" (id. at pp. 54-60, 61, 63, 68-69, 72, 74-75). I note that when the parents objected to the CTT recommendation because of incidents that had reportedly occurred

---

[7] Although the IEP reflected that the assistant principal acted as a district representative at the CSE meeting (Parent Ex. D at p. 2), it is not clear if that is the person who the parents requested to attend the meeting or if the assistant principal had the authority to recommend out of school services (see Parent Ex. N).

during the 2007-08 school year, the CSE offered for the student to attend a CTT class in another school (id. at pp. 57-58).

In light of the above I find that the hearing record reflects that CSE recommendations for the student were not predetermined and thus did not significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student. The student's recommended program and services were designed to meet the student's academic, language, fine and gross motor, and social/emotional needs within the school day.[8]

The parents further contend that the impartial hearing officer erred in concluding that the district's recommended placement at the district school that the student had been attending at the time of the June 2008 CSE meeting was reasonably calculated to provide the student with meaningful educational benefits because the evidence shows that the "hostile, bullying environment" that the district was allegedly allowing or encouraging to occur rendered that placement inappropriate. Further, the parents contend that after finding that the issue of bullying "places in question the location of where such educational programs and related services should be provided," the impartial hearing officer wrongly burdened the parents with the duty to discuss alternative placements, rather than placing the burden upon the district to offer an appropriate placement.

Turning to the student's needs and the appropriateness of the district's recommended placement and program, as indicated above, the student demonstrates delays in her expressive, receptive, and pragmatic language skills; social skills; auditory processing; and gross and fine motor skills (Tr. p. 367; Parent Exs. D; P at p. 1). The district's school psychologist testified that the student's strengths include her sensitivity and empathic and serious manner along with her good sense of humor (Tr. p. 369) and that she exhibits weaknesses that include staying on task, completing assignments, and her verbal expression (Tr. p. 367). The school psychologist also testified and the FBA produced by the school psychologist reflected that the student demonstrated anxiety and misinterpreted social cues (id.; Dist. Ex 1 at p. 2). The school psychologist further testified that that the student had friends, enjoyed relating with others, and that her academic skills were on grade level (Tr. pp. 369-70).

The parents contend that placement in a CTT class for the 2008-09 school year was not appropriate for the student and that she required a language-based special education school. The hearing record reflects that reports dated April and May 2007 and prepared by the student's school-based and home-based ABA SEITs and ABA SEIT supervisor/program consultant, indicated that during the 2006-07 school year, when the student was attending a district second grade CTT class, the student demonstrated progress in academics, social skills, and language skills (Parent Ex. B at p. 6). For the 2007-08 school year, two developmental pediatricians, all of the student's ABA SEITs, and the ABA SEIT supervisor/program consultant consistently recommended placement in a district third grade CTT class with full-time 1:1 ABA SEIT support that would be gradually "faded" during the school year, and at least ten hours per week of home-based ABA SEIT services (id.).

---

[8] I remind the district that any special education programs and services recommendations must be based on the student's needs. Here, the district offered the student an appropriate program and the failure to consider home-based services did not deny the student a FAPE.

In the student's third grade progress reports completed in winter 2008, the student's CTT teachers indicated that the student was "creative and outgoing" and had the ability to perform at or above grade level but hesitated to apply herself fully (Parent Ex. K at p. 3). The student's CTT teachers also indicated that the student exhibited much potential (id.). Although the student's home-based SEIT testified that the student needed 1:1 instruction in a small and nurturing environment to succeed (Tr. p. 1608), the student's third grade progress report completed in spring 2008 indicated that the student had made academic progress throughout the school year (Parent Ex. L at p. 3). The CTT teachers reported that the student's reading abilities were on grade level, that when she read she was highly engaged, and that she was an "enthusiastic participant" regarding topics that were of interest to her (id.). The CTT teachers recommended that the student develop both strategies for maintaining her attention and engaging with her classmates (id.). The student's spring progress report also reflected that the student was either at or approaching grade standards in all areas and that she required additional development in writing and her work habits (id. at p. 1).

The hearing record reveals that the June 2008 CSE recommended a fourth grade CTT program that consisted of both a general education teacher and special education teacher (Tr. p. 365; Parent Ex. D at p. 1). The hearing record also reveals that there were 14 general education students and 9 special education students in the CTT class, with 7 of the 9 students receiving related services of speech-language, OT, and/or counseling (Tr. p. 591). The special education teacher testified that the general education students were selected for the CTT class because of their "exceptional behavior and social skills" and to be peer models (Tr. pp. 582-83). The fourth grade CTT special education teacher testified that in the recommended CTT class, the students benefit from having two teachers, various teaching models, and small group instruction consisting of both homogeneous and heterogeneous groupings (Tr. p. 584). The special education teacher further testified that during the 2008-09 school year, the recommended class included two paraprofessionals assigned to other students and one student teacher (Tr. pp. 584-85). The special education teacher testified that the two paraprofessionals and the student teacher worked with all students in the classroom, both in small groups and on an individual basis, and were present in the schoolyard, at lunch, and during special activities (id.). The fourth grade CTT special education teacher testified that the students in the CTT class had classifications of a speech or language impairment, a learning disability, or an emotional disturbance (Tr. p. 587). The special education teacher indicated that the functional levels of the students in her class consisted of mostly students who were approaching or meeting the learning standards, with the exception of one student (id.). The special education teacher indicated that regarding behavior, there were some students in the class who were "sensitive" and "a little bit short tempered" and that these behaviors were addressed in the classroom through role modeling and discussion (Tr. pp. 588-89). The special education teacher testified that regarding "bullying" there was a "zero tolerance" policy and that if she were unable to resolve conflicts in her classroom that the guidance counselor or the assistant principal would be informed or both the principal and the parents (Tr. pp. 589-90).

The CTT special education teacher testified that a typical day in the CTT class began with the students unpacking their materials and organizing themselves so that "they have enough books for the day, they hand in their homework, they hand in mail, they take out their lunch..."

(Tr. p. 585). The CTT special education teacher further testified that there was then a work study period focusing on spelling or vocabulary during which the students worked in homogenous groups, followed by a writing period during which the students were arranged in two large heterogeneous groups (id.). The CTT special education teacher indicated that the students had their math period in a homogenous group followed by whole group reading instruction and then small group and individual reading instruction (Tr. p. 586). The CTT special education teacher also indicated that the students would then have a "special" such as art or music followed by lunch and yard time (id.). The CTT special education teacher testified that at the end of the day the students "pack up," copy homework, and the teaching staff read to the students (id.).

The fourth grade CTT special education teacher testified that the students were continuously assessed to insure that the students were appropriately grouped together (Tr. p. 586). The special education teacher further testified that in spelling, the students were grouped "according to where they are on the developmental spelling continuum so they work exactly at their level" (id.). She indicated that in writing, the class was separated into two groups and that the curriculum was "very targeted toward what those children need to learn" (id.).

The CTT special education teacher testified that teacher and parent contact consisted of "teacher night" at beginning of the year, two parent-teacher conferences, telephone conferences, field trips, and almost daily contact in the school yard when parents dropped their children off and picked them up (Tr. p. 590). Additionally, the fourth grade CTT class held a monthly program entitled "parents are learning partners," at which time parents were invited in to view the "class at work" (id.).

The CTT special education teacher testified that within the fourth grade CTT classroom the special education teacher and regular education teacher worked "very, very closely together," "confer[ed] on everything" and taught all subjects simultaneously (Tr. p. 594). ). The CTT special education teacher further testified that she was the student's CTT special education teacher during the student's second grade year (Tr. p. 591). The special education teacher further testified that in the recommended CTT class, the student would have received instruction in the manner she "learns best," whether in a large group, a small group, or individual instruction (Tr. pp. 597-98). The special education teacher testified that in the CTT class, the student would have been grouped with other students who were functioning at the same grade level (Tr. p. 597). The CTT special education teacher testified that regarding the student's social/emotional functioning, she would have benefitted from small group instruction and from specific and explicit instruction on methods of interaction with her peers and the completion of activities (Tr. pp. 601-03).

The special education teacher reviewed the student's June 2008 IEP and testified that the recommendations in the IEP were "completely manageable in the 4th grade CTT class" (Tr. pp. 612, 678). The special education teacher further testified that the student's "additional adult support" in the CTT class would have consisted of two teachers, two paraprofessionals, related service providers, and the administration (Tr. pp. 678-79). The special education teacher testified that the other students in the recommended CTT class had similar behavioral needs and similar BIPs as the student, as well as similar annual goals and short-term objectives (Tr. pp. 603-04, 606-07). The special education teacher testified that rewards were used within the

classroom along with rating systems "to motivate" the students and that the strategies implemented in the classroom included praise, prompting, redirection, checklists, graphic organizers, and visual aids (Tr. pp. 608-10).

The district school psychologist who completed the student's FBA and participated in the June 2008 CSE meeting testified that the recommended fourth grade CTT class was "very language enriched" and that there was language stimulation throughout the day (Tr. p. 365). The school psychologist further testified that in the recommended CTT class, the teachers modified the curriculum according to student need and functional level (id.). According to the school psychologist, whole group learning activities in the CTT class provided opportunity for appropriate peer modeling by the general education students who were "picked carefully" (Tr. pp. 365-66). The school psychologist testified that the teachers in the recommended CTT class incorporated "skillfully taught instruction" that included methods such as scaffolding to "break" material down into smaller and "simple" terms, and "steps" (Tr. p. 366). The school psychologist further testified that the CTT class was highly structured and that this student did well with a "high-structure setting" (Tr. pp. 370-71).

The June 4, 2008 IEP developed by the CSE provided the student with 43 annual goals and 212 corresponding short-term objectives in the areas of math, reading, writing, social/emotional skills, speech-language, and gross and fine motor skills (Parent Exs. D; F; G; H). The hearing record reflects that the recommended annual goals and short-term objectives from the student's home-based providers were incorporated into the June 2008 IEP (Tr. pp. 216-17, 763). A review of the annual goals and short-term objectives reveals that the majority of the short-term objectives focused on the student's needs in organization and transition, her pragmatic, expressive, and receptive language needs, and the deficits in her social/emotional functioning (Parent Ex. D at pp. 7-32). As discussed above, the student's June 2008 IEP also included a BIP that was based on an FBA to address the student's needs in attending, interpreting social cues, and anxiety (id. at p. 38). The annual goals were measurable and the short-term objectives were related to the student's needs (Parent Ex. D). The parents had the opportunity to discuss the annual goals and short-term objectives at the June 2008 CSE meeting (Parent Ex. J).

Regarding the June 2008 CSE's related service recommendations for PT, OT, and speech-language therapy, the district's physical therapist testified that the student's PT annual goals could be met within the 30-minute sessions recommended by the June 2008 CSE (Tr. pp. 1124). The district's physical therapist further testified that the student's annual goals in balance and strength could be addressed through the use of methods that included "wheel barrow walk," jumping, and skipping, both inside the therapy room and in the yard and opined that the PT program recommended in the June 2008 IEP was appropriate for the student (Tr. pp. 1118-20, 1125). Likewise, the district's occupational therapist also testified that the student's needs could be met by the CSE's recommendation of three individual sessions of OT for 30 minutes (Tr. pp. 1179-80). To address the student's needs, the occupational therapist testified that she would have used the "Handwriting Without Tears" program, workbooks, clay, a slant board, adaptive paper, and multisensory methods when working with the student (Tr. pp. 1172-73, 1175). The occupational therapist further testified that she would have supported the student "in the packing up routine, or unpacking routine," getting on line, transitioning from one of the "preps...picking her up there, and then transitioning to our room..." (Tr. p. 1177). The district's speech-language

23

pathologist also testified that the June 2008 CSE recommendation regarding speech-language therapy was appropriate for the student (Tr. pp. 548-49). The district's speech-language pathologist testified that the recommended individual sessions would have addressed the student's "academic concerns" including her "language goals," and that the group sessions would have allowed the student to work with her peers (Tr. p. 549). The speech-language pathologist further testified that the student's "pragmatic difficulties" would have been addressed in both individual and group speech-language therapy sessions (id.). Both the physical therapist and the speech-language pathologist attended the June 4, 2008 CSE meeting (Parent Ex. D at pp. 2-3; Parent Ex. J).

Although the hearing record reflects that all of the student's private evaluators and home-based providers recommended that the student attend a special education school, the district's school psychologist testified that the CSE determined that the district's CTT class with related services was appropriate for the student because:

> "[W]e felt as a team a CTT was appropriate for her. Since she had been in our setting for a number of years, she does well with small-group instruction. She does well with a highly structured setting. She had friends in the class...she knew the whole school. The whole setting. She had a couple of years before middle school. It just felt like the right – the right place for her. She was on grade level."

(Tr. pp. 370, 391)

As discussed above, the hearing record also reveals that the principal indicated to the parents at the June 2008 CSE meeting that the student could attend a "CTT in another school" (Parent Ex. J at p. 57). I find that the hearing record demonstrates that the district's recommended fourth grade CTT class included many of the programmatic elements that the student's private neurologist, school-based SEIT, and private speech-language pathologist testified were necessary for the student to learn and that the district's recommended program was designed to confer educational benefits to the student in the LRE (Tr. pp. 279-80, 287-90, 1367, 1375, 1487).

In November 2007, a private pediatric psychologist evaluated the student and reported that the student had made ongoing progress in all areas (Parent Ex. XX at p. 1). The private psychologist indicated that the student was able to "keep up academically with her peers at her current public school. She has some close friends with whom she enjoys play dates and other recreational activities, and she is able to comfortably participate in group and class discussions ...with a great deal of supports" (id. at p. 3). Although a private neuro-developmental evaluation report dated February 18, 2008 noted that the student reported that her "teachers are mean and so are some of the kids" and that the student "was a little more nervous than last year," the evaluation report also indicated that the student had "some friends at school and enjoy[ed] working" (Parent Ex. PP at p. 1). The evaluation report further reflected that the student had made progress in receptive, expressive, and pragmatic language skills and social skills, and that the student's "spontaneous language and conversational skills ha[d] improved and are quite normal sounding"(id. at p. 3).

24

The student's home-based speech-language pathologist also reported in a May 21, 2008 speech-language progress report that the student continued to make steady progress in all areas of speech-language throughout the 2007-08 school year, but that her speech-language delays adversely affected her academically and socially (Parent Ex. CC at p. 1). The student's home-based SEIT indicated in a May 23, 2008 educational progress report that "[o]ver the course of this academic year, [the student] has continuously expressed her sadness, frustration, anxiety and discomfort with her being bullied by various children in her class in school," and that that these incidents negatively affected the student's ability to initiate, concentrate, attend, and stay on task with her homework assignments and activities after school, which had affected her academic performance (Parent Ex. V at p. 3). However, the home-based SEIT also described the student as a "cooperative, motivated and enthusiastic participant and partner in her learning activities and homework assignments" and indicated that the student coped with the issues she experienced with her peers by discussing the "negative situations" with the home-based SEIT and with her parents "to strategize how to address them in school" (id. at pp. 2, 3). The home-based SEIT also reported in her May 2008 progress report that in the area of social/emotional skills, the student had made progress initiating conversations and social interactions with peers, but that at times she required teacher support to maintain them or join in and that the student appreciated her friends and looked forward to spending time with them (id. at p. 2).

Additionally in her May 22, 2008 progress report, the parents' program consultant reported that the student continued to demonstrate progress in all targeted areas in school, home, and community environments (Parent Ex. W at p. 1). She identified the student's target areas as including reading comprehension, writing fluency, social skills, staying on task, following multi-step directions, math word problems, multi-step math problems, higher level language processing skills, and auditory comprehension and processing (id. at pp. 1-2).

The hearing record also reveals that the student's home-based speech-language pathologist determined that the student had continued to demonstrate progress during the 2007-08 school year as evidenced by her May 28, 2008 speech-language progress note (Parent Ex. P). The home-based speech-language pathologist reported that the student had made "steady" progress in her speech-language therapy sessions and that the student exhibited some improvement in her receptive, expressive and pragmatic language skills, but continued to demonstrate weaknesses in these areas including greeting familiar individuals, and initiating and maintaining the topic during conversational exchanges (id. at p. 1).

Third grade progress reports completed by the student's CTT teachers also reflected that the student made academic progress throughout the 2007-08 school year, was reading on grade level, and was an enthusiastic participant when learning about topics of interest (Parent Exs. K at p. 1; L at pp. 1, 3).

As indicated above, the student demonstrates delays in her expressive, receptive, and pragmatic language skills as well as her social skills (Tr. p. 367; Parent Exs. D; P at p. 1). According to the school psychologist's testimony, the student's strengths included her sensitivity and empathic and serious manner along with her good sense of humor (Tr. p. 369) and that she exhibited weaknesses that include staying on task, completing assignments, and her verbal expression (Tr. p. 367). The school psychologist also testified that the student demonstrated

anxiety and misinterpreted social cues (Dist. Ex 1 at p. 2). The school psychologist further testified that that the student had friends, enjoyed relating with others and that her academic skills were on grade level (Tr. pp. 369-70). Although the student's school-based SEIT testified that following incidents of inappropriate social interactions in the schoolyard and classroom, the student's demeanor would decline and she then had a harder time attending to class tasks and would focus on what had happened (Tr. 1473-74), I find that the hearing record does not support a finding that these incidents rendered the recommended CTT program for the 2008-09 school year inappropriate to meet the student's needs. I do, however, encourage the parties to work collaboratively to resolve any concerns regarding the student's needs (Schaffer, 546 U.S. at 53; Cerra, 427 F.3d at 192-93

In conclusion, I find that the district offered the student a FAPE in the LRE.

Having decided that the impartial hearing officer correctly determined that the district offered the student a FAPE for the 2008-09 school year, I need not address the parties' remaining contentions.

**THE APPEAL IS DISMISSED.**

Dated:      Albany, New York
            October      , 2009
                    22

PAUL F. KELLY
STATE REVIEW OFFICER

# FINDINGS OF FACT AND DECISION

Case Number:              116413

Student's Name:           L██ K███████

Date of Birth:            October 5, 1998

District:                 2

Hearing Requested By:     Parent

Dates of Hearing:         July 8, 2008
                          September 3, 2008
                          November 21, 2008
                          December 4, 2008
                          December 5, 2008
                          March 5, 2009
                          March 12, 2009
                          March 13, 2009


Hearing Officer:          Judith T. Kramer, Esq.

Hearing Officer's Findings of Fact and Decision                                    1

Case No. 116413

---

NAMES AND TITLES OF PERSONS WHO APPEARED JULY 8, 2008

For the Student:
GARY MAYERSON, Attorney

For the Department of Education:
CHARLES CROWLEY, Attorney

NAMES AND TITLES OF PERSONS WHO APPEARED SEPTEMBER 3, 2008

For the Student:
GARY MAYERSON, Attorney
TRACEY WALSH, Attorney
T███████ K██████████, Parent
DR. STEVEN BLAUSTEIN, Speech and Language Pathologist

For the Department of Education:
CHARLES CROWLEY, Attorney
PEGGY CHUNG, Guidance Counselor, P.S. 6 (Via Telephone)

NAMES AND TITLES OF PERSONS WHO APPEARED NOVEMBER 21, 2008

For the Student:
GARY MAYERSON, Attorney
T███████ K██████████, Parent

For the Department of Education:
CHARLES CROWLEY, Attorney
DR. ANNE MULDOWNEY, School Psychologist
ANDREA SCHWARTZ, Speech Therapist

NAMES AND TITLES OF PERSONS WHO APPEARED DECEMBER 4, 2008

For the Student:
GARY MAYERSON, Attorney
JENNIFER FRANKOLA, Attorney
T███████ K██████████, Parent

For the Department of Education:
CHARLES CROWLEY, Attorney
KATE GUTWILLIG, Special Education Teacher
ANNA GRINKHORN, Occupational Therapist, P.S. 6 (Via Telephone)
BEVERLY VACHHER, Physical Therapist, P.S. 6 (Via Telephone)

Case No.  116413

___

## NAMES AND TITLES OF PERSONS WHO APPEARED DECEMBER 5, 2008

For the Student:
GARY MAYERSON, Attorney
T█████ K█████████, Parent

For the Department of Education:
CHARLES CROWLEY, Attorney
CHARLES SCHOLL, DOE Intern
LAUREN FONTANA, Principal, P.S. 6

## NAMES AND TITLES OF PERSONS WHO APPEARED MARCH 5, 2009

For the Student:
GARY MAYERSON, Attorney
T█████ K█████████, Parent
SHERRY BORDOFF, Clinical Director, Summit School (Via Telephone)

For the Department of Education:
CHARLES CROWLEY, Attorney
BEVERLY VACHHER, Physical Therapist, P.S. 6 (Via Telephone)
EVALYN BLADSTROM, Occupational Therapist, P.S. 6 (Via Telephone)

## NAMES AND TITLES OF PERSONS WHO APPEARED MARCH 12, 2009

For the Student:
GARY MAYERSON, Attorney
T█████ K█████████, Parent
SHARIFA WIGGINS, SEIT
DR. MAUREEN PACKARD, Neurologist, Developmental Pediatrician
MARY KUTCH, Lovaas Consultant
DOMINIQUE FABER, SEIT
SHANNON MALONEY, SEIT

For the Department of Education:
CHARLES CROWLEY, Attorney

## NAMES AND TITLES OF PERSONS WHO APPEARED MARCH 13, 2009

For the Student:
GARY MAYERSON, Attorney
T█████ K█████████, Parent
MARIANNA GERSH, SEIT
LORI LESSER, Speech and Language Pathologist (Via Telephone)
DORA ROSEN, Occupational Therapist (Via Telephone)

For the Department of Education:
CHARLES CROWLEY, Attorney

## INTRODUCTION

On July 8, 2008, an impartial hearing was commenced pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415 regarding the issue of pendency during the proceeding regarding the alleged failure of the Department of Education ("DOE") to provide a free appropriate public education ("FAPE") to L.K. ("the child") for 2008-2009 school year. The hearing was held at the Impartial Hearing Office of the Board of Education of the City of New York located at 131 Livingston Street, Brooklyn, New York. The hearing commenced at 10:00 a.m. The hearing on the merits of the underlying complaint regarding the denial of FAPE was continued on September 2, 2008, November 21, 2008, December 4, 2008, December 5, 2008, March 5, 2009, March 12, 2009, and March 13, 2009.

A list of exhibits that were admitted into evidence is attached to this decision.

## BACKGROUND

The child who was previously diagnosed with PDD-NOS and classified as "autistic" is currently classified as "learning disabled." This classification is not in dispute. The child attended P.S. 6 for the 2007-2008 school and for several years prior. She was in a Collaborative Team Teaching ("CTT") classroom and received various related services.

In June 2008, a Committee on Special Education ("CSE") review meeting was held and an Individualized Education Program ("IEP") was created which contained a recommendation that the child remain in a CTT Program for the 2008-2009 school year and that she continue to receive various related services as modified on the June IEP. No particular school placement was recommended on the IEP. The parent's disagreed with the recommendations on the IEP and placed their child in the Summit School, a NPS approved by NYS, and procured additional home-based related services for her some of which were provided under the pendency provisions of the IDEA and some were not. They are seeking reimbursement for the private school tuition as well as reimbursement for all of the home-based related services, which they have paid for during the 2008-2009 school year.

Hearing Officer's Findings of Fact and Decision                    4

Case No. 116413

## THE PARENT'S POSITION

The parent contends that the child was not provided an appropriate placement by the DOE for the 2008-2009 school year. He contends that the IEP process was flawed and the recommended placement was inappropriate. He seeks tuition reimbursement for his unilateral placement of the child at the Summit School ("Summit") which he contends is an appropriate placement as well as for the continued private services of 7.5 hours of Applied Behavioral Assessment/Special Education Itinerant Teacher (ABA/SEIT) services, occupational therapy services, physical therapy services, speech and language services, and reimbursement for team meetings/parent trainings conducted outside of school; with all of these services being implemented by private providers. He contends that the equities favor him.

## THE DOE'S POSITION

The DOE contends that it provided the student with a FAPE and that the placement and related services offered was appropriate. Moreover, the DOE contends that neither the program nor the additional related services selected by the parents are appropriate for the student and that the equities do not favor the parent. The DOE contends that the parent's request for reimbursement in all respects should be denied.

## THE EVIDENCE PRESENTED

The child is classified as speech and language impaired but has a prior classification of autism. As a third grader at P.S. 6, she had been enrolled in and participated in a CTT program, to which the parent agreed.

On June 4, 2008, an Individualized Education Plan ("IEP") was conferenced and developed for the child. A recording of the June 4 meeting was made by the parent and a transcript of that recording is in evidence as Parent's Exhibit J. There were 18 people at the CSE review meeting. The meeting was between 1.5 and 2 hours. The meeting began with a discussion of the child's current academic performance during which the child's teacher described as being on grade level in reading and progressing nicely in math. (Parent's Ex. J-4, 5). Although an earlier evaluation conducted in February 2008 by Dr. Packard yielded slightly different results (e.g. WRAT subtest was found to be at the 3.6 grade level) and parent was surprised by the teacher's statements in light of earlier mid-term report cards (Parent's Ex. J-7), the teacher's testimony is supported by the

Hearing Officer's Findings of Fact and Decision                                    5

Case No. 116413

child's report cards dated June 2008 (Parent's Ex. L) and by Dr. McCarton's evaluation which was done after Dr. Packard's in April 2008. Dr. McCarton found that the child's reading and writing abilities were high average to superior and that her math skills were average. (Parent's Ex. NN-17).

The CSE team next discussed the child's speech and language needs, her OT requirements and her PT requirements. An attempt was made to discuss counseling but the discussion was taken off track. (Id. at p. 30-31) The team then began a discussion of whether CTT was an appropriate program for the child. The parent's stated that it was inappropriate primarily because the parent's experts recommended that the child be placed in a small school setting for the speech and language impaired. The parent also stated that P.S. 6 was inappropriate for the child because the staff had refused to address the issue of alleged bullying of the child there and that she was allegedly not successful in her third grade CTT class. (Id. at 63, 69). At the meeting, the principal suggested that the parent could ask that the child attend a CTT class in another public school;, but the parent rejected that idea. (id.)

At the parent's request, the team next addressed the issue of changing the child's classification from autism to LD to which the team agreed. (Id. at 72) The meeting ended after the CSE team made its recommendations as to program and related services and the parent requested a copy of the IEP and the child's math and ELA scores when they are released. (Id. at 76) The parent was given a copy of the completed IEP the next day. (Parent's Ex. B-2)

The IEP indicates that child is classified as learning disabled. (Parent's Ex. D) The IEP recommended a program of CTT with related services of OT for thirty minutes in a one-to-one session twice a week, and a group of two once a week; speech and language therapy for thirty minutes in a one-to-one session twice a week, and a group of three twice a week; PT for thirty minutes in a one-to-one session once a week; and counseling. All of the related services were to be delivered to the child during the school day by the public school related service providers.

The DOE presented several witnesses to support the CSE recommendation of CTT as the LRE for the child and for the related services, which were recommended.

Hearing Officer's Findings of Fact and Decision                                    6

Case No.  116413

_____

Kate Gutwillig is a special education teacher in the fourth grade CTT program at P.S. 6. (Tr. 581). She has a Masters degree from Bankstreet and has been working in special education for over 18 years. (Tr. at 581). The CTT program is handpicked for students who would benefit from the social emotional elements. (Tr. at 582). The students benefit from two teachers and from the small group instruction. (Tr. at 582). She described the benefits of role modeling for students with social emotional issues. (Tr. at 582). Ms. Gutwillig taught the child in the second grade and was familiar with her levels of functioning. (Tr. at 582).

Ms. Gutwillig looked at the DOE's proposed 2008-2009 IEP for the child before the CSE meeting. (Tr. 639; See P-D). Ms. Gutwillig testified that the IEP was not ambiguous and that the IEP in question contained more information and better written than most the IEP's she has read. She stated that all IEPs are vague, stating "it's up to the individual teacher to do her job or his job." (Tr. 657- 660).

Ms. Gutwillig testified that the 4th grade CTT class has 22 students-13 general education and 9 special education students. Seven of the nine receive related services of SL, OT and counseling.

Ms. Gutwillig testified that the child would have been functionally grouped with the other students in the CTT program based on her academics and that she works on the deficit areas that the child struggles with. (Tr. at 598). She further testified that the other students in the CTT program for 4th grade have the same social and emotional deficits that the child presented with. (Tr. at 606). She elaborated that she works on similar behavior intervention plans as the child had. (Tr. at 606). She testified that she works on similar goals and short term objectives and would be able to implement them and would also do an on-going assessment on the student, which would begin at the start of the year. (Tr. 606-612). Ms. Gutwillig described a program, which she believed would help the child succeed academically and socially.

With regard to the issue of alleged "bullying", Ms. Gutwillig recalled one incident in the second grade when the parents made her aware of the fact that the child was scratched in the auditorium. She drew a distinction between bullying and a conflict where bullying is a repeated attempt to humiliate.

Hearing Officer's Findings of Fact and Decision                                      7

Case No.  116413

_____

     Anna Grinkhorn is the Occupational Therapist at P.S. 6. She has been working as an OT since 1991 and has worked with children with autism and speech and language issues. She is certified in ABA therapy. Ms. Grinkhorn attended the child's IEP meeting as an OT clinician. (Tr. 758). The meeting lasted more than one hour. Ms. Grinkhorn called the parent for permission to work with the child in a group of three in May but the parent refused to permit it. The parent also refused to allow her to observe the child with the SEIT. In order to get a sense of the child, she conducted an informal observation of the child during class on the day before the IEP meeting. (Tr. 770, 771-72, 784). Ms. Grinkhorn was asked to do the observation of the child by a member of the "SBS" team. (Tr. 801). Ms. Grinkhorn testified that the proposed OT goals were drafted before the meeting by an outside provider. The parents did not ask to discuss them at the IEP meeting and they were not discussed. (Tr. 762). Ms. Grinkhorn serviced other children in The child's classroom as an OT during the 2007-2008 school year, but would not be the child's OT for the 2008-2009 school year. (Tr. 757). Ms. Grinkhorn does not recall any student ever receiving more than 1.5 hours of OT at school. (Tr. 793) She has provided sessions that are more than 30 minutes and up to 45 minutes in duration at school. She is confident in her ability to implement the BIP.

     Evalyn Bladstrom is one of the occupational therapists at PS 6. She testified that she has provided services for students with a myriad of classifications, including autism. Ms. Bladstrom has never worked with the child. (Tr. 1179). She opined that the CTT program recommended would have been appropriate to meet the child's OT needs. She indicated that she would be able to implement interventions, such as implementing self-regulation and sensory activities as part of a sensory diet, utilizing the "Handwriting without Tears" program, self-care issues, games with manipulative to improve fine-motor skills, assist with object manipulation for math, and paper pencil activities for visual perception issues. (Tr. 1159-1180). She delivers her services on a push-in or pullout basis, depending on the needs of the student. (Tr. 1155). She would schedule a phone conference or personal meetings with the parent to discuss home- and community-based OT goals. (Tr. 1188).

     Ms. Bladstrom was of the opinion that child's recommended OT mandate for the school-based support is appropriate. (Tr. 1180).

Beverly Savilla Vachher, the school-based physical therapist from P.S. 6 works with students in the CTT. She is licensed in the State of New York, and has been a physical therapist for six and a half years. (Tr.1103 ). She has experience working with students with various classifications, including autism. (Tr. 1104). She attended the child's IEP meeting for 10-15 minutes, as well as the behavior intervention plan meeting in March 2008. (Tr. 1109, 1138). She has not worked with the child, although she has observed the child once in the classroom and playing the yard on one occasion. (Tr. 1108, 1136-37).

In reviewing documentation from the private physical therapist, Ms. Savilla Vachher indicated that the reports reflect that the child demonstrated a lot of strengths, in terms of being able to function in the school setting. Specifically to address the child's issues with endurance, she testified that after conducting her own evaluation of the child, she could have the child participate in practice running in the yard with peers, jumping exercises, and other activities to increase agility and endurance. (Tr. 1122).

In reviewing the child's IEP goals, Ms. Savilla Vachher opined that she could certainly meet the child's needs, including goals for eye/hand coordination, upper limb coordination, endurance activities. (Tr. 1125). Her testimony indicates that PT in the CTT program could be met and that push in during yard time could be utilized for this child. She stated that the decreased had decreased endurance and that a session of more than 30 minutes could make the child fatigued.

Andrea Schwartz, the speech and language provider from P.S. 6 testified as to the details of the school-based related service. (Tr. 538-571). She testified that she is familiar with the child from observing her within the classroom setting, and reviewing her reports. She further indicated that she was present for the IEP review that was held in June 2008. (Tr. 538).

She has never evaluated the child, although she tried to arrange a last minute meeting a few days before the IEP meeting. (Tr. 535-36). Ms. Schwartz did review Dr. Blaustein's report. (Tr. 535).

Based on her review of the documentation concerning the child, Ms. Schwartz testified that she recommended that the child have three sessions of speech and language therapy, 1:1, for 30 minutes, and two sessions, 1:3 for 30 minutes in a group of two. (Tr.

548). She opined the group sessions were appropriate to address the child's pragmatic issues, as she has found students have the best experience in addressing pragmatic issues when conversing with their peers. (Tr. 548). In addressing the child's receptive issues, such as understanding inferences and prediction, she would use keyword concepts and graphic organizing as well. (Tr. 548). And finally, Ms. Schwartz testified that she works with students in the CTT program and stated "the teachers tend to be quite accustomed to doing comprehension checking to repeating direction, to breaking things down, to using a lot of the strategies that a typical student who receives speech and language would need." (Tr. at 556). She further elaborated, "In a CTT classroom you have—the full range of ability, so there is always someone, you know, hopefully one step ahead of you or one step behind you so that you know a lot of the children find that they are able to build up their weaknesses and also use their strengths to help other students around them." (Tr. at 557).

Peggy Chung is a counselor with a Masters degree in counseling and guidance from New York University. (Tr. at 125). She is familiar with the child because she worked with other children in her class in the third grade and gave group counseling sessions to the whole class. The child was present at those sessions and made meaningful contributions.

In addition, she intervened last year when the child was having a hard time after she allegedly slapped a teacher across the face. Ms. Chung testified that the child wanted to apologize to the teacher and tell her she did not mean it. When the parent came to the school she was belligerent to Ms. Chung and denied that the incident ever happened. When counseling was recommended for the child at that time, the parent rejected it. Ms. Chung again recommended the child receive counseling service during her IEP meeting, however, the child's parents again did not consent. (Tr. 152-53). Ms. Chung does not remember the parents reasoning for rejecting counseling. (Tr. 235). Ms. Chung believes that the child's parents rejected counseling because it was a "pull-out" service. Ms. Chung admitted that if the child is pulled out of the classroom many times throughout the school day, it could be overwhelming for her. (Tr. 168-69). Ms. Chung offered to do the counseling in the classroom to avoid pulling the child out. She further testified that at the June CSE meeting which she attended, other related services were

offered to the child on push in basis or during gym or yard time but the parents were not receptive.

This year, Ms Chung worked with certain students in the 4th grade CTT program while working as a counselor at PS 6. (Tr. at 130). She tried to group students together based on needs. Ms. Chung testified that she is very familiar with the fourth grade CTT teachers at PS 6 and works them closely. (Tr. 160). Ms. Chung stated that she felt a CTT program with the related service of counseling was appropriate for the child because "she has demonstrated a lot of social emotional growth throughout the year. And especially with the behavior intervention plan which is more specific and she thrives on that encouragement and positive reinforcement and I do believe it would be helpful for her to have a guidance counselor with her to continue to make that growth." (Tr. at 162).

With regard to the issue of bullying, she defined bullying as a consistent and repetitious assertion of abusive power over another. If it occurs once, it is not bullying. If it occurs twice it may be bullying if it is intentional and done by the same person or group.

Dr. Anne Muldowney testified to the child's social emotional needs in the CTT program. .Dr. Muldowney has a Masters degree in cognitive development from Columbia University and a PhD from the Durner Clinic at Adelphi University. (Tr. at 353). .She is a certified school psychologist and a licensed psychologist. She stated that the parents did not permit her to observe or examine the child before the IEP meeting. The SEIT told her that the parents would not allow Dr. Muldowney to speak to the child. Dr. Muldowney testified as to the appropriateness of the CTT program for the child based upon other reports provided by the parents. She confirmed that the child could attend a CTT class at another school. She did not think that home based services were appropriate and that all related services could be adequately provided at the school either pushed in or pulled out. She stated the child is performing at grade level in all areas.

She opined about the CTT that "It's very language enriched—there's a lot of stimulation language, stimulation all day long." .She elaborated "the teachers are trained and skilled at breaking things down very carefully.. So when they present a new topic or a new concept or even if they are reviewing something new, they break it down into simple terms and steps. It is carefully skillfully taught instruction." (Tr. at 366).

Dr. Muldowney attended the child's 2008-2009 IEP meeting, which she described as being tense. (Tr. 357, 359). She never made a written request to the parent to do an assessment or observation of the child but she testified that the parents refused to consent to an oral request to evaluate or observe the child. (Tr. 387, 397). Despite the failure to secure prior parental consent, the OT did observe the child informally before the IEP meeting. (Tr. 401).

The child's parents requested her classification be changed from "autism" to "learning disabled," which Dr. Muldowney agreed with. (Tr. 362, 364; *See* P-D). Dr. Muldowney testified that the child has difficulty staying on task and completing assignments, difficulty with social cues, but she is generally performing at grade level in all academic areas. (Tr. 367, 369).

Dr. Muldowney attended the March 2008 behavior intervention plan meeting. (Tr. 378). The BIP was aimed at addressing the child's interfering behaviors that prevented her from staying on task. (Tr. 381). This behavior intervention plan was never discussed at the IEP meeting, although it was briefly mentioned that the guidance counselor would be involved in implementing the plan. (Tr. 427-28).

Dr. Muldowney recommended that the child remain at P.S. 6 because she believed that the child had "friends" at the school. ( Tr. 391, 434, 485). Dr. Muldowney testified that bullying was not discussed at the CSE meeting because there were other future opportunities to discuss it and the IEP meetings do not usually take more than a period. (Tr. 500-502). Dr. Muldowney testified that one option if a child complains of request bullying is for the parents to request to move their child to another school. (Tr. 492).

Dr. Muldowney testified that school policy is that all related services provided in school are in 30-minute sessions in school but that as many sessions as needed could be placed upon the IEP. (Tr. 443-44, 475). Dr. Muldowney testified that if the child was constantly pulled out of the classroom for related services, her opportunities for learning and modeling after her peers would be disrupted. (Tr. 442).

Lauren Fontana has been the principal at P.S. 6 for three years. (Tr. 818-19). She testified that there is a zero tolerance policy for bullying at P.S. 6. She stated that there is a handbook about school policy in that regard that was made available during the child's year in second grade. She testified that many conflicts escalate but that they do not all

Hearing Officer's Findings of Fact and Decision                                    12

Case No.  116413

---

amount to bullying.  She stated that all conflict are written up.  She stated that she had one conversation with the child's parents regarding bullying. She contacted the parent when the child pulled another student's hair, slapped and hit a teacher. These incidents were written up.

Ms. Fontana testified that there is a protocol to deal with bullying in the classroom. The teacher is to provide the first level of intervention. Ms. Fontana testified that she attempted to speak to the parents about their concerns regarding bullying. She stated that she invited them into her office but the parents insisted upon speaking about it in front of the child. She said the child was agitated so she then asked them to leave. She said she felt threatened by the family who was yelling, the child was shaking in a fit of rage. Ms. Fontana said she was going to call security. The parents no longer wished to speak to her but she responded to their letters by telephone. (Tr. 928)

Ms. Fontana claimed that she had only one conversation with the child's parents about bullying when someone stepped on the child's toes, but she did not believe the child was the victim of bullying. (Tr. 831, 845, 979). Ms. Fontana defines bullying as "someone out of the blue...threatening another child, trying to coerce them to do something they feel uncomfortable with...and that child feels unsafe." (Tr. 824).  She does not consider a pattern of escalating conflict as bullying. (Tr. 824).  When the child's toes were stepped on, Ms. Fontana testified "it was more of an inappropriate conflict between two children," not bullying, although she did agree that bullying often involves conflict. (Tr. 896, 1055). Ms. Fontana does not recall any steps being taken to investigate the alleged bullying against the child. (Tr. 852).

Ms. Fontana testified that she heard about an incident where two classmates called the child at home over the weekend to tease her. (Tr. 941). Ms. Fontana testified that she asked the child's teachers to make copies of the incident reports, but she did not know whether they actually did so. No report was produced regarding this incident. (Tr. 950).

Ms. Fontana, who attended the IEP meeting, would not address the bullying situation at that meeting because "I don't think it's an opportunity for us to be talking about situations that occurred in the classroom related to their child that not necessarily everyone else in the room can participate in." (Tr. 877). Ms. Fontana would not permit

Hearing Officer's Findings of Fact and Decision                                    13

Case No. 116413

discussion of the derogatory drawing of the child at the IEP meeting "because we were not there to discuss that." (Tr. 963; P-MM).

Ms. Fontana testified that the IEP team cannot recommend a private school placement, only defer it to the Central Based Support Team ("CBST"). (Tr. 975-76, 978, 983). She did not recommend deferral to the CBST because Ms. Fontana felt CTT was an appropriate LRE recommendation for the child and that the parent could request another school for the 4th grade CTT of they wished to. (Tr. 978, 983,984). Ms. Fontana testified that the CTT model has proven successful even with the difficulties that the parents have has with the school. (Tr. 1083). When she offered to help them find another CTT program in another public school, the parents refused and told her that the child was going to go to a private school. (Tr.1085).

The parent testified that his decision to pursue a unilateral placement at Summit, began when the child complained about bullying at P.S. 6 on almost a daily basis during the 2007-2008 school year, and such complaints occurred on a weekly basis during the second half of that school year. (Tr. 1706). He never saw any written incident reports from her teachers or other students, nor was the issue of bullying discussed at her behavior plan meeting in March 2008. (Tr. 1705-06). The child's SEITs reported the bullying problems to him. (Tr. 1707). According to the parent, he tried to address the issue with the principal on more than one occasion, but she did not want to discuss it with him. (Tr. 1752).

The parent testified about a situation where the child wanted to bring dolls to school (for comfort purposes) because she felt insecure; however, at some point she was not permitted to have them in the classroom. (Tr. 1698-99, 1729; See also P-HH, P-II, P-JJ). When the parents approached the principal about the doll situation and tried to discuss the bullying, the principal ended the meeting abruptly and threatened to call security if they did not leave her office. (Tr. 1701). After that meeting, at which the child was present, according to the father, the child had a lingering fear of the principal and kept questioning whether she would be going to jail. (Tr. 1701).

In advance of and at the IEP meeting, the parents requested all documents being used to evaluate the child. They were provided with only one document which was a "single piece of paper that was unsigned, undated and un-authored. We received no

reports, no evaluations, nothing else." (Tr. 1722; *See also* P-M, P-N, P-Q, P-T). The parents ever received any written response to their letters, only a few phone calls. (Tr. 1718, 1748-49). The parents were provided a draft BIP at the March 2008 "behavior intervention plan" meeting, but they did not receive a final copy until they received the 2008-2009 IEP. (Tr. 1757-58).

The parent stated that there was no discussion of a 10- or 12-month program at the IEP meeting. The recommendations from the McCarton Center and Dr. Packard which were submitted to the CSE by the parent were for a ten-month academic program. Those two recommendations also addressed the fact that in their opinion the child should receive her related services 52-weeks a year. The DOE recommended a 10-month academic program with related services for the child on the IEP that was sent to her parents. (Tr. 1799-1800; *See* P-D, P-NN-17, P-PP-4).

At the 2008-2009 IEP meeting, the parent testified that he tried to discuss what he described as the ongoing bullying situation, including a derogatory drawing of the child by a classmate (P-MM). The principal and assistant principal determined that the issue should not be discussed at the IEP meeting. (Tr. 1702-03, 1734; *See also* P-J). The father testified that the parents were told at the IEP meeting that another meeting would be scheduled to discuss that issue. That meeting did not occur. (Tr. 1703, Parent's Ex. J).

The father testified that there were incidents of bullying, teasing and problems with the child at school during the 2007-2008 school year that were brought to the attention of the administration, but were not being addressed. (Tr. 1696, 1717, 1732-33; *See* P-I, P-HH, P-II, P-QQ, P-WW). The father stated that the administration would argue with him and the mother that the bullying issue even existed. (Tr. 1711). The parents felt they needed to explore other placement options. (Tr. 1696).

The parents considered moving her to a private placement at the second half of last year when the alleged bullying issues were reported to be escalating. (Tr. 1711-12). They visited a number of non-public placement options in New York and New Jersey. (Tr. 1732).

The parents rejected the proposed placement at P.S. 6 because of the alleged difficulties the child had when she attended the school for the two years prior. (Tr. 1771, 1773; *See* P-I). The parents sent the DOE a letter rejecting the placement and then they

received the resolution meeting notice. (Tr. 1783; *See* P-I). The parents chose to place the child at Summit.

The parent testified that Summit is a speech and language based program. (Tr. 1690; *See* P-TT). Its program is designed to address the child's expressive, receptive and pragmatic language deficits. (Tr. 1692). The 2008-2009 school year is the first year that the child has not had fulltime 1:1 support in the classroom. (Tr. 1707-08). This year, the child had a social worker/counselor at Summit whom she met with on a daily basis. (Tr. 1689). While the child is making meaningful progress, there are still issues that need to be addressed, including her attention deficits. (Tr. 1691).

The parents have seen "remarkable progress with the child in all areas of her social and academic progress" at Summit. (Tr. 1690). The father said that she is a completely different child this year that she was last year at P.S. 6. (Tr. 1710). He testified that the child has friends and is happy at school, the teachers listen to her, and she looks forward to going to class every day. (Tr. 1712). The father believes that Summit and the services it provides are appropriate and necessary for the child's continued progress and education. (Tr. 1750). In the father's opinion, the child continues to require a 12-month program to prevent regression. (Tr. 1800).

Dr. Maurine Packard is a Pediatrician and Neurologist. Dr. Packard graduated from medical school in 1976 with her initial training focused on pediatrics. (Tr. 1355-56). Dr. Packard did the first evaluation of the child when the child was 20 months old and has evaluated her every year since. (Tr. 1356). Dr. Packard's reports were admitted as exhibits P-FF and P-PP.

In February 2008, Dr. Packard saw the child for an evaluation. She testified that the child had continued to make progress and that her academic skills were "on target". (Tr. 1363). She had a concerned about the child's mental health status because the child did not seem as happy as she had in the past, she was more subdued. (Tr. 1364). Dr. Packard testified that the child needed to get out of the school because of the conflict the family was having with the school over the years. She felt this conflict was affecting the child's mental health. (Tr.1375).

She observed the child in class for 90 minutes. (Tr. 1373). The child seemed to have "shut down and really needed her SEIT to…get her going much more than I had seen the year before." (Tr. 1372). Dr. Packard described the role of the SEIT during her observation as prompting the student to focus but did not describe her as offering any academic support. (Tr. 1369-72). Dr. Packard was concerned that "the large public school classroom" was inappropriate for the child. (Tr. 1367). She did not define what she meant by large. She testified that the child was making progress in receptive and expressive language processing, pragmatic language and especially her social skills. (Tr. 1392)

She testified that the child had a best friend at P.S. 6 and outside of school. (Tr. 1390). Over the spring break, the child and her best friend were broken up. (Tr.1390). She testified that as of February 2008, the parents had looked at least four private schools. (Tr. 1388).

Dr. Packard testified that she learned that child was being "bullied" in school. (Tr. 1358). She said that the child told her that the teachers were mean to her but she saw no evidence of that. (Tr. 1373-1374). Dr. Packard did not see significant interaction between and her peers at P.S. 6 during her observation. (Tr. 1372). She did not know of the teachers at P.S. 6 utilizing any positive support or reinforcement. (Tr. 1372-74, 1379). She testified that based upon report from the SEIT's, she believed that the child was not accepted by many of her classmates as she was often made fun of and some students would do things that were inappropriate to her. (Tr. 1416, P-P-1).

Dr. Packard testified that the child would benefit from a school that focuses on learning disabilities as part of a team approach with trained staff to help her. (Tr. 1404-05). "The idea was for her not to have a SEIT with her in class for the rest of her educational career. The idea was to make her more independent." (Tr. 1413). Further, the child needed to be in a "less toxic environment" than P.S. 6, and she needed to be surrounded by other students at her intellect level with similar disabilities. (Tr. 1404). She did not specifically opine that the CTT program was inappropriate for the child.

Dr. Packard has noticed that since the child started attending Summit, she has been excited about school. (Tr. 1376). Over the past year, the child has even increased her ability to skip and hop. (Tr. 1395-96). At Summit, positive rewards are used for good

behavior. (Tr. 1379).  When, for example, an issue came up between the child and another student at Summit who called her a name on the bus, the school personnel addressed it immediately and the other student was spoken to by the principal. (Tr. 1396-97). Dr. Packard would not characterize this isolated incident as bullying by that boy.

Sherri Bordoff is the Clinical Director at Summit. (Tr.1230)  Ms. Bordoff has a Bachelor's Degree in Elementary Education and Psychology and a Master's Degree in Social Work and School Building Leadership.  Ms. Bordoff is a licensed clinical social worker. (Tr. 1225). Summit has been open for 40 years and caters to students who have an average or better than average IQ but are learning disabled or emotionally disturbed. (Tr. 1225, 1227; See P-TT).  The teachers must be licensed and certified in New York State with a Master's Degree. (Tr. 1228).

Summit utilizes a "social skills" curriculum which varies based on the needs and problems in the classroom, and the academic curriculum is based on the New York State mandated curriculum. (Tr. 1238).  All of the students are assigned a school social worker. (Tr. 1242).  Contact is constantly maintained between the parents and the student's social worker and teachers. (Tr. 1252).  Students at Summit have a point card for behavior management that is broken down into various areas, including time, homework, behavior, work and contract. (Tr. 1231).  The points are used by the students to purchase rewards at the end of the week and can be used daily for reinforcements. (Tr. 1232).  The goals are reviewed weekly, by teachers and student, and are developed based on what needs to be worked on. (Tr. 1231, 1240, 1253).  Students can also lose points for poor behavior, which impact what tangible items they are able to get.  There is also a "quiet room" that is utilized for students who have problem behaviors in class. (Tr. 1270).

At the Summit intake process, there is a discussion with both the student and the parents about how students should respect each other at the school, what the expectations are, and how the student should express when they feel hurt or disrespected. (Tr. 1234). At Summit, there is no tolerance for bullying or teasing and this is discussed with the students at the beginning of the year and is reviewed periodically. (Tr. 1232, 1235).  If a situation does arise, the school will meet with the student to find out what happened, investigate the situation, then arrange a meeting between the students involved to discuss their feelings and how to change the situation. (Tr. 1234-35, 1268-69).

Hearing Officer's Findings of Fact and Decision                                    18

Case No. 116413

When the child first arrived at Summit, she would get anxious and very apologetic when she believed she was acting poorly. The child has problems with self-regulation and reading social cues. (Tr. 1245). The child is very active in the contract process, giving her view on whether she feels she has made any progress on her own goals. (Tr. 1236). When the child masters the goals, the school personnel discuss with her other goals that may help her. (Tr. 1240).

Ms. Bordoff testified that the child is progressing across the board. She is better able to focus on her schoolwork and the child knows the strategies to rely upon to learn. (Tr. 1251). The child is better able to manage herself instead of relying on teachers to tell her what to do next. (Tr. 1236). The child is better able to stay on task and not blurt out in class when inappropriate. (Tr. 1246). The child is showing leadership skills by working in the school store to assist other students to redeem their behavior points. (Tr. 1237). Apparently unaware of the incident described by Dr. Packard, Ms. Bordoff testified that, to her knowledge, the child has not been involved in any teasing or bullying at Summit, either as a victim or an aggressor. (Tr. 1271).

Ms. Bordoff testified that the child is appropriately placed based on her academic skills and social profile. (Tr. 1252). There are still some behaviors that are being worked on, such as being off task, requiring prompts to stay focused, waiting, impulsive behaviors and calling out. (Tr. 1251). If the child exhibits impulsive behaviors in the classroom, school personnel will use cues, prompts, modeling supports and marking her point card to get her back on track. (Tr. 1245, 1259).

Mary Kutch is the child's ABA Consultant. Ms. Kutch has her Bachelor's Degree in Psychology and has been working at the Lovaas Institute for two years. (Tr. 1420). Ms. Kutch started working with the child in August 2007 (Tr. 1463). Ms. Kutch was the program teacher for child's program in 2007-2008, and she provides program coordination between the school and home-based program for the 2008-2009 school year. (Tr. 1421, 1430). Ms. Kutch currently takes a "more minimal role, using five hours a month on average" to provide program coordination and consultation. (Tr. 1464). Ms. Kutch's report was admitted as exhibit P-W. The report indicates the areas which the SEIT is working on with the child. They include among other things: participation in social activities/conversation, responding to social cues, auditory comprehension, reading

comprehension, comprehension of language heavy math problems, increasing language processing skills and writing fluently. (P-W-1)

Ms. Kutch visited the child at P.S. 6 between four and five times during the 2007-2008 school year. (Tr. 1423-24). Ms. Kutch testified that the teacher support in the classroom was "not good" and the SEITs took on more of the "teacher" role in the classroom. (Tr. 1424-25). Ms. Kutch recalled a situation where other students refused to give his/her spelling test to the child for peer grading and the SEIT had to intervene to get another student to work with the child. (Tr. 1454).

Ms. Kutch attended child's 2008-2009 IEP meeting by telephone and prepared a progress report and proposed goals for the IEP. (Tr. 1422; *See* P-W). "It was a very tense meeting, and everyone kind of was trying to talk all at once, and from what I could tell, it was just ended." (Tr. 1435). Ms. Kutch did not have the opportunity to speak. (Tr. 1436). Ms. Kutch also attended the March 2008 behavior intervention plan meeting. She was never provided with a draft or final version of the BIP. (Tr. 1433-34).

Ms. Kutch works with the child's fourth grade teacher and the school social worker at Summit to address their concerns with ability to stay on track, discussing ideas that would help focus and motivate the child. (Tr. 1432). Summit uses a point motivation system which allows students to earn up to 40 points per day. (Tr. 1436). This is a positive reinforcement system similar to what the Lovaas Institute uses. (Tr. 1446-47).

Marianna Gersh is the child's home-based SEIT. Ms. Gersh is a licensed New York State Special Education teacher. (Tr. 1597; *See also* P-U). Ms. Gersh provided at-home SEIT services to the child during the 2007-2008 and 2008-2009 school years. (Tr. 1599, 1604). Ms. Gersh has special training and experience in working with special needs students that helps her redirect and focus the child's on school work. Ms. Gersh's report prepared in May 2008 was admitted as exhibit P-V. The report indicates that the child has made progress in language, writing comprehension, organization, processing speed, fluency and many other areas. Id. The report states that the child is performing on grade level in math. Id.

Ms. Gersh works with the child on focusing her attention, homework, and social skills. (Tr. 1601-02, 1609). Ms. Gersh also works with the child on pragmatic language skills, including starting, sustaining and ending conversations. (Tr. 1604-05). Ms. Gersh

Hearing Officer's Findings of Fact and Decision                                    20

Case No. 116413

also works with the child on maintaining skills that are no longer being addressed in school. (Tr. 1638-39).

At P.S. 6, the child told Ms. Gersh that various students "bullied" her . Tr. 1600; *See* P-V. The child is improving during 2008-2009 with the small, more nurturing environment at Summit, but still requires 1:1 assistance outside of school but does not give any current reason why. (Tr. 1605, 1608, 1618, 1639). "With support, she's making progress, both academic and social." (Tr. 1611). This year, the child says she enjoys going to school, whereas before she did not enjoy actually being at school (Tr. 1604). Also, the child has a lot more play dates with classmates and conversations about school and the other students are positive rather than negative. (Tr. 1603, 1622).

Dominique Faber was the child's SEIT at P.S. 6 during the 2007-2008 school year on Mondays, Wednesdays and Fridays. (Tr. 1469; *See* P-R). Ms. Faber's reports were admitted as exhibits P-S and P-GG. In her report, she did not recommend that SEIT services be continued. (Parent's Ex S) Ms. Faber testified that there was a lot of negativity towards the child from her classmates at P.S. 6. (Tr. 1472). Ms. Faber observed situations where the child was pushed out of the way by other students when trying to approach a friend. (Tr. 1473-74). She also observed the child being tripped by another student, after which the teacher reprimanded the child for "making a scene." (Tr. 1477-78). Other students would also blame the child if items were missing or if they tripped or stumbled. (Tr. 1501-02).

Other students were permitted to have dolls or toys with them at all times; however, the child's teachers decided the child should not have one because it was too distracting for her. (Tr. 1480; *See* P-JJ). Ms. Faber testified that the school's approach toward the dolls was inconsistent: "One day she had them in her desk, and the next day we say she can't put them in her desk, and then the next day they are in her backpack, [and] a week from now you need to leave them home." (Tr. 1495, 1528).

Ms. Faber was present when the parents spoke to the principal about the "dolls". (Tr. 1479-80). When the parents stated that the dolls made the child feel more secure, the principal "got the phone and said she was calling security and made us leave the building." (Tr. 1482-83, 1530). Ms. Faber did not consider this appropriate in front of the

child, and after this incident, the child would repeatedly ask Ms. Faber if security was coming and she was going to jail. (Tr. 1483, 1503, 1534).

At the 2008-2009 IEP meeting, the child's parents tried to address the bullying issue and the principal "actually slammed her hand on the table saying that was not going to be addressed and to move on with the meeting." (Tr. 1485). At the IEP meeting, the child's academics and strong points were discussed, but the team did not address deficits or weaknesses. (Tr. 1488). Ms. Faber stated that she did provide input in the BIP development. ( Tr. 1527).

Ms. Faber does not feel that P.S. 6 is appropriate for the child because it is "overstimulating," the class was too large, and does not have the consistency or positive support that the child needs. (Tr. 1486). She did not offer an opinion regarding the appropriateness of the CTT program. Ms. Faber was aware the parents were considering other placement options. (Tr. 1518)

Shannon Maloney was the child's other SEIT at P.S. 6. Ms. Maloney has a Bachelor's Degree in Psychology and a Master's Degree in Applied Behavior Analysis. (Tr. 1549-50; P-DD). Ms. Maloney started working with the child in November 2007 on Tuesdays and Thursdays. (Tr.1551- 1552) Academically, there were skills that the child was "okay" at and others where she required more one-on-one attention. (Tr. 1586). Ms. Maloney's report prepared in May 2008 was admitted as exhibit P-EE. Her report did not recommend that the SEIT services be continued. Id.

When Ms. Maloney worked in the child's classroom at P.S. 6, it was evident that the child did not have good relationships with the other students. (Tr. 1555). There was "a great deal of teasing, a great deal of just children backing away from the child, not including her." (Tr. 1555). Ms. Maloney testified that the child "looks" normal and academically functions at the same level as her typically developing peers. Tr. 1564. Ms. Maloney testified that she was concerned about the child's self-esteem while attending P.S. 6 because. The child "was internalizing everything...occurring around her from other students" and thought the child might need counseling. (Tr. 1587). She was apparently unaware that the parent rejected counseling as a related service that was recommended for the child.

Ms. Maloney testified that the teachers in the child's classroom were not respectful of the child's special needs. The child would be reprimanded by her teachers for raising her hand and not immediately speaking because she was collecting her thoughts, or calling out without raising her hand. (Tr. 1568). Ms. Maloney observed an incident where the other students refused to use a pencil that the child had touched. The teacher's response was to label the pencil with the child's names, which only reinforced the behavior of the other students. (Tr. 1556-58). The child would often be sent to the "teacher removal" room which was more welcoming and friendlier for the child than her regular classroom. (Tr. 1562-63). Ms. Maloney also personally felt hostility from the teachers and administrators at P.S. 6. (Tr. 1555-56). Ms. Maloney helped develop the child's Behavior Intervention Plan, but she never saw it being implemented at school. (Tr. 1566-67).

The child's classroom at P.S. 6 had nearly 30 students, two teachers, an assistant, two paraprofessionals, and other students with 1:1 aides. (Tr. 1569). Ms. Maloney recommended that the child go to another placement but did not testify that CTT was inappropriate for the child. (Tr. 1569). Ms. Maloney was aware that the child's parents were looking into the possibility of a private school placement. (Tr. 1583).

Ms. Maloney attended the child's 2008-2009 IEP meeting and testified that she had never seen an administration act towards parents the way this administration did towards the parents and herself. (Tr. 1561, 1573-74).  When the bullying issue was brought up at the IEP meeting, the principal would not discuss the issue. (Tr. 1560, P-J).

Sharifa Wiggins has a Bachelor's Degree in Psychology, a Master's Degree in Counseling Psychology, and a Master's Degree in Special Education, with a secondary certificate in general education through third grade. Tr. 1294. Ms. Wiggins worked with the child as a substitute SEIT for four days when the regular classroom teacher was also absent . (Tr. 1294, P-LL-3). Ms. Wiggins SEIT notes were admitted as exhibit P-LL. Ms. Wiggins defines bullying as "stigmatizing a child or...causing her to feel depressed or less than other children." (Tr. 1299). She described an "incident" in which a drawing was made by "Jalyssa", another student, who was told to throw it away. (P-MM) There was no evidence that the picture was ever shown to the child or to anyone else. The SEIT took it out of the trash and kept it to show the parents. She did not report it to the

Hearing Officer's Findings of Fact and Decision                                    23

Case No. 116413

administration. Ms. Wiggins noticed that when the child was being teased and bullied, she would complain that her stomach was bothering her this was not noted in her report. (Tr. 1323).

On another occasion, Ms. Wiggins observed a male student approach the child with ketchup on his hands, telling the child it was "blood" and then chasing the child. (Tr. 1305). Ms. Wiggins observed a group of boys try and lure the child into stepping on ketchup packets they had put on the ground. (Tr. 1306). Ms. Wiggins observed a group of boys inappropriately push against the child. (Tr. 1320). Ms. Wiggins also observed the other students refusing to use a pencil that had been used by the child. (Tr. 1320). There was no written reports which she prepared regarding these incidents. It is unclear when they occurred. Ms. Wiggins did not state that she reported their incidents to the child's regular classroom teachers or the administration.

Dr. Steven Blaustein is the child's speech pathologist. Dr. Blaustein has a Ph.D. in Speech and Hearing Sciences. (Tr. 261). He has evaluated and worked with the child for approximately seven years. (Tr. 262). Dr. Blaustein evaluates the child at least once per year. (Tr. 307-08). Dr. Blaustein's report which was prepared in April and May of 2008 was admitted as exhibit P-KK.

When he first began working with the child, she presented with marked receptive and expressive language impairment and she met the criteria for PDD-NOS. (Tr. 264, 265). Today, Dr. Blaustein would classify the child as a child with a language-based learning impairment, although she still has difficulty with "inferencing" and discourse. (Tr. 266). Over the years, Dr. Blaustein has noticed the child has made progress with her language skills. (Tr. 273). "Her vocabulary is increasing. Her sentence structure is increasing." (Tr. 273). However, the child has consistently struggled with "higher level language types of abilities" and she is not yet on an age appropriate level. (Tr. 274-75).

Dr. Blaustein attended the child's 2008-2009 IEP meeting on June 4, 2008. (Tr. 265). The IEP team agreed to change. The child's administrative classification from "autism" to "learning disabled." (Tr. 278). The child's parents attempted to discuss her placement at P.S. 6 and the bullying situation at the IEP meeting, but the team would not address the issue. (Tr. 272-73, 278, P-J).

Dr. Blaustein recalls speaking with the child's parents about bullying issues as far back as second grade. (Tr. 270). Dr. Blaustein testified that children with language impairments are often victims of bullying because they cannot comprehend higher level language, such as jokes and sarcasm. (Tr. 267).

Dr. Blaustein testified that a special education classroom, such as the child's classroom at Summit, is in his opinion, less restrictive than a CTT classroom with a 1:1 SEIT. (Tr. 279). The CTT environment with approximately 26 other students is too overwhelming for the child. (Tr. 288). "For her [the child] to be in a smaller class without an aide in a situation that recognized her language difficulties…would actually enable her…to be more comfortable, be on her own more, more self reliant, [and] learn not to be dependent on adults for scaffolding and processing." (Tr. 280). Dr. Blaustein also recommends the child continue receiving an additional three hours per week of home-based speech and language therapy. (Tr. 288). He did not give any reason why additional therapy needs to be home-based.

Dr. Blaustein did not agree that the peer modeling offered in a CTT would be a benefit. He testified that "As…typically appropriate peers get older, the social demands become greater, [and] the differences [between the child and her typical peers] become greater… Peer modeling can actually become not advantageous, but a difficulty." (Tr. 309). He stated for example, that although the child has been in a classroom with typically developing peers for years, this has not been sufficient to help her overcome her language deficits. (Tr. 309).

Lori Lesser is the child's home-based speech therapist. Ms. Lesser is a speech and language pathologist and she has her Bachelor's Degree in English with a Master's Degree in Speech Pathology. (Tr. 1644-45). Ms. Lesser is a "contract worker" through the DOE. (Tr. 1645).

Ms. Lesser currently works with the child three hours per week. (Tr. 1645). The child also receives two 30-minute sessions in-school at Summit, one individual session and one group session. (Tr. 1647). Ms. Lesser works with the child on conversational speech, pragmatic language skills, listening and writing skills, question response, and social skills. (Tr. 1648). Ms. Lesser has noticed significant progress in the child's socialization and pragmatic language, and believes that the additional speech "definitely

benefits her." (Tr. 1648, 1650, 1651). Ms. Lesser continues to feel that the child requires the additional speech therapy to address her deficits. (Tr. 1647).

Dana Rosen is the child's home-based OT Ms. Rosen has a Bachelor's Degree, and she is a licensed and registered OT who has been working since 2001. (Tr. 1657; *See* P-X). Ms. Rosen worked with the child five hours per week during the 2007-2008 school year in her home. (Tr. 1657-58). Based on the child's improvement, it was recommended that the child's home-based OT sessions be reduced to three hours per week for the 2008-2009 school year. (Tr. 1658, 1660). Ms. Rosen currently works with the child on Thursdays and Fridays. (Tr. 1666). The child also receives two 30-minute sessions per week of OT in school. (Tr. 1663). Ms. Rosen opined that the child still requires three hours per week of home-based OT to address her deficits. (Tr. 1663). Ms. Rosen's progress report which was prepared in May 2008 was admitted as exhibit P-Y. The report indicates that the child has continued to make progress throughout the school year and as such recommends a reduction on OT services.

Ms. Rosen utilizes the "Handwriting Without Tears" program with the child. (Tr. 1667). Ms. Rosen also works with the child on her visual-perceptual skills, working with the child on puzzles. (Tr. 1670). This year Ms. Rosen is also working with the child on her organizational skills by having all the child's school subjects separated in a binder and using a homework planner. (Tr. 1670-71). Ms. Rosen works with the child on ADL skills which for most of them, the child is able to manage independently at this time. (Tr. 1679, P-Y-2). The child's therapists at Summit, work on the child's transitioning issues. (Tr. 1677).

The child has made significant progress this year. *See* P-Y. "She's a completely different child. She's so happy and she's very motivated to work with me." (Tr. 1672). The child's handwriting skills have improved, and is now legible. (Tr. 1661-62). The "Handwriting Without Tears" program has proven beneficial, helping the child with the spacing and sizing of letters, as well as staying within the lines. (Tr. 1668).

Ms. Rosen has not spoken with any school personnel at P.S. 6 because the child is not receiving any OT from the school (Tr. 1680). Ms. Rosen was invited to attend the child's 2008-2009 IEP meeting, but was unable to attend because of a scheduling conflict. (Tr. 1682-83).

Case 1:10-cv-00752-JBW-VMS   Document 1   Filed 02/19/10   Page 65 of 81 PageID #: 65

---

## CONCLUSIONS OF LAW

Under the IDEA, a child with a disability is entitled to a free appropriate public education (FAPE). 20 U.S.C. § 1400(d)(1)(A).  A FAPE includes special education and related services specially designed to fulfill the unique needs of the student with a disability, and it is provided in conformity with a written IEP. 20 U.S.C. §1401(8).

A FAPE is offered to a child with a disability when "a) the board of education complies with the procedural requirements set forth in the IDEA, and b) the IEP developed by its CSE through the procedures is reasonably calculated to enable the student to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 206-207 (1982); See Application of the New York City Department of Education, No. 06-037.

This case involves only the 2008-2009 school year.

With regard to the first obligation above, the DOE has met its obligation to comply with the procedural requirements of the IDEA. The evidence shows that the CSE held a lengthy meeting – almost two hours -- attended by eighteen people either in person or over the telephone in which all of the appropriate individuals participated. The IEP that was created was developed with the input of the parents and with input from some of the student's outside providers who prepared the goals. The parent complains that not all of the goals were discussed at the meeting and some were vague.  However, the testimony of the other participants as well as the transcript of the meeting provided by the parents suggests that all of the issues related to the IEP that were of concern to the parent were adequately discussed.

In addition, Ms. Gutwillig testified that the IEP created for the child contained more information than most that she had read and, though vague, was not unlike all of the others she had read. She stated that the IEPs are interpreted with more particularity by the teachers who are familiar with the child.

The parent further complains that he did not receive the IEP after the meeting. He did however, receive it the next day. There is no requirement that he be given a copy of the IEP after the meeting particularly when after the discussion took place, the child's classification was going to be changed and thus the IEP had to be modified.

Hearing Officer's Findings of Fact and Decision                                    27

Case No. 116413

The parent's complaint regarding the lack of discussion of the BIP is also not compelling. The parents had attended a lengthy meeting in March 2008 regarding the BIP at which their concerns were discussed and the BIP was modified to incorporate them. They further assert that there was no FBA performed prior to the creation of the BIP. This is not supported by the evidence. Dr. Anne Muldowney testified that she created a FBA. (Tr. 508) The evidence further indicated that the prepared FBA was utilized to construct an appropriate BIP which was contained within the IEP. (Tr. 509)

It is true that the parent was not given an opportunity to discuss the issue of "bullying" and specifically, Exhibit MM[1], the drawing made of the child, but the principal made it clear that there was no time to discuss that issue and that discussion of that issue should take place at a separate meeting.  In this case, the issue of bullying is really a separate issue since it does not go to the heart of whether the CTT program and the related services recommended on the IEP were appropriate. At best, it places in question the location of where such educational programs and related services should be provided to the child. However, when given the opportunity to discuss that issue, the parent declined to discuss an alternative public school placement.

It is also true that the IEP did not reflect their wishes that the child should be deferred to CBST for private school placement but that goes to the second obligation above and not the propriety of how the meeting was conducted or how the IEP was created.

Finally, the parent complains that they were not provided with documents prior to the IEP meeting. However, from the evidence presented, there were no DOE documents identified as being withheld from the parents which were relied upon by the CSE team. The DOE witnesses testified that they reviewed the evaluations and the reports prepared

---

[1] With regard to the drawing, the evidence does not establish that the child ever saw it or, if she did, who showed it to her.  In fact, the evidence shows that consistent with the school's zero tolerance policy, the teacher in the classroom, in an effort to thwart any effort by another child to make fun of the child, immediately told the child who created the picture to throw it away which she did. (Parent's Ex. LL-3) If the child never saw the drawing, it could not have effected her. Thus, no finding can be made as to that picture that it constituted bullying.  In addition, some witness testified that bullying can affect a child's academic performance, but the record here does not establish that this child's academic performance suffered. When Dr. Packard opined about the toxic environment at P.S. 6 she was very clear that it effected the child's mental health status. Moreover, and such result is not unique to a child with LD and not a topic that would influence the content of an IEP except for a recommendation which was made and was rejected by the parent.

Hearing Officer's Findings of Fact and Decision                                    28

Case No. 116413

by the evaluators selected by the parent as well and the reports submitted by the child's own providers. The parents had all of these documents. The DOE witness testified that they did not evaluate or formally observe the child themselves because the parent refused to consent to them doing such evaluations and observations. To the extent that the IEP reflects there were assessments done of the child by the teachers for purpose of the drafting of the IEP, it appears that they were based upon teachers' assessments and "performance assessment task" completed on or shortly before June 4th, the day of the meeting. It is not clear that any documents existed or were created by the teachers in the performance of these teacher assessments and the parent never asked that they be produced by the DOE at the hearing. In addition, the results of these assessments were no different from the results obtained by the parent's own evaluators and thus, did not have a material impact upon the recommendations made in the IEP. Thus, the impact of the failure of the DOE to produce such documents, if any exist, was *de minimus* and not a denial of FAPE.

As mentioned above, the second obligation of the DOE to establish that it provided the child with a FAPE is that "the IEP developed by its CSE through the procedures is reasonably calculated to enable the student to receive educational benefits." The DOE has also met this obligation.

The DOE recommended that the child attend a ten-month CTT program with related services to be provided in school as follows: OT twice a week for thirty minutes 1:1, once a week for thirty minutes 2:1; PT once a week for thirty minutes 1:1; speech and language therapy twice a week for thirty minutes 1:1 and three times a week for thirty minutes 3:1; as well as counseling and a full time paraprofessional.

The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression'" and if the IEP affords the student with an opportunity greater than mere "trivial advancement" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130); in that that it is likely to provide some "meaningful" benefit (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]). The educational program must also place the student in the least restrictive environment (Carlisle Area School v. Scott P., 62 F.3d 520, 535 (3rd Cir. 1995).

The evidence establishes that the child has done very well academically in the ten-month CTT program with related services. All of the witness and reports show that she was performing at grade level in every area and has been making consistent progress in social skills as well. Despite the testimony from Dr. Blaustein that he did not think that CTT was the least restrictive environment, it is well established that a placement in a special school for learning disabled students is more restrictive than a CTT placement. And, while the parent has the right to place their child in a more restrictive environment, the DOE may not disregard the LRE requirement.

In fact, none of the parent's witnesses stated that the CTT program itself was inappropriate. For example, Dr. Packard reported that all of the child's skills were on target but that the child would benefit from a small school for the learning disabled. Of this there is little doubt, but it is not DOE's obligation to provide it when CTT has proven to be a program where the child has made significant and consistent progress. Dr. Packer testified that the child should attend a different school other than P.S. 6 because the school's toxic environment created by the family's conflict with the school administration was having an effect on the child's "mental health". This is far different from stating that the CTT program in general with related services was not offering or could not offer the child an "educational benefit" and that it was likely to produce progress and not regression.

The witness presented by the DOE who spoke to the issue testified that CTT was an appropriate placement for the child. They testified that the child had made significant strides in a CTT program in the past and was functioning on grade level in all areas. The evidence shows that the 4th grade CTT class had only 22 student with a ratio of 9:1 special education students to each special education teacher and was smaller than the third grade CTT. Indeed, the one witness who functioned as the child's classroom teacher the previous year, testified that CTT would provide that child with a program which she believed would help the child succeed academically and socially.

Having found that the recommended CTT program was appropriate, the next issue is whether the IEP contained the proper levels of related services. The evidence presented with regard to OT establishes that the child has made significant gains and that her ADL can be performed independently. Thus, the issue of whether some ADL's had to be

Hearing Officer's Findings of Fact and Decision                    30

Case No. 116413

addressed at home is moot. Her own OT testified that the child's OT services should be reduced. While the amount of OT mandated in the IEP is less than her private provider recommends, the OT providers who testified for the DOE stated that the goals, which were prepared by the provider, could be met in school within the time frames recommended on the IEP. Moreover, the DOE OT utilizes the same program— "handwriting without tears"-- as the outside provider. While every child may benefit from additional related services, it is not the obligation of the DOE to provide the child with an optimum level of services. Having heard the testimony of the child's OT that she could receive a benefit even her OT services were reduced, the IEP recommendation for OT will provide a benefit to the child and thus, are appropriate.

The evidence presented with regard to speech and language also establishes that the IEP recommendations for speech and language five times a week will produce a benefit to the child. Dr. Blaustein's testimony that the child would not benefit from group sessions because at some point exposure to peers may not have a positive effect, is too speculative to be given much weight. The child is only nine and as much of the testimony seems to indicate seems to enjoy being around her peers this year.

As to PT, it is not being given at all at Summit and the evidence shows that she is not receiving any at all.  A parent who rejects a service cannot now complain that the amount of the service is inappropriate.

As to counseling, the testimony of Ms. Chung was that the child should receive counseling. The parent disagreed. There is no other evidence to suggest that Ms. Chung's recommendation was inappropriate. Indeed, based upon the testimony of Ms. Chung that he child had gotten extremely upset in school on at least one occasion when she had an altercation with a teacher and the testimony of Dr. Packard that the child was withdrawn by the end of the school year, counseling was an appropriate recommendation.

Finally, the issue of a SEIT must be addressed. The evidence provided by each of the in- school SEITs was that the child no longer needed an in-school SEIT. There is no dispute about that. As to the parent's contention that the child continues to require a SEIT at home, the evidence is not that clear. The home-based SEIT supervisor, Mary Kutch testified that the child was doing "ok" at school academically in 2007-2008.  Ms. Gersh, the home-based SEIT provider said that she now works with the child primarily on social

Hearing Officer's Findings of Fact and Decision                                31

Case No. 116413

issues. The evidence shows that the child has improved in all domains including development social skills, thus the IEP program provided by the CSE was sufficient to provide the child with growth in these areas. Moreover, in 2007-2008 Ms Gersh worked with the child on academics primarily focusing upon her language based issues which are the issues that are being specifically addressed at Summit. Since the parent made it clear at the IEP meeting that he was not sending his child to public school and he unilaterally chose to place the child at Summit, a special school to address learning issues, there is no reason to assume that the child continues to require home-based SEIT services or that the DOE should pay for such services to help her with her learning issues. Accordingly, the CSE recommendation to exclude after school home-based SEIT services on the IEP was appropriate.

The SRO has consistently held that the DOE is not responsible for after school services provided in the student's home if, in fact, the DOE's program offers the student an appropriate educational program during the day. *See* <u>Application of the Board of Education of the City School District of the City of White Plains</u>, Appeal No. 96-81 (finding that it would be "speculative to assume" that the student would not have otherwise achieved progress absent extra ABA, despite the fact the student had previously received extra ABA over and above that which had been provided at school); *See also* <u>Application of a Child with a Disability</u>, Appeal No. 96-29 <u>Application of the Board of Education of the Sackets Harbor Central School District</u>, Appeal No. 99-8; <u>Application of a Child with a Disability</u>, Appeal No. 02-and <u>Application of a Child with a Disability</u>, Appeal No. 03-036. Where, as here, both the parent and the providers stated that SEIT services were not needed in school, it is hard to justify providing such services at home.

On the issue of whether the related services, if all delivered at school, would be too disruptive to the child because of the sheer number of sessions mandated, the evidence shows that the child was offered the option of having some sessions on a push-in basis as well as delivery of some services such as OT during gym and yard. This option would have reduced the number of pull-outs to a reasonable number and minimized the amount of regular classroom time missed by the child.

Hearing Officer's Findings of Fact and Decision                                    32

Case No. 116413

---

Finally, with regard to the issue of whether the related services should be provided on a twelve month basis, it is well settled that for services to be provided for 52 weeks, there must be proof that the child would suffer substantial regression if they were not. No objective evidence of regression was offered. For example, what were the child's skills like after Christmas or winter break? Did the providers have to bring her back up to speed after such a school break? There was no testimony as to this from anyone. Indeed, the testimony was uniformly that the child was making consistent progress in all domains. Accordingly, there is no basis to find that the child would suffer substantial regression if she did not receive her related services over the summer.

Assuming, the DOE is found not to have met its burden that it provided the student with a FAPE, the next question is whether the parent presented evidence to meet her burden to demonstrate that Summit is an appropriate placement. (Frank G., 459 F. 3d. at 364; M.S. v. Bd. of Educ., 231 F.3d 96, 104 [2d Cir. 2000], cert denied, 532 U.S. 942, 121 S. Ct. 1403, 149 L.Ed.2d 346 [2001]; Application of a Child with a Disability, Appeal No. 02-111; Application of a Child with a Disability, Appeal No. 95-57). In order to meet that burden, the parent must show that the private school placement met the student's special education needs (Burlington, 471 U.S. at 370; M.S., 231 F.3d at 104-05; Application of a Child with a Disability, Appeal No. 02-111).

On this issue the evidence is mixed. There is no doubt and the evidence supports a finding that the student has made progress in her behaviors and academics at Summit this year. She is apparently very happy there. However, program at Summit does not provide the child with any PT, counseling or with the appropriate number of hours of OT or speech therapy in a group as mandated by the child's IEP. There is no credible evidence to suggest that the recommendation on the IEP with regard to these recommendations were erroneous. The only evidence offered on this point is that the parent has chosen to supplement the OT and speech therapy with outside providers and expects the DOE to cover the cost and has chosen to withhold PT and counseling from the child altogether. While the parent is free to make this choice at his own expense, it does not make Summit an appropriate placement.

Case 1:10-cv-00752-JBW-VMS   Document 1   Filed 02/19/10   Page 72 of 81 PageID #: 72

As a matter of law, a parent's unilateral placement of a student in a school that does not provide the necessary services renders the placement inappropriate. See Application of the Dept. of Educ., Appeal No. 08-025 (holding that unilateral placement is inappropriate where it did not offer counseling program as recommended by the neuropsychological evaluation and IEP); Application of a Student with a Disability, Appeal No. 08-119 (unilateral placement inappropriate because it does "not provide the level of related services identified as appropriate to meet [the student's] needs"); Application of the Board of Education of the City School District of the City of Long Beach, Appeal No. 07-097 (finding that "[s]upplementation of the regular education services [at the unilateral placement] by private therapy does not support a finding" that the services at the unilateral placement are appropriate, and denying the parents' request for reimbursement); (same). See also, e.g., Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 660 (S.D.N.Y. 2005) (where it is determined that a student needs therapy, the parents' placement in a school that does not offer such services as a matter of course – but rather only at extra expense and without vouching for the credentials of the third party provider – is not appropriate and does not warrant tuition reimbursement). For all of the foregoing reasons, the parent has not sustained her burden of proving that the unilateral placement at Summit is appropriate.     Therefore, the parent's claim for tuition reimbursement must be denied.

Finally, the parent has not established that the equities tip in his favor. It is clear that the parent intended to send the student to Summit even before the CSE meeting was held. The reasons he gave for rejecting the CTT placement were not supported by the expert testimony or the other evidence. He kept stating that CTT and P.S. 6 was inappropriate for the child. He took issue with the refusal of the principal to discuss bullying at the IEP meeting and her refusal among other things to allow the child to bring a doll to class. While there is no question that P.S. 6 was, in words of Dr. Packard, a toxic environment for the child for a variety of reasons, the parent's refusal to consider alternate CTT placements was unreasonable. Everyone who attended the CSE meeting and who testified stated that the CSE meeting was contentious and the atmosphere was tense. The transcript bears this out and the father spoke disrespectfully to the principal.

Hearing Officer's Findings of Fact and Decision                                     34

Case No. 116413

_____

Accordingly, the equities do not favor the parent and his request for tuition reimbursement is denied in all respects.

    **Ordered** that the parent's request for tuition reimbursement for Summit School for 2008-2009 school year is denied and that their request for reimbursement for additional home-based services is denied.

Dated: July 21, 2009


                                 *Judith T. Kramer*

                               JUDITH T. KRAMER, ESQ.
                               Impartial Hearing Officer

JTK:jm


**PLEASE TAKE NOTICE**

    **Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.**

    **"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.**

    **Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.**

Hearing Officer's Findings of Fact and Decision                              35

Case No.  116413

---

## EXHIBIT LIST

### Parent's Exhibits

|       | DATE             | DOCUMENTS                                                                                                                                                       | PAGES    |
|-------|------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------|----------|
| P-A   | June 20, 2008    | Demand for Due Process                                                                                                                                          | 6 Pages  |
| P-B   | June 25, 2008    | New York City Department of Education Answer By: Diane Caiazza                                                                                                  | 3 Pages  |
| P-C   | June 11, 2008    | Decision of the State Review                                                                                                                                    | 23 Pages |
| P-D   | June 4, 2008     | New York City Department of Education IEP                                                                                                                       | 37 Pages |
| P-E   | February 21, 2008 | Addendum to the Findings of Fact and Decision By: Dora Lassinger, Esq.                                                                                         | 12 Pages |
| P-F   |                  | Speech & Language Therapy: Annual Goals & Short-Term Objectives, 08/09SY                                                                                        | 5 Pages  |
| P-G   |                  | Occupational Therapy: Annual Goals & Short Term Objective, 08/09SY                                                                                              | 5 Pages  |
| P-H   |                  | Academic Annual Goals & Short-Term Objectives, 08/09SY                                                                                                          | 12 Pages |
| P-I   | June 6, 2008     | Letter to Region 9 from the Parents                                                                                                                             | 4 Pages  |
| P-J   | June 4, 2008     | Annual IEP Meeting Transcript                                                                                                                                   | 81 Pages |
| P-K   | Winter 2008      | Third Grade Progress Report & Specialist Progress Report with Teacher's Comments Attached By: Marissa Vassari, *Sp. Ed.* & Melanie Fine, *Gen. Ed.* & the Teachers of the Special Classes [P.S. 6] | 3 Pages  |
| P-L   | Spring 2008      | Third Grade Progress Report & Specialist Progress Report with Teacher's Comments Attached By: Marissa Vassari, *Sp. Ed.* & Melanie Fine, *Gen. Ed.* & the Teachers of the Special Classes [P.S. 6] | 3 Pages  |

Hearing Officer's Findings of Fact and Decision                                    36

Case No.  116413

| | **DATE** | **DOCUMENTS** | **PAGES** |
|---|---|---|---|
| P-M | May 29, 2008 | Letter to P.S. 6 from the Parents | 1 Page |
| P-N | May 28, 2008 | Letter to P.S. 6 from the Parents | 2 Pages |
| P-O | May 28, 2008 | Letter to the Parents from P.S. 6 | 1 Page |
| P-P | May 28, 2008 | Speech and Language Progress Note<br>By: Donna Glaser Orloff, C.C.C./SLP<br>[Full Potential Resource Center] | 2 Pages |
| P-Q | May 27, 2008 | Letter to P.S. 6 from the Parents | 2 Pages |
| P-R | | Resume & Public School Teacher Certificate<br>For: Dominique Faber, *SEIT* | 2 Pages |
| P-S | May 23, 2008 | SEIT: Student Progress Report<br>By: Dominique Faber, *SEIT*<br>[New York Therapy Placement Services, Inc.] | 1 Page |
| P-T | May 23, 2008 | Letter to P.S. 6 from the Parents | 2 Pages |
| P-U | | Resume for Marianna Gersh, M.S., Ed. | 2 Pages |
| P-V | May 23, 2008 | Educational Progress Report<br>By: Marianna Gersh, M.S., Ed. | 4 Pages |
| P-W | May 22, 2008 | ABA/Consultation Progress Report<br>By: Mary Kutch, B.A., *ABA/Consultant*<br>[LOVAAS Institute] | 2 Pages |
| P-X | | Registration Certificate for Dana L. Rosen, OTR/L | 1 Page |
| P-Y | May 22, 2008 | Occupational Therapy Progress Report<br>By: Dana L. Rosen, OTR/L | 2 Pages |
| P-Z | | Resume for Ashely B. Sefecka, P.T., DPT | 2 Pages |
| P-AA | May 21, 2008 | Physical Therapy Progress Report<br>With Annual Goals & Short-Term Objectives<br>Sheet Attached<br>By: Ashley B. Sefecka, P.T., DPT | 8 Pages |

Hearing Officer's Findings of Fact and Decision                                      37

Case No.  116413

| **DATE** | **DOCUMENTS** | **PAGES** |
|---|---|---|
| P-BB | Resume for Jessica R. Peller, M.S., CCC-SLP | 1 Page |
| P-CC   May 21, 2008 | Speech & Language Therapy Report<br>By: Jessica R. Peller, M.S., CCC-SLP | 3 Pages |
| P-DD | Resume for Shannon Maloney, M.A., BCBA | 2 Pages |
| P-EE   May 20, 2008 | Educational Progress Report<br>By: Shannon Maloney, M.A., BCBA<br>[Theracare] | 2 Pages |
| P-FF   May 15, 2008 | Neuro-Developmental Report<br>By: A. Maurine Packard, M.D. | 3 Pages |
| P-GG   May 9, 2008 | SEIT Notes<br>By: Dominique Faber, *SEIT* | 2 Pages |
| P-HH   May 8, 2008 | Letter to P.S. 6 from the Parents | 2 Pages |
| P-II   May 7, 2008 | Letter to P.S. 6 from the Parents<br>With The child's Letter Attached | 3 Pages |
| P-JJ   May 7, 2008 | Letter from Ms. Fine & Ms. Vassari<br>To the Parents | 1 Page |
| P-KK   April & May 2008 | Language Evaluation<br>By: Steven H. Blaustein, PhD | 7 Pages |
| P-LL   April 18, 2008 | SEIT Notes<br>By: Sharifa Wiggins, *SEIT* | 3 Pages |
| P-MM   April 18, 2008 | Derogatory Caricature of 'Llixe' Drawn During<br>Class Time<br>By: A Class 3-209 Student | 1 Page |
| P-NN   April 17, 2008 | Developmental Evaluation with Test Scores<br><br>Attached<br>By: Cecelia McCarton, M.D. &<br>Jennifer Susan Leach, PhD | 17 Pages |
| P-OO   April 1, 2008 | Art Class Report<br>[92 Street Y] | 1 Page |

Hearing Officer's Findings of Fact and Decision                                38

Case No.  116413

---

| | **DATE** | **DOCUMENTS** | **PAGES** |
|---|---|---|---|
| P-PP | February 18, 2008 | Neuro-Developmental Evaluation<br>By: A. Maurine Packard, M.D. | 4 Pages |
| P-QQ | February 5, 2008 | Letter to P.S. 6 from the Parents | 3 Pages |
| P-RR | Feb. thru June 2008 | ABA/Consultation Invoices, Invoice Breakdown<br>& Proof of Payment | 12 Pages |
| P-SS | July thru Aug. 2008 | PT, SEIT & OT Invoices, Invoice Breakdown<br>& Proof of Payment | 9 Pages |
| P-TT | | Program Description of The Summit School | 2 Pages |
| P-UU | | 2008/2009 SY Enrollment Contract & Proof<br>1st Payment<br>[The Summit School] | 2 Pages |
| P-VV | July-Sept. 2008 | The Summit School Calendar | 3 Pages |
| P-WW | November 29, 2007 | Letter to P.S. 6 from the Parents | 1 Page |
| P-XX | November 1, 2007 | Psychological Consultation with Appendix<br>Sheet Attached By: David H. Salsberg,<br>Psy.D., DABPS | 8 Pages |
| P-YY | December 2008 | The Summit School Progress Report<br>By: Nicole Brown, *Homeroom Teacher* | 12 Pages |
| P-ZZ | | NYC DOE-Respect for All, Rules & Policies | 1 Page |
| P-AAA | September 3, 2008 | NYC DOE-Anti-Harassment Initiatives to Stop<br>Bullying & Bias-Related Incidents in City's<br>Public Schools | 4 Pages |
| P-BBB | July 2008 thru<br>January 2009 | Invoice Breakdown, Invoices & Proof<br>of Payments | 25 Pages |
| P-CCC | | Documents Provided by DOE in response to<br>our Request | 137 Pages |

# **INTERIM ORDER**

Case Number:              116413

Student's Name:           L██ K██████

Date of Birth:            October 5, 1998

District:                 2

Hearing Requested by:     Parent

Date of Hearing:          July 8, 2008
                          September 3, 2008

Hearing Officer:          Judith T. Kramer, Esq.

Hearing Officer's Interim Order                                                    I

Case No. 116413

---

## NAMES AND TITLES OF PERSON WHO APPEARED JULY 8, 2008

CHARLES J. CROWLEY, ESQ.          Attorney, Office of Legal Services, DOE
GARY MAYERSON, ESQ,               Parent's counsel

## NAMES AND TITLES OF PERSON WHO APPEARED SEPTEMBER 3, 2008

## A P P E A R A N C E S:

**For the Student:**
GARY MAYERSON, ESQ., Attorney
TRACEY WALSH, ESQ., Attorney
T██████ K██████, Parent/Father
DR. STEVEN BLAUSTEIN, Speech and Language Pathologist

**For the Department of Education:**
CHARLES CROWLEY, ESQ., Attorney, Office of Legal Services, DOE
PEGGY CHUNG, Guidance Counselor, P.S. 6
(Via Telephone)

Hearing Officer's Interim Order                                                          2

Case No. 116413

---

Whereas on June 20, 2008, counsel for the parent filed a request for an impartial hearing alleging that the child has been denied a Free Appropriate Public Education (FAPE) for the 2008-2009 school year including the summer of 2008 ;

Where as the parent's counsel has made an application for a interim order for pendency;

Whereas the Department of Education (DOE) has not objected to the parent's application for pendency ;

Whereas the "stay put" provision of the Individuals with Disabilities Education Act (IDEA), 20 USC § 1415 (e)(3) provides that a disabled child "shall remain in [his or her] then current educational placement pending the completion of any review proceedings unless the parents and state or local educational agency otherwise agree, See, Honig v. Doe, 484 U.S. 305 (1988);

Whereas on June 8, 2008, the State Review Officer (SRO) determined that the child should receive three hours a week of speech therapy;

Whereas the DOE has stipulated and greed that pending the completion of the hearing, it will continue to provide three hours a week of speech therapy to the child;

Whereas the parties have stipulated and agreed that pending the completion of the hearing, the speech therapy shall be obtained through the issuance of an Related Services Authorization (RSA) and that said RSA shall be issued by July 22, 2008;

**INTERIM ORDER**

It is hereby ordered that pending the completion of the hearing on the merits:

1. the DOE shall provide the child with speech therapy three hours a week;

2. the DOE shall issue an RSA by July 22, 2008 which shall be used to obtain the speech therapy from an approved provider.

Dated:  October 3, 2008

JUDITH T. KRAMER, ESQ.
Impartial Hearing Officer

JTK:nn

Hearing Officer's Interim Order                                                    3

Case No. 116413

---

## PLEASE TAKE NOTICE

Within 35 days of the receipt of this decision, the parent and/or Board of Education has a right to appeal the decision to the State Review Officer of the New York State Department of Education under Section 4404 of the Education Law and the Individuals with Disabilities in Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25-or 35- day period."(8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal the decision.

Directions and forms for filing an appeal are included with this decision. Directions and forms can also be found in the office of the State Review website: www.sro.nysed.gov/appeals.htm.