**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

T.K. and S.K., individually and on behalf of L.K.,

                Plaintiffs-Appellants,

        - against -              **10 Civ. 00752 (JBW)(ALC)**

New York City Department of Education,

                Defendant-Appellee.

-------------------------------------------------------------

**PLAINTIFFS-APPELLANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR**
**MOTION FOR MODIFIED *DE NOVO* REVIEW**

Mayerson & Associates
*Attorneys for Plaintiffs-Appellants*
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200
(212) 265-1735 (facsimile)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ..................................................... 7

ARGUMENT ................................................................................................................... 8

I.  THE LIMITED APPLICABILITY OF THE "DUE DEFERENCE" STANDARD ................... 8

II.  THE *BURLINGTON/CARTER* TEST FOR REIMBURSEMENT ........................................ 9

    A.  PRONG I: THE SRO'S DETERMINATION THAT L.K. WAS OFFERED A FREE
        APPROPRIATE PUBILC EDUCATION WAS CLEARLY ERRONEOUS ...................... 10

        1.  P.S. 6 WAS A HOSTILE AND POISONOUS ENVIRONMENT AND COULD NOT
            POSSIBLY BE CONSIDERED FAPE FOR L.K. WHERE DEFENDANT REFUSED TO
            DISCUSS THE BULLYING ISSUE AND FAILED TO RELEASE THE INCIDENT
            REPORTS ..................................................................................................... 11

        2.  DEFENDANT ENGAGED IN IMPERMISSIBLE PREDETERMINATION AND FAILED
            TO MEANINGFULLY INCLUDE PLAINTIFFS IN THE IEP DEVELOPMENT PROCESS ........15

    B.  PRONG II: L.K.'S UNILATERAL PROGRAM AT THE SUMMIT SCHOOL WAS
        "REASONABLY  CALCULATED"  TO  PROVIDE  L.K.  WITH  MEANINGFUL
        EDUCATIONAL BENEFITS ................................................................................. 18

    C.  PRONG III: THE EQUITIES DECIDEDLY FAVOR PLAINTIFFS AND SHOULD NOT
        PRECLUDE OR DIMINISH REIMBURSEMENT RELIEF ........................................... 21

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Board of Education v. Rowley,*
    458 U.S. 176 (1982)........................................................................................8, 10, 11

*Cerra v. Pawling Central School District,*
    427 F.3d 186 (2d Cir. 2005).......................................................................................8

*Davis v. Monroe,*
    526 U.S. 629 (1999).................................................................................................11

*Deal v. Hamilton County Board of Education,*
    392 F.3d 840 (6th Cir. 2004) ........................................................................ 10-11, 16

*E.S. v. Katonah-Lewisboro School District,*
    No. 09 CV 4770, 2010 U.S. Dist. LEXIS 103457 (S.D.N.Y. Sep. 30, 2010) .........................9

*Eugene B. v. Great Neck Union Free School District,*
    635 F.Supp. 753 (E.D.N.Y. 1986) ..............................................................................24

*Florence County School District Four v. Carter,*
    510 U.S. 7 (1988).................................................................................................9, 18

*Frank G. v. Board of Education,*
    459 F.3d 356 (2d Cir. 2006)...........................................................................9, 10, 18, 19

*Gagliardo v. Arlington Central School District,*
    489 F.3d 105 (2d Cir. 2007)........................................................................................9

*Greenland School District v. Amy N.,*
    358 F.3d 150 (1st Cir. 2004)..................................................................................21-22

*J.D. v. Pawlet School District,*
    224 F.3d 60 (2d Cir. 2000)..........................................................................................8

*Justin G. v. Board of Education,*
    148 F.Supp.2d 576 (D. Md. 2001) ..............................................................................24

*K.M. v. Hyde Park Cent. School District,*
    381 F.Supp.2d. 343 (S.D.N.Y 2005)...........................................................................11

*Knable v. Bexley City School District,*
    238 F.3d 755 (6th Cir. 2001) .......................................................................................8

*M.H. v. New York City Department of Education,*
    No. 09 CV 3657, 2010 U.S. Dist. LEXIS 45400 (S.D.N.Y. May 10, 2010) ...........................9

*M.S. v. Yonkers Board of Education,*
    231 F.3d 96 (2d Cir. 2000).......................................................................................19

*M.V. v. Shenendehowa Central School District,*
    No. 06 CV 0571, 2008 U.S. Dist. LEXIS 182 (N.D.N.Y. Jan. 2, 2008) ........................ 8-9, 10

*Mrs. B. v. Milford Board of Education,*
    103 F.3d 1114 (2d Cir. 1997)...............................................................................9, 10

*Mrs. C. v. Voluntown Board of Education,*
   226 F.3d 60 (2d Cir. 2000)...................................................................................21

*Rose v. Chester County Intermediate Unit,*
   1996 WL 238699 (E.D. Pa. 1996), *aff'd* 114 F.3d 1173 (3d Cir. 1997)..................24

*Schaffer v. Weast,*
   546 U.S. 49 (2005)..............................................................................................24

*School Committee of Burlington v. Department of Education,*
   471 U.S. 359 (1985)..............................................................................................9

*Shore Regional High School Board of Education v. P.S.,*
   381 F.3d 194 (3d Cir. 2004).................................................................................11

*Still v. DeBuono,*
   101 F.3d 888 (2d Cir. 1996).........................................................................10, 21

*T.P. v. Mamaroneck Union Free School District,*
   No. 07-3705-CV, 2009 U.S. App. LEXIS 1948 (2d Cir. Feb. 3, 2009) ............... 10-11, 16, 17

*Walczak v. Florida Union Free School District,*
   142 F.3d 119 (2d Cir. 1998)...................................................................................8

*Wall v. Mattituck-Cutchogue School District,*
   945 F.Supp. 501 (E.D.N.Y. 1996) .........................................................................8

*Warren G. v. Cumberland County School District,*
   190 F.3d 80 (3d Cir. 1990).............................................................................19, 24

*Werth v. Board of Directors of Public Schools,*
   472 F. Supp. 2d 1113 (E.D. Wisc. 2007).............................................................12

*Winkelman v. Parma City School District,*
   127 Sup.Ct. 1994, 1996 (2007) ................................................... 16-17, 17

*Wolfe v. Taconic-Hills Central School District,*
   167 F.Supp.2d 530 (N.D.N.Y. 2001) ...............................................................8, 24

### NEW YORK OFFICE OF STATE REVIEW CASES

*Application of a Child with a Disability,*
   Appeal No. 97-44...................................................................................................22

*Application of a Child with a Disability,*
   Appeal No. 99-015.................................................................................................22

*Application of a Child with a Disability,*
   Appeal No. 02-059.................................................................................................22

*Application of a Child with a Disability,*
   Appeal No. 03-003............................................................................................22, 24

*Application of a Child with a Disability,*
   Appeal No. 03-091.................................................................................................22

*Application of a Child with a Disability,*
    Appeal No. 04-049 ................................................................................................24

*Application of a Child with a Disability,*
    Appeal No. 05-070 ................................................................................................22

*Application of a Child with a Disability,*
    Appeal No. 05-087 ...........................................................................................22, 24

*Application of a Child with a Disability,*
    Appeal No. 06-014 ................................................................................................21

*Application of the Board of Education,*
    Appeal No. 01-068 ................................................................................................22

*Application of the Board of Education,*
    Appeal No. 04-091 ................................................................................................24

*Application of the Board of Education,*
    Appeal No. 05-030 ................................................................................................24

*Application of the New York City Department of Education,*
    Appeal No. 07-032 ..........................................................................................21-22

## STATUTES AND LEGISLATIVE MATERIALS

20 U.S.C. §1412(a)(10) ...............................................................................................21

20 U.S.C. §1414(d)(1)(B)(i) ........................................................................................16

20 U.S.C. §1415 .............................................................................................................7

20 U.S.C. §1415(f)(3)(E)(ii) (2010) ..........................................................................18

34 C.F.R. §300.321(a)(1) ............................................................................................16

34 C.F.R. §300.613(a) ...........................................................................................15-16

N.Y. Educ. Law § 4404(c) ..........................................................................................10

PRELIMINARY STATEMENT

*"If you wanted to look it up, you could without having to go through every **fucking** incident report." - **Lauren Fontana**, Principal of Public School 6*
*Deposition of Lauren Fontana, p. 51(Oct. 20, 2010)*

This memorandum of law is respectfully submitted in support of plaintiffs' motion for a modified *de novo* review of and appeal from the October 22, 2009 Decision of State Review Officer ("SRO") Paul F. Kelly.[1]  *See* Ex. A.[2]  The SRO Decision affirmed the prior "Findings of Fact and Decision," dated July 21, 2009, of the Impartial Hearing Officer ("IHO").  *See* Ex. B.

Even the SRO held that defendant had violated the law by failing to respond to plaintiffs' requests for incident reports.  However, the SRO failed to impose any consequences for such violations.  *See* Ex. A, p. 17.  Moreover, as shown below, neither of the underlying administrative decisions properly came to grips with: (a) the existence and negative impact of the bullying and hostile classroom environment that L.K. was forced to endure while at P.S. 6; (b) defendant's repeated acts of stonewalling on the bullying issue (flatly refusing to even discuss the issue with plaintiffs and withholding incident reports); and (c) the fact that P.S. 6 was the only school placement that defendant ever identified and offered to L.K. for the then upcoming 2008-2009 school year.  As shown below, both of the underlying administrative decisions should be reversed as clearly erroneous.

It is, to be certain, highly unorthodox to begin a federal court briefing with patently offensive and disrespectful language such as the language appearing above.  The offensive language in question, however, is highly relevant as it was spoken by Lauren Fontana, the Principal of P.S. 6, during her court-ordered deposition in this action.  *See* Ex. C, p. 51.

---

[1] SRO Kelly unexpectedly just resigned his position amidst numerous actions, proceedings and reported decisions where parties had challenged his impartiality.

[2] This reference, and all similar references (*i.e.*, "Ex. A") are to the exhibits as annexed to the accompanying Affidavit of Gary S. Mayerson.

1

The fact that Ms. Fontana, a public school principal, would flippantly show such disrespect to the Court and its processes offers this Court a compelling window of insight as to how this same person failed to take action to protect L.K. from in-school bullying and how this same person stonewalled, intimidated and bullied plaintiffs (*i.e.*, L.K.'s parents), by refusing to even discuss the bullying issue. Under these circumstances, plaintiffs were amply justified in removing L.K. from her public school setting at P.S. 6. No parents should be expected to tolerate repeated stonewalling and other dismissive and disrespectful behavior by school administration. If there is a single person to blame for the underlying proceeding, it is P.S. 6 Principal Lauren Fontana.

Only relatively recently has bullying become the focus of the national media, but L.K. struggled with bullying and a hostile classroom environment at P.S. 6 for years.[3] The record reflects that plaintiffs had serious and genuine concerns about L.K. being bullied at P.S. 6. Tr. 1696, 1717, 1732-33[4]; *see* P-I, P-HH, P-II, P-QQ, P-WW.[5] Defendant apparently started to generate and accumulate written "incident reports" back in the 2007-2008 school year, but not a single one of those reports was ever disclosed to plaintiffs prior to L.K.'s litigation. Only after Ms. Fontana's December 5, 2008 examination in the underlying administrative hearings did incident reports finally start to surface and, even then, only as a result of a subpoena being issued.

The record reflects that plaintiffs attempted to meet personally with Ms. Fontana to discuss L.K.'s bullying problem at P.S. 6. Despite the fact that defendant publicizes a "zero tolerance" stance towards bullying, Ms. Fontana refused to discuss the bullying problem with

---

[3] We have not found any reported "bullying" cases, *i.e.*, a reported decision where bullying was a core issue, within the Second Circuit.

[4] This reference, and all similar references (*i.e.*, "Tr. 1"), are to the transcript at the administrative hearing.

[5] This reference, and all similar references (*i.e.*, "P-A"), are to the evidence admitted at the administrative hearing.

2

plaintiffs, and in the presence of L.K., threatened to "call security" if plaintiffs did not leave.[6] Tr. 1482-83, 1530; *see also* Tr. 1701.  Ms. Fontana never offered plaintiffs another opportunity or forum to discuss the bullying problem that L.K. was enduring at P.S. 6.  Thereafter, plaintiffs repeatedly wrote to Ms. Fontana and other personnel to secure incident reports and related documentation, but not a single incident report was ever provided to plaintiffs prior to this litigation. *See* P-I, P-HH, P-II, P-QQ, P-WW.

Plaintiffs were (and are) entitled to such documentation and they needed such documentation to develop an appropriate IEP (Individualized Education Plan) for purposes of the 2008-2009 school year.   Without such documentation, plaintiffs were deprived of the opportunity, at L.K.'s IEP meeting, to use the information contained in such reports to request appropriate goals and objectives, as well as accommodations.  The team trying to develop L.K.'s behavior intervention plan also was deprived of this documentation.  Ms. Fontana admitted as much during her October 20, 2010 court ordered deposition. *See* Ex. C, p. 11.

Prior to L.K.'s June 4, 2008 IEP meeting, L.K.'s substitute SEIT (Special Education Itinerant Teacher), rescued from the trash and delivered to plaintiffs a detailed and highly derogatory drawing of  L.K. that L.K.'s classroom teacher threw out, but never told plaintiffs about. *See* P-MM.  This drawing, we urge, is indicative of the bullying and hostile classroom environment that L.K. had to endure at P.S. 6.  It also is indicative of the ongoing stonewalling that plaintiffs had to endure at the hands of Ms. Fontana and other P.S. 6 personnel.  But for L.K.'s alert SEIT, this kind of evidence never would have seen the light of day.

---

[6] During her examination, Ms. Fontana claimed that she did not want to discuss the bullying issue "in front" of L.K. Tr. 847-48.  Ms. Fontana's alleged desire to "protect" L.K. was entirely pretextual, as Ms. Fontana had no problem with traumatizing L.K. by threatening in her presence to call the security police detail.  Moreover, thereafter, Ms. Fontana never found any other time to discuss the bullying issue with plaintiffs.

On June 4, 2008, Ms. Fontana chaired L.K.'s IEP meeting, called for the ostensible purpose of developing an appropriate IEP program for the 2008-2009 school year. Plaintiffs again tried to bring up the subject of bullying and they tried to start a dialogue about bullying using the derogatory drawing that had been rescued from the trash, among other instances of bullying. Once again, however, the record reflects that Ms. Fontana flatly refused to discuss the bullying issue. Once again, Ms. Fontana never afforded plaintiffs any opportunity to discuss, much less resolve, the bullying problem that L.K. had been experiencing at P.S. 6. Plaintiffs were thus frustrated and thwarted by defendant at every turn, and wound up at the end of their rope. No wonder plaintiffs were exploring other placement options for L.K. for 2008-2009.

Thereafter, defendant issued a Final Notice of Recommendation to again recommend and offer P.S. 6 as L.K.'s school placement. Other than P.S. 6, no other school placement was ever identified and offered to L.K. for the 2008-2009 school year. Defendant's Answer filed in the underlying proceeding, dated June 25, 2008, squarely admits that "a final notice of recommendation was issued to the parent, in which placement at M02P006 [P.S. 6] was offered." *See* P-B. As such, defendant is judicially estopped to now contend that it ever identified and offered any other placement to L.K. for purposes of the 2008-2009 school year.

During the underlying hearing, Ms. Fontana claimed that she had instructed her teaching staff to provide plaintiffs with the pertinent incident reports and related documentation. However, despite numerous letters to Ms. Fontana and four other school personnel, including L.K.'s teachers (requesting incident reports and related documents prior to the June 4, 2008 IEP meeting), no such documentation was ever provided to plaintiffs. Such documentation was not provided even after the June 4, 2008 IEP. Only after Ms. Fontana testified in the underlying hearing and a subpoena issued did plaintiffs begin to see any such documents.

The IHO focused almost exclusively on the CTT (collaborative team teaching) "program" that defendant had offered L.K. for the 2008-2009 school year.  The IHO did not properly address or assess the negative impact of the bulling and defendant's stonewalling on the bullying issue because of her flatly erroneous belief that P.S. 6 was not the school that had been offered to L.K. for the 2008-2009 school year.

The IHO stated: "There was no recommendation for PS 6.  The father was told he could have an alternative placement."  Tr. 1060.  Whatever was said during the June 4, 2008 IEP meeting, there is absolutely no evidence in the record that defendant ever identified or offered any specific school placement other than P.S. 6.

Indeed, defendant issued a Final Notice of Recommendation (again) recommending P.S. 6 to L.K.  Defendant certainly had every opportunity after the June 4, 2008 IEP meeting to identify and offer a different school site, but it never did so.  As noted above, defendant is judicially estopped from contending otherwise because in its June 25, 2008 Answer filed in the administrative proceeding, defendant admitted "a final notice of recommendation was issued to the parent, in which placement at M02P006 [P.S. 6] was offered."  *See* P-B.

Accordingly, as a matter of law, the IHO improperly side-stepped the issue of the bullying and stonewalling at P.S. 6 by erroneously concluding that P.S. 6 was not going to present a problem because "there was no recommendation for P.S. 6." to L.K. for 2008-2009.  Tr. 1060.  The documentary evidence, including defendant's judicial admissions, shows that P.S. 6 was, in fact, the singular placement that the defendant identified and offered to L.K. for 2008-2009.

Just like the IHO, the SRO similarly improperly glossed over the bullying and stonewalling problem at P.S. 6.  The SRO's tact was to focus myopically on the components of

5

the offered educational program in the IEP.  Even the SRO concluded "the district's failure to timely disclose the FBA and timely respond to the request for incident reports constitutes a procedural violation."  Ex. A, p. 17.  However, having identified defendant's violative acts and omissions on this point, the SRO then held that such violative conduct was not material enough to constitute a FAPE (free appropriate public education) deprivation.  This Court should find that defendant deprived L.K. of a FAPE, and deprived plaintiffs of meaningful participation in the IEP process by failing and refusing to address plaintiffs' concerns about bullying and by then compounding that failure by stonewalling plaintiffs' repeated written and oral requests for the incident reports.

Defendant's stonewalling continued even into this action.  Defendant resisted producing Principal Lauren Fontana for a mere two-hour deposition limited to a few issues framed by Magistrate Judge Carter.  When, after an appeal to this Court, Ms. Fontana finally appeared for that deposition, she revealed her abject disrespect for this Court and its process by referring to the incident reports as follows: "If you wanted to look it up, you could without having to go through every <u>fucking</u> incident report."[7]  Ex. C, p. 51.

Plaintiffs' counsel showed Ms. Fontana the many letters that plaintiffs wrote to her and other functionaries during the 2007-2008 school year in an effort to secure incident report type documentation.  According to Ms. Fontana, she (orally) issued instructions to L.K.'s teachers to release the incident report documents to L.K.'s parents.[8]  Ex. C, p. 56-57.  It is undisputed that Ms. Fontana refused to meet with plaintiffs to discuss the bullying issue.  It is undisputed that

---

[7] Incredibly, we had to ask defendant's counsel to direct Ms. Fontana "to be more respectful of the process."  Ex. C, p. 51.

[8] Ms. Fontana testified that in the normal course of business, if she requested that the documents be sent to the parents, it would have happened.  *See* Ex. C, p. 57.  In actuality, plaintiffs needed to secure a subpoena after Ms. Fontana's examination to secure such documents.  The fact that Ms. Fontana's stonewalling continued even during the due process proceeding, and even in this action, speaks volumes.

Ms. Fontana refused to discuss the issue even at L.K.'s June 4, 2008 IEP meeting – the educational meeting that was supposed to result in an educational plan for the 2008-2009 school year.  Given the established and repeated pattern of stonewalling that appears in the record, this Court can draw its own conclusions as to whether Ms. Fontana ever lifted a finger.

On this appeal, Plaintiffs seek declaratory, reimbursement and related relief for the costs and expenses of L.K.'s unilateral educational program and placement at the Summit School for the 2008-2009 school year.  The Summit School is a state approved school that specializes in teaching and supporting children like L.K. who have been classified as "learning disabled." Plaintiffs' unilateral placement of L.K. at the Summit School with additional services was appropriate and "reasonably calculated" to provide L.K. with meaningful educational benefits. Given defendant's outrageous stonewalling and dismissive disrespect, the equities here decidedly favor plaintiffs.  This Court has broad review powers under 20 U.S.C. § 1415.  Accordingly, the SRO's decision should be reversed, this Court should find in favor of plaintiffs as to all three prongs of the *Burlington/Carter* test for reimbursement, and plaintiffs should be declared as the substantially prevailing party.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiffs respectfully refer this Court to their Local Rule 56.1 Statement of Material Facts for a full recitation of the pertinent facts and procedural history.

# ARGUMENT

## I.   THE LIMITED APPLICABILITY OF THE "DUE DEFERENCE" STANDARD

The district court is charged with making an independent decision based on the preponderance of the evidence, giving "due weight" to pure *factual* determinations made during the state administrative process. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). It is well settled that the district court's review of the record and proceedings below is in no way a *pro forma*, "rubber stamp[ing]" exercise. *See Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (*quoting Rowley*, 458 U.S. at 206, 208).

Rather, in this context, the district court satisfies its obligation to provide "due weight" to the factual determinations from below by employing "some deference" to the administrative findings. *See Walczak*, 142 F.3d at 129; *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). Moreover, "[t]he amount of weight given to the administrative proceedings is discretionary." *Wolfe v. Taconic-Hills Cent. Sch. Dist.*, 167 F.Supp.2d 530, 533 (N.D.N.Y. 2001) (*referencing Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F.Supp. 501, 507 (E.D.N.Y. 1996)).

There is, however, absolutely no "due deference" as to questions of law and statute, or mixed questions of law and fact. On those kinds of inquiries, the district court is entitled to proceed and decide *de novo*. *See J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 64-65 (2d Cir. 2000); *see also Cerra v. Pawling Central Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005). Questions of law and mixed questions of law and fact in an IDEIA case (including the core issue of whether there was a denial of a FAPE) are entitled to be reviewed on a purely *de novo* basis. The SRO should be according "due deference" only to matters of educational policy, not to credibility findings. *M.V. v. Shenendehowa Central Sch. Dist.*, No. 06 CV 0571, 2008 U.S. Dist. LEXIS

182 (N.D.N.Y., Jan. 2, 2008).  Also, this Court need not give any weight to conclusions of law concerning the interpretation of the IDEIA.  *See Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1221 (2d Cir. 1997).

In *M.H. v. N.Y. City. Dep't of Educ.*, No. 09 CV 3657, 2010 U.S. Dist. LEXIS 45400 (S.D.N.Y. May 10, 2010), this Court recently reversed the SRO because the SRO's analysis "falls far short of that warranting deference under *Gagliardo* [*v. Arlington Central School District*, 489 F.3d 105 (2d Cir. 2007)].  Therefore, the SRO's decision is not entitled to deference because … the decision was not thorough and careful.  *M.H.* at *97-98.  In addition, this Court very recently *again* reversed the SRO in *E.S. v. Katonah-Lewisboro Sch. Dist.*, No. 09 CV 4770, 2010 U.S. Dist. LEXIS 103457 (S.D.N.Y. Sep. 30, 2010).  Here too, the SRO (just like the IHO) completely glossed over the bullying and stonewalling problem at P.S. 6, as P.S. 6 was the only school placement that was ever identified and offered to L.K. for 2008-2009.  The SRO also erred in properly recognizing defendant's acts and omissions as being violative, but then doing absolutely nothing about it.

## II.   THE *BURLINGTON/CARTER* TEST FOR REIMBURSEMENT

In determining whether parents of a disabled child are entitled to reimbursement for a unilateral placement, courts look to: (1) whether the IEP (placement and program) proposed by the school district was appropriate (Prong I); and (2) whether the services provided by the parents were "reasonably calculated" pursuant to the somewhat less stringent Prong II standard applicable to unilateral placements.  *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-370 (1985); *Florence County School Dist. Four v. Carter*, 510 U.S. 7, 12-14; *Frank G. v. Bd. of Educ.*, 459 F.3d 356 (2d Cir. 2006).

On Prong II, there is no controlling test other than the Second Circuit's "reasonably calculated" test. This *prospective* analysis, one that defendant distorts with its after the fact, revisionist testimony, does *not* require a retrospective flyspecking of the child's actual progress. Moreover, the Second Circuit has recognized that the Prong II analysis is somewhat *less* stringent than the Prong I analysis, and that "least restrictive environment" considerations, even where existing, will not necessarily preclude or diminish the reimbursement claim. *Frank G. v. Bd. of Educ.*, 459 F.3d 356 (2d Cir. 2006). The parents' unilateral placement need not be perfect, and need not satisfy all of the child's educational needs.

Once the court has made a determination in favor of a child on the first two prongs, it then should determine whether equitable considerations (Prong III) still support the parents' claim, and order "appropriate" relief. *See Still v. DeBuono*, 101 F.3d 888, 891 (2d Cir. 1996) ("appropriate" relief includes "the authority to order reimbursement for expenditures made to obtain appropriate educational services").

A. PRONG I: THE SRO'S DETERMINATION THAT L.K. WAS OFFERED A FREE APPROPRIATE PUBLIC EDUCATION WAS CLEARLY ERRONEOUS

The Supreme Court held that the FAPE required by the IDEIA means an education which must be "tailored to the unique needs of the handicapped child by means of an individualized education plan." *Rowley*, 458 U.S. at 181-82; *see also M.V.*, No. 06 CV 0571, 2008 U.S. Dist. LEXIS 182. Here in New York, it is the local educational agency that has the Prong I burden. N.Y. Educ. Law. § 4404(1)(c). To provide a FAPE, a school district must comply with the procedural requirements set forth in the IDEIA, and the IEP that is developed must be "reasonably calculated" to enable the child to receive meaningful educational benefits. *Mrs. B.*, 103 F.3d 1114; *see also T.P. v. Mamaroneck Union Free Sch. Dist.*, No. 07-3705-CV, 2009 U.S.

App. LEXIS 1948 at *14-15 (S.D.N.Y. May 11, 2007) (*citing Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004).

The Supreme Court held that the FAPE required by the IDEIA means an education which must be "tailored to the unique needs of the handicapped child by means of an individualized education plan." *Rowley*, 458 U.S. at 181-82. While, concededly, not every violation is considered "material," the Supreme Court and Congress have emphasized the importance of the procedural provisions found in the IDEIA. *Rowley*, 458 U.S. at 205 ("the importance Congress attached to these procedural safeguards cannot be gainsaid").

1. *P.S. 6 WAS A HOSTILE AND POISONOUS BULLYING ENVIRONMENT AND COULD NOT POSSIBLY BE CONSIDERED FAPE FOR L.K. WHERE DEFENDANT REFUSED TO DISCUSS THE BULLYING ISSUE AND FAILED TO RELEASE THE INCIDENT REPORTS*

While the Second Circuit does not appear to have directly addressed bullying in any reported decision, the Third Circuit has held that bullying can result in a denial of FAPE. *Shore Regional High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194 (3d Cir. 2004). The Supreme Court has not yet decided a case related to bullying in the IDEA (tuition reimbursement claim) context, but its discussion of peer sexual harassment in schools, and its holding that school systems can be held liable in damages if they do not act appropriately in response to student harassment, is instructive. *Davis v. Monroe*, 526 U.S. 629 (1999). The high court used the following test to determine if the district can be held liable:

> (1) the victim was harassed on the basis of her gender; (2) the alleged harassment was so severe, pervasive and objectively offensive that it altered the condition of her education and created an abusive educational environment; (3) the school district had actual notice about the gender-related harassment; and (4) the school district was deliberately indifferent to the harassment.

*K.M. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343 (S.D.N.Y 2005) (*citing Davis*). The same standards would apply if this Court were to apply this test to a student who was

11

discriminated against because of a disability (rather than gender). This modified *Davis* test for students with disabilities was used in *Werth v. Bd. of Directors of Public Schs.*, 472 F. Supp. 2d 1113 (E.D.Wisc. 2007) (district court applied the modified *Davis* test to analyze whether the district was liable for discrimination against a student with a disability).

L.K. has a qualifying disability, and she was bullied because she was "different." As one of the SEITs testified, one of the frequent tactics of the other children was to trip her, and watch as the teacher would then "get upset with her for making a scene." Tr. 1477-78. The other children recognized that L.K.'s main deficits were in social interaction, so they acted in a way that would affect and aggravate those deficits. As for the second prong, the harassment was severe. It lasted for years, involved many of the children in L.K.'s class, and made her unwilling to go to school and negatively affected her academic and social progress. Thirdly, plaintiffs repeatedly attempted to address the bullying with various officials, including Ms. Fontana, the principal of the school, so actual knowledge is easily shown. Finally, the stonewalling-type response by the defendant's administrator at P.S. 6 (Ms. Fontana) would certainly qualify as "deliberate indifference."

In this case, defendant refused to address the bullying that plagued L.K. for two years, despite a supposed "zero tolerance" policy for bullying. *See* P-CCC. The bullying had reached a level where it was negatively affecting L.K.'s ability to be educated – L.K. frequently did not want to go to school, her academic performance was negatively impacted, and there was damage to her emotional and social well-being. These problems were even admitted by defendant's witnesses. Tr. 1358, 1364, 1375, 1412, 1416, 1472, 1477, 1478, 1473-74, 1503-04, 1536-37, 1564, 1587, 1600, 1614-15, 1696, 1697, 1706, 1717, 1732-33; *see also* P-I, P-HH, P-II, P-QQ, P-WW, P-V.

Numerous witnesses testified to the devastating and negative impact that nearly two years of bullying was having on L.K.'s social and emotional well-being, as well as on her academic performance. Dr. Packard, L.K.'s pediatrician and neurologist, testified that while L.K. was attending P.S. 6, she was concerned about L.K.'s mental health status and L.K. was doing poorly in school. Tr. 1364, 1375, 1412. Ms. Faber, L.K.'s SEIT at P.S. 6, testified that the bullying situation negatively affected L.K.'s academics, social and mental well-being and should have been addressed at the IEP meeting. Tr. 1503-04, 1536-37.

Compounding the record evincing repeated bullying and taunting of L.K., the record shows that when plaintiffs made efforts to meet with defendant's P.S. 6 administrators to discuss and address the problem, they were repeatedly stonewalled and given excuse after excuse as to why it was allegedly inappropriate or not the right time to discuss the issue of L.K.'s bullying. *See* Tr. 272-73, 278, 434, 485, 500, 831, 845, 852, 877, 963, 979, 1382-83, 1405-06, 1427, 1482-83, 1485, 1530, 1560, 1696, 1701, 1711, 1717, 1732-33; *see also* P-I, P-HH, P-II, P-QQ, P-WW. The administrators at P.S. 6 never, however, scheduled or made any time(s) to have the kind of meaningful discussion that plaintiffs were requesting. Undoubtedly, this only heightened the level of frustration and concern that plaintiffs already were then experiencing.

Plaintiffs sought to raise the bullying issue before the IEP meeting, at the IEP meeting, and even after the IEP meeting, but their concerns were never meaningfully addressed because defendant refused to discuss the issue! Plaintiffs have exhausted the administrative process. The bullying was well-known by defendant's personnel, and they were in a position to end the harassment suffered by L.K., but no action was taken. *See* P-HH, P-II, P-MM, P-WW.

Based on Ms. Fontana's testimony both during the hearing and during her deposition, it is apparent that she mightily resists characterizing any behavior as bullying. Tr. 824, 896, 1055. If

one is unable or unwilling to characterize a behavior as constituting bullying, and then repeatedly refuses to discuss the issue, it is axiomatic that there can never be a meaningful discussion about bullying.

P.S. 6 was a "toxic environment" for L.K., both for the bullying she experienced at the hands of her peers and the negative attitudes, actions and interactions of the adults in the school who were supposed to be protecting her. L.K.'s teachers at P.S. 6 did not use positive support or reinforcement with her. Tr. 1372-73, 1374, 1379. Instead, they often singled her out in the classroom. Tr. 1411. When plaintiffs tried to meet with Ms. Fontana to discuss the bullying problem, Ms. Fontana refused to have that discussion and threatened to call security! This left L.K. fearful of her school principal and very concerned about the possibility of being sent to jail.[9] Tr. 1701.

Despite all of these problems with P.S. 6, no alternative placement was ever identified and offered. Tr. 1771-72, 1778. As a matter of law and statute, the record is clear on a core Prong I issue for which defendant had the burden of proof. P.S. 6 was the only placement offered by defendant to L.K. for the 2008-2009 school year. Tr. 1771-72, 1778. Plaintiffs were not directed to any other potential sites. Tr. 1771-72, 1778. In fact, there was no one at the IEP meeting who had placement authority, despite plaintiffs' request for such a person in writing. Tr. 1803-04; see P-N, P-T. The IHO clearly erred by concluding, as she did, that "there was no recommendation for P.S. 6. The father was told he could have an alternative placement." Defendant's Answer below proves that P.S. 6 was the only school placement that was ever identified and offered to L.K. for 2008-2009. See P-B. Accordingly, the unresolved and unremediated bullying and stonewalling problems at P.S. 6 were only going to continue for L.K.

---

[9] Ironically, Ms. Fontana's pretextual excuse for refusing to discuss bullying with plaintiffs was that she did not want to have that kind of discussion "in front of" L.K. Tr. 847-48.

Plaintiffs rejected the proposed placement at P.S. 6 for 2008-2009 because of: (a) the bullying and degradation that L.K. had endured without respite during 2006-2007 and 2007-2008 and (b) the failure and refusal of P.S. 6 administrators to discuss, address and come to grips with the fact that there was a bullying problem.  Tr. 434, 485, 500, 831, 845, 852, 877, 963, 979, 1771, 1773; *See* P-I, P-HH, P-II, P-QQ, P-WW.  Given L.K.'s documented difficulties at P.S. 6 and the negative impact these difficulties were having on L.K.'s performance, such a placement could not be considered "reasonably calculated" to provide L.K. with a FAPE.

Here, the hostile environment and repeated instances of bullying were important environmental conditions of the recommended placement that were and are inextricably intertwined with the core issue of whether or not defendant offered L.K. a FAPE.  One cannot look myopically at only the "academic" program of services without also considering the attendant environmental conditions – conditions that defendant knew about.  *See* P-I, P-HH, P-II, P-QQ, P-WW.  Where, as here, defendant's P.S. 6 administrators were failing and refusing to discuss and meaningfully address and remedy the bullying, the hostile environmental conditions were not "reasonably calculated" to ever end.  Indeed, the bullying and degradation was "reasonably calculated" to *continue*, and we urge that for that reason alone, defendant failed to offer L.K. a FAPE.  To compound matters, by refusing to discuss the bullying issue, and by failing to release any of the incident reports to plaintiffs, defendant made crystal clear that the stonewalling and dismissive treatment of L.K.'s parents was only going to continue.

2. *DEFENDANT ENGAGED IN IMPERMISSIBLE PREDETERMINATION AND FAILED TO MEANINGFULLY INCLUDE PLAINTIFFS IN THE IEP DEVELOPMENT PROCESS*

The IDEIA states that "each participating agency must permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by

meeting regarding an IEP." 34 C.F.R. §300.613(a). Furthermore, parents are to be considered equal members of the IEP team for purposes of IEP development. 20 U.S.C. §1414(d)(1)(B)(i); 34 C.F.R. §300.321(a)(1). Parents are entitled to be meaningful participants throughout the entire IEP development process and the deprivation of that entitlement, as a matter of law, constitutes a FAPE deprivation. *T.P.* at *14-15 (S.D.N.Y. May 11, 2007) (*citing Deal*, 392 F.3d 840 (6th Cir. 2004) (child was deprived of a FAPE where the school district did not come to the IEP meeting with an "open mind" and had predetermined the IEP by refusing to give meaningful consideration to the parents' requests).

Here, as in *Deal*, the defendant engaged in impermissible predetermination and deprived plaintiffs of meaningful participation in the IEP development process when defendant: (a) repeatedly refused, even at L.K.'s IEP meeting, to even discuss plaintiffs' legitimate concerns about bullying and (b) failed, despite repeated parental requests, to provide plaintiffs (and the rest of the IEP team) with any incident report documentation.

The Supreme Court in *Winkelman v. Parma City School District*, 127 Sup.Ct. 1994, 1996 (2007), specifically held:

> Parents play a significant role in the development of each child's IEP. They are IEP team members, and their concerns for enhancing their child's education must be considered by the team ... The IEP proceedings entitle parents to participate not only in the implementation of IDEA's procedures but also in the substantive formulation of their child's educational program (internal citations omitted).

The Court goes into further detail:

> IDEA requires school districts to develop an IEP for each child with a disability, with parents playing a significant role in this process. Parents serve as members of the team that develops the IEP. The concerns parents have for enhancing the education of their child must be considered by the team. IDEA accords parents additional protections that apply throughout the IEP process. The statute also sets up general procedural safeguards that protect the informed involvement of parents in the development of an education for their child. See, *e.g.*, §1415(a) (requiring States to "establish and maintain procedures ... to ensure that children

with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education"); §1415(b)(1) (mandating that States provide an opportunity for parents to examine all relevant records).

*Id.* at 2000 (internal citations omitted).

The IHO erroneously held that any failure on defendant's part to provide and disclose documents to plaintiffs was *di minimus*. Ex. B, p. 28. That kind of thinking would mean that a school such as P.S. 6 would have a blank check to put parents at a decided informational disadvantage, despite the fact that parents are supposed to be "equal members" of the IEP team.[10] While not all procedural errors result in a FAPE deprivation, here defendant engaged in abominable and outrageous stonewalling-type conduct that, in essence, deprived plaintiffs of meaningful participation as equal members of the IEP team. *T.P.* at *14-15; *see also Winkelman* at 1996.

The SRO held that defendant's failure to provide plaintiffs with the repeatedly requested incident reports and other related documents *was* a violation of the IDEA, but held that this was not a denial of FAPE. Bullying, as discussed above, was a significant issue for L.K. and her parents. Plaintiffs repeatedly requested that the incident reports, and all other documents relating to L.K., be turned over before the IEP meeting. *See* P-M, P-N, P-Q, P-T. However, the disclosure did not occur until months after the documents were subpoenaed during the litigation process, and after Ms. Fontana had testified. *See* P-CCC. The only document plaintiffs received before the subpoena was a single piece of paper that had no date, author, or signature. Tr. 1722.

---

[10] On the other hand, had there been evidence that plaintiffs had been intentionally withholding reports or evaluations from defendant, defendant would have seized upon such evidence as warranting an adverse "equitable circumstances" finding against plaintiffs as to Prong III.

Even after being ordered to turn over all relevant documents, these records still appear incomplete.[11]

Since plaintiffs did not have access to these records, they were unable to adequately participate in the development of the IEP. Ms. Fontana admitted at her deposition that even the team responsible for L.K.'s behavior intervention plan was deprived of the incident report documentation. Ex. C, p. 11. This raises the violation to the level where a FAPE was denied. *See* 20 U.S.C. §1415(f)(3)(E)(ii) (2010).

We respectfully submit that defendant's intentional and deliberate refusal to provide documents to plaintiffs that were vital and relevant to the IEP process is hardly a *de minimus* error and is part of defendant's pattern of stonewalling and bullying. Such behavior is entirely consistent with a school principal who openly and repeatedly refuses to even discuss the bullying issue with parents who have that concern.

B. PRONG II: L.K.'S UNILATERAL PROGRAM AT THE SUMMIT SCHOOL WAS "REASONABLY CALCULATED" TO PROVIDE L.K. WITH MEANINGFUL EDUCATIONAL BENEFITS

The Prong II burden on parents to prove their placement is appropriate is less stringent than the Prong I requirements for the school district to provide a FAPE to a child. *See Frank G.*, 459 F. 3d 356 (2d Cir. 2006). Parents are still eligible to receive reimbursement when they choose a unilateral school that would not have met the definition of a FAPE if the placement had been recommended by the school district; in other words, the parents can be reimbursed even if the placement does not meet all of the child's special education needs. *Id.* at 364 (*citing Carter*, 510 U.S. at 14.) Where, as here, a child has been denied a FAPE, parents who are not in the

---

[11] Ms. Fontana, was deposed on October 20, 2010 regarding the incident reports. Ms. Fontana's often vague, sometimes contradictory answers, coupled with her repeated acts of stonewalling, leave plaintiffs concerned that other documents exist, despite a judicial order to produce them. *See, e.g.,* Ex. C, p. 48.

business of being professional educators necessarily will be working hard to cobble together an appropriate program. Plaintiffs did so here, and that program worked for L.K.

In *Frank G.*, the Second Circuit held that once the evidence establishes a Prong I deprivation, the unilateral placement on Prong II need *not* be perfect, need *not* meet all of the child's special education needs, and need not even be in the child's least restrictive environment. Furthermore, the Prong II unilateral placement need not even offer the child an IEP, or employ "certified" special education teachers. *See Frank G.*, at 364. In essence, "the test for the parents' private [unilateral] placement is that it is appropriate, and *not* that it is perfect." *Id.* (*referencing M.S. v. Bd. of Educ.*, 231 F.3d 96 (2d Cir. 2000), *quoting Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999)) (emphasis added). The test of appropriateness under *Frank G.* is that the placement and program are "reasonably calculated" to provide meaningful educational benefits to the child. This is essentially a prospective test.

The IHO applied an impermissibly high standard as to Prong II when she incorrectly held that because the Summit School did not provide L.K. with all of the services necessary to address all of her unique deficits, that such placement was not reimbursable under Prong II. This approach by the IHO not only (erroneously) allowed a "one size fits all" analysis - it essentially required (also erroneously we contend) - that a unilateral placement offer a "one size fits all" in terms of all the student's areas of deficit.[12] The SRO failed to even address the Prong II appropriateness of the Summit School based upon his core Prong I finding in favor of defendant.

For purposes of the "reasonably calculated" test on Prong II, the Summit School actually was (and is) a very good fit for L.K. in terms of a core school-based placement that was

---

[12] Assume, for example, that a student with an autism spectrum diagnosis required "vision therapy" among other interventions and services. Employing the IHO's wooden approach to Prong II, a school placement that was otherwise the nearest thing to perfection would be deemed as "inappropriate" if it did not also offer vision therapy. The Second Circuit's "reasonably calculated" approach to Prong II is far more elastic and forgiving than the IHO was in the case at bar.

"reasonably calculated." The program at the Summit School is a speech and language program, so L.K.'s deficits in those areas are addressed in the general curriculum, and by the extra in-school sessions she receives weekly. *See* P-TT. L.K. is also assigned a social worker at the Summit School, and received daily counseling. Tr. 1242, 1689. Plaintiffs have seen L.K. make "remarkable progress ... in all areas of her social and academic progress" at Summit. Tr. 1690.

Furthermore, the evidence showed that although the Summit School is an appropriate, core component of L.K.'s program, she still required and benefited from additional home- and community-based services, including SEIT support, speech and language therapy and occupational therapy. *See* P-P, P-Y, P-CC, P-KK. Ms. Gersh, L.K.'s home-based SEIT, testified that L.K. improved during the 2008-2009 school year with the small, more nurturing environment at the Summit School, but still requires 1:1 assistance outside of school. Tr. 1605, 1611, 1608, 1618, 1639. Ms. Lesser, L.K.'s speech and language therapist, testified that although she has noticed significant progress in L.K.'s socialization and pragmatic language, the additional speech "definitely benefits her." Tr. 1648, 1650, 1651. Ms. Rosen, L.K.'s occupational therapist, opined that L.K. still requires three hours per week of home-based occupational therapy to address her deficits. Tr. 1663. Defendant offered no evidence to rebut plaintiffs' testimony. In fact, defendant's proposed IEP for the 2008-2009 school year continued to recommend speech and language therapy, as well as occupational therapy. *See* P-D.

We urge that L.K.'s unilateral program and placement was not only "reasonably calculated" to provide L.K. with meaningful educational benefits, the evidence showed even by retrospective analysis that such placement and program did, in fact, provide L.K. with the anticipated benefits. L.K. has been quite successful in her unilateral program and placement.

C. PRONG III: THE EQUITIES DECIDEDLY FAVOR PLAINTIFFS AND SHOULD NOT PRECLUDE OR DIMINISH REIMBURSEMENT RELIEF

Once the fact finder has made a determination in favor of the parents on the first two Prongs of the *Burlington/Carter* test for reimbursement, he or she may then determine whether equitable circumstances support the parents' claims pursuant to Prong III, and order "appropriate" relief. *See Still*, 101 F.3d at 891; *see also Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000)) (noting that "[e]quitable considerations are relevant to fashioning relief under the IDEA").

Although the SRO never bothered to reach the Prong III issue, the record shows that plaintiffs cooperated with defendant. When plaintiffs did not make L.K. available for testing and observation only days before the IEP meeting, it was for legitimate reasons and not to protract the proceedings. Plaintiffs have never declined a written request for evaluation or observation. School officials are not allowed to evaluate L.K. without her parents' knowledge. Defendant attempted to schedule tests days before IEP meetings. Plaintiffs did not agree to these assessments because performing them so late would not give the defendant any time to write reports or use the testing in any meaningful way at the IEP meeting.

Reimbursement may be reduced if parents fail to give appropriate notice of their removal of the child, or engage in some other form of recognized unreasonable conduct. 20 U.S.C. §1412(a)(10); *see also Application of a Child with a Disability*, Appeal No. 06-014. This is a limitation on an IHO's ability to diminish or preclude an award for reimbursement based on equitable considerations.

The notice requirement of parents' intent to seek reimbursement for a unilateral program and placement "serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and

determine whether a [FAPE] can be provided in the public schools." *See Application of the N.Y. City Dep't of Educ.*, Appeal No. 07-032 (*quoting Greenland School Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir. 2004)). Here, plaintiffs provided sufficient notice both at the IEP meeting and in a written letter dated June 6, 2008.[13] *See* P-I, P-J. Even Petitioner's demand for due process dated June 20, 2008 <u>reiterated</u> notice to defendant. *See* P-A. Plaintiffs never received a response from defendant and defendant <u>never</u> recommended another program other than its P.S. 6 program. Tr. 1771-72, 1778, 1783.

Plaintiffs' preference for a unilateral school placement has been repeatedly not found to be a barrier to reimbursement. *See Application of a Child with a Disability*, Appeal No. 05-087 (*referencing Application of a Child with a Disability*, Appeal No. 05-070; *Application of a Child with a Disability*, Appeal No. 03-003; *Application of a Child with a Disability*, Appeal No. 02-059; *Application of the Bd. of Educ.*, Appeal No. 01-068). Even if the parent has entered into a unilateral school contract prior to the IEP meeting, this is not a bar to recovering tuition reimbursement relief. *See* Appeal No. 05-087 (*referencing Application of a Child with a Disability*, Appeal No. 03-091; Appeal No. 02-059; *Application of a Child with a Disability*, Appeal No. 99-015; *Application of a Child with a Disability*, Appeal No. 97-44). In this case, a unilateral school placement was plaintiffs' preference because they saw that nothing was being done to address the bullying of L.K. at P.S. 6, and, as was discussed above, no other placement was ever offered to plaintiffs. In these circumstances, a unilateral placement was plaintiffs' only recourse.

The IHO erroneously concluded that because plaintiffs "did not consider" any alternative public placements to P.S. 6, that the equities did not support plaintiffs' claims. This erroneously

---

[13] This was fully three weeks before the (July 1, 2008) start of the 2008-2009 school year. Accordingly, notice was timely given, and defendant failed to identify and offer L.K. a different school placement. Indeed, defendant's reaction to plaintiffs' notice letter was to do absolutely nothing.

presupposes that some alternative placement was identified and offered.  What the IHO fails to note, however, is that plaintiffs were <u>never offered any other identified placement</u> other than P.S. 6, public or otherwise.  Tr. 1771-72, 1778.   Even defendant's Answer in the underlying proceedings admits that P.S. 6 was the school that was offered to L.K. (again) for the 2008-2009 school year. *See* P-B.

It is patently unfair to put the burden on plaintiffs to "consider" mythical alternative placements that were <u>never actually identified and offered</u>.  That is the critical distinction between virtual reality and actual reality.  Here, the burden was on defendant to establish that it did, in fact, offer L.K. some other identified placement and program.  It never did.

The evidence shows that plaintiffs went into the IEP process with an open mind.  Plaintiffs' numerous (unsuccessful) attempts to discuss the bullying problem with the P.S. 6 administration and to get the incident report documentation show that they were trying to keep L.K. in a public school setting.   In this regard, it must be kept in mind that L.K. had been enduring the P.S. 6 program for years.   Plaintiffs were bending over backwards to try to keep L.K. in a public school program. Plaintiffs tried to get the administration at P.S. 6 to discuss and address the bullying problem, but they were met by repeated acts of stonewalling.  Plaintiffs did not consider moving L.K. to a unilateral placement until the second half of the 2007-2008 school year when the bullying issues were reported to be <u>escalating</u>.  Tr. 1711-12.  Plaintiffs sought reimbursement for L.K.'s unilateral program only <u>after</u> it was clear that defendant was not offering any other program than P.S. 6, and returning to P.S. 6 was not appropriate for L.K. where, as here, defendant repeatedly failed and refused even to discuss the bullying problem.[14]

---

[14] It would seem fairly axiomatic that whether one is dealing with alcoholism, drug addiction or bullying, a first step in remedying the problem would be the recognition that the problem existed.  Here, defendant refused to acknowledge the obvious and thus, it was "reasonably calculated" that the bullying and victimization of L.K. would only *continue* going into the 2008-2009 school year if L.K. should return to P.S. 6.

As the State Review Officer explicitly has held, "[i]n the absence of evidence demonstrating that the parents failed to cooperate in the development of the IEP or otherwise engaged in conduct that precluded the development of an appropriate IEP, equitable considerations generally support a claim of tuition reimbursement." *See* Appeal No. 05-087, (*referencing Application of the Bd. of Educ.*, Appeal No. 05-030; *Application of the Bd. of Educ.*, Appeal No. 04-091; *Application of a Child with a Disability*, Appeal No. 04-049).

Moreover, in determining to what extent, if any, equitable considerations should reduce or diminish any reimbursement award, the fact finder is to look at the school district's actions (and inactions) in working to offer a FAPE. *See* Appeal No. 03-003. Specifically, a school district's denial of FAPE may "rise to such a level that a parent is not to suffer the consequences for the district's violation." *Id.* (*referencing Warren G.*, 190 F.3d at 86; *Rose v. Chester Co. Intermediate Unit*, 1996 WL 238699 (E.D.Pa. 1996), *aff'd* 114 F.3d 1173 (3d Cir. 1997); *Schaffer v. Weast*, 546 U.S. 49 (2005); *Wolfe*, 167 F.Supp.2d 530, 534-35 (N.D.N.Y. 2001); *Justin G. v. Bd. of Educ.*, 148 F.Supp.2d 576, 586 (D.Md. 2001); *Eugene B. v. Great Neck Union Free School Dist.*, 635 F.Supp. 753, 759 (E.D.N.Y. 1986)). Otherwise stated, parents' actions (or inactions) may be "outweighed by actions [or inactions] taken by a school district which may have resulted in a denial of FAPE." Appeal No. 03-003.

As discussed above, defendant repeatedly failed to provide plaintiffs with documents regarding L.K. that were requested in writing. *See* P-M, P-N, P-Q, P-T. Plaintiffs only received these documents in response to a subpoena issued during the hearing. *See* P-CCC. Defendant's unreasonable and disrespectful treatment of plaintiffs continued at the IEP meeting. *See* P-J. By all accounts, the meeting was contentious. Ms. Faber, L.K.'s SEIT, testified that the principal "actually slammed her hand on the table saying that [the bullying issue] was not going to be

24

addressed and to move on with the meeting." Tr. 1485. Ms. Maloney, another SEIT, testified that she had never seen an administration act towards parents the way this administration did towards plaintiffs and her. Tr. 1561, 1573-74. On the other hand, Ms. Maloney did not recall any of the administrative personnel ever being cut off from speaking at the IEP meeting, by plaintiffs or otherwise. Tr. 1574. Plaintiffs acted reasonably under all the circumstances.

"The [IDEIA] was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives" (*Burlington*, 471 U.S. at 372) … In short, "in considering the equities the Court must not lose sight of the [IDEA]'s goal of providing a free appropriate education to all handicapped children (*Eugene B.*, 635 F.Supp. 753, 759 (E.D.N.Y. 1986))." Appeal No. 03-003. Plaintiffs' urge that the IHO erred in finding against plaintiffs as to Prong III and her decision should be reversed.

## CONCLUSION

For all the reasons set forth herein, the IHO's and SRO's Decisions should be reversed and judgment should be granted to plaintiffs. Further, plaintiffs should be declared the "substantially prevailing" party and granted leave to submit a fee application pursuant to the express fee-shifting provisions of the IDEIA.

Dated: November 17, 2010
      New York, New York

                         Gary S. Mayerson (GSM 8413)
                         Brianne N. Dotts (BD 1575)
                         Mayerson & Associates
                         *Attorneys for Plaintiffs*
                         330 West 38th Street, Suite 600
                         New York, New York 10018
                         (212) 265-7200
                         (212) 265-1735 (facsimile)
                         gary@mayerslaw.com
                         www.mayerslaw.com