

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 26 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

T.K. AND S.K., INDIVIDUALLY AND ON
BEHALF OF L.K.

                    Plaintiff-Appellant,

– against –

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                    Defendant.

---

**MEMORANDUM &
ORDER**

10-CV-00752

**JACK B. WEINSTEIN, Senior United States District Judge:**

**APPEARANCES:**

For Plaintiff:

> GARY S. MAYERSON
> Mayerson and Associates
> 330 West 38th Street, Suite 600
> New York, NY 10018
>
> BRIANNE NICOLE DOTTS
> Mayerson and Associates
> 330 West 38th Street, Suite 600
> New York, NY 10018

For the Defendant:

> Michael A. Cardozo, Corporation Counsel of the City of New York
> By: JOHN MICHAEL BUHTA, Of Counsel
>     ABIGAIL LYNNE GOLDENBERG, Of Counsel

## Table of Contents

I.  Introduction ............................................................................................................... 3

II.  Facts ........................................................................................................................... 4

   A.  Party's Contentions ............................................................................................. 4

   B.  L.K.'s Academic Program ................................................................................... 6

   C.  Evidence of Bullying .......................................................................................... 8

   D.  School's Knowledge of Bullying ...................................................................... 10

   E.  Bullying in America .......................................................................................... 11

     1.  What Constitutes Bullying ............................................................................ 13

       a.  Cyberbullying ......................................................................................... 15

       b.  Increased State Efforts to Address Bullying ........................................... 16

     2.  Distinguishing Bullying From Horseplay ..................................................... 17

     3.  How Bullying Differs Between Boys and Girls ............................................ 18

     4.  Why Kids Bully ............................................................................................ 18

     5.  Bullying and Students With Disabilities ....................................................... 21

   F.  Effects on Children ........................................................................................... 23

     1.  Victim ........................................................................................................... 24

     2.  Bully ............................................................................................................. 26

     3.  Bystander ...................................................................................................... 27

III.  Law ......................................................................................................................... 28

   A.  Summary Judgment Standard ........................................................................... 28

   B.  Obligations of Schools to Remedy Bullying .................................................... 28

     1.  Due Process ................................................................................................... 28

     2.  Guaranteed Right to Be Protected From Abuse in School ............................ 30

     3.  Title IX of the Civil Rights Act and Individuals with Disability Education Act (IDEA) ............................................................................................................ 31

   C.  IDEA and Guarantees of a Free and Appropriate Education ............................ 32

     1.  General Requirements ................................................................................... 32

     2.  Exhaustion of Administrative Remedy ......................................................... 35

   D.  Bullying and IDEA ........................................................................................... 37

     1.  Court of Appeals for the Second Circuit ....................................................... 37

     2.  Court of Appeals for the Third Circuit ......................................................... 38

     3.  Court of Appeals for the Seventh Circuit ..................................................... 39

     4.  Court of Appeals for the Ninth Circuit ......................................................... 40

     5.    Possible Legal Standards ........................................................................41

         a.    Title IX of the Civil Rights Act .............................................41

         b.    Due Process Under Section 1983...........................................43

         c.    Equal Protection Under Section 1983.....................................44

         d.    Applicable Standard................................................................45

IV.    Application of Law to Facts ............................................................................48

V.     Predetermination...............................................................................................49

VI.    Conclusion.........................................................................................................50

## I.    Introduction

This case presents the largely unresolved issue of the extent to which bullying by other students inhibits a disabled child from being educated appropriately, and what her school must do about it. A strict legal test is developed and applied.

Plaintiff L.K. acting through her parents, challenges her public school placement by the New York City Department of Education ("DOE") under the Individuals with Disabilities Education Act. After exhausting her administrative remedies, she brings this action arguing that the placement was procedurally and substantively inappropriate, and her parents seek reimbursement for private school tuition. The DOE moves for summary judgment.

The primary complaint is that L.K. was deprived of an appropriate education because her assigned public school did nothing to prevent her from being so bullied by other students as to seriously reduce the opportunity for an appropriate education. Such a contention, under the Individuals with Disability Education Act ("IDEA") provisions that require a proper school placement and appropriate education, apparently have not yet been ruled upon by the Court of Appeals for the Second Circuit. For the reasons stated below, the issue requires a court evidentiary hearing, and, a possible remand to the state authorities for a rehearing.

Access to a free and appropriate education for all students remains one of the central issues for our time. For children with disabilities, the struggle for equal access to education at

their local public schools is now decades old. Thirty-five years ago, passage of the Individuals with Disabilities Education Act required communities to provide equal access for students with special needs.

In 1970, before the IDEA's passage, United States schools provided special education to only one in five children with a disability. U.S. Dep't of Educ., *Thirty-five Years of Progress in Educating Children With Disabilities Through IDEA* 3 (2010), *available at* http://www2.ed.gov/about/offices/list/osers/idea35/history/idea-35-history.pdf. By 2008, 95 percent of children with disabilities received special education in their neighborhood public schools. *Id.* at 2. But an effective and appropriate education may be negated by child bullying. When a school fails to take reasonable steps to prevent such objectionable harassment of a student, it has denied her an educational benefit protected by statute.

No one gains from ignoring school bullying – not even the bullies themselves. The students who are bullied may suffer lasting scars in the form of an inferior education, emotional damage, and decreased self-confidence; the bullies are left to continue on a path that may lead to future violence. *See* Gayle L. Macklem, *Bullying and Teasing: Social Power in Children's Groups* 42-47 (2003) (noting that bullying may lead to sexual harassment and an increased likelihood of being convicted of a felony). Bullying and inappropriate peer harassment in its many forms provides an unacceptable toxic learning environment. For the reasons stated below defendant's motion for summary judgment is denied. Defendant's motion to dismiss plaintiff's predetermination claim is granted.

## II. Facts

### A. Party's Contentions

Plaintiff presents two arguments. First, that bullying made L.K.'s educational environment hostile – a factor not properly taken into account during the administrative process. Plaintiff's Memorandum of Law in Support of Motion for De Novo Review ("Pl's Mem. Supp. Mot. De Novo Rev.") at 11, November 17, 2010, Docket Entry No. 18.

L.K. argues that in considering bullying during the administrative review, the test for determining if a school district is liable for sexual harassment of a student developed in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) should be applied. *Id.* Plaintiff alleges that she was subjected to repeated bullying at school as a result of her disability, that the school was aware of this conduct, and that the school stonewalled her parents' attempts to address the issue, establishing its deliberate indifference. *Id.* at 12-13.

Second, L.K. contends that the school improperly predetermined her Individualized Education Plan ("IEP") and did not provide a meaningful opportunity for her parents to participate. *Id.* at 15-17. She supports this argument by pointing to the school's withholding of documents and failure to discuss bullying as it related to her IEP. *Id.*

As an initial matter, defendant urges this court to defer to the opinions rendered by the Independent Hearing Officer and the State Review Officer that L.K. was not denied a free, appropriate public education ("FAPE"). Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for De Novo Review ("Def. Mem. Opp. Mot. De Novo Rev.") at 2, Dec. 17, 2010, Docket Entry No. 29. It asserts that bullying as a denial of a FAPE is "unsupported by any law, and is not relevant . . . ." *Id.* at 6. It contends that L.K.'s parents not only had the chance to participate in developing the IEP, but they played an active role in the deliberations of the Committee on Special Education ("CSE") that developed the program. *Id.* at 11-14.

Finally, Defendant argues that the IEP was "reasonably calculated to enable the child to

receive educational benefits" and thus provided L.K. with a FAPE. Defendant's Memorandum

of Law in Support of Motion for Summary Judgment ("Def. Mem. in Supp. of Mot. Summ. J.")

at 10, November 17, 2010, Docket Entry No. 23. In particular, the DOE contends that the IEP

was likely to produce progress because it was the result of appropriate input from L.K.'s parents,

teachers and school staff and accounted for the student's performance, goals for the future, and

ways to measure achievement. *Id.* at 11-14.

The facts set out below are based on filed documents in the case. For the purposes of this

summary judgment motion, they are assumed to be true.

### B.    L.K.'s Academic Program

L.K. is a 12-year-old girl who was originally diagnosed as autistic, but has since been re-

classified as learning disabled. Pl.'s Ex. J at 36-37, 72. During the 2007-2008 school year, the

DOE placed her in a "Collaborative Team Teaching" ("CTT") classroom, which involved

teaching students who are learning disabled alongside those who are not. Defendant's Rule 56.1

Statement of Material Facts ("Def's Rule 56.1 Statement") at ¶ 2, November 17, 2010, Docket

Entry No. 22; Plaintiff's Rule 56.1 Statement of Material Facts ("Pl.'s Rule 56.1 Statement" at ¶

2, November 17, 2010, Docket Entry No. 19. To assist L.K. with her studies, she was provided a

teacher's aide on a one-to-one basis. She received additional school services including speech

therapy, occupation therapy, and physical therapy. Pl.'s Rule 56.1 Statement at ¶ 2; Pl.'s. Ex. NN

at 1; P at 1.

On June 4, 2008 a meeting was held to develop L.K.'s IEP for the 2008-2009 school

year. L.K.'s parents requested all documents used to evaluate their daughter in advance of the

meeting. Pl.'s Ex. T at 1. They were given a single piece of paper. Pl.'s Ex. O; Impartial

Hearing Officer Hearing Transcript ("IHO Tr.") 1722, Sept. 3, 2008–March 13, 2009. As a

result of the meeting the Committee of Special Education recommended that L.K. continue in the same CTT setting at the same school. The classroom would contain two teachers, one student teacher and two aides assigned to specific students other than L.K. It had a 12:1 student to teacher ratio. Pl.'s Ex. D at 1. The plan called for continued speech therapy, occupational therapy, and physical therapy. Def.'s Rule 56.1 Statement at ¶12; Pl.'s Ex. D at 1. The 2008-2009 plan was the first under which L.K. did not have a 1:1 aide at all times in the classroom. IHO Tr. 1707-08.

During this CSE meeting, L.K.'s parents sought to discuss bullying of their daughter, but were rebuffed by the school's principal. Pl.'s Ex. J at 45-46. The principal stated that it was not the appropriate time to discuss bullying, but the matter could be discussed later. *Id.*; IHO Tr. 1702-03, 1734. No future meeting was scheduled or took place. IHO Tr. 1703. L.K.'s parents contend that this failure to address their concerns is just one example of many where bullying was brought the school's attention and nothing was done. Pl's Mem. Supp. Mot. De Novo Rev. at 13.

Prior to the CSE meeting, L.K.'s parents placed a deposit to secure a place for her at the Summit School, a private institution. Pl's Ex. UU. After the IEP meeting, the parents rejected the proposed placement at P.S. 6, where L.K. had been the year before, and instead enrolled her in the Summit School. A not-for-profit organization approved by the New York State Education Department; it provides educational and therapeutic services for learning disabled students. *See* The Summit School, http://www. summitschoolqueens.com/about (last visited April 14, 2011); Def. Rule 56.1 Statement at ¶ 38; Pls. Rule 56.1 Statement at ¶ 50.

The instant action is brought to recover tuition and related expenses only for the 2008-2009 school year. Since that school year, the family has moved outside of the New York City

Department of Education District. *See* Plaintiff's Opposition to Defendant's Motion to Quash, at n. 2, Feb. 22, 2011, Docket Entry No. 37.

L.K.'s parents appealed from the DOE administrative decision to an Impartial Hearing Officer (IHO) and then to a State Review Officer (SRO). Both appellate officers sided with the DOE. *See* Part III.C.2, *infra.*

## C. Evidence of Bullying

During the 2007-2008 school year, L.K complained to her parents almost daily about being bullied at school. IHO Tr. 1706. Her father insists that this constant bullying made her "emotionally unavailable to learn." *Id.* at 1697. L.K.'s parents contend that their attempts to address the bullying issue with the school principal both in person and in writing were summarily dismissed. *Id.* at 1696-97.

Throughout the 2007-2008 school year, L.K. had one-on-one teacher's aide help in her classroom during the day. This support was supplied by two women who worked on alternate days. Both report that L.K. was ostracized in the classroom and the subject of ridicule from other students. *See* IHO Tr. 1477-85, 1555-66.

Shannon Maloney was L.K.'s teacher's aide on Tuesdays and Thursdays beginning in November 2007. When she arrived at the school, she described it as a "hostile environment" in which she was simply "just trying to get . . . [L.K.] by each day." *Id.* at 1555. Maloney reported that there was a great deal of teasing of L.K., with other children physically backing away to avoid her. *Id.* at 1556-58.

Dominique Faber was L.K.'s aide on Mondays, Wednesdays, and Fridays during the 2007-2008 school year. She testified that there was "constant negative interaction" between L.K. and other students on a daily basis. *Id.* at 1472. Other children would intentionally stay away

from L.K. and at times physically push her away for fun. *Id.* at 1472-74, 1477. "She would be tripped, where she was walking by and they would stick out their feet just to see what would happen. And then if she fell, well, then the teachers would get upset with her for making a scene." *Id.* at 1477-78.

Testimony from a substitute aide supports these contentions. Sharifa Wiggins worked as a substitute aide for L.K. four times during the 2007-2008 school year. IHO Tr. 1292, 1324. Her reaction was that "[L.K.] was isolated by girls and boys in her classroom. There was an incident in the classroom when there was a group of students at one table that [L.K.] was sitting at, where they had to write an assignment, and there was a pencil that [L.K.] touched. And for some reason, she put it down and no one wanted to touch the pencil." *Id.* at 1319. This behavior continued when L.K. tried to participate in class. "And a question was asked of the class . . . to give an opinion about a situation. And [L.K.] raised her hand and kind of people laughed at her." *Id.* at 1320-21.

Others at the school for brief periods of time noticed the same isolation. Mary Kutch, who was the director of L.K.'s school program referred to an incident where a student refused to take a paper from L.K. to grade it, requiring an aide to intervene. IHO Tr. 1454.

Specific incidents of bullying include: a drawing in the record made by a student in L.K.'s class depicting L.K. in a disparaging light; a student chasing L.K. with what he claimed was blood but was in fact ketchup; other students refusing to touch things once L.K had; and a prank phone call made to L.K.'s home, which the school was informed about. *See* Pl.'s Ex. MM; Tr. 941, 1305, 1320. No incident reports were generated by the school relating to these occurences. This lack of records is significant because it raises questions about whether the school was actually on notice, or if it was, whether it was deliberately indifferent.

9

The DOE has no incident reports of bullying where L.K. was the victim. It has, however, provided several reports where the school alleges she was the aggressor, including one where she is accused of hitting her teacher. *See* Pl.'s Ex. CCC at 9. These documents were furnished after repeated requests by the plaintiff, leading the State Review Office to find a procedural violation of the IDEA, but not one that rose to the level of a denial of FAPE.

L.K.'s parents maintain that bullying caused their daughter to resist attending school, hurt her academic performance, and damaged her emotional well-being. Pl's Mem. Supp. Mot. De Novo Rev. at 12. The DOE points to progress reports showing L.K.'s academic progress and portraying her as an enthusiastic classroom participant. Def.'s Rule 56.1 Statement at ¶ 3.

### D.    School's Knowledge of Bullying

L.K.'s parents sent several letters to her school about her being bullied, which the school principal says she responded to via telephone call. IHO Tr. 853-55, 932-34; 1695-1702; 1718. The principal recalls receiving letters from L.K.'s parents specifically reporting two acts of bullying. *Id.* at 875, 893.

During the 2007-2008 school year, L.K.'s parents brought her to the school principal's office to discuss bullying in the school. IHO Tr. at 847-48. After showing them into her office, the principal asked L.K.'s parents to have the conversation outside of L.K.'s presence. *Id.* When L.K.'s parents continued to try to discuss the matter, the principal asked them to leave. As the parent's continued to try to discuss their daughter's problem the principal opened the door to her office and said she would call security if they did not leave. *Id.*

No subsequent meeting about bullying with school personnel took place. The principal does not recall what she did to investigate any claims of bullying. IHO Tr. 851-52. ("Question: What, if anything, did you do to investigate [claims of bullying] internally? Answer: I can't

recall."). When L.K.'s parents, tried raising the issue of bullying during a meeting to set the educational plan at issue they were rebuffed. *Id.* at 876-77. The school principal did not permit this discussion because she said she thought it was not appropriate for a CSE meeting. *Id.* at 877.

Maloney, the school aide, testified that when she brought incidents of bullying to the attention of classroom teachers, it was ignored. IHO Tr. 1556-58. When trying to discuss a particular incident with the principal, Maloney says that she was turned away and told there was no time for a meeting. *Id.* at 1559.

### E. Bullying in America

Were bullying characterized as a disease affecting America's youth, a team from the Center for Disease Control charged with investigating epidemics would have been called in to study it. Joseph L. Wright, Address at *American Medical Association Educational Forum on Adolescent Health: Youth Bullying* 23 (2002), *available at* http://www.ama-assn.org/ama1/pub/upload/mm/39/youthbullying.pdf. ("If [bullying] were a medical issue, for example an infectious disease in my pediatrics practice, we would have the Epidemic Intelligence Service people from the Centers for Control and Prevention investigate it. The prevalence and epidemiology is striking."). The problem is pervasive; it is perceived by educators as serious, particularly in the middle school years. Michaela Gulemetova, Darrel Drury, and Catherine P. Bradshaw, *Findings Form the National Education Association's Nationwide Study of Bullying: Teachers' and Education Support Professionals' Perspectives, in* White House Conference on Bullying Prevention, at 11-12 (March 10, 2011), *available at* http://www.stopbullying.gov/references/white_house_conference/index.html. ("Over 40 percent of [teachers and support staff surveyed] indicated that bullying was a moderate or major problem in their school, with 62 percent indicating that they witnessed two or more incidents of bullying in the

11

last month, while 41 percent witnessed bullying once a week or more."). It is the most common type of violence in our schools. Macklem, *supra,* at 7.

The issue first seized the attention of the American public after the 1999 shooting at Columbine High School that killed fifteen students and wounded two dozen more. Susan P. Limber, *Addressing Youth Bullying Behaviors, in* American Medical Association Educational Forum on Adolescent Health: Youth Bullying 5 (2002), *available at* http://www.ama-assn.org/ama1/pub/upload/mm/39/youthbullying.pdf. As part of the investigation that followed the Columbine massacre, the Secret Service examined thirty-seven shooting incidents. They determined that in two-thirds of those cases, the shooter described feeling bullied, persecuted, or threatened at school. Bill Dedman, *Secret Service Findings Overturn Stereotypes,* Chicago Sun-Times Report, Oct. 15-16, 2000, at 9; Limber, *supra,* at 5. "I just remember life not being much fun, a shooter recalls. 'Reject, retard, loser.' I remember stick boy a lot 'cause I was so thin." Dedman, *supra,* at 9.

More recently, stories of bullied victims taking their own lives have become common. *See, e.g.,* John Schwartz, *Bullying, Suicide and Punishment,* N.Y. Times, Oct. 3, 2010, at A1 (discussing the suicides of three teens as a result of online bullying); Limber, *supra,* at 5 (noting that internationally the study of bullying was triggered by the suicides of three young boys in Norway in the 1980s). Some one third of students are engaging in aggressive behavior directed at their peers, oftentimes with the goal of increasing their popularity. Tara Parker-Pope, *Web of Popularity, Achieved by Bullying,* N.Y. Times blog, (Feb. 14, 2011, 5:03 p.m.), *available at* http://well.blogs.nytimes.com/2011/02/14/web-of-popularity-weaved-by-bullying/?scp=1&sq=Tara%20Parker-Pope%20bully&st=cse.

National leaders and educators continue to work toward a solution. President Obama held a summit and announced new federal programs that aimed at "dispel[ing] the myth that bullying is just a harmless rite of passage or inevitable part of growing up." Jackie Calmes, *Obama Focuses on Antibullying Efforts*, N.Y. Times, March 10, 2011, at A18.

Presidential summits and school shootings achieve headlines, but the day-to-day adverse affects of bullying in damaging educational opportunities to students are as real as they are unnoticed. It is a problem that affects the school performance, emotional well-being, mental health, and social development of school children throughout the United States. Tonja R. Nansel et. al., *Cross-national Consistency in the Relationship Between Bullying Behaviors and Psychosocial Adjustment*, 158 Archive of Pediatric and Adolescent Med. 730, 733-35 (2004). Whether a child is the victim, aggressor, or merely a bystander, research shows that those in a close vicinity to bullying are adversely marked. *Id. See also,* Macklem, *supra,* at 44, 90-92.

## 1. What Constitutes Bullying

Bullying is not a new phenomenon; literature is blotted with bullies, and many people have had personal experience with a schoolyard antagonist. Dan Olweus, *Bully at School: What We Know and What We Can Do* 1 (1993). The bully-victim relationship is characterized by a real or perceived imbalance of power and encompasses a variety of negative acts that are carried out repeatedly over time. *Id.* at 9; Nels Ericson, U.S. Dep't of Justice Office of Juvenile Justice and Delinquency Prevention Fact Sheet, *Addressing the Problem of Juvenile Bullying* 1 (2001), *available at* http://www.ncjrs.gov/pdffiles1/ojjdp/fs200127.pdf. Negative actions can broadly be described as inflicting or attempting to inflict discomfort upon another. Olweus, *supra,* at 9. Bullying takes three forms: physical (e.g. hitting); verbal (e.g. taunting); and psychological (e.g.

engaging in social exclusion). Ericson, *supra*, at 1. Indirect, psychological bullying, in the form of exclusion and isolation is often less visible, but not less corrosive. Olweus, *supra*, at 10.

"The consensus among physicians and social scientists, educators and youth development organizations, civil rights advocates and law enforcement is that bullying is neither inevitable nor normal . . . ." Julie Sacks and Robert S. Salem, *Victims Without Legal Remedies: Why Kids Need Schools to Develop Comprehensive Anti-Bullying Policies*, 72 Alb. L. Rev. 147, 147-48 (2009). Despite this consensus, bullying continues to occur at an alarming rate. A study by a group of psychologists provides an illustration. While observing groups of kindergarten and first grade students, researches noted an incident of bullying on the playground every three to six minutes. James Snyder et. al., *Observed Peer Victimization During Early Elementary School: Continuity, Growth, and Relation to Risk for Child Antisocial Depressive Behavior*, 74 Child Dev. 1881, 1885 (2003).

"(T)he highest prevalence of bullying is among elementary-school aged children." Gwen M. Glew et. al., *Bullying Psychological Adjustment, and Academic Performance in Elementary School*, 159 Archives of Pediatric and Adolescent Med.1026, 1026 (2005). Younger students of both sexes are the most likely to be singled out as victims. J.F. Devoe and S. Kaffenberger, U.S. Dep't of Educ., *Student Reports on Bullying: Results from 2001 School Crime Supplement to the National Crime Victimization Survey* 14 (2005), *available at* http://nces.ed.gov/pubs2005/2005310.pdf. Children who struggle academically are more likely to be victims or be both victim and aggressor. Glew, *supra*, at 1030. Bullying can be carried out by an individual or a group. Olweus, *supra*, at 9. The victim of school bullying is most often a single person. *Id.*

14

Initially, victimization is situational; "only over time does the field of children who are consistently victimized become narrowed on the basis of ongoing experience." Snyder, *supra*, at 1881; Macklem, *supra*, at 66 (finding that once a child is labeled a victim, his status within the peer group drops). This leads to a subset of children being caught up in a "vicious cycle in which victimization and maladjustment feed off one another." Snyder, *supra*, at 1881. In particular, girls who are unable to develop supportive peer relationships are at an increased risk for persistent ostracism and rejection. *Id.* at 1895.

"Youth who are victimized are likely marginalized from the mainstream peer group, lacking access to prosocial peers who provide role models of appropriate social skills, and also protection against bullying." Nansel, *supra*, at 735. The most common place for victimization in elementary school is the playground, followed by the classroom and gym class. Glew, *supra*, at 1029.

### a.    Cyberbullying

With changes in technology, the Internet has become the venue where widespread hurtful bullying is inflicted by and on young people. *See* Jan Hoffman, *As Bullies Go Digital, Parents Play Catch-up*, N.Y. Times, Dec. 5, 2010, at A1 (examining the widespread nature of bullying on the Internet and difficulties schools have in stopping it); Schwartz, *supra* (discussing the suicides of three teens as a result of online bullying).

The Internet has become a fertile area for bullying behavior. Cyber-bullying is defined as "willful and repeated harm inflicted through the use of computer, cell phones and other electronic devices." Sameer Hinduja and Justin W. Patchin, *Overview of Cyberbullying, in* White House Conference on Bullying Prevention, at 21 (March 10, 2011), *available at*



http://www.stopbullying.gov/references/white_house_conference/index.html. About 20 percent

of eleven to eighteen year-olds have been cyberbullied at some point in their lives. *Id.*

Cyberbullying differs from traditional bullying in several ways. First, a cyberbully can

attack anonymously. *Id.* at 22. Second, the bullying can go viral, with many people harassing

the same target at once. *Id.* Third, the bully does not see the emotional toll his bullying creates,

allowing the culprit to push further than he or she might in a face-to-face relationship where the

adverse effects are clearly perceived. *Id.* at 23. Fourth, many parents and teachers do not have

the technological know-how to monitor these actions. *Id.*

### b. Increased State Efforts to Address Bullying

Legislatures across the country have been taking note of the problem in schools. In

recent years, forty-five states have passed laws dealing with bullying and harassment in schools.

Arne Duncan, Secretary of Education, *Secretary of Education Bullying Law and Policy Memo*,

Dec. 16, 2010, *available at* http://www2.ed.gov/policy/gen/guid/secletter/101215.html. In

September 2010, New York's Dignity for Students Act was enacted; it goes into effect in July

2012. *See* New York Education Law, §§10-17 (2010) (protects students against discrimination

on the basis of race, color, nation of origin, ethnic group, religion, disability, sexual orientation,

or gender). *See also,* New York Civil Liberties Union, *The Dignity For All Students Act* (2010),

*available at* http://www.nyclu.org/files/publications/OnePager_DASA.pdf. The Act requires

incidents of bullying to be reported to the state Department of Education on at least an annual

basis and the development of appropriate codes of conduct. *Id.* at §12. ("No student shall be

subjected to harassment by employees or students on school property or at a school function; nor

shall any student be subjected to discrimination based on a person's actual or perceived race,

color, weight, national origin, ethnic group, religion, religious practice, disability, sexual

16

orientation, gender, or sex by school employees or students on school property or at a school function."); *Id.* at §13 ("The board of education and the trustees or sole trustee of every school district shall create policies and guidelines that shall include, but not be limited to . . . [p]olicies intended to create a school environment that is free from discrimination or harassment . . . ."); *Id.* at §15 ("The commissioner shall create a procedure under which material incidents of discrimination and harassment on school grounds or at a school function are reported to the department at least on an annual basis . . . . "). *See also,* Erin Cargile, *Lawmakers Move Education Bill Forward,* Austin News, April 14, 2011, *available at* http://www.kxan.com/dpp/news/texas_lege/Lawmakers-move-bullying-bill-forward.

### 2. Distinguishing Bullying From Horseplay

Every disagreement among children does not amount to bullying. "What distinguishes bullying from other forms of childhood aggression, whether a hard-fought basketball game or rough-and-tumble play, is unequal and coercive power." Philip C. Rodkin, *Bullying and Children's Peer Relationships, in* White House Conference on Bullying Prevention, at 33 (March 10, 2011), *available at* http://www.stopbullying.gov/references/white_house_conference/index.html. *See also,* Olweus, *supra,* at 10 ("It must be stressed that the term bullying is not . . . used when two students of approximately the same strength . . . are fighting or quarreling."). Increased power need not be actually present, but there must be at least a perceived advantage for the bully either physical or psychological. *Id.*; Bonnie Bell Carter and Vicky G. Spencer, "The Fear Factor and Students With Disabilities," 21 Int'l J. of Special Educ. 11, 12 (2006).

The bully-victim connection can be viewed as the opposite of a healthy peer relationship. Peers are equals on the same social standing, while a bullying nexus lacks equality of standing.

Rodkin, *supra*, at 33. It is the inequality, abuse, and unfairness associated with bullying that makes it incompatible with what we conceive of as the appropriate "American character." *Id.*

### 3.     How Bullying Differs Between Boys and Girls

Children of both genders experience the gamut of bullying behavior. Olweus, *supra*, at 18. Boys are more likely to bully and to be bullied than girls. *Id.* When they do bully, boys are inclined to engage in direct bullying such as hitting or taunting, while bullying among girls most often takes the indirect forms of social exclusion or rejection. *Id.;* Macklem, *supra*, at 55; Devoe, *supra,* at 4. Boys physically striking one another and girls harassing with their words has become "an accepted part of peer culture." Rodkin, *supra*, at 35. Girls often bully by slandering a classmate, spreading rumors about her, and manipulating friendships to harass their target. Olweus, *supra*, at 19. Because bullying among girls is most often more subtle, it is underreported. Macklem, *supra*, 55. Girls know that these actions are "mean," but they are unlikely to report them as bullying. *Id.* Such harassment enables the bully to have "power over others by controlling relationships and friendships." Macklem, *supra*, at 56. This form of bullying brings with it the ability to damage the victim's reputation or status within the peer group. *Id.* It is a behavior among girls developed early. Children are able to use this method as early as five years old, and as they get older continue to rely on it. *Id.* at 57. This may be because it is the most effective and tolerated form of bullying. *Id.* "Girls use relational bullying earlier than boys, which may be due to the more sophisticated nature of relational aggression." *Id.* at 60.

### 4.     Why Kids Bully

Children interact in various settings: school, home, church, neighborhoods. Within each there are risk factors. Swearer, *supra*, at 3. How children interact in these various backgrounds

helps to define bullying and why children engage in it. *Id.* "There is no one single causal factor for bullying." *Id.*

When asked why certain children are selected for ridicule, students typically point to external differences such as "obesity, red hair, an unusual dialect, or wearing glasses." Olweus, *supra*, at 30. Research does not support this conclusion. *Id.* The one external characteristic that is likely to play a role in whether a male child will be bullied is lack of physical strength. *Id.* This does not hold true for girls, however, who are more likely to bully those who are actually physically stronger than they are. Macklem, *supra*, at 55. Differences among students in areas such as religion, disability, or ethnicity have the ability to affect the struggle for power among young people and lead to a student being singled out as an object of harassment. Rodkin, *supra*, at 35.

Several other factors play a major role in determining what makes students more likely to bully. One is the climate of the school. When a school is not supportive or is negative, bullying thrives. Swearer, *supra*, at 5. When teachers downplay bullying or view it as kids being kids, bullying rates are higher. Macklem, *supra*, at 27-29.

One study suggests that the aura of the school with respect to bullying has more to do with whether bullying occurs than the behavior of the victim. *Id.* at 26. The school's atmosphere includes the disciplinary system, preventive policies, the architecture of the building itself, resources, support services, and morale. *Id.* School control is at its worst when staff and dominant students model this behavior, bullying is ignored or reinforced, or it is accepted as normal and expected. *Id.*

Parents play a role in determining whether someone is likely to bully. Bullies tend to come from homes with "low cohesion, little warmth, absent fathers, high power needs [that]

19

permit aggressive behavior, physical abuse, poor family functioning, and authoritarian parenting. [Those who are both bully and victim] come from families with physical abuse, domestic violence, hostile mothers, powerless mothers, uninvolved parents, neglect, low warmth, inconsistent discipline, and negative environment." Swearer, *supra*, at 6. *See also,* Macklem, *supra*, at 15-20 (discussing the potential correlation between family environment and bullying.)

Bullying may also be the result of a life cycle where students believe it is simply their turn to play the abusing role. Kathy Liguori, *Time to Get to the Heart of Bullying*, Newsday, March 21, 2011, at A36 (quoting a student who explained he was bullying a younger student because he thought it was his turn to do so). Children use bullying to demonstrate to their peer group that they are able to dominate. Olweus, *supra*, at 35; Macklem, *supra*, at 38-39; Rodkin, *supra*, at 33. In this way, bullying becomes a social event where the dominance of the bully is put on display for an audience. Research demonstrates that in 90 percent of observed cases, a bully was playing to an audience. Rodkin, *supra*, at 36. *See also*, Deborah A. Pepler et.al., *Peer Process in Bullying*, in *Handbook of Bullying in Schools: An International Perspective* 472 (2010) ("Even though a vast majority of students report that they find it unpleasant to report bullying, the vast majority of bullying episodes have an audience."). "Thus the problem of bullying is also a problem of the unresponsive bystander, whether that bystander is a classmate who finds the harassment to be funny, or a peer who sits on the sidelines afraid to get involved, or an educator who sees bullying as just another part of growing up." Rodkin, *supra*, at 36.

For those students who are connected with their social group, bullying serves as a way to control their peers. *Id.* at 33. For those bullies who are excluded by their peers, bullying represents a way to lash out at a social system that keeps them on the periphery. *Id.* A majority

of bullies who are marginalized are male; students being controlled by their peer group are evenly split between both genders. *Id.* at 34.

These bullies who are integrated within their peer social groups are easy to ignore or mischaracterize – leading two researchers to describe them as "hidden in plain sight." *Id.* at 36. They have a variety of friends and possess strengths such as good social skills, athleticism, and attractiveness. *Id.* at 34.

Culture is weighty in determining why someone will bully. Television, video games, and the Internet may be linked to increased aggression and an increased likelihood for bullying behavior. Macklem, *supra*, at 21-23. These influences, if they have any affect at all, are not as strong as other cultural influences such as the neighborhood and the environment in which the child is raised. *Id.* at 24.

### 5. Bullying and Students With Disabilities

The United States Department of Education has defined disability harassment as "intimidation or abusive behavior based on disability that creates a hostile environment." U.S. Dep't of Educ., Reminder of Responsibility Under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act July, 25 2000, *available at* http://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html (hereinafter DOE Reminder of Responsibilities Letter). Studies have shown that students with a disability, whether it is visible or non-visible, are subject to increased bullying that is often directed at the disability. John Young, Ari Ne'eman, and Sara Gelser, *Bullying and Students With Disabilities*, *in* White House Conference on Bullying Prevention, at 74 (March 10, 2011), *available at* http://www.stopbullying.gov/references/white_house_conference/index.html. These students are also at more risk for bullying directed at factors other than their disability. *Id.* at 77. Harassing

21

conduct may take many forms, including verbal acts and name-calling, as well as nonverbal behavior, such as graphic written statements, or conduct that is physically threatening, harmful, or humiliating. DOE Reminder of Responsibilities Letter, *supra.*

Overall, students with disabilities are less popular, have fewer friends, and struggle more with loneliness and peer rejection, increasing the likelihood they will become the victim of bullying. Carter, *supra*, at 12-21 (noting a study that indicated child with even mild learning disorder had fewer friends and another that indicated those who are bullied are more likely to be alone at play time); Young, *supra*, at 74 ("Many students with disabilities have significant social skills challenges, either as a core trait of their disability or as a result of social isolation due to segregated environments and/or peer rejection. Such students may be at particular risk for bullying and victimization."). Students who suffer from learning disabilities and emotional disorders often lack social awareness, which makes them more vulnerable. Carter, *supra*, at 12. Other research concludes that disabled students themselves are more likely to perpetuate bullying behavior in response to being bullied. Swearer, *supra*, at 4.

Despite an increased focus in recent years on instructing special education students in general education classrooms, there has not been a corresponding concern about the way these children integrate socially in the classroom. Carter, *supra*, at 11. Without healthy social interaction, students with disabilities become targets of harassment.

One study found that four factors were predictive of a student being bullied: 1) receiving extra help in school; 2) being alone at playtime; 3) having fewer than two friends; and 4) being male. *Id.* at 14. While disabled students often receive extra help, they sometimes struggle to make friends. In one study, learning disabled children reported that they were threatened,

22

assaulted, or had their possessions taken away from them with greater frequency than non-learning disabled students. *Id.* at 18.

Some states have recognized that students who suffer from a learning disability are at a greater risk for bullying than their non-disabled peers and that IEPs should take this into account. In passing a comprehensive law dealing with school bullying, Massachusetts recently adopted the following requirement:

> Whenever the evaluation of the Individualized Education Program team indicates that the child has a disability that affects social skills development or that *the child is vulnerable to bullying*, harassment or teasing *because of the child's disability*, the Individualized Education Program shall address the skills and proficiencies needed to avoid and *respond to bullying*, harassment or teasing.

Mass. Senate No. 2404 (2010) (emphasis added).

Massachusetts Advocates for Children sought to determine how often children along the autism spectrum are harassed at school. Eighty-eight percent of those parents who responded indicated their child was bullied while at school. Massachusetts Advocates for Children, *Targeted, Taunted, Tormented: the Bullying of Children with Autism Spectrum Disorder* 2 (2009), *available at* http://www.massadvocates.org/documents/Bullying-Report.pdf. (finding that verbal harassment was the most common form reported at 88.7 percent).

### F.    Effects on Children

If nothing is done to rectify the situation, a bully is likely to continue bullying and victimization continues. Olweus, *supra*, at 27. Thus, without a change in the dynamic, a child who suffers at the hands of a tormentor, is unlikely to be able to escape. And the effects of bullying are likely to continue unabated. *Id.* at 28. Each child can be bully, victim, or bystander. And with each of those labels comes different, but often related consequences.

### 1. Victim

The typical victim of bullying is more anxious and insecure than her peers. Olweus, *supra*, at 32. She is more likely to be quiet, sensitive, and have low self-esteem. *Id.* It is important to note, however, that not all victims react in the same way. Macklem, *supra*, at 63.

"Students who are bullied in schools have no escape from bullying other than feigning illness and staying home which is a very temporary reprieve." *Id.* at 61. Not surprisingly, being a victim is most strongly associated with a feeling that one did not belong at school and an increase in the classroom days missed. *Id.* at 70; Glew, *supra*, at 1030. "Feeling as though one did not belong at school was most strongly associated with being the victim; the odds of members of this group being a victim were 4.1 times higher than those who felt they belonged at school" Glew, *supra*, at 1030. "For students who felt sad most days, their odds of being a victim were 1.8 times higher than the odds of being a victim among those who did not feel sad most days." *Id.* Being sad most days is known to be a precursor to diagnoses of major depression. *Id.*

"The take-home message is that elementary school-aged children…who struggle academically are more likely to be victims or bully-victims." *Id.* (defining a "bully-victim" as one who both is the victim of bullying and the bully at different times). Bullying brings with it a whole host of other issues. It impairs concentration and leads to poorer academic performance. *Id.* Additionally, victims are more likely to engage in antisocial behavior, have increased health problems, and struggle to adjust emotionally. *See* Macklem, *supra*, at 68 ("Being the victim of bullying is related to sliding grades, absenteeism, poor academic achievement, being lonely, exhibiting withdrawal behaviors, difficulty acting assertively, or being aggressive."); Snyder, *supra*, at 1881, 1887; Nansel, *supra*, at 733-34 ("Youth involved in bullying – as bully, victim,

or both – consistently reported significantly higher levels of health problems, poorer emotional adjustment, and poorer school adjustment than non-involved youth. Victims and bully victims also consistently reported significantly poorer relationships with classmates than uninvolved youth.")

Victims who are friends of a non-victim peer are less likely to internalize problems such as feelings of depression and sadness. Rodkin, *supra*, at 36. Even children as young as those in first grade who have one friend and do not suffer in isolation, have fewer problems than children who have no peer to rely upon. *Id.* "The victims are lonely and abandoned at school. As a rule, they do not have a single good friend in their class." Olweus, *supra*, at 32. This solitude perpetuates feelings of shame and unattractiveness, and a belief that the victim is stupid. *Id.*

Children with feelings of rejection and loneliness, withdraw and have trouble making new friends. Macklem, supra, at 68. "Withdrawal because a child is rejected by peers places the child at a greater risk [of isolation] than is the case for children who prefer to play alone or who are socially anxious." *Id.* Victims have lower self-esteem and begin blaming themselves for what is happening. *Id.* at 69 ("Self-esteem drops once a child becomes a victim....They blame themselves for being victimized, and give in quickly or respond in a disorganized manner when they are teased or bullied."). "Self-views are unlikely to change for the better, unless the child who has been victimized becomes more accepted in the group." *Id.*

The end of school does not bring an end to the damage done by years of harassment. As a result of this trapped setting, where harassment is a repeated occurrence, victims carry lasting emotional and psychological scars into adulthood. *Id.* at 68 (citing Olweus study that found those who were bullied for at least three years in grades six through nine had higher rates of depressive symptoms and lower self-esteem when they were twenty-three years old.)

25

## 2. Bully

Not surprisingly, a bully is likely to have an aggressive attitude. Olweus, *supra*, at 34. He will probably have a positive attitude toward violence and a strong self-image. *Id.* Typically, he will be of average popularity and often will be surrounded by a small group of friends who support him. *Id.* at 35.

"The bullies don't do well later on." Macklem, *supra*, at 42. Despite his center position in the school social hierarchy, the impact of being the bully will leave a lasting adverse mark. Perpetrators of bullying report being sad most days, and have somewhat the same depressive symptoms as victims. Glew, *supra*, at 1030 ("Students who felt unsafe and sad most days had 2.5 and 1.5 times the odds of being a bully . . . "). Bullies themselves typically have more health problems and a poorer emotional adjustment than students not involved in bullying. Nansel, *supra*, at 733-34; Macklem, *supra*, at 43; Glew, *supra*, at 1031.

Females who bully are more likely to have hostile inter-personal interactions in their adulthood. Macklem, *supra*, at 43. They also may have more trouble adjusting to the role of parent than students who were not bullies. *Id.*

Bullying behavior may simply be the beginning of an antisocial behavioral pattern that will endure during the tormentor's entire life. *Id.* at 42. Those students who start bullying early on in their academic lives are more likely to assault or sexually harass their classmates in high school. *Id.* As young people continue to grow up, bullying may be a precursor to violence in dating. *Id.* at 43.

"Bullies and bully-victims [but not victims] consistently reported significantly more frequent alcohol use." Nansel, *supra*, at 734; Olweus, *supra*, at 35-36 ("Bullying can also be viewed as a component of a more generally antisocial and rule-breaking ('conduct disordered')

behavior pattern. From this perspective, it is natural to predict that youngsters who are aggressive and bully others, run a clearly increased risk of later engaging in other problem behaviors such as criminality and alcohol abuse. A number of recent studies confirm their general prediction.") Additionally, bullies are more likely than non-bullies to commit a felony in the future. Olweus, *supra*, at 36; Macklem, *supra*, at 44 (finding in one longitudinal study that "[b]ullying was clearly a precursor to later violent behavior for this group, although, of course, not all bullies would persist along this pathway toward violence"). In one study, 60 percent of boys identified as bullies in grades six to nine had at least one conviction by age 24, and 35 to 40 percent of them had three or more convictions. Olweus, *supra*, at 36. This is a four-fold increase in the level of criminality over that of non-bullies. Victims had an average or below-average chance of engaging in future criminality. *Id.*

"Chronic bullying has a cost for society as well as for the individual and, of course, the victim." Macklem, *supra,* at 43. The children who they harass are left to try to move on after years of uncontroverted harassment. The bullies themselves, through their own actions, are then more likely to require social services, educational services, and criminal justice services. *Id.*

### 3. Bystander

Bullies typically operate in front of a crowd, and the students who act as onlookers do not escape the effects of bullying. These students, who often watch, or even step away from the bullying actions, are more likely to feel powerless and to be fearful at school. Macklem, *supra*, at 91-92. Bystanders feel as though they are incapable of controlling the situation, and thus are not themselves safe. *Id.* at 91.

Students may go along with the group in the bullying behavior out of fear that if they were to speak up they might lose their space within the peer group and open themselves up to be

the next victim. *Id.* As time goes on, if bulling persists at a high level, bystanders become desensitized and are less willing to step in to prevent the harassment. *Id.*

## III. Law

### A. Summary Judgment Standard

Summary judgment in an IDEA case is "more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009). A district court must base its decisions on the preponderance of the evidence and give due weight to the prior administrative proceedings. *Id.*

While the parties may call an IDEA action a motion for summary judgment, it is in substance an appeal of an administrative determination. *Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005). The court is not ruling in a typical summary judgment setting, but instead it is determining whether the administrative record, combined with additional evidence taken, establishes compliance with the IDEA. *Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F.Supp. 501, 508 (E.D.N.Y. 1996). ("[S]ummary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions where, as here, in addition to the record at the administrative level, 'additional evidence' is submitted to the court. The inquiry, however, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.").

### B. Obligations of Schools to Remedy Bullying

#### 1. Due Process

28

The central question raised by this case is what actions, if any, a school is required to take to stop bullying of disabled students. Generally, the Due Process Clause of the Constitution does not require that the state "protect the life, liberty, and property of its citizens against invasion by private actors." *Deshaney v. Winnebago County Dep't of Soc. Services,* 489 U.S. 189, 195 (1989). The Due Process Clause forbids the state from itself depriving citizens of those rights, but it does not require the state to provide aid, even when it may be necessary. *Id.* at 195-96. ("The Clause is phrased as a limitation of the State's power to act, not as a guarantee of certain minimal levels of safety and security....Its purpose was to protect the people from the State, not to ensure that the state protected them from each other.").

Nevertheless, there are limited circumstances where the state has created a danger or has a special relationship with an individual, when it will be required to protect a person's right to personal inviolability from private or public abuse. *See Estelle v. Gamble,* 429 U.S. 97 (1976) (holding that a state is required to provide medical care to incarcerated individuals); *Youngberg v. Romeo,* 457 U.S. 307 (1982) (holding that the state must provide involuntarily committed mental patients with services that insure their reasonable safety). *See also, Yin Jin Gang v. City of New York*, 996 F.2d 522, 533-35 (2d Cir. 1993) (explaining the difference between claims that arise out of a special relationship and those that arise when the state has created the danger). If it removes an individual's ability to care for himself, "it is only just that the state be required to care for him." *Deshaney,* 489 U.S. at 198-99 (quoting *Estelle,* 429 U.S. at 103-104).

The Court of Appeals for the Second Circuit apparently has not squarely been presented with a claim that by failing to prevent harm to a student in their care, school officials have violated substantive due process. *DiStiso v. Wolcott,* No. 3:05-cv-1910, 2010 WL 4365670, at *20 (D. Conn. Oct. 19, 2010); *Bungert v. City of Shelton,* No. 3:02-CV-01291, 2005 WL

29

2663054, at *4 (D. Conn. Oct. 14, 2005). Where such claims have been brought elsewhere, they have not been successful. *See, e.g. Hasenfaus v. LaJeunesse*, 175 F.3d 68, 71-74 (1st Cir. 1999) (rejecting due process claim and finding a lack of a constitutional duty to protect. Noting that the court was "loath to conclude now and forever that inaction by a school toward a pupil could never give rise to a due process violation....perhaps in narrow circumstances there might be a 'specific' duty."); *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997) (relying on *Deshaney* to find that a school had no duty to protect a student in its care).

Where an elementary school student is required to attend school, and truancy laws forcing attendance are in effect, that student may be "owed *some* duty of care." *Pagano v. Massapequa Pub. Schs.*, 714 F.Supp. 641, 643 (E.D.N.Y. 1989) ("We consider elementary school students who are required to attend school, the truancy laws still being in effect, to be owed *some* duty of care by defendants which may or may not rise to the level required . . . ."). (emphasis in original).

The Court of Appeals for the Second Circuit has considered involuntary custody sufficient for a finding of a special relationship. *Matican v. City of New York*, 524 F.3d 151, 156 (2d Cir. 2008) ("Our own opinions have also focused on involuntary custody as the linchpin of any special relationship exception.").

It is uncertain whether under the Due Process Clause, a public school has the duty to protect an elementary school student from bullying where truancy laws are in effect. This question need not be answered now since students have a right to be secure in school and schools have a duty to prevent students from harassment under IDEA and Title IX.

### 2.     Guaranteed Right to Be Protected From Abuse in School

Students can find a right to "be secure and to be let alone" in Supreme Court school First Amendment jurisprudence. *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969); *see also*, Daniel B. Weddle, *You're On Your Own, Kid....But You Shouldn't Be*, 44 Val. U. L. Rev 1083, 1090 (2010). *Tinker* addressed the question of when a school could discipline a student for private expression. In assessing the claim, the Supreme Court ruled that the proper test is whether the student's expression created a material or substantial disruption of school work or infringed on a student's right to be let alone. 393 U.S. at 508, 512-13.

First Amendment cases have held that "there is no constitutional right to be a bully." *Sypniewski v. Warren Hills Reg.l Bd. of Educ.*, 307 F.3d 243, 264 (3d Cir. 2002). "Intimidation of one student by another, including intimidation by name calling, is the kind of behavior school authorities are expected to control or prevent." *Id.* One First Amendment case found that the right to be let alone includes the right to be free from physical intrusions as well as psychological attacks. *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178 (9th Cir. 2006), *vacated as moot*, 549 U.S. 1262 (2007) ("Public school students who may be injured by verbal assaults on the basis of a core identifying characteristic such as race, religion, or sexual orientation, have a right to be free from such attacks while on school campuses. As *Tinker* clearly states, students have the right to be secure and to be let alone. Being secure involves not only freedom from physical assaults but from psychological attacks that cause young people to question their self-worth and their rightful place in society.") (internal quotations and citation omitted).

### 3. Title IX of the Civil Rights Act and Individuals with Disability Education Act (IDEA)

Title IX, IDEA, and Section 504 of the Rehabilitation Act place upon schools the affirmative duty to address bullying and harassment. The United States Department of

Education has been advising schools of their obligations, and possible liability under these statutes, for at least ten years. DOE Reminder of Responsibilities Leter, *supra*. "Where the institution learns that disability harassment may have occurred, the institution must investigate the incident(s) promptly and respond appropriately." *Id.*

Section 504 of the Rehabilitation Act is distinct from the Individuals with Disability Education Act, but both statutes require the same outcome – recipients of federal funds must provide students with a free, appropriate public education. *See* 29 U.S.C. §701(c); *McAdams v. Bd. of Educ. Of Rocky Point Union Free Sch. Dist.*, 216 F. Supp.2d 86, 93 (E.D.N.Y. 2002) ("the ADA and the Rehabilitation Act claims seek relief for the alleged failure to provide [the student] with appropriate educational services. The IDEA is precisely intended to remedy these types of claims.").

Proof of a violation of Section 504 requires a plaintiff to prove: 1) a disability; 2) that the defendant was subject to the relevant statute; and 3) that plaintiff was denied an opportunity to benefit scholastically because of the disability. *See E.H. v. Bd. of Educ. of Shenendehowa Cent. Sch. Dist.*, No. 08-4857-cv, 2009 WL 3326627 at * 4 (2d Cir. Oct. 16, 2009). Guidance provided under Section 504 is applicable to IDEA.

### C. IDEA and Guarantees of a Free and Appropriate Education

#### 1. General Requirements

IDEA provides procedural and substantive safeguards for special education children with respect to the education programs tailored for them. The requirements in New York are well established. The precise scheme governing students with special needs in New York was recently summarized as follows:

> "Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public

education [('FAPE')]."" *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); *Bd. of Educ. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). "To meet these requirements, a school district's program must provide special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Id.* (quoting *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted)). "Such services must be administered according to an [Individualized Education Plan ('IEP')], which school districts must implement annually." *Id.* The IEP is "[t]he centerpiece of the IDEA's educational delivery system." *D.D. ex rel. V.D. v. N.Y. City Bd. of Ed.,* 465 F.3d 503, 507 (2d Cir. 2006). It is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *Id.* at 508 (quoting *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). "The IEP must provide 'special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits.'" *A.D. & M.D. ex rel. E.D. v. Bd. of Ed.,* No. 08 Civ. 9424, 2010 WL 447371, at *2 (S.D.N.Y. Feb. 9, 2010) (quoting *Gagliardo,* 489 F.3d at 107). Substantively, the IEP must be "likely to produce progress, not regression, and [must] afford[] the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 254 (2d Cir. 2009).

New York "has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts." *Gagliardo,* 489 F.3d at 107 (quoting *Walczak,* 142 F.3d at 123). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Id.* at 107-08. "[T]he CSE must also be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities to the maximum extent appropriate alongside their non-disabled peers." *Id.* at 108.

"New York parents who disagree with their child's IEP may challenge it in an 'impartial due process hearing' before an

[impartial hearing officer ('IHO') ] appointed by the local board of education." *Id.* (citations omitted). The IHO's decision may be appealed to a State Review Officer ("SRO"), "and the SRO's decision in turn may be challenged in either state or federal court." *Id.* The district court may "receive the records of the administrative proceedings" and also "hear additional evidence." 20 U.S.C. § 1415(i)(2)(C). It conducts a "modified de novo" review of the administrative proceedings, *M.N. v. N.Y. City Dep't of Educ.,* --- F.Supp.2d ----, No. 09 Civ. 20, 2010 WL 1244555, at *4 (S.D.N.Y. Mar. 25, 2010), and must base its determination "on the preponderance of the evidence," § 1415(i)(2)(C). The court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education when a school district fails to provide a FAPE." *Forest Grove Sch. Dist. v. T.A.,* --- U.S. ----, 129 S.Ct. 2484, 2492, 174 L.Ed.2d 168 (2009); *see Sch. Comm. of Burlington v. Dep't of Ed. of Mass.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (holding that IDEA authorizes reimbursement).

*M.H. and E.K. v. New York City Department of Education,* 712 F. Supp. 2d 125, 130-131 (S.D.N.Y. 2010); *M.S. v. New York City Dep't of Educ.,* 734 F. Supp. 2d 271, 273-74 (E.D.N.Y. 2010).

Parents have a right to be involved in the decision-making process regarding their child's IEP. Specifically, they must be given an opportunity to participate in meetings regarding the education of their child and must be part of a group that makes decisions about that educational placement. 20 U.S.C. § 1414(e); 34 C.F.R. § 300.501(b)(1)(i); 34 C.F.R. § 300.501(c)(1). Educational placement refers to the individualized education plan developed and not a specific location or program. *K.L.A. v. Windham Southeast Supervisory Union,* No. 08-1225-cv, 2010 WL 1193082, at *2 (2d Cir. Mar. 30, 2010).

IDEA has four purposes: 1) assure that children with disabilities have a free appropriate education, which emphasizes special education and related services designed to meet their unique needs; 2) assure that the rights of children with disabilities and their parents are protected; 3) assist states and local governments in providing education of all children with disabilities; and

4) assess and assure the effectiveness of efforts to educate all children with disabilities. *See P.L. 94-142* (1975); *U.S. Dep't of Educ., Thirty-five Years of Progress in Educating Children With Disabilities Through IDEA* 5 (2010) (discussing the purpose of statue when it was passed); 34 C.F.R. § 300.1.

If the state fails to provide a free and appropriate public education, parents may enroll their child in a private school and seek reimbursement. *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006). When an IEP is inappropriate, the parents of the child have the burden of proving their alternative placement was appropriate. *Id.* The question posed is whether the private placement is reasonably calculated to enable a child to receive an appropriate educational benefit, which was not accorded in the public schools. *Id.* at 364.

## 2.    Exhaustion of Administrative Remedy

Before a district court may exercise subject matter jurisdiction over an IDEA case, a plaintiff must first exhaust the administrative process. *See* 20 U.S.C. §1415(f); *Smith v. Guilford Bd. of Educ.*, No. 06-1094-cv, 2007 WL 1725512, at *5 (2d Cir. June 14, 2007); *Polera v. Bd. of Educ.*, 288 F.3d 478, 483 (2d Cir. 2002). A plaintiff need not pursue administrative remedies if doing so would be futile, or if the administrative process would not provide an appropriate remedy. *Id.*

Here, administrative remedies have been exhausted.

L.K.'s parents filed an administrative appeal of the June 4, 2008 IEP to an independent hearing officer arguing that the placement of L.K. in a CTT classroom at P.S. 6 was inappropriate. The IHO found that the school had complied with both the procedural and substantive requirements of the IDEA. Impartial Hearing Officer Op. at 26-31, July 21, 2009. The hearing officer determined that the IEP was reasonably calculated to enable the student to

receive educational benefits and thus denied the appeal. It found that the issue of bullying did

not bear on the appropriateness of the education program and related services, but rather on

whether the particular location was appropriate – and thus touched upon a different issue. *Id.* at

27. ("In this case, the issue of bullying is really a separate issue since it does not go to the heart

of whether the CTT program and related services recommended on the IEP were appropriate. At

best, it places in question the location of where such educational programs and related services

should be provided to the child.")

      L.K. next appealed the decision of the IHO to the State Review Officer. The SRO

affirmed the IHO ruling, finding that the educational plan was designed to confer appropriate

educational benefits on L.K. State Review Officer Op. at 24, Oct. 22, 2009.

> I find that the hearing record demonstrates that the district's
> recommended fourth grade CTT class included many of the
> programmatic elements that the student's private neurologist,
> school-based SEIT, and private speech-language pathologist
> testified were necessary for the student to learn and that the
> district's recommended program was designed to confer
> educational benefits to the student . . . .

*Id.*

The hearing officer passingly referred to the issue of bullying in his decision. SRO Op. at 20,

24-26. When bullying was discussed the focus was on how the student had been progressing

academically despite these claims of bullying. *Id.* at 24-26. Ultimately, the SRO determined

that bullying did not deprive L.K. of a FAPE, though no specific test appears to have been used

in arriving at this conclusion. *Id.* at 26.

> Although the student's school-based SEIT testified that following
> incidents of inappropriate school interactions in the schoolyard and
> classroom, the student's demeanor would decline and she then had
> a harder time attending to class tasks and would focus on what
> happened, I find that the hearing record does not support a finding
> that these incidents rendered the recommended CTT program for

the 2008-2009 school year inappropriate to meet the student's
needs.

*Id.*

### D. Bullying and IDEA

While the general requirements of IDEA are well established, the question of whether

bullying can be grounds for finding that a school district deprived a student of a free and

appropriate education is an open question in the Second Circuit. There is, however, some

indication from this circuit's court of appeals that it might be willing to extend FAPE protections

to bullying. *See Smith v. Guilford Board of Education,* No. 06-1094-cv, 2007 WL 1725512 (2d

Cir. June 14, 2007). Three other circuit courts of appeals have expressly noted that bullying can

be a basis for denial of a FAPE, but a common framework under which to analyze the issue has

not emerged. *See M.L. v. Fed. Way. Sch. Dist.,* 394 F.3d. 634 (9th Cir. 2005); *Shore Regional*

*High Sch. Bd. of Ed. v. P.S.,* 381 F.3d 194 (3d Cir. 2004); *Charlie F. ex rel. Neil F. v. Bd. of*

*Educ.,* 98 F.3d 989, 993 (7th Cir. 1996). *See also,* Note, "Deliberately Different: Bullying as a

Denial of a Free Appropriate Public Education Under the Individuals with Disabilities Education

Act," 43 Ga. L. Rev. 191 (2008).

### 1. Court of Appeals for the Second Circuit

In *Smith v. Guilford Board of Education,* the Second Circuit Court of Appeals vacated the

district court's granting of a motion for summary judgment in a FAPE case where the allegations

involved a diminutive student being bullied. No. 06-1094-cv, 2007 WL 1725512 (2d Cir. June

14, 2007). The court reasoned that the district court had "failed to consider whether Plaintiffs

sufficiently alleged a violation of the student's *statutory* right to a FAPE; instead, the court

considered his right to a FAPE only to the extent that it might constitute a property interest

protected by procedural due process." *Id.* at *4. Though the student did suffer from attention

deficit hyperactive disorder, his complaint alleged that the bullying was the result of his diminutive size, and not his learning disability. *Id.* at *5. The court found that it was unable to determine whether and to what extent liability may arise out of behavior unrelated to a student's disability because the student's education plan was not before it. *Id.* It suggested that liability might be founded on disability. *Id.* ("The underlying events described in the amended complaint…surround [the student's] diminutive stature, not his ADHD. Because [the student's] individual education plan is not before us on this appeal from the granting of a Rule 12(c) motion, we are unable to determine whether and to what extent liability may arise from conduct unrelated to the triggering disability under the IDEA.").

### 2. Court of Appeals for the Third Circuit

In finding that a student was denied a free and appropriate public education due to bullying, the Court of Appeals for the Third Circuit did not provide the rubric under which it analyzed the plaintiff's claims. *See Shore Regional High Sch. Bd. of Ed. v. P.S.*, 381 F.3d 194 (3d Cir. 2004). Instead it looked at the alleged conduct to find that the lack of a school environment free from harassment was grounds for finding a denial of FAPE. *P.S.*, 381 F.3d at 197, 201-202.

P.S. was socially isolated from his classmates and the victim of relentless physical and verbal abuse. *Id.* at 195. The focus of ridicule was P.S.'s perceived effeminate nature and lack of athletic prowess. *Id.* A long list of derogatory words were directed to P.S. Many times the words turned into violence. *Id.* When new students came to school, they were told not to associate with him. When P.S. sat down for lunch at a table, he quickly found himself sitting alone. *Id.* The school administration was informed, but nothing happened. Ultimately, after an IEP was developed that would have sent P.S. back to school with the same bullies who had

tormented him, P.S.'s parents sent him to another school and sought reimbursement for their expenses. *Id.* at 196.

The appellate court credited an administrative law judge's assessment that P.S. was deprived of a FAPE because of legitimate and real fears that harassment would continue in the future. *Id.* at 197. Conclusive testimony at the administrative hearing established that the school "would not have been able to remedy the problem because, among other things, the same bullies would be present at [the school]; bullies generally do not stop on their own; even 'intensive interventions' are often not effective when they are not begun until after a course of harassment has continued for some time . . . ." *Id.* at 201. In reaching its conclusion, the court recognized, but did not consider, knowledge of the school district. It did note the improved educational performance of P.S. upon switching schools, but it did not expressly factor this into its decision. Instead, as a basis for reversing the district court, it relied on a lack of due weight given to expert testimony. *Id.* at 199.

Some commentators have pointed to the *P.S.* case as the model for the IDEA being used to protect children with disabilities from harassment in their schools. Paul M. Secunda, *At the Crossroads of Title IX and a New "IDEA": Why Bullying Need Not be "A Normal Part of Growing Up" for Special Education Children*, 12 Duke J. Gender L. & Pol'y 1 (2005). It is a model in need of a rule under which to analyze future claims.

### 3. Court of Appeals for the Seventh Circuit

The Seventh Circuit Court of Appeals found that "at least in principle" harassment can be a denial of a FAPE. *Charlie F.*, 98 F.3d at 993. The case involved a teacher who invited students to list their complaints about another student, which led to his loss of confidence, self-esteem, and fistfights. *Id.* at 990. The court was unable to delve deeper into the merits of the claims

because the parents bringing the case on behalf of the child had not exhausted their administrative remedies. *Id.* at 993. ("Both the genesis and the manifestations of the problem are educational; the IDEA offers comprehensive educational solutions; we conclude, therefore, that at least in principle relief is available under the IDEA.... The case is remanded with instructions to dismiss for failure to use the IDEA's administrative remedies.").

### 4. Court of Appeals for the Ninth Circuit

The Court of Appeals for the Ninth Circuit has developed a test, which asks whether a teacher was deliberately indifferent to bullying and the abuse so severe that a child can derive *no* educational benefit. *M.L.*, 394 F.3d at 650. ("If a teacher is deliberately indifferent to teasing of a disabled child and *the abuse is so severe that the child can derive no benefit* from the services that he or she is offered by the school district, the child has been denied a FAPE.") (emphasis added). The court based its reasoning on the gender discrimination case of *Davis v. Monroe County Board of Education,* 526 U.S. 629 (1999), but seemingly modified *Davis* by requiring a finding that *no* educational benefit was received. In *Davis*, the test required a showing that harassment bars access to an educational opportunity or benefit. *Id. See also* Part III.D.5.a., *infra* for a discussion of *Davis*.

The student involved in *M.L.* only remained in his elementary school for five days, which failed to give the school a chance to remedy the teasing. *Id.* at 651. Additionally, the court found that the plaintiff had not demonstrated that the bullying interfered with his education. *Id.* (describing testimony that the student was "happy as a little lark").

This test is too rigid and too narrow. It fails to acknowledge that a student may have her academic success stunted as a result of harassment, but still achieve some success. A student

who received some educational benefit despite bullying might have received more if not faced with the serious obstacle of peer harassment.

### 5. Possible Legal Standards

In recent years, stories of bullying have led to claims under state and federal law with limited success. *See* Susan L. Pollet, *Bullying in Our Schools: Is there any Legal Help in Sight?*, N.Y.L.J. 4, col. 4, (May 3, 2007). Students have unsuccessfully brought cases under Title IX, substantive due process, equal protection, and state tort law. *See* Sacks and Salem, *supra*; Daniel B. Weddle, *Bullying in Schools: The Disconnect Between Empirical Research and Constitutional, Statutory, and Tort Duties to Supervise*, 77 Temp. L. Rev. 641 (2004). Part of the problem has been the way courts have looked at these issues as incident based rather than as institutional deficits:

> Current legal theories and approaches to bullying suffer from a common flaw: they view bullying from an incident-based perspective rather than from a school culture perspective. They focus on what school officials knew about a specific bullying incident rather than addressing what school officials have done to ensure a culture where bullying is unacceptable to everyone in the school. A serious gap exists between what educational research reveals about bullying prevention and what the law defines as adequate supervision. As a result, victims are left without protection in schools they must attend; and then, under both state and federal law, they are left without redress when their tormenters inflict serious and long-lasting injury.

Weddle, *supra*, at 658-59.

Because the federal appellate courts have not articulated a uniform test, legal theories used in the context of Title IX, substantive due process and equal protection must be examined to test their applicability in determining if bullying can be a basis for a denial of a FAPE.

### a. Title IX of the Civil Rights Act

Students' claims of sexual harassment under Title IX against schools are analyzed under a test developed in *Davis v. Monroe*, which requires an examination of the basis for the harassment, its severity and whether the school had actual notice. *Davis*, 526 U.S. at 640-53. A plaintiff is required to prove 1) that she was harassed due to her gender; 2) that it was severe, pervasive and objectively offensive so that it altered her education; 3) the school district had actual notice of the gender-based harassment; and 4) the school was deliberately indifferent to the harassment. *Id. See also, Doe v. East Haven Bd. of Educ.*, No. 05-2709-cv, 2006 WL 2918949, at *1 (2d Cir. Oct. 10, 2006).

At least two district courts have modified this test and applied it to situations where students are being abused in school because of their disabilities. This modified test requires an inquiry into whether: 1) the plaintiff is an individual with a disability who was harassed because of that disability; 2) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive environment; 3) the defendant knew about the harassment; and 4) the defendant was deliberately indifferent to the harassment. *See Werth v. Bd. of Dirs. of Pub. Schs.*, 472 F. Supp.2d 1113, 1127 (E.D. Wisc. 2007); *K.M. v. Hyde Park Cen. Sch. Dist.*, 381 F. Supp. 2d 343, 358-60 (S.D.N.Y. 2005). *See also* Secunda, *supra*, at 14.

Deliberate indifference requires a finding that the state entity had actual knowledge of the harassment and failed to respond adequately. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750 (2d. Cir. 2003). ("[Plaintiff] must also provide evidence that one or more of the individual defendants, who admittedly are vested with authority to address the alleged discrimination and to institute corrective measures on [plaintiff's] behalf, had actual knowledge of the discrimination and failed adequately to respond.") (internal quotations and citations omitted). In applying

*Davis*, the Court of Appeals for the Second Circuit has stated that a school's failure to respond to sexual harassment must be "clearly unreasonable in light of known circumstances." *D.T.* v. *Summers Cent. Sch. Dist.*, No. 08-6207-cv, 2009 WL 3316419, at *2 (2d Cir. Oct. 15, 2009) (quoting *Davis,* 526 U.S. at 648). The deliberate indifference of the school must cause students to be harassed or make them more vulnerable to such conduct. *D.T.,* 2009 WL 3316419, at *2.

The principles behind this Title IX test are applicable to the case at hand. But they must be interpreted to comport with IDEA, a distinct statute designed to protect student learning opportunities. Reliance on the expert guidance provided to school districts by the Federal Department of Education is appropriate. *See* references to United States Department of Education directives in Part III.D.5.d., *infra.*

### b. Due Process Under Section 1983

The right to be free from unjustified intrusions on personal security is a historic liberty protected by the Due Process Clause of the Fourteenth Amendment. *Ingrham v. Wright*, 430 U.S. 651, 673 (1977); *Matican v. City of New York*, 524 F.3d 151, 155 (2d. Cir. 2008) ("Among the liberties protected by the Due Process Clause of the Fourteenth Amendment is a right to be free from . . . unjustified intrusions on personal security.") (internal quotations and citation omitted). This right must be examined in light of *DeShaney*, which does not require the government to protect against intrusions from third parties absent a special relationship or state created danger. *See DeShaney*, 489 U.S. at 196; Part III.B. 1., *supra.*

Merely proving an obligation is not enough to state a claim under Section 1983, but it is a predicate for doing so. The plaintiff must also prove that the behavior at issue was "so egregious, so outrageous, that it may fairly be said to shock the contemporary consciousness." *Matican*, 524 F.3d at 155 (quoting *County of Scaramento v. Lewis*, 523 U.S. 833, 448 n.8

(1998)). This rigorous standard assures that the Constitution is not demoted to the equivalent of tort law. *Id.*

In *Smith*, a student was persistently harassed and bullied by other students. 2007 WL 1725512 at *1. The school board knew about some or all of the abuse. The Court of Appeals for the Second Circuit described this type of abuse as "highly unfortunate," but not "so brutal and offensive to human dignity as to shock the consciousness." *Id.* at 2 (quoting *Smith v. Half Hollow Hills Cent. Sch. Dist*, 298 F.3d 198, 173 (2d Cir. 2002)). Most importantly, while deciding *Smith* the court distinguished a due process property interest from an IDEA statutory interest. *Id.* at 4. To rely on the due process test would make indistinguishable L.K.'s property interest in education and her statutory rights to a free appropriate education -- a notion the Court of Appeals for the Second Circuit rejected.

### c. Equal Protection Under Section 1983

The Equal Protection Clause requires that similarly situated people be treated alike. *Prestopnik v. Whelan*, No. 06-3186-cv, 2007 WL 2389678, at *2 (2d Cir. Aug. 17, 2007). Such a claim may be the result of membership in a protected class or result from an individual being a member of a class of one. *Id.* To succeed on an equal protection claim in the harassment context, a student must show that he was afforded a lower level of protection as opposed to other students, and that this lower level of protection was the result of his disability. *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996) (finding a reasonable fact-finder could determine that a student was denied Equal Protection due to harassment based on his gender and homosexuality); Weddle, *supra*, at 670-72 (referencing cases where students have brought Equal Protection claims as a result of bullying and finding that students often are unable to demonstrate

44

that they are part of an identifiable class or that inaction was the result of membership in that class).

A student seeking to succeed on a claim of violation of the Equal Protection Clause against a school district must show that the harassment was the result of a government custom, policy, or practice. *Fitzgerald v. Barstable Sch. Com.*, 129 S. Ct. 788, 797 (2009) (distinguishing sexual harassment claims brought against a school under Title IX of the Civil Rights Act and similar claims brought against the school under Section 1983 for Equal Protection).

Applying this test to bullying under the IDEA suffers from inadequacies similar to those in applying the test developed under Due Process. To adopt it would take an IDEA violation outside of the realm of its statutory protections and into that of more difficult to prove constitutional violations.

### d. Applicable Standard

The applicable standard should take into account administrative advice that has long been given to schools in how to apply the IDEA and other child protective legislation. By giving weight to this guidance, the expectations of the parties are not upset, and precise notice of expected conduct is provided. To that end, under IDEA the question to be asked is whether school personnel was deliberately indifferent to, or failed to take reasonable steps to prevent bullying that substantially restricted a child with learning disabilities in her educational opportunities.

This standard does not impose a new obligation on schools. For at least ten years the Department of Education has informed schools that they are legally obligated to comply with it.

> A school is responsible for addressing harassment incidents about which it knows or reasonably should have known. In some situations, harassment may be in plain sight, widespread or well-known to students and staff, such as harassment occurring in

45

> hallways, during academic or physical education classes, during extracurricular activities, at recess, on a school bus, or through graffiti in public areas. In these cases, the obvious signs of the harassment are sufficient to put the school on notice. In other situations, the school may become aware of misconduct, triggering an investigation that could lead to the discovery of additional incidents that, taken together, may constitute a hostile environment.

U. S. Dep't of Educ., Office of Civil Rights, Dear Colleague Letter: Bullying and Harassment, at 2 (Oct. 26, 2010), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf (hereinafter DOE Bullying and Harassment Letter).

Earlier, the Department of Education had advised schools that "[w]hen disability harassment limits or denies a student's ability to participate in or benefit from an educational institution's programs or activities, the institution must respond effectively. Where the institution learns that disability harassment may have occurred, the institution must investigate the incident promptly and respond appropriately." DOE Reminder of Responsibilities Letter, *supra.*

Conduct need not be outrageous to fit within the category of harassment that rises to a level of deprivation of rights of a disabled student. The conduct must, however, be sufficiently severe, persistent, or pervasive that it creates a hostile environment. *Id.* Where a student is verbally abused repeatedly and suffers other indignities such as having his property taken or is struck by his fellow students, and a school does nothing to discipline the offending students despite its knowledge that the actions have occurred, the student has been deprived of substantial educational opportunities. *Id.*

The rule to be applied is as follows: When responding to bullying incidents, which may affect the opportunities of a special education student to obtain an appropriate education, a school must take prompt and appropriate action. It must investigate if the harassment is reported

to have occurred. If harassment is found to have occurred, the school must take appropriate steps to prevent it in the future. These duties of a school exist even if the misconduct is covered by its anti-bullying policy, and regardless of whether the student has complained, asked the school to take action, or identified the harassment as a form of discrimination. *Compare,* DOE Bullying and Harassment Letter, *supra, to Werth v. Bd. of Dirs.of Pub. Schs.,* 472 F. Supp.2d 1113, 1127 (E.D. Wisc. 2007); *K.M. v. Hyde Park Cen. Sch. Dist.,* 381 F. Supp. 2d 343, 358-60 (S.D.N.Y. 2005) (citing *Davis,* 526 U.S. at 640-53).

It is not necessary to show that the bullying prevented all opportunity for an appropriate education, but only that it is likely to affect the opportunity of the student for an appropriate education. The bullying need not be a reaction to or related to a particular disability.

In its October 2010 Bullying and Harassment letter, the Department of Education provides an illustration of when a school is required to act, and what type of response is required. It is useful in applying the above test. A hypothetical student with a disability is verbally teased by other students and on one occasion is tackled, hit with a binder, and has his personal affects thrown in the garbage. DOE Bullying and Harassment Letter at 8-9. The student approaches teachers and guidance counselors who suggest counseling, but they do nothing to punish the bullies. *Id.* The bullying then continues and the student, who was once doing well, begins showing the signs of victimization at the hands of other children. *Id.* at 9. The school in this hypothetical responded in part to the bullying, in offering the student counseling to deal with what he was going through. But it did not respond adequately. It did not fully investigate the bullying or punish those who were perpetrating the harassment. In this example, the school deprived the student of his educational benefit.

47

## IV. Application of Law to Facts

T.K. has provided evidence of each element of the test. First, her parents have produced witnesses who have testified that L.K., a disabled student, was isolated and the victim of harassment from her peers. The school denies these allegations. The IHO erred in finding that bullying went to placement and not to the adequacy of a program, and in making judgment about the veracity of the witnesses' accounts. A fact finder could conclude on this record that L.K. was the victim of bullying.

Second, the parents allege that they sent letters and tried to speak to the principal about the issue. There is evidence on both sides. The principal acknowledged knowing about an incident of bullying but cannot recall what she did to investigate it. She admits receiving letters that reveal incidents of bullying. She acknowledges asking L.K.'s parents to leave a meeting designed to discuss concerns about bullying. This meeting was never rescheduled. Aides who helped L.K. state that they tried to bring the bullying to the attention of their superiors but were ignored. No determination was made by the IHO about whether school personnel had notice of substantial bullying.

Third, L.K. presents evidence that could reasonably be construed as proving the school's failing to take reasonable steps to address the harassment. The school has not provided documentation that it either investigated claims of bullying or took steps to remedy the conduct. This evidence was not touched upon by the fact finder.

Fourth, L.K.'s parents state that she withdrew emotionally, did not want to go to school, and suffered social scars as a result of the bullying. The school district refutes this by pointing to academic progress for L.K. Whether the harassment rose to a level that deprived L.K. of an educational benefit was not decided in the administrative hearings. A student is not required to

prove that she was denied all educational benefit. She may not be deprived of her entire educational benefit, but still may suffer adverse educational effects as a result of bullying. *See* DOE Reminder of Responsibilities Letter, *supra* ("Harassment of a student based on disability *may decrease* the student's ability to benefit from his or her education and amount to a denial of FAPE."). To be denied educational benefit a student need not regress, but need only have her educational benefit adversely affected. *Id.*

Academic growth is not an all-or-nothing proposition. There are levels of progress. A child may achieve substantial educational gains despite harassment, and yet she still may have been seriously hindered. Growth may be stunted providing an education below the level contemplated by IDEA. In New York, IEP's are required to give children more than an opportunity for just "trivial advancement." *Mamaroneck Union Free Sch. Dist.,* 554 F.3d at 254. The law recognizes that a student can grow academically, but still be denied the educational benefit that is guaranteed by IDEA. Where bullying reaches a level where a student is substantially restricted in learning opportunities she has been deprived a FAPE. Whether bullying rose to this level is a question for the fact finder.

The suggestion that the rule applied here will open the floodgates to litigation since bullying is so pervasive in our schools is rejected. First, this test requires that a student have a disability since recovery is under the IDEA. Second, this test merely requires schools do what the Department of Education has told them to do for years. Application of the test is unlikely to substantially increase the cost of special education.

These are the same concerns faced when the Supreme Court found in *Davis* that a school can be responsible for failing to remedy sexual harassment. There, the Court acknowledged the burdens placed on school administrators, but stated "the standard set out here is sufficiently

49

flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action." *Davis*, 526 U.S. at 649.

The IHO and the SRO both touched upon the issue of bullying, but they did not apply the proper standard. The IDEA gives a court broad authority to grant appropriate relief. *See Forest Grove Sch. Dist.*, 129 S.Ct. at 2492. The motion of defendant for summary judgment dismissing the case is denied.

## V.     Predetermination

There was no error in the IHO and SRO rejection of L.K.'s contention that her IEP was predetermined, and her parents did not have an opportunity to take part in the creation of her plan. L.K.'s parents did have a chance to take part in the special education committee meeting that developed her IEP. The transcript of this meeting shows that there was a meaningful discussion about what was the best plan for L.K. Experts stated their professional opinions about what was needed for L.K. to have the best chance of developing academically. *See* Pls. Ex. J (eighty-one page transcript of the discussion that took place during L.K.'s IEP meeting). Changes to L.K.'s plan did in fact take place during this meeting. At the request of L.K.'s parents, it was during this meeting that she was reclassified from autistic to learning disabled. Pls. Ex. J at 72.

Defendant's motion to dismiss plaintiff's claim for predetermination without an opportunity for her parents to be heard is granted.

## VI.     Conclusion

The motion of the defendant for summary judgment is granted in part and denied in part.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: April 25, 2011

Brooklyn, New York