# MAYERSON & ASSOCIATES

330 WEST 38TH STREET, SUITE 600 • NEW YORK, NEW YORK 10018
PHONE (212) 265-7200 • FAX (212) 265-1735 • EMAIL:GARY@MAYERSLAW.COM

### WWW.MAYERSLAW.COM

GARY S. MAYERSON, PRINCIPAL
TRACEY SPENCER WALSH, PARTNER

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JUL 2 0 2012  ★

July 17, 2012

**VIA REGULAR MAIL**

BROOKLYN OFFICE

Hon. Jack B. Weinstein, U.S.D.J.
United States District Court, E.D.N.Y.
225 Cadman Plaza East
Brooklyn, New York 11201

F + 1)
ju 7|19|12

> **Re:**   **T.K., et al. v. N.Y. City Dep't of Educ.**
> **10 Civ. 752 (JBW)(ALC)**

Dear Judge Weinstein:

We assume that Your Honor is aware of the full page treatment that the New York Post gave to Your Honor's May 25, 2011 Decision in the above matter in its 7/15/12 Sunday edition (copy enclosed). We declined to be interviewed as to this matter, as it is still active and pending at the administrative levels, following Your Honor's remand order. For the same reason, we declined an interview yesterday to ABC News. This case and Your Honor's landmark decision are entirely newsworthy, but we do not wish to try this matter in the media.

The Post article is missing the following status update that we provide to Your Honor.

By Decision dated June 6, 2012 (copy enclosed), the IHO, following a ten day remand trial, held that there _was_ *repeated* bullying of L.K. over a period of two school years, and that the defendant (the New York City Department of Education) refused to ever *acknowledge* that there was any bullying problem, much less take any steps to address or remediate the hostile environment at P.S. 6. However, despite this core finding, the IHO concluded (once again) that there was no resulting FAPE deprivation. Accordingly, in order to "exhaust the administrative remedy," plaintiffs have filed a further appeal petition to the State Review Officer (SRO) and those appeal papers also are enclosed.

Based upon Mr. Buhta's reported comments in the Post article, we will all undoubtedly be back before Your Honor soon enough.

Sincerely,

Gary S. Mayerson

cc:   John Buhta, Esq (via regular mail without attachments)
      T.K., et al. (via email)

8

nypost.com

New York Post, Sunday, July 15, 2012

# IT'S 'TEASE'Y MONEY

## Taxpayers must foot bill for bullied kids' tuition

**EXCLUSIVE**

By SUSAN EDELMAN

Schools that fail to stop bullying may soon give taxpayers a financial beating.

A New York judge has ruled that a 12-year-old girl who was tormented at highly rated PS 6 on the Upper East Side may have been deprived of her educational rights — and the city could be on the hook for her $40,000 annual tuition at a private school.

The landmark ruling, if upheld, could be "fiscally disastrous" for the city, one expert said, noting it opens the door to millions in claims from special-ed and even nondisabled students who want to go to private school because they are bullied.

The precedent-setting case centers on a learning-disabled girl who suffered constant abuse from classmates. They laughed when she raised her hand and refused to touch pens or paper she had handled. They also handed her a crude drawing of her that they marked with words like "ugly" and "smelly."

They pushed and tripped her "for fun." One kid chased the girl with ketchup, telling her it was blood.

But PS 6 Principal Lauren Fontana, told of such incidents by classroom aides, allegedly did nothing — and refused to discuss the bullying with the girl's parents. They finally put their distraught daughter in the Summit School in Queens, a state-approved private school.

The parents have demanded that the city Department of Edu-



**HARD KNOCKS:** A young girl transferred out of PS 6 (above) to escape classmates' tormenting, which included the caricature at right. The city may now have to pay for her private schooling.

cation pay them $40,000 for the girl's year at Summit before the family moved to another school district in the state.

The DOE reimburses about $235 million a year in private-school tuition to parents who prove public schools did not adequately serve their kids with disabilities — but never before because of bullying.

The ruling by Brooklyn federal Judge Jack Weinstein paves the way for payment in such cases.

"When a school fails to take reasonable steps to prevent such objectionable harassment of a student, it has denied her an educational benefit protected by statute," he wrote.

Weinstein has sent the case back to a DOE hearing officer to find whether bullying occurred and what, if anything, was done about it before he decides on the payment.

The precedent could cost the city millions. About 200,000 of the city's 1.1 million public-school kids get special-ed services.

"Most special-ed students are bullied in school. They make up the biggest percentage of bullying victims in the US," said Parry Aftab, a lawyer and national bullying expert.

Weinstein's ruling could also open the floodgates beyond special ed, Aftab said. "Schools can be liable for not addressing bullying or cyberbullying for all students, and parents can sue for money damages," he said.

In the Weinstein case, the girl, identified as "L.K.," was originally diagnosed with autism. During the 2007-08 school year at PS 6 — where affluent Upper East Side parents raise hundreds of thousands of dollars a year for extras — she was put in a team-teaching classroom that mixed learning-disabled students with those who were not.

She was given a one-on-one teacher's aide, along with speech, occupational and physical therapy.

The city insists the girl received a "free and appropriate public education," the legal standard and vows to fight the parents' push for payment.

"The DOE takes claims of bullying extremely seriously and works hard to make each school a safe and positive learning environment," assistant city attorney John Buhta said in a statement to The Post.

susan.edelman@nypost.com



## Big special-ed tab

Several thousand learning-disabled city students get reimbursed by taxpayers for private educations after their parents contend public schools do not meet their needs.

The cost of such "Carter cases" jumped from $144 million in 2009 to $235 million last year, the Independent Budget Office says.

They stem from a 1993 US Supreme Court ruling for a South Carolina girl, Shannon Carter, who was failing in public school. Her parents put her in a private school, where she thrived, and sued for tuition.

More city parents are following suit.

Private-school tuition ranges from $30,000 to six figures, depending on the disability. Parents also collect legal fees.

In 2007, the high court ruled the city had to pay Tom Freston, the multimillionaire Viacom CEO, $37,000 a year for his son's private school, even after he refused a placement in a top public school.

A bill on Gov. Cuomo's desk could cost taxpayers more. It would require "home life and family background" be considered in special-ed placements.

Critics say parents could cite food or clothing customs to argue religious schools better serve their kids.   Susan Edelman

---

## Subway grope suspect grabbed

It was underground justice caught on video.

Good Samaritans got hold of an alleged groper and held him until police arrived to cuff his filthy paws, cops said.

Victor Sigler, 30, allegedly touched a 35-year-old woman's butt as they left a

northbound G train at Lorimer Street at about 9:45 p.m. Friday, then tried to flee by hopping a Manhattan-bound L.

But the woman — yelling, "He groped me! He groped me!" — and a pal chased after him, and some straphangers

forced him off the train.

Another rider caught it all on his cellphone camera and uploaded it to YouTube — and Sigler can be seen giving his captors the finger.

He was arrested and charged with forcible touching.   Rebecca Harshbarger

## River tragedy kills boy, 10

A 10-year-old boy died after falling into the Harlem River yesterday, officials and witnesses said.

Ebrima Wally and a friend were standing on the edge of the water in Roberto Clemente Park in The Bronx near River Park Towers at 6:10 p.m.

and throwing rocks into the water when Ebrima slipped.

"They were on the other side of the gate," said Steven Pullen, 14. "Everyone started screaming and ran towards them."

After Ebrima fell in, his pal went after him, but was

unable to bring him to shore.

About 20 minutes later, FDNY diver pulled Ebrima. The child was rushed to Bronx Lebanon Hospital where he died about an hour later.

Kenneth Gar

# FINDINGS OF FACT AND DECISION

**Case Number:** ████████

**Student's Name:** L██ K███████

**Date of Birth:** October 5, 1998

**District:** 2

**Hearing Requested By:** Parent

**Date of Hearing:** June 8, 2011
July 13, 2011
September 21, 2011
September 22, 2011
October 5, 2011
October 6, 20111
December 2, 2011
December 21, 2011
February 6, 2012
May 21, 2012

**Actual Record Close Date:** May 30, 2012

**Hearing Officer:** Judith T. Kramer, Esq.

Hearing Officer's Findings of Fact and Decision                                    1

Case No.: ████████

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 8, 2011

For the Student:
GARY MAYERSON, Attorney
████████████ Parent

For the Department of Education:
STACY FARACI, Attorney
DANIELLE SKOLNIK, Attorney
CHARLES CROWLEY, Attorney
JOHN BUDITA, Attorney

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JULY 13, 2011

For the Student:
GARY MAYERSON, Attorney
████████████, Parent
████████████, Attorney

For the Department of Education:
JOHN BUHTA, Assistant Corporation Counsel
STACEY FARACI, Attorney
MARISSA VASSERI, Special Education Teacher
CHARLES CROWLEY, Attorney

## NAMES AND TITLES OF PERSONS WHO APPEARED ON SEPTEMBER 21, 2011

For the Student:
GARY MAYERSON, Attorney
TRACEY WALSH, Attorney
████████████, Parent
DR. ANNE MULDOWNEY, School Psychologist-P.S. 206

For the Department of Education:
STACEY FARACI, Attorney
CHARLES CROWLEY, Attorney,
JOHN BUHTA, Assistant Corporation Counsel

## NAMES AND TITLES OF PERSONS WHO APPEARED ON SEPTEMBER 22, 2011

For the Student:
GARY MAYERSON, Attorney
TRACEY WALSH, Attorney
RICK EISMAN, Social Worker

Hearing Officer's Findings of Fact and Decision                              2

Case No.: ▮▮▮▮

For the Department of Education:
CHARLES CROWLEY, Attorney
STACEY FARACI, Attorney
JOHN BHUTA, Assistant Corporation Counsel

NAMES AND TITLES OF PERSONS WHO APPEARED ON OCTOBER 5, 2011

For the Student:
GARY MAYERSON, Attorney
▮▮▮▮▮▮, Parent

For the Department of Education:
CHARLES CROWLEY, Attorney
STACEY FARACI, Attorney
JOHN BHUTA, Assistant Corporation Counsel
AMY SANTUCCI, Assistant Principal-PS-6

NAMES AND TITLES OF PERSONS WHO APPEARED ON OCTOBER 6, 2011

For the Student:
GARY MAYERSON, Attorney
▮▮▮▮▮▮, Parent
MELANIE SHER, Teacher

For the Department of Education:
JOHN BHUTA, Attorney
CHARLES CROWLEY, Attorney
STACEY FARACI, Attorney

NAMES AND TITLES OF PERSONS WHO APPEARED ON DECEMBER 2, 2011

For the Student:
For the Department of Education:
STACEY FARACI, Attorney
CHARLES CROWLEY, Attorney
JOHN BUHTA, Attorney

NAMES AND TITLES OF PERSONS WHO APPEARED ON DECEMBER 21, 2011

For the Student:
GARY MAYERSON, Attorney
▮▮▮▮▮▮Father

Hearing Officer's Findings of Fact and Decision                    3

Case No. ▇▇▇▇

For the Department of Education:
STACEY FARACI, Attorney
CHARLES CROWLEY, Attorney
JOHN BHUTA, Assistant Corporate Council
AMY SANTUCCI, Assistant Principal-P.S. 6 *(via telephone)*

NAMES AND TITLES OF PERSONS WHO APPEARED ON FEBRUARY 6, 2012

For the Student:
GARY MAYERSON, Attorney
For the Department of Education:
STACEY FARACI, Attorney
CHARLES CROWLEY, Attorney
JOHN BUHTA, Attorney

NAMES AND TITLES OF PERSONS WHO APPEARED ON MAY 21, 2012

For the Student:
GARY MAYERSON, Attorney
MARIA MCGINLEY, Attorney
▇▇▇▇▇▇▇▇, Parent

For the Department of Education:
CHARLES CROWLEY, Attorney
JOHN BUHTA, Assistant Corporation Counsel

Case No.: ███████

## INTRODUCTION

On June 8, 2011, a second impartial hearing was commenced pursuant to a Federal court decision dated April 25, 2011. The hearing was held at the Impartial Hearing Office of the Board of Education of the City of New York located at 131 Livingston Street, Brooklyn, New York. The hearing commenced at 10:00 a.m. At the request of both parties, the hearing was continued on July 13, 2011, September 21, 2011, September 22, 2011, October 5, 2011, October 6, 2011, December 2, 2011, December 21, 2011, February 6, 2012, May 21, 2012 after appropriate requests were made by both parties to extend 45 -day timeline.

A list of exhibits that were admitted into evidence is attached to this decision.

## BACKGROUND

On June 20, 2008, the parent filed a request for an impartial hearing alleging that the DOE failed to provide the child a FAPE for the 2008-2009 school year because, among other reasons, it was alleged that the child was the victim of bullying. The initial hearing was held for eight days between July 8, 2008 and March 13, 2009. A "Findings of Fact and Decision" ("FOF") was timely issued on July 21, 2009, after appropriate applications were made for extensions of the 45-day timeline. In that decision, it was determined that the DOE had provided L.K (the child") with a FAPE. It was further held that the unilateral placement of the child at the Summit school was not an appropriate placement and that the equities tipped in favor of the DOE. That decision was affirmed by the SRO. The parties then filed an action in Federal court, the next level of review under the IDEA. The Federal court wrote a lengthy decision creating new standards to be applied in cases filed under the IDEA where the issue of "bullying" has been raised. The court stated that the standards to be applied when assessing whether the child was denied a FAPE were: 1) was the child a victim of bullying?, 2) was the DOE aware of the bullying?, 3) did the DOE take appropriate steps to address the bullying?, and 4) was the child significantly restricted in her educational opportunities as a result of the bullying? Accordingly, since these standards had not yet been created at the time of the initial hearing and preparation of the initial FOF in this case, the Federal court remanded the

case in order for the issue of "bullying" to be fully addressed under the new standards by the initial trier of fact.

## THE PARENT'S POSITION

The parents contend that the DOE denied the child a FAPE because pursuant to the new standards: 1) the child was the victim of bullying; 2) the DOE staff at PS 6 was aware of the incidents of bullying; 3) the DOE staff at PS 6 took no action to address the "bullying" and 4) the child was significantly restricted in her educational opportunities as a result. The parent further contends that the remand permits the IHO to revisit the second and third prongs of the Carter analysis and urges that the IHO reverse the original findings under Prongs II and III.

## THE DOE'S POSITION

The DOE contends that: 1) the child was not bullied; 2) the DOE staff at PS 6 was not aware of the incidents in question; 3) there is and was a "Zero Tolerance" bullying policy at PS 6 and anti-bullying programs and training was administered at PS 6 and the staff was not deliberately indifferent to the issue of bullying, and 4) the child made academic and social progress during the 2007-2008 school year and thus, was not significantly restricted in her educational opportunities. The DOE further contends that the remand is limited to reconsideration of Prong I and that the initial IHO decision as to Prongs II and III are law of the case and should not be disturbed.

## THE EVIDENCE PRESENTED

The child, who was previously classified as autistic, was reclassified at her parent's request as learning disabled at the June 4th, 2008 Individual Education Program ("IEP") meeting. The child attended PS 6 for the third grade and for several years prior. During the 2007-2008 school year, she was placed with the parent's consent in a Collaborative Team Teaching ("CTT") classroom. She also received various related services that were mandated on her IEP to which the parent also consented. In June 2008, the Committee on Special Education ("CSE") met to review the child's IEP for the upcoming 2008-2009 school year. The parents did not agree with the recommended CTT class program for fourth grade and unilaterally placed her in a private school for the 2008-

2009 school year. They now seek reimbursement in the amount of $28,640.80 for that private school tuition. (Ex.MMMMM ).

Both parties elicited testimony during the remand from various witnesses exploring facts in greater depth related to the new standards delineated by the Federal court. Summarized below is that new testimony together with a discussion of the evidence submitted in the case as a whole.

Melissa Vassari was a special education teacher at PS 6 between September 2007 and June 2009. (T. 2001, 2003) It was her first teaching assignment since graduate school. (T. 2004) She taught the Collaborative Team Teaching (CTT ) class, together with Ms. Melanie Sher (formerly Fine), also a first year teacher (T. 2004), to which the child was assigned for the 2007-2008 school year. (T. 2003) CTT is a combined class for special education and general education students. There were 12 special education students in her class. The rest of the class was comprised of general education students were selected by design to be model students and to encourage the special education students to branch out socially and academically. (T. 2130) There were occasional conflicts between students. In those instances, she would: 1) speak to the students individually and together, 2) have them write letters of apology, 3)take away yard time and access to the treasure box, 4) do theme drawings on how to behave and 5) read stories to encourage friendship and diversity. (T.2131)

Ms. Lauren Fontana, the principal at PS 6 was her boss and she never failed to follow Ms. Fontana's instructions. (T. 2006) Ms.Vasari testified that she was instructed on how to fill out Incident Reports ("IRs") and that she filled out between 10 and 20 such reports during her two year tenure at PS 6. (T. 2007, 2010) They were intended for administrative purposes, put into a school system and were not released to parents.(T. 2013-2014) She testified that neither Ms. Fontana nor anyone in administration ever told her to release IRs to the child's parents. (T. 2013, 2015) She did not know whether the child ever filled out an IR.

She said that none of the incidents that she reported involved the issue of bullying. However, she said that there was a zero tolerance policy at PS 6 and bullying was discussed. (T. 2009) There was a protocol for bullying involving different types of

behavior which she discussed with Ms. Fontana such as "mean words", physical aggression, intimidation and intentional malicious behavior. ( T. 2011,2013)  In her classroom, she conducted "read alouds", she would model appropriate behavior, she had a share box in the classroom where children could place notes if they had concerns which was reviewed weekly (T. 20500-2051). There were class meetings, they would draw pictures of social situations, compose "I" messages to express their feelings and every week they would discuss the "Golden Rule." (T. 2050-251, 2122) She implemented a reward system using a jar of marbles for positive reinforcement of good behavior. If the class got 25 marbles, they would have a pizza party. (T. 2123)  If a child got 6 stars, they would get a certificate and be allowed to select a prize from the treasure chest. Id.  In addition, the guidance counselor came in to the class and taught a lesson about respect. T. 2201) Finally, Ms. Vasari testified that there were rules in her class room to encourage punctuality, smooth transitions, focusing and kindness.  She wanted to create a positive environment and to raise awareness during these lessons. (T. 2051) She said that both she and Ms. Fontana wanted the class to be a safe place. (T. 2009)

She testified that on November 29, 2007 the child hit her in the face. She filled out an IR on that day. (T.2067, Ex. CCC.9-10).  She did not give the parents a copy or call the parents.  (T. 2067) She said that the administration handled it.  (T. 2068) It was the first time that the child hit someone and they talked as group about hitting.  (T. 2069) The child was not cooperative and she did not want to deal with the consequences but the child never hit her or anyone else again.  (T. 2071-2072) She said that the parents never acknowledged that the child had hit her.

Ms. Vasari said that there were other IRs written about the child's actions. For example, Ex. CCC1 was prepared when it was alleged on February 4, 2008 that that the child pulled Ms. Sher's hair.(T. 2074). Both she and Ms Sher spoke to the child about the incident. Administration was called and an IR was filled out.  (T. 2145) They called the parent who was not receptive. (T. 2146)[1] Ex. CCC11 was prepared when the child pulled another child's hair. (T. 2075)  She would have told the child that it was not appropriate to pull hair. With regard to Ex JJJ, the child was not following directions. She took the

---

[1] In Ex. QQ, the mother denied that the child pulled Ms. Sher's hair intentionally.

Hearing Officer's Findings of Fact and Decision                                8

Case No.: ▇▇▇▇

child's "squishy balls" away and the child threw a chair off of the desk. (T. 2152) An IR
was prepared. She made the child pick up the chair using a firm tone but never yelling.
(T. 2152) With regard to Ex. II, Ms Vasari said that the child took out her toys to class
after she was told to leave them home because they became a distraction. ( T. 2113,
2155) No child was allowed to have their toys out in class. ( T,2113,2153)
She and Ms. Sher spoke to the child about why they weren't going to let her bring her
dolls anymore. She said that the child sulked a little after she was told that she could not
bring her dolls. (T. 2156)

She testified that the child was worried about bullies. She discussed the topic of
bullying in class but she does not recall a general discussion with the child 1:1 about
bullying. (T. 2018) She said that in the beginning of the year, the child used the word
bully more than other children do but did not understand the word. (T. 20190-2020) She
said that the child was confused as to the difference between accidental behavior and
intentional acts. She never saw bruises on the child. She said that she never observed the
child being bullied or being a bully in the classroom but stated that she did not go to the
yard or attend lunch periods with the class. (T. 2023)

On one occasion when the child seemed upset, she initiated a project supervised
by the SEIT, in which the child wrote down a list of her feelings and concerns. (Ex.
GGG) It helped the child. (T. 2133) She had a 1:1 conversation with the child about the
items in the list. One item in the list was "I am worried about bullies". (T. 2020, 2022)
Another item on the list was that her parents were getting a divorce. (Ex. GGG) She did
not remember if she discussed the list with Ms. Fontana. (T. 2029). She does not
remember asking the child who in the class was bullying her. Id. She said that the child's
concern with bullying "petered out" as the year went on. (T. 2022).

Ms Vasari stated that she had monthly meetings with the parents during her lunch
hour. (T. 2100) She did not recall the parents ever complaining about bullying in the
classroom or at the monthly meetings. (T. 2024, 2100, 2107) She stated that the topic
came up early in the year with the child's mother and she may have gotten a letter from
the mother but, if she did, she sent it to administration. (T. 2026) She remembers hearing
about the February 10th letter in which the mother complained that the child was getting

Hearing Officer's Findings of Fact and Decision                                                    9

Case No.: ████████

prank calls from children in the class. (Ex. HHH). Ms. Vassari stated that third graders make prank calls. (T. 2148) She would have addressed it in class as being unacceptable. Id. There is no evidence that she addressed the issue in class. She said that the parent's letter was exaggerated. Id. No IR was prepared because the negative calls did not occur on school property. (T. 2104, 2106). She doesn't remember if she spoke to Ms. Fontana about the letter but had spoken to her about the letters in general. (T. 2108).

When shown Ex. II, a letter from the parent dated May 7, 2008, she remembered receiving it but did not remember receiving Ex. HH , T, Q, N or M. She did not respond to the May 7th letter because on one occasion in the Fall of 2007, when she did send a written list of the child's concerns home (See, Ex. GGG), it was "thrown back in her face" by the parents. (T. 2115)

She was asked about a derogatory drawing of the child. (Ex MM) She testified that she never saw it until the hearing. (T. 2062) She did not know who drew it. (T. 2063) She never spoke to anyone at PS 6 (T. 2062) about it but she said that if she had seen it, she would have considered it "verbal" bullying. (T. 2163) She would have spoken to the child who drew it and had a classroom discussion about why it cannot happen again. (T. 2197)

Ms. Vasari testified that during the second half of the school year, the child was engaging more and was becoming more self- confident. (T. 2040) She also noted that the child's absences and lateness were increasing at the same time but that the child never told her that she was afraid of coming to school nor did she voice any concerns. (T. 2040) The child appeared comfortable and safe in the classroom. (T. 2040)

She was not told about a continual bullying problem. (T. 2149) She testified that she never heard any child call the subject child a "freak" or "fat" or "annoying." If she had, she said she would have addressed it immediately. (T. 2159)

She did not see Ex.WW, in which the mother reported that a child "J" had stepped on the child's toes. (T. 2090) She stated that if she had seen it, she would have taken the student aside, called the parent of the child who stepped on the child's toes , talked to the other child and then would have brought both children together. She also would have had the other child write a letter of apology. (T. 2131).

Hearing Officer's Findings of Fact and Decision                    10

Case No.: ███████

    With regard to the child's own habits, Ms. Vasari testified that she was quiet in the beginning of the year but they did partnership work and she worked well with other students. She said that the child made social and emotional progress. (T. 2167) She said that the child had a couple of close friends, but her behaviors got in the way. The child would call out, not always focus and she had difficulty drawing some students to her because she picked her nose, passed gas a couple of times, bit her nails and played "puppet hands". (T. 2203) When the child passed gas, the class laughed. (T. 2204) She discussed it with the whole class and told them not to laugh.Id. She then spoke to the child away from the group so as not to embarrass her. (T. 2133) She had conversations about hygiene with the whole class and reminded them to wash their hands and use tissues. Each group had tissues and a hand sanitizer on their desk. (T. 2206) She said that the class was accepting of the child and worked with her unless she engaged in certain behaviors. (T. 2129)

    Ms, Vassari reviewed report cards Ex. K and L. She said that K was completed in January and L in June 2008. (T, 2043)  According to Ms. Vasari , the child made academic progress in reading, math and writing during the 2007-2008 school year. She noted that child made minimum progress during the first marking period in personal and social growth due to her behaviors such as calling out. (T, 2047- 2048). She made more academic progress during the second half of the year. (T. 2166) The child's  hygiene improved, she became more comfortable and began to volunteer more frequently in class, (T. 2040-2042) she sought out her peers more frequently, her nose picking decreased, (T. 2168) her fingerpicking decreased, (T. 2168) her puppet hands decreased and she no longer rolled around on the carpet. (T. 2168, 2204) The child was not left out of groups and was not isolated. She testified that neither the child nor the parents ever communicated to her that the child was afraid of coming to school. (T. 2044) However, she said that the child often came in late and she looked tired many times . Id. She raised the issue of tardiness with the parent at the monthly meetings. (T. 2218)

    Melanie Sher (formerly Ms. Fine) , (T. 2804), testified that she was the co-teacher in the 3rd grade CTT classroom with the child. (T. 2808) She first started teaching in 2007 as a licensed teacher. (T. 2804) During that school year, there were 6 adults in that

Hearing Officer's Findings of Fact and Decision                                    11

Case No.: ███████

classroom including two teachers, an assistant teacher, two paraprofessionals ("paras")
and a SEIT. (T. 2899) The children spent the whole day in the classroom except for lunch
(yard) and "specials". (T. 2901) The paras always went to lunch with the children. (T.
2901-02) A teacher always accompanied them to "specials". They were never without an
adult. (T, 2903) The children in the yard at lunchtime were all the same age. (T. 2975)

Ms. Sher was supervised by Ms. Fontana, Ms. Santucci and Ms. Kim, (T. 2805)
another Assistant Principal at PS 6. In August of 2007, she obtained the child's
cumulative records and the IEP. (T. 2807) The child did not have counseling on the IEP
at that time. Id. She testified that during the 2007-1008 school year, the child called out,
drew all over her folders and notebooks. (T. 2815) She remembered the child being
acrimonious with other children. She met with parents several times together with Ms.
Fontana and Ms. Santucci. She did not remember ever smelling urine on the child or
anyone else ever telling her about this. (T. 2826-2828) If she had, she would have raised
it with guidance. (T. 2827) She did state that the child was not always put together
nicely. (T. 2903) Her hair was long and not neat; (T. 2904) her clothing was ill-fitting.(T.
2825) The child picked her nails until they bled. (T. 2956-57) The nurse once asked
about the child's hygiene and told her that she was going to call home. (T. 2936-2938)

The child also had issues with personal space. She would twirl around, bump into
other children. She said that children bump into other children or trip each other all of the
time. She makes them apologize even if it is an accident. (T. 2926-27) The child also had
difficulty sitting in the rug, she would roll around and stretch out. (T. 2904-05) Ms. Sher
believed that the child had general anxiety and would have benefitted from counseling.
(T. 2915)

She was not formally trained with respect to bullying and physically assaultive
behavior. (T. 2808, 2821) She testified that in order to determine if there was bullying,
you need to do a case by case analysis. (T. 2913) The child has to be negatively affected.
(T. 2969) Whether something constitutes bullying may also depend upon where it is
coming from. (T. 2967-68, 2970-71) One child may do things to different children
repeatedly. In this case, it appeared to her that it was the other special education children
who were bothering the child. (T. 2973 -74) She later learned, too, that the child who

Hearing Officer's Findings of Fact and Decision                                    12

made the drawing was also a special education child. (T. 2929-2974) She stated that with
regard to Exhibit MM, if the child hadn't seen it, she could not be harmed by it, but the
child who drew it should have been be counseled. (T. 2852, 2914) She did not
investigate it. (T. 2855) She stated that she had never seen it before until the hearing. (T.
2850) She was not sure if it was an example of bullying. (T. 2852) She did not remember
any child referring to the child in a derogatory way. On another unrelated occasion, there
was another drawing done by a child about another student which was very threatening.
(T. 2931) On that occasion, she immediately called the guidance counselor to speak to
the student and she spoke to Ms. Fontana about it. (T. 2930)

She employed certain tools to prevent bullying and establish a comfortable
classroom. For example, she would have circle time in the morning, she would have
"read- alouds" with strong messages about kindness, used compliment cards and had a
"worry box" where children could place notes about their concerns. She taught lessons in
appreciating differences in learning abilities. (T.2900) The issues were addressed in the
handbook. There was a book of rules and procedures to follow. For example, if she saw
an incident, she would have to fill out an IR, notify the parent and speak to the children
involved. On occasion, Ms. Fontana would notify the parents. She said that the
procedures for filling out an IR is outlined on the handbook. They are completed by the
witnesses and the child involved.

She only filled out one IR for the child when the child pulled her hair. (Ex.
CCC.1, T. 2836) She said that the incident happened on February 4, 2008 in the staircase.
(T. 2826, 2844) She said that it is unusual for a student to lay a hand on a teacher but she
knew that the child had slapped Ms. Vasari and an IR was completed for that incident as
well. ( T. 2839, 2863) She notified Ms. Fontana of the incident and she contacted the
mother the next day to inform her about what happened. (T. 2843, 2858) She does not
remember speaking to the child or the a special education itinerant teacher ("SEIT")
about the incident. (T. 2843-44) She did not see the other IRs until recently. (T. 2812) It
might have been helpful if she had seen the IRs. (T. 2841-42) She completed IRs for
other children that year as well. (T. 2818-19) She was unaware of the policy with regard

Hearing Officer's Findings of Fact and Decision                                     13

Case No.: ▆▆▆▆▆

to sharing the IRs with the parents. (T. 2813) Neither Ms. Fontana nor Ms. Santucci ever directed her to release IRs to the parents. Id.

She was aware that an impartial hearing had been requested. (T. 2829) The child was the only one in the school with a SEIT .(T. 2829) She did not know why the child had a SEIT but said that she was helpful in redirecting the child and giving her prompts. (T. 2830-31) The child had two new SEITs in late Fall of 2007, Ms. Faber and Ms. Maloney. (T. 2832) The SEITs were not permitted to speak to her that often (T. 2908-09). It would have been helpful if they had been. She spoke to all of the children's services providers.

She recalled getting letters from the parents. She referred all of them to Ms. Fontana and did not respond to any of them. (T. 2870-71) It was uncomfortable at times interacting with the parents. She felt like she was being attacked by the mother when she spoke to her on the phone. (T. 2910) The mother was very aggressive. (T. 2911) She said that the father never threatened her in any way.

She filled out the report cards together with Ms. Vasari (Ex. K and L). She relied upon assessments given throughout the year. She recalls that the child's absences and lateness increased and were unusually high. (T. 2878) She defined lateness as being five or ten minutes late. (T. 2889) The child never told her that she did not want to come to school anymore. (T. 2894) By mid-year, the child no longer needed to work on social/emotional domains. ( Ex. L,T. 2880-2881, 2886)

She does not remember seeing Exs. M,N, Q , T, HH, QQ, II, WWW. (T. 2889-93) When asked if she knew about two incidents in 2007 when a girl said that she could not be friends with the child or when a boy would not play with her in the yard, she said that she did not know of these incidents. (T. 2919). She said that if she had known, she would have required apologies from the girl, she would have addressed the issue with the boy and she would have spoken to the child as well. (T. 2917-2919) If she can resolve the issue with the students, there may be no reason to go any further. (T. 2818-2820) She does not generally use the word bullying she just addresses the individual acts.

Rick Eisman was the school social worker at PS 6 during school year 2007-2008 and still is. (T. 24-37-2438) He works with children with disabilities. (T.2438) He never

Hearing Officer's Findings of Fact and Decision                                   14

Case No.: ▮▮▮▮

had meaningful contact with the child or her teachers except at meetings such as the BIP meeting and the IEP meeting since the child was not assigned to his caseload. (T. 2438-39, 2466) He heard allegations of bullying at the BIP meeting which was also attended by the parents, Ms. Muldowney, Ms. Santucci and the teachers. (T. 2440-41,2455, 2456) The BIP meeting was held in March of 2008. (T. 2466) He said that the father was agitated during the meeting and was upset because there was a parent member present. (T. 2521-22, 2564) The father was told that it was required. (T. 2522) He said that the father can be aggressive and difficult to interact with. (T. 2524) He testified that that father was speaking about a teacher who was present in a manner that was pretty brutal and appeared to be an "attack". (T. 3525) Mr. Eisman stated that the father's behavior was atypical. (T. 2569, 2579)

Mr. Eisman testified that the purpose of the BIP is to address the behavioral issues of the child in question, not the actions or behaviors of others. (T. 2443) Aggressive behavior should be noted on the BIP. He stated that since the behaviors were being discussed at the BIP meeting , (T. 2508) he did not need to see the IRs at that meeting.(T. 2539) He doesn't remember the substance of the parents' remarks. He does not remember discussing the child as an aggressor. (T. 2444) He recalls that portions of the BIP were removed at the parent's request. (T.2577) He also stated that he never attended an IEP meeting where the IRs were discussed because they do not affect the recommended services. (T. 2538) He testified that the parents tried to raise the issue of bullying at the IEP meeting. (T. 2454).

Mr. Eisman testified that he too has not had any formal training with regard to bullying or IRs. (T. 2445-46) He stated that the guidance counselor speaks to the staff about bullying. In his opinion, bullying is over-diagnosed. (T. 2474) The phrase is used all of the time incorrectly. It is often used interchangeably with "teased". (T. 2574) He said that kids use it if they are being picked on. (T. 2526) He also said that a parent's view of bullying can affect the child's view of bullying. (T. 2526) According to Mr. Eisman, bullying must be repetitive on a daily or regular even monthly basis by one or more children (group or gang) against the same child. (T. 2580-81) Repetition is significant because over time, a person starts to feel sad and depressed; they doubt

Case No.: ▮▮▮▮▮

themselves. (T. 2527) It is important to speak to the bully and the victim together. (T. 2538) He further stated that bullying should be treated the same whether the victim is a disabled or typically developing child but he noted that perceptions might be different in a disabled child. (T. 2605)  The best way to prevent bullying is to work on community building, role modeling, small student/ teacher ratio, class-wide counseling and adult intervention. (T.2601)  He testified that the SEIT should have reported incidents of bullying if she thought she observed them.

He said that he probably read the School Discipline policy for 2007-2008 at the time. He stated that PS 6 has a zero tolerance policy with regard to bullying. (T .2473)  If bullying is raised by a parent, it is investigated. He testified that children are constantly saying mean things but it may not be bullying. It has to be done on a regular, weekly basis. Isolated incidents are not bullying. If there is repeated negative behavior by one child to another , it may be bullying.(T. 2453) He has no knowledge of anyone doing anything negative to the child or of the child doing anything negative to any other child. (Id. ,T. 2454) He did not see any IRs with regard to the child but he writes them all of the time with regard to incidents at lunch for such things as, name calling and physical incidents. He stated that many children who are being bullied do not disclose it until the end of the year. (T. 2586).

He testified that a secretary enters IRs into the "system". Parents are not provided with copies of IRs and he never heard of a parent asking for them. (T. 2483) Ms. Fontana never told him to release the IRs to the parents. (T. 2485)  Mr. Eisman explained that an Occurrence Report ("OR") is different from an IR. (T. 2538)

He remembers getting letters from the parents but did not respond because the child wasn't in his caseload. (T. 2456-57)  He never saw Ex. HHH, but he stated that phone calls can rise to the level of bullying. (T. 2486) He never saw Ex. II. (T. 2989) He said he never saw Ex. HH where the mother stated her objection to the child not being allowed to take her dolls to school, but he thought that the letter should have been shared with the guidance counselor. He never saw Ex. MM but if he had, he would have been concerned. (T. 2459-60) Pictures like that would have been covered by one of the criteria

of the school's discipline policy. (Ex. 2.1–4) He does not know if anyone was disciplined for creating the drawing. (T. 2464)

With regard to the issue of the child's concerns that her parents were getting a divorce, Mr. Eisman testified that a child can feel overwhelmed if their parents are separating whether real or imagined. (T. 2563-64) The child can feel anxiety, anger, sadness and will display these emotions. (T. 2543-44) In addition, he stated that a child who is anxious or overwhelmed can act out (T. 2531) , say inappropriate things, can become physical, pull hair, throw a chair or withdraw. Id. He testified that when counseling was recommended for the child at the IEP meeting, the parents wrote a letter refusing to allow the guidance counselor to see the child. (T. 2573)

Dr. Anne Muldowney, a school psychologist at PS 6, who testified on November 28, 2008 (See, pp. 10-11 of Ex. iii for a summary of her prior testimony), testified a second time at the parents' request. She participated in functional behavior assessment ("FBA") meeting in the late Spring of 2008 (T. 2427) with the parent and Dr. Tubero (T. 2469), another school psychologist at PS 6. She interviewed the parents, the child and spoke to her teachers in preparation for the meeting. (T. 2369) The parent did not raise the issue of bullying at the FBA meeting. (T. 2369) Counseling would have addressed the issue of helping the child to interpret social cues, but as Ms. Peggy Chung testified in the first hearing, the parent rejected counseling for the child on more than one occasion. (T. 152-153, 2370)

She stated that the father did not speak of divorce but she heard that they were getting a divorce. (T. 2364, 2390) She stated that if the child thought the parents were in the process of getting divorced she could act impulsively or try to get into trouble. (T. 2366-67) Counseling could have addressed that issue as well. (T. 2367)

She said that she also participated in the BIP meeting in March 2008. (T. 2278) She stated that it was different from any other BIP meeting she had ever attended because both parents were present and they went over every line of the BIP. Id. It took two hours. Id. The meeting was very unusual because there was "standing room only".(T. 2275) The members of the school based support team attended as well as the teachers. Ms. Fontana was not present. (T. 2276) There was a lot of collaboration. (T.2275) The child's

Case No.: _____

behavior was discussed but the parent insisted that every word relating to her disruptive behaviors be removed. (T. 2363) She thought it was "outrageous" that the parent chose to edit the BIP in that fashion. (T. 2395)

She stated that the IRs were not discussed or accessible at the BIP meeting. (T. 2277) She has never written an IR but she has assisted a student in doing so. They are maintained in the main office with administration she never gets copies of the IRs and was not instructed by Ms. Fontana to release them to the parents. (T. 2278, 2290) They are intended to document extreme behaviors and often the parents are called to take care of the conflict. (T. 2280, 2320) Although she has not reviewed them at the time of the BIP meeting, she has reviewed the IRs related to the child since then. She stated that it would not have been helpful to have the IRs at the BIP meeting because they were able to fully discussed the child's behavioral issues without them. (T. 2281-82, 2330) She was aware that the child misinterpreted social cues. (T. 2290) The topic of bullying never came up at the BIP. Id. She does not remember if the topic of bullying came up at the IEP meeting but she recalls that the mother was very agitated. (T. 2291) She is not sure if she saw Ex. MM at the IEP meeting. (T. 2294) It would concern her because it is hurtful. (T. 2295) She also stated that if the child never saw it, it cannot be hurtful and is not an example of bullying. (T. 2324) She said that she is not an expert in bullying, but she defined it as aggressive, repetitive behavior that can be verbal or physical. (T. 2295-96) An isolated incident is not bullying. (T. 2324) If a child steps on another child's toes multiple times, it could be bullying and such a child should be counseled. (T. 2324, 2427) If the child also pinched the child, it would be bullying. (T.2423). It should be addressed. (T. 2426) She would have investigated bullying of she was told to do so. However, if the teacher investigated, that would be sufficient.

Ms. Muldowney testified that she was never given any training on the three- tier discipline policy or process for a child who bullies or makes fun of another child 's ideas or looks. (Ex. 2.4, T. 377, 2428)

She stated that a parent has right to discuss bullying with the school staff. (T. 2297) She never saw Exs. JJJ, QQ, WW, FFF, and HHH, (T. 2302, 2315, 2316, 2326, 2327 ) which were about allegations of bullying, or HH and II which were about the fact

Hearing Officer's Findings of Fact and Decision                              18

Case No.: ██████

that the child could not have her dolls at school. (T. 2331-32) If she had received letters like these, she would have investigated and would have wanted to see the IRs. (T. 2336, 2338) She would have spoken to the teachers and staff. (T.2337) She would have wanted to speak to the SEITs but she said that for this child, she was not be permitted to speak to them without the parent's permission. (T. 2337, 2349) She stated that she was the addressee on a number of the letters sent by the parents. (See, Exs. T, Q, N, M and I [which either requested documents or were cover letters providing documents]) She did not recall seeing all of them. (T. 2342,2344,2448,2453) Although she requested the mother's permission to discuss Ex. N with the SEIT, the parent never gave her permission to do so during that school year. (T. 2349-51) She stated that even if she had seen all of the letters, the BIP would have remained the same.

Dr. Muldowney testified that the BIP and the IEP meetings were tense. (T. 2382) The parents could be difficult, assertive and always seemed annoyed. (T. 2382,2384-85) The first time she met the mother, the mother screamed at her and immediately got on her cell phone. (T. 2383) She did not think that the parents wanted services to be provided in the school setting. (T. 2382)

Amy Santucci is the Assistant Principal at PS 6. She has been in that position for seven years. (T. 2612) Her duties are to support the children, the parents and the teaching staff. She deals with discipline issues. She has an open- door policy.(T. 2613)

She described what she believed were the anti-bullying policies and practices during the 2007-2008 school year. Id. There was a "Stop the Bullying" handbook prepared in 2006 for teachers. (DOE Ex. 6) She testified that PS 6 participated in a program called "Project Excel" in which the staff worked on creating lessons about social/emotional issues. Id. The guidance counselors were involved. There was an expert in conflict mediation who was invited to work with the staff and create a committee during the 2003-2004 school year prior to her arrival there. (T. 3320) His name was Jim Tobin. (T. 26141) He facilitated a workshop for parents on bullying. The administration sponsored a retreat for administrators to educate the staff with respect to bullying and conflict resolution.(T. 2615, 2618) A teacher's reference guide with respect to bullying was prepared for the retreat and was also available to staff. Id.

They created a safety squad to help; out in the yard and in the cafeteria. (T. 2622) She testified that the safety squad , composed of student volunteers, put together a DVD to be shown in the Assembly. (T. 2623) The safety squad informed students where they can go with their issues. Id. In addition, there was a program called "Success for Kids" designed to help students grow their social / emotional intelligence. (T.2624)

They assembled a conflict resolution committee. (T. 2615) The principal put extra funds aside to hire an additional part-time guidance counselor. They created a peer mediation program. There was a staff handbook in which the school-wide discipline policies were set forth simply and clearly. (T. 2616) The children were to be "kind, safe and responsible". (Ex. 2.1, Id.) She testified that there was a PS 6 Handbook available to all teachers on a thumb drive.

Jim Tobin conducted parent workshops to educate parents as to what constitute bullying, how to deal with children and strategies to use at home. (T. 2621-22) He distributed literature to them. Id.

Ms . Santucci also testified about her familiarity with the child while she was in the 3rd grade CTT class The class was 60% general education students and 40% special education students. (T. 2627) The general education students were picked for positive role modeling and empathy. Id. She described the child's academic performance as approaching grade level. (T. 2628)   She said the child was smart and had grown tremendously. (T. 2628)  She described the child's social/ emotional status. She said that the child had challenges. She had some happy days when she was engaging with the other children and the teacher and she had unhappy days where she was crying,  had violent outbursts, engaged in hair pulling, slapping and chair throwing. (T. 2629) Some days she had friends and some days  she did not have friends. She described her as being "consistently inconsistent". Id.

She described the child as being very pretty with long hair to her waist but not well kept. (T. 2630) She stated that the child's hair was not combed; her clothes were too small, her stomach was exposed, she wore short skirts and you could see her underwear when she sat on the rug. (T. 2631) She said the child smelled like urine. Id. She testified that the nurse stated that the clothes were not washed. Id. She stated that children made

Case No.: ▇▇▇▇▇

comments to the teacher privately. Some of the disabled students told the child that she smelled. (T. 2632)

She said that there was steps taken at the beginning of the year to work through these issues through guidance and through the SEIT, Miss Nancy Del Gracio. Ms Santucci said that Ms. Del Gracio cared for and loved the child. (T. 2633) She worked well with the teachers. She worked professionally. Ms Santucci said that one day Ms. Del Gracio came to the principal's office crying and said that she would not be returning because the mother verbally abused her. (T. 2634) After Ms. Del Gracio left, there was a substitute SEIT for a few days (T. 2635) and then two younger SEIT's replaced Ms. Del Gracio. Id. These two SEITs split the time spent with the child. Id. They kept copious notes and ABA data. (T. 2636) This information was given to the mother but not shared with the staff. Ms Santucci believed that not sharing this information was counterproductive. (T. 2637-39, 3315)

She stated that beginning in the second grade and thereafter, they had monthly meetings with the parents which the SEITs did not attend. (T. 2748) They worked on strategies for the behaviors of the child and discussed her academics. She was one of the only children at PS 6 for whom such meetings were held. (T. 3316)

She also interacted with the parents. She testified that she admired the time and care that the family put into their child and that the father had told her that she was fair despite their disagreements. (T. 2646) There were many positive interactions but some were not. For example, at the IEP meeting, the father was loud and later apologized. Id. She stated that bullying was mentioned in the mother's letters but much less in personal meetings with her. (T. 2626, 2644)

She did state that the father's interactions with the principal were not so positive. (T. 2647) On one occasion she was present when the parents wanted to speak to the principal in front of the child. (T. 2648)  Ms. Fontana did not think that it was appropriate. Id. The child appeared as though she wanted to leave the room. (T. 2648) She said that the principal asked the parent to leave her office or she would call security. The father was not listening, he was speaking loudly. She felt uncomfortable in the room.

Hearing Officer's Findings of Fact and Decision                    21

Case No.: ▮▮▮▮▮

The principal asked him to leave several times and then called security. Id. She said that
he lost control and called the principal a" jerk". (T. 2650)

Ms. Santucci testified that she was present at the BIP meeting. (T. 2673) There
was a lot of discussion about the child picking her nails. (T. 2676) There was a discussion
about counseling but she testified that the parent never followed up. (T. 2677) It was
explained to the mother before the IEP meeting how important it was for the child to have
counseling but the mother never consented. (T.2679) Without the parent's consent, the
proper interventions could not be administered.

She testified that shortly after the BIP meeting and the meeting with Ms. Fontana
where she had to call security, the father informed her that he was going to place the child
in a private school for the following school year. (T. 2690) She concluded that the father
wanted the BIP to read a certain way for future use. She stated that the parents were
argumentative and challenged every word. The father repeatedly said that he was a
litigator and some teachers felt threatened by him. (T. 2647) Teachers did not want to
meet with him unless an administrator was also present. (T. 2696) She said that letter
"briefs " were sent by the parent after every meeting. (T. 2697) The parent's expectations
were inconsistent. The mother told her several times that the child experienced a lot of
anxiety about having to come to her office, so when an incident occurred with the child,
she would call the mother and talk about the incident rather then prepare an incident
report. (T. 3353) The mother was also inconsistent about when was it okay to speak to the
child or to have the child write things down (T. 3357-3358). But, she felt that the staff
bent over backwards for the child. (T.3362)

Ms. Santucci was made aware of the child's behaviors before BIP the meeting.
She was aware of the incident where the child slapped a teacher. She said that the mother
was called from the classroom after it happened and the mother said it was the teacher's
fault. There was a 45 minute discussion with the mother. She was also aware of the
incident where the child pulled the hair of the other teacher and mother told her that she
did not believe that her child did it, but, if she did, it was not on purpose. (See, Ex. 3.1)
She spoke to the mother after the teacher called the mother. She said that the mother was
very intimidating to the teachers and that the teachers felt uncomfortable speaking with

the parents alone. She was "vaguely" familiar with the incident in 2006-2007 where another child referred to herein as "J" pinched the child. (T. 3320, 3350) She said that "J" was an African American, thin, male child who was not significantly taller or bigger than the child. He had a narrow frame while the child had a larger frame and was overweight. (T. 3346, 3347, 3374, 3409) J also had a IEP with his own set of issues.(T. 3324-3325). He came from a low socio-economic class.(T. 3374) His parents involvement at the school was limited. (Id.,T. 3387) He suffered from a lot of depression and that his cognitive abilities did not really match his output in class meaning that his intellect was higher than his class performance (Id.,T. 3386-87) He was in the CTT class with the child for two years because it was the only CTT class at PS 6 and his IEP required that he be placed in a CTT class. (T. 3327) He was involved in a few incidents with the child and with other students as well. (T.3332), but he was not always the aggressor.(T. 3348-3349) There was a pattern of incidents between the child and J. (T.3377)

There were some interventions put in place for J and the child such as seating them apart and asking the SEIT to keep a eye on them in the yard to monitor the situation. (T.3327) She had several conversations with J's parents when their phone number was in service. Sometimes is was not in service. (T.3387, 3388) His parents were sometimes separated and the father, who worked during the day, was the one who was heavily involved. They discussed getting him into counseling and putting him on medication. (Id,T.3389)

Ms. Santucci said that she did not recall the toe-stepping incident. But, she testified that the mother expressed on a regular basis that she had a problem with J. The mother was heated when she spoke about him. (T.3329)

When the child was in the first grade, the mother told Ms. Santucci what she thought "bullying" was. Ms. Santucci gave the following example. (T. 2653) In 2005-2006, the mother volunteered to supervise in the yard. Ms. Santucci was approached by 6 parents who were upset because the mother had grabbed a child. She spoke to each parent and child separately. (T. 2653) They each told her that the mother's older daughter had classmates in the yard. Mr. Fagleson, the former principal at PS 6, told her that the mother said that the girls were bullying her older daughter. (T. 2655, 2657) After they

Case No.: ████████

spoke to the principal, he discontinued the parent volunteers in the yard. She said that the other children were not really bullying the older child and it was just the nature of their relationship. (T. 2658) She said that the mother used the term bullying as an umbrella statement "a lot". (T.3363)

Ms. Santucci testified that that the issue of bullying was first raised with regard to the child when she was in the third grade. It was raised by the father at the meeting with Ms. Fontana where she had described the father as loud and physically threatening. He was irate. (T. 2709) He paced around, he stood up at the table and leaned in towards Ms. Fontana who was sitting at the table. She thought that it was inappropriate to continue the discussion because the child was present and it was upsetting the child.

She stated that the issue of bullying was also raised at the IEP meeting. (See Ex. J, pp-62-62) She testified that she thinks it is appropriate to discuss bullying at an IEP meeting if "there were specific things that applied to bullying in the IEP. (T. 2721) She does not think it is appropriate "to dismiss parents" if they want to talk about something. She thinks that you have to offer parents a time where they can talk about things like that. Id. But, she stated that the primary purpose of an IEP meeting is to draft the IEP. Id. After the IEP meeting, the father called her. She told him to call back and set up time when they could talk. He never followed though. (T 2726) During the call, he said that he would never speak to Ms. Fontana again and that is when he called her a "jerk". (T.2727).

In her opinion, whether bullying has occurred depends on the context of the action; whether it is repeated and whether the children are aware of how they are acting. The staff was less concerned with giving a particular name to an action than with the action itself. (T. 2734-2735). If an incident occurs that might be bullying, it is written up by the teacher who was present. (T. 2736) If it is brought to her attention, it could be referred to the other AP, to guidance or to Ms Fontana. It depends on the nature of the incident. If there were witnesses, they would obtain statements. They would obtain a statement from the victim if the parent consents. They might do an investigation themselves.(T. 2737) Sometimes there are consequences and sometimes the parent is called.

Ms. Santucci clarified that difference between the IRs and the ORs. She explained that the ORs were the cover sheet for the IRs and that they both are submitted to be entered into the data system. (T. 2660-61) She stated that parents have access to ORs with the names redacted which they can pick-up in the main office as stated in the parent handbook.(T. 2662)

She recalls that after the child wrote Ex. GGG in which the child expressed concerns about bullying and divorce, she heard about it. (T. 2664) She learned that the parent demanded that Ms. Fontana return all of the letters to her. She opined that if the child thought that her parents were getting divorce, she could have become angry, have emotional outbursts, withdraw, cry and engage in inexplicable behavior. (T. 2666-67)

With regard to the child's performance at school during the 2007-2008 school year, she testified that when a child maintains or increases their grades throughout the school year, they have to have made some improvement. (T. 2669) When looking at the child's report cards Ex. K and L, she testified that the child progressed in the third grade. (T. 2668) She noted that 22 absences and 24 occasions of lateness were " a lot." (T. 2789) She was unaware of the reason but stated that the mother told her that the child was not happy at school.

She received a lot of letters from the mother. (T. 2743) She spoke to the child several times about the issues raised in the letters. It turned out that they may not have happened the way the parent thought. When she got a letter addressed to her she called the mother. If they were not addressed to her, she might not call. (T. 2743)

The next issue which was addressed by Ms. Santucci was the PS 6 handbook. (T. 2750) She testified that she was not sure if it existed in 2007-2008 or if it was available online. (T.2750) She stated that the policy with regard to IRs is in the parent handbook. She testified that the parents were told the procedures on how to get IRs. (T. 2663, 2714)

The father, who had previously testified at the initial hearing (See, Ex. iii, pp.13-15) testified again on the remand.[2] He said that the child began attending PS 6 in 2004-2005. (T. 3418) He took the child to school each day and that the mother picked her up. He stated that at that time the child was about 4' 7" or 4'8' in height . (T. 3232-33) He

---

[2] There was little mention of the IRs at the first hearing and no demand was made for them at that time.

stated that although she was reclassified as learning disabled from autistic, (T. 3229) she still had language deficits and was awkward. (T. 3206, 3229)

He stated that at the end of the school year 2006-2007 when the child was in the CTT class for the second grade, the child came home with a bruise on her arm. He said that his wife called him and told him that the child was crying. (T. 3025) He took a picture of the injury about 4-5 hours after the incident. (Ex. EEE, T. 3024-25). In addition, the father wrote a letter to Ms. Fontana informing her of the incident.( Ex FFF, T. 3027)). There was no written response, (T. 3031) but Ms Fontana called his home at 8:00 pm. She said that she was sorry and that she would investigate the issue. (T. 3028) She never got back to the parents. Id. The parent was not asked to fill out an IR. (T. 3029) No IR was prepared by anyone with regard to that incident. Id.

At the beginning of the next school year, there was an initial meeting with the teachers in which the incident came up. (T. 3030) The father stated that the child was afraid to discuss the incident but she identified J to her father. Id. He stated that J was placed in the third grade CTT class with her. (T. 3031-32) He never heard anything further about it from the school but since J was in her class again, he had concerns. (T. 3033)

In August 2007, there was a meeting with Ms. Fontana. The father asked the principal the results of her investigation about the pinching incident with J. She replied that it was taken care of but refused to tell him how it had been addressed. (T. 3432) He stated that she made a cryptic remark about the child's SEIT and whether the SEIT would continue to be at PS 6 because of the impartial hearing which the father has commenced. (T. 3074-75)

During the third grade around Thanksgiving, there was a second incident between the child and J. (Ex. WW, T. 3034)). The father testified that as it was reported to him by the child, J "stomped" on her toes." (Ex. CCC.16) He testified that the child would misread cues from others but thought that the toe stepping by J was not an accident. (T. 3034) He never spoke to J's parents. He is unaware of an apology offered by J to the child. Id. When J was asked about the incident for the purposes of an IR, J denied it. (See.

Case No.: ████████

CCC, p. 16, T. 3417) The father stated that he was not given an opportunity to write an IR regarding that incident. (T. 3418, 3036)

He said that he thought that Ms. Fontana should have addressed the bullying so the child would not have been "attacked" twice. The father said that there were ongoing incidents between the child and J. (T. 3417) He said that Ms. Fontana continually cut off conversation with him about the incident between the child and J. (T. 3147)

The father also testified on a variety of topics in response to Ms. Santucci's testimony.

When discussing IRs, the father denied ever having a conversation with Ms Santucci about the procedures on how to obtain an IR. (T. 3078, 3085-85) He was aware of IRs since 2007-2008 when an IR was completed about the child pulling another child's hair, but he was never told how to obtain them. He did not say whether he ever asked about them at that time.

He stated that after Ms. Santucci testified about the existence of a parent handbook, he checked his files and stated that he was never given a copy of the parent handbook for the 2007-2008 school year. (T. 3412) He testified that there was no link to it on the web-site when he checked in 2011. (T. 3422) The father reviewed Ex. GGGGG and HHHHH which were student planners. He stated that there was nothing in either of them about IRs or obtaining records but there were two pages with regard to behavior. He was never informed about the school's disciplinary policy or how to obtain IRs. (T. 3412-15) He said that Ex. III was the first handbook that explained IRs. He further testified that the child was not offered peer mediation or to his knowledge referred to the safety squad for assistance. (T. 3085,3087)

When discussing the BIP, the father testified that he stood during the meeting because the room has only small child-sized chairs and that he had back pain due to three bulging disks. (T. 3158-59, 3161) He informed the attendees of the meeting that he would be standing. He denied ever "yelling" at the meeting but stated that for thirty minutes, he did refuse to go forward with the meeting in the presence of a parent advocate because he did not think it would advance the process to have her present. He said that first part of the meeting was heated. (T. 3107)  He said that the rest of the meeting was "not heated"

but the issues were addressed "forcefully". (T. 3053) The father testified that he tried to raise the issue of bullying at the BIP meeting but was told that he should not raise it at that time. (T. 3100,3053) He said that there was no alternative opportunity offered to discuss it. (T. 3101) He agreed that he asked that the BIP be edited to remove what he considered to be "derogatory language." (T. 3109) Such language included "picking her nose and eating it" and negative interactions with other children." (T. 3108) He received the BIP at the IEP meeting. (T. 3059) He stated that the IRs were not made available to anyone at the BIP meeting or the IEP meeting. (T. 3056, 3098)

With regard to the child's other sensory integration issues, the father stated that she has personal care issues. (T. 3043) For example, she has long hair and it is very difficult to keep her hair unknotted. Id. She was getting OT to teach her not to twist her hair. In addition, he said that she wiped her hands on her clothing on a regular basis so even though the mother washed her clothes, (T.3044) they usually got dirty during the day. Id. He stated that her clothes were ill-fitting because she liked to wear her old clothes. (T. 3045) He denied that they ever smelled of urine. Id. He stated that he was never informed that her nails were bleeding . (T. 3046) He stated that the child gained 30-40 pounds in one year. She went from 145 to 185 pounds. (T.3045)

When addressing the "monthly" meetings with the teachers, he said that he had only attended two such meetings. (T. 3075-76) He denied yelling at these meetings or at the BIP meeting. (T. 3051-52) He stated that the mother was sometimes the point of contact for school issues. Later, he testified that he attended several meetings and that there was never a meaningful discussion about bullying and no one at PS 6 ever defined bullying to him. (T. 3096) He confirmed that after the 2007-2008 meeting about the "doll situation" (See, FOF, p. 13), he told Ms Santucci that the child would not be returning to PS 6 in the Fall. (T. 3098)

He stated that he does not believe he ever called Ms. Fontana a jerk. (T. 3097) He said that she was impossible to deal with. Id. He tried to deal with Ms. Santucci with whom he had a "fair" relationship but he was very angry at that point. Id.

When discussing the IEP meeting, the father testified it was the first time a change in the child's classification was discussed and the first time that counseling was formally

Hearing Officer's Findings of Fact and Decision                                    28

Case No.: ▮▮▮▮▮▮

recommended. (T.3135, 3059) He also stated that IRs were not made available despite his requests for all documents prior to the meeting. (T. 3098) He was not allowed to discuss bullying at the IEP meeting either.   Prior to the IEP meeting, he was never told that bullying was an inappropriate subject to raise there. (T. 3100)

When discussing the child's absences, he stated that the child was absent due to sore throats and "strep". (T. 3237) He said that she was often late when Ms. Del Gracio was the SEIT because she did not want to get ready for school in the morning because she was afraid. (T. 3065-66)

When discussing why he rejected counseling as an option for the child, he stated that he did not trust the counselors at PS 6 because they did not handle the bullying properly. In addition, he did not want the child to be pulled out of the class for any additional services as she was already being pulled out for other services. (T. 3110) He stated that he never obtained counseling for the child in or out of school. (T. 3110-11)

He addressed Ex. GGG by explaining that he and his wife had been married for 24 years and were not seeking a divorce. They explained that to the child. (T. 3070) They did have an intense discussion a day or two before the child wrote Ex.GGG which the child may have overheard. In those discussions he stated that "It is not worth getting divorced over it". (T. 3124) He surmised that the child was "in earshot" of this remark and thought they were getting a divorce. (T. 3125)

With regard to the child's first SEIT, Ms.  Del Gracio, she was asked to leave by the agency by which she was employed after the parent learned that she was leaving twenty minutes early each day and because she asked the child to erase something on Ex. GGG. (T. 3068- 3069). He said that the two new SEITs were satisfactory. Id.  On one occasion, there was a substitute SEIT. (T. 3142) She prepared two versions of her report. (T. See Ex. LL and Ex. 7, T. 3145) The second one contained different information than the first one. Id. The father stated that the second report was "amplified" at the request of the mother.(T. 3146-47) He did not know if either version was ever share with PS 6 staff. (T. 3149) He testified that the SEITs were not allowed to share their notes with anyone at PS 6 due to the agency's policy that was in effect in kindergarten and first grade. (T.

3149-50) He never asked the agency if that policy remained the same by the time t³he child was the third grade. (T. 3151)

The father stated that after the incident with J, he did not ask for the child to be placed in another classroom. (T. 3106) He knew that there was only one CTT class at PS 6. Id. As he previously testified, he refused to consider any other public school where there was an open CTT placement for the child.

' Instead, the parents completed an admissions application from the Summit School on February 11, 2008. On that application the parents did not mention bullying. There was no mention that the child was unhappy at PS 6. The parent reported there that the child participated in social activities at school and was generally happy, engaging and outgoing with a sense of humor. (Ex. AAAAA, pp . 4,8.)

Ms. Fontana was deposed during the course of the Federal action. The transcript of her deposition was admitted into evidence in this proceeding as Ex. DDD. The scope of the deposition was limited by the court to issues relating to a subpoena in which the parent requested documents "relating to the bullying issue" and DOE's response thereto that led to the production of documents contained in Ex. CCC. (Ex. DDD, pp. 5-7) Ms Fontana testified that she turned over every document that was in the computer data base that tracks IRs as well as other documents that were responsive to the request but were not in the computer data base. Ms Fontana explained how data is entered into the computer system. (Ex, DDD, p.9) She further explained that parents are not given copies of data entries. When there is an incident, parents are called on the phone. However, she said that parents can request copies in writing. She doesn't know how parents are made aware of the computer system.

She testified that she did not know if IRs were generated following the pinching and toe-stepping incidents but she stated that she believed that there were. (Ex. DDD, p.12). She was not aware of the toe-stepping incident until the parents brought it to her attention. She said that the teachers did not know because the child did not tell anyone at the school. (Ex. DDD, p.13)

Case No.: ██████

Ms. Fontana also spoke to the OR system. She said that ORs are never brought to meetings. She did not know if they were disclosed to the parents. She did not know when the OR dated November 27, 2007 was created. She explained that the IRs and the ORs were not produced at the BIP or the IEP meetings. She explained that while behaviors are discussed at IEP and BIP meetings, she has never had to prove that they occurred by bringing the ORs or IRs to such meetings. During those meetings, they are more concerned with how to support a child.

Ms. Fontana explained that the computer system is maintained by all schools in the DOE. It is part of the Citywide Discipline Code and the Bill of Rights. It is a way of documenting incidents that occur in the building to ensure that they are investigated. They create the ORs at PS 6 so that all the school has to do following an incident is to get a written statement at the time of the incident . Each statement is given a number,. The system can provide information as to who the child was, who witnessed the incident, when and where the incident occurred, who is reporting it and whether the parents were called. In certain instances where weapons are involved the OR will state whether the superintendent or the police were called.(Ex DDD, p. 25). They are not allowed to disclose the names of the children.

She answered questions about letters that she received from the parents. She said that she never responded to any of them in writing. With regard to the January 28, 2008 incident, she said that she did not provide the documents to the parents. She did not recall any witnesses to the alleged incident in deposition Ex.#1 (Ex. CCC.8) or deposition Ex. # 2 (Ex. CCC.3). She did not do any additional write up for the incident described in deposition Ex. # 3 (Ex. CCC.1) when Ms. Sher's hair was pulled. She said that she asked the teacher to copy Ex. 3 and send it to the parents. (Ex. DDD, p. 43)

There seemed to be some confusion between the IRs and ORs. Ms. Fontana was trying to explain why some IRs did not have ORs attached and why the dates of each did not always match. . She explained for the second time that the ORs have a number so you do not have go through every "fucking" IR to find the incident. (Ex. DDD, T. 51) There was some colloquy regarding Ms. Fontana's choice of words, she was instructed by counsel for the DOE not to use that type of language. The deposition than continued.

Hearing Officer's Findings of Fact and Decision                    31

Case No.: ████████

Ms. Fontana acknowledged receipt of Ex. QQ dated February 5, 2008 sent by the parents requesting copies of documents relating to any incident written by a teacher, a student or by the child. She stated that she does not give documents to parents unless they request them in writing. She verbally asked the teachers to send the to the parents with names redacted. (Ex.DDD, p. 56-57). She thought the teacher had produced them to the parents. (Ex. DDD, p.65). She said that she was not aware that her requests were not followed. (Ex.DDD, p.68). She did not inquire as to whether the teachers sent the IRs to the parents prior to the IEP meeting. (Ex. DDD, p. 70)

She did not recall ever seeing the letters from May 23, 2008 May 28, 2008 (Ex. N) or May 20th prior to the IEP meeting. They were not addressed to her. (Ex. DDD, pp. 58, 61).

**CONCLUSIONS OF LAW**

    **A.  Who bears the burden of proof?**

At the outset of this hearing, the parties asked for a ruling with regard to which of parties had the burdens of production and persuasion with regard to the Federal court's four-prong test. The parent argued that N.Y. Education Law Section 4404(1)c) (McKinney's 2009) places the burden of proof upon the DOE to show that FAPE was provided. They further argued that since the DOE is the party in possession and control of the information "as to what happens behind its schoolhouse doors" (See, Parents' Memorandum of Law dated June 6, 2011, Ex. LLLLL), it should also bear the burden of production on all four issues.

Not surprisingly, the DOE contends that it should not bear either burden. The DOE cited to the "general evidentiary rule" that these burdens with regard to any evidentiary issue are both allocated to the same party, and that here, that party should be the parent. They rely upon several cases where "deliberate indifference" is an element of the cause of action which "universally" place the burdens upon the plaintiff. They further argue that the parents are in possession of knowledge to show that the student was a victim of harassment, that they put the DOE on notice and that there was a negative effect on the student's education. Thus, the DOE contends that the parent should bear both burdens (See, DOE's Memorandum of Law dated June 6, 2011, Ex. 9)

These issues were argued and decided on the first day of the hearing. It was determined that the DOE had the burden of proof to show that FAPE was provided and thus, it had the burden on all four prongs of the test. New York law is clear on this point. It provides that: "The board of education or trustees of the school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof, including the burden of persuasion and burden of production, in any such impartial hearing, except that a parent or person in parental relation seeking tuition reimbursement for a unilateral placement shall have the burden of persuasion and burden of production on the appropriateness of such placement." N.Y. Education Law Article 89, Section 4404 (1) ( C ).

It was also decided that the burden of production should be shared as follows: the DOE had the burden of production as to the first, second and fourth elements of the new test and the parent had the burden of production as to the third element. In fact, the burden of production should have been placed upon the DOE for all four elements of the test pursuant to that same section of the N.Y. Education Law. However, the issue as to the burden of production is now irrelevant because the parties called witness in no particular order and both parties questioned each witness on the day of their appearance. Thus, there was no prejudice to the parent on account of that initial ruling placing the burden of production on them for the third element of the test.

### B. Was the child denied a FAPE?

Under the IDEA, a child with a disability is entitled to a free appropriate public education (FAPE). 20 U.S.C. § 1400(d)(1)(A). The issue of "bullying" is not directly addressed in the IDEA. The issue of "bullying" and its relationship to FAPE has now been addressed by the Federal court in this case. The Federal court set forth a new set of standards for an IHO to apply when bullying is alleged in the request for an impartial hearing under the IDEA. The Federal court rendered its decision in the face of the recent waive of bullying that has been taking place and has come to the forefront of our consciousness as it never has before. As the Federal court recognized, bullying can indeed be dangerous when it occurs between school-aged children whether they are typically developing children or children with disabilities. And, children with disabilities,

Case No.: ▓▓▓▓▓▓

by their very nature, are more vulnerable to being singled out and teased or bullied by their typically developing peers or by other students who have disabilities. It is within this context and following the new standards that the evidence will be re-examined to determine whether FAPE was provided.

The applicable standard set forth by the Federal court to determine if bullying led to a denial of FAPE is as follows: 1) was the child a victim of bullying; 2) did the school authorities know or should they reasonably have known about the bullying, 3) did the school authorities take appropriate steps to fully investigate the bullying and take remedial action against those who were perpetrating the harassment or were they deliberately indifferent to the bullying; 4) did the bullying reach a level where the student was "substantially restricted" in her learning opportunities?. The answer must be yes to all four to show that the child was denied a FAPE.

### 1) Was the child a victim of bullying?

During the remand hearing, each and every DOE witness was asked to offer their opinion as to what constitutes bullying. While most of them admitted that they had no formal training on the subject, they were willing to give their opinion based upon their own practical experience working with children. Each of them had a somewhat different understanding, but they all agreed that bullying had to be more than one incident, it could be verbal or physical, by one or more children who intended that their actions or words would hurt the victim. In other words, bullying is not accidental.

In addition, during the initial hearing, Dr. Blaustein, the child's speech pathologist testified that children such as this child who has a language based impairment, are often victims of bullying because they cannot comprehend higher levels of language such as jokes and sarcasm. (T. 267). A review of this record shows that the child was, at the very least, repeatedly a victim of practical jokes which a typically developing child might understand but this child did not. At the very worst, she was a victim of repeated teasing and ostracism by her peers. In either case, she was harmed sufficiently by the actions of her peers to conclude that she was a victim of bullying.

Interestingly, the mother was most offended and disturbed by the actions of J who was also a disabled child with serious issues of his own. However, the evidence shows

Hearing Officer's Findings of Fact and Decision                                    34

Case No.: ██████

that he and the child had many conflicts with each other where he was not always the aggressor. He, in the same way as the child, may not have understood the nature or results of his actions. But, nonetheless, he was a perpetrator. [4]

The evidence shows that on two occasions, six months apart, the child and J were involved in physical incidents. The first incident occurred in May 2007 and was documented by the mother in a letter dated May 11, 2007. In the letter she described the injury as a bruise about 1.5 inches long that was "raised, swollen, red with a scratch that broke the skin and formed a scab". (Ex FFF) The father testified that he took a picture of the injury 3-4 hours after the incident. (Ex. EEE) The child told her that it happened at recess. She later told her father that it was J who pinched her. The mother came to the school and took the child to the school nurse who administered treatment and documented the injury. (Ex.FFF). The mother tried to speak to the principal that day but was referred to Mr. Kim, an Assistant Principal at PS 6. He said that he would investigate the incident. There was one IR created for the incident. It was written by J who blamed somebody else. (Ex. CCC, p.16) The child herself was not asked about the incident. She was not asked to complete an IR.

The second incident with J occurred on November 28, 2008. On that occasion, the mother wrote a letter documenting an incident in which the child told her that J "intentionally" stepped on her toes. (Ex. WW) That letter was sent to the child's two teacher with copies to the principal and the two assistant principals. Id. There was no IR created for that incident. The child was not asked to complete an IR presumably because on or about the same time the parents had gotten upset when the child was asked to write something without their permission. (See, Exs. GGG and NNN)

On February 10, 2008, the parent sent another letter to Ms. Fontana documenting the fact that a child in the CTT class, L, made prank phone calls to their home one evening directed at the child. (Ex. HHH) the letter stated that the child was very upset and felt humiliated by the calls. Id. The mother asked the principal to take some action. No

---

[4] As was pointed out by Judge Weinstein, victims of bullying can often become aggressors or perpetrators. Thus, it is not surprising that the child herself engaged in a series of aggressive actions with teachers as well as other students that caused the administration some concern. Each and every action in which the child was the aggressor was documented in an IR. (See. Ex. CCC , pp. 1-15, JJJ)

Hearing Officer's Findings of Fact and Decision                                    35

Case No.: ▉▉▉▉

IRs were completed presumably because the calls were made off school property. As Ms. Fontana explained, IRs were to document incidents occurring on school property or during a school activity.

Ms. Faber, the child's SEIT, prepared a report in which she stated that there was negative social interaction between the child and members of her class. (See, Ex. S) She testified that the child was pushed and tripped by classmates. (T. 1473-74) She further stated that on one occasion she observed the children in the class refusing to touch the child's pencil. (T.1556-58)

Ms. Maloney, the child's other SEIT, stated that there was "a great deal of teasing, a great deal of backing away from the child and not including her." (T. 1555) For example, she confirmed the testimony of Ms. Faber that on one occasion, the other students refused to touch a pencil that the child had touched. (T. 1562-63)

Ms. Wiggins, a substitute SEIT for the child in April 2008, testified that it was she who saw a child drawing Ex. MM. She identified the perpetrator in her report by name. She took the drawing out of the trash which is where the teacher placed it before any of the other children or the child saw it. She did not show the drawing to anyone at the school but gave it to the parents. (T. 1323). Ms. Wiggins also observed a child with ketchup on his hands teasing the child saying it was blood and laughing. (Ex. LL, T.1305) She observed the child being lured by some boys into stepping on ketchup packets and other boys inappropriately pushing against the child. (Id., T. 1306,1320) She further reported that during class, the children were asked to exchange papers, but none of the other students would physically touch the child's paper. (Ex. LL, p.1)

While each of these incidents considered separately may not be deemed harassment or bullying, when viewed together, they constitute a pattern of behavior towards the child at PS 6 which meets the criteria of bullying. It was repeated behavior, by one or more children in the class which, in at least several of these examples, was intended to hurt the child. It is true that these perpetrators were also children with IEPs, but even children with disabilities are capable of knowingly and intentionally causing harm to another child whether it is done in fun or not.

Hearing Officer's Findings of Fact and Decision                                    36

Case No.: ████

The DOE presented no evidence to contradict the version of events offered by the mother's letters and the SEITs. They only offered alternative reasons why these behaviors took place, such as the child smelled, the child's fingers were bleeding, and the child was often the aggressor. But, none of these explanations cast any doubt upon the actual occurrence of each incident described above. None of the explanations make the cumulative effect of the incidents of bullying any less hurtful to the child.

## 2) Did the school authorities know or should they reasonably have known about the bullying?

The school authorities were made aware of some of the incidents of bullying but it is less clear that they actually knew about all of them. For example, as indicated above, the mother wrote several letters to the school in which she gave an account of at least three incidents. (Exs. FFF, HHH, WW). In addition, there was testimony from Ms. Faber that she informed the teacher when the children in the class refused to touch the child's pencil. (T. 1557-58) However, there is no evidence that the staff at PS 6 was made aware of the other incidents reported by the SEITS as described above, e.g the offensive drawing (Ex. MM).

Nonetheless, there was a great deal of testimony relating to the parents' efforts to raise the issue of bullying directly with school authorities on at least three different occasions. The first time was at the BIP meeting on March 26, 2008. The parents wanted to discuss the bullying issue. The record is silent as to the particular incidents that the parents wished to discuss. The school based support team and the teachers explained that a BIP meeting was to discuss the behavior of the child, not the behavior of other children. Thus, the issue of bullying was not discussed at that time. The second time was on May 9, 2008. On that date, the parents arrived at the principal's office. It is unclear whether they had an appointment. They came with the child. The evidence shows that the principal asked them to remove the child but they refused. The principal had to call security when the situation got heated. The child was getting upset. The principal terminated the meeting without further discussion. The meeting was never rescheduled by either the parent or the principal. Once again, the details and particulars of the bullying issue which the parents wanted to discuss were not disclosed at that time. The third occasion occurred

Hearing Officer's Findings of Fact and Decision                                        37

Case No.: ████████_____

on June 4, 2008 at the IEP meeting. The meeting was to develop an IEP. The meeting was well underway when the father attempted to raise the issue of bullying. Once again, he was told that it was not the right time or place to discuss the issue of bullying. He was invited to set up another meeting to discuss the issue but he never did and no one from PS 6 called him to do so.

While it is true that many of the particular incidents of bullying of which the parents complain were not specifically disclosed to the PS 6 staff,  DOE personnel was certainly made aware by the parents and Ms. Faber that the child had been the victim of both physical and verbal harassment before and during the course of the school year in question. Thus, the DOE reasonably should have known that there may have been an issue with regard to bullying. That the school authorities did not afford the parents an opportunity to discuss bullying during the 2007-2008 school year whenever it was raised[5], does not mean that it was reasonable for the principal and others to now claim that they had not been made aware of the problem. The school authorities should have known that the child was or could have been a victim of bullying because of the parents' repeated attempts to bring the issue to their attention.

**3) Did the school authorities: a) take appropriate steps to fully investigate the bullying, b) take remedial actions against those who were perpetrating the harassment or c) were they deliberately indifferent to the bullying?**

The DOE had the burden of proof to show that the incidents of bullying were fully investigated. There was a great deal of evidence presented through the testimony of the teachers, the school social worker and the Assistant Principal about what has been done

---

[5] The principal may have had a right to insist that the meeting in her office be terminated because it was getting heated, the child was present and getting upset. She may have had a right to defer discussion of bullying at the IEP meeting. But, she cannot claim that she did not know that there was a problem that the parents wanted to address. As Ms. Santucci stated in her testimony, she does not think it is appropriate "to dismiss parents" if they want to talk about something. Ms Fontana did just that on several occasions. The parents should have been given an opportunity to discuss their concerns about bullying at a later date. Since Ms. Santucci had been discussing bullying generally with the parent for several years, she stated that she did not think that the mother understood the meaning of bullying. Perhaps a discussion with the mother after the first complaint of bullying could have prevented the child from experiencing hurt feelings and embarrassment from some of the other incidents. It may also have prevented the intense acrimony that developed over the years between the parents and the school authorities.

Hearing Officer's Findings of Fact and Decision                                    38

school-wide over the last several years to build community and thus, to try to prevent bullying.

Ms. Santucci described the school-wide anti-bullying policies and practices in effect during the 2007-2008 school year. She described a "Stop the Bullying" handbook prepared in 2006 for teachers. (DOE Ex. 6) She testified that PS 6 participated in a program called "Project Excel" in which it appears that some but not all staff worked on creating lessons about social/emotional issues. An expert in conflict mediation was invited to work with the staff during the 2003-2004 school year and who also held a workshop for parents on bullying. A retreat was held to educate the staff on bullying and conflict resolution. A teacher's reference guide with respect to bullying was prepared and was also available to staff. A safety squad was created to help in the yard and in the cafeteria. There was a conflict resolution committee. An additional part-time guidance counselor was hired. A peer mediation program was created. And, a staff handbook was prepared in which the school-wide discipline policies were set forth. (Ex. 2.1)

There was also testimony from the child's teachers about how bullying was addressed in the classroom. The teachers confirmed that there was a zero tolerance policy at PS 6 and bullying was discussed. There was a protocol for bullying involving different types of behavior. Some activities included "read alouds", a share box, class meetings, drawing pictures of social situations, composing "I" messages to express feelings and a weekly discussion of the "Golden Rule." A reward system for positive reinforcement of good behavior was in place. In addition, the guidance counselor came in to the class and taught a lesson about respect.

However, it was clear from the testimony of the teachers, the school psychologist and the social worker that none of them took part in any of the programs and retreats described by Ms. Santucci. They all testified that they received no formal training with regard to bullying. The DOE cannot rely upon workshops that took place years before the then current staff came on board to prove that they took meaningful steps to prevent bullying.

Moreover, the record is very slim as to what steps, if any, the PS 6 staff took with regard to this individual child. In May 2007, when the mother wrote to Ms. Fontana to

Case No.: ████████

inform her that the child was pinched, Ms. Fontana called the mother and told her that she would investigate the incident. Ms. Fontana's investigation apparently ended the minute the child J said that it was someone else who did the pinching. She did not try to speak to the child herself. There was no documentation offered to show that any other child who may have seen the incident was questioned or that any effort was made to discover who else, if not J, could have pinched the child. There was no evidence offered to show what, if anything, was done to remediate the situation. Ms Fontana never informed the parents about the results of her investigation until she was asked by them at a subsequent meeting in August 2007. At that time, she said that it was "taken care of". She never told them how she took care of it and there were no documents to show how it was "taken care of".

Similarly, with regard to the toe-stepping incident reported by the mother in November 2007, there was no evidence offered to show how or if it was investigated. There was no IR at all prepared for that incident. Even if, as the DOE contends, the incident was accidental, how would they know if they did not ask J as they had done the previous school year.[6] In the absence of even a statement from J that it was an accident, the DOE's contention cannot be credited. Moreover, even if it was accidental, there should have been someone called upon to testify that J was made to apologize to the child (if in fact he was). It was made pretty clear by the teachers that when children bump into each other by accident, they are asked to apologize. Presumably, stepping on someone's toes by accident should warrant an apology. Otherwise the victim is sent the message that such behavior need not be acknowledged. To the child, as well as to the other children, it creates the impression that it was all right to do whatever they wanted to her without consequences of any kind.

In February 2008, when the mother again brought an incident to the attention of Ms. Fontana, it does not appear that anything was done by the administration to address it. (Ex. HHH) Granted that the prank calls were made on a weekend and in the evening and might not warrant the completion of an IR with regard to the incident, but it does not

---

[6] It should be noted that the IR policy was implemented very arbitrarily at PS 6. For example, when the mother wrote a letter stating that the child pulled the teacher's hair by accident, an IR was completed that did not reflect the mother's response but did reflect the teacher's belief that it was done "on purpose". (Ex. CCC, pp.1-2)

Case No.: ▮▮▮▮▮

justify the administration's failure to respond. The administration knew or should have known, since the teachers were informed by the SEIT, that there were children who refused to touch her pencil. They should have known that the child was laughed at in class. Thus, the administration aware that the child was the victim of ridicule which was hurtful to the child in the past and should have intervened in this instance to prevent future harassment of the child in and out of class.

"Deliberate indifference" requires, in the first instance, a finding that the school officials had "actual knowledge" of the incidents in question and second, that the officials failed to adequately respond. Hayut v. State University of New York, 352 F3d 733, 750 (2d Cir. 2003). With regard to the two incidents involving J ,the prank calls and the children refusing the touch the child's pencil, the P.S. 6 staff had actual knowledge. They were put on notice by the parent of the first three incidents and a teacher was made aware of the fourth. The administration's failure to take any steps, much less adequate steps, to address these various incidents of harassment was clearly unreasonable in light of the known circumstances and did make the child more vulnerable to such conduct. D.T. v.Summers Cent. Sch Dist., 2009 WL 3316419 at* 2, (2d Cir. Oct. 15, 2009). Accordingly. the staff members at PS 6: 1) failed to take appropriate steps to investigate the incidents of bullying, 2) failed to show that remedial action was taken to prevent further bullying of this child including failure to train the staff with regard to bullying and thus, were deliberately indifferent .

> 4) **Did the bullying reach a level where the child was "substantially restricted" in her learning opportunities?**

Despite the fact that the child was bullied and was at times reprimanded for being the bully, she has in her parents own words " been able to accept the time outs " and move on. (Ex. AAAAA, p. 8) The parents have described the child as "happy, engaging and outgoing". Id. They stated that she is able to work with a partner and in small groups

Hearing Officer's Findings of Fact and Decision                                    41

Case No.: ▉▉▉▉▉▉

at school. Id. She is motivated to learn. Id. p. 7. [7] Perhaps that is because the bullying in question was not so severe as to substantially interfere with her total school experience.

Unlike the example appearing in the October 2010 Bullying and Harassment letter prepared by the United States Department of Education, the child does not appear to have shown signs of "victimization" as a result of the bullying. In fact, she made improvements over the course of the school year in question academically, emotionally and socially. As the teachers reported, the child was concerned with bullying and seemed anxious in the beginning of the school year at or around the time the child prepared Ex. GGG . But, as the school year progressed, and the parent's explained to the child that they were not getting a divorce, the child's concerns with bullying "petered out" and she appeared comfortable and safe in the classroom. (T. 2022, 2040) This is consistent with the parents' account of the child's ability to "move on".

By the second half of the school year, the evidence shows that the child was engaging more and was becoming more self-confident. The teacher, Ms. Vasari, stated that the child made social and emotional progress that year and went from a child who was quiet in the beginning of the school year to a child who, as her parents also acknowledged in Ex AAAAA, did partnership work and worked well with other students. Ms. Vasari testified that the child made academic progress in reading, math and writing during that school year—particularly during the second half of the year, her hygiene improved, she sought out her peers, her nose and finger picking decreased, she no longer rolled around on the carpet or made puppet hands. She was no longer left out of groups. (T 2166-68, 2204-42). By mid-year, the child did not need to work on social /emotional domains. (T. 2880-81, 2886, Ex.L)

As the DOE notes in its post-hearing memorandum, the child's progress was so marked that her classification on her IEP was changed at the June 4th 2088 IEP meeting from Autism to Learning Disability. (T. 362, Exs. D, PP, KK) Dr. Packard stated at the IEP meeting that the child had "outgrown that diagnosis this year."(Ex. J) He mentioned

---

[7] The parents' main reason for sending the child to Summit School as opposed to another CTT class in public school system was because as they stated in the application to the Summit School, a large classroom interferes with the child's expressive language delays. (Ex AAAAA, p.7)

Case No.: ▉

that the child had made progress in receptive, expressive and pragmatic language skills, math problems, writing fluency and social skills. (Ex.V,CC, P, W) He observed that her conversation skills had improved and that her academic progress showed that she was "fairly on target." (T. 1363-1364) Dr. Packard confirmed the testimony of Ms. Vasari by reporting that the child had friends in school and enjoyed working with them there. (Ex. PP.) Dr. Salsberg noted that the child has made progress in all areas and is able to keep up with her peers. (Ex. XX) Mary Kutch noted that the child continues to demonstrate gains in all areas of programming at home and as school. Ex. W. The child was meeting learning standards and was at above target range in math on the New York State standardized test administered in March 2008. ( Ex. CCC, pp. 37-38) Ms.Muldowney stated that the child was doing very well academically. (T. 369-70) Finally, Ms. Santucci testified that when comparing the report card issued in mid-year with the one issued in the Spring of 2008, the child did go up and was meeting grade level standards in reading, word study and writing. (T. 2668-2670, Compare Exs. K, L)

Accordingly, based upon the evidence which includes the opinions offered by all of the child's teachers and professionals familiar with her development in various domains as well as the parents own acknowledgment of this significant progress, the child's educational opportunities were not significantly impaired during the 2007-2008 school year. Thus, fortunately, she was not denied a FAPE as a result of the bullying. Since it had been determined that the child was not denied a FAPE, it is not necessary to revisit the initial FOF rendered in this case in 2009.  The outcome of that decision remains undisturbed.

**ORDERED THAT:**  The parent's request for tuition reimbursement for the Summit School for 2007-2008 is denied in all respects.

Dated: June 6, 2012

JUDITH T. KRAMER, ESQ.
Impartial Hearing Officer

JTK:jj

Hearing Officer's Findings of Fact and Decision                                   43

Case No.: ▓▓▓▓▓

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                                    44

Case No.: ████

## DOCUMENTATION ENTERED INTO THE RECORD

### PARENT

| | |
|---|---|
| A | Demand for Due Process, 6/20/08, 6 pp. |
| B | Answer New York City Department of Education By: Diane Caiazza, 6/25/08, 3 pp. |
| C | Decision of the State Review, 6/11/08, 23 pp. |
| D | IEP New York City Department of Education, 6/4/08, 38 pp. |
| E | Addendum to the Findings of Fact and Decision By: Dora Lassinger, Esq., 2/21/08, 12 pp. |
| F | Speech and Language Therapy: Annual Goals and Short-Term Objectives, 2008-2009SY, 5 pp. |
| G | Occupational Therapy: Annual Goals and Short-Term Objective, 2008-2009SY, 5 pp. |
| H | Academic Annual Goals and Short-Term Objectives, 2008-2009SY, 12 pp. |
| I | Letter to Region 9 from the Parents, 6/6/08, 4 pp. |
| J | Annual IEP Meeting Transcript, 6/4/08, 81 pp. |
| K | 3rd Grade Progress Report and Specialist Progress Report with Teacher's Comments Attached By: Marissa Vassari, *Sp. Ed.* and Melanie Fine, *Gen. Ed. and* the Teachers of the Special Classes [P.S. 6], Winter 2008, 3 pp. |
| L | 3rd Grade Progress Report and Specialist Progress Report with Teacher's Comments Attached By: Marissa Vassari, *Sp. Ed.* and Melanie Fine, *Gen. Ed. and* the Teachers of the Special Classes [P.S. 6], Spring 2008, 3 pp. |
| M | Letter to P.S. 6 from the Parents, 5/29/08, 1 p. |
| N | Letter to P.S. 6 from the Parents, 5/28/08, 2 pp. |
| O | Letter to the Parents from P.S. 6, 5/28/08, 1 p. |
| P | Speech and Language Progress Note By: Donna Glaser Orloff, C.C.C./SLP [Full Potential Resource Center], 5/28/08, 2 pp. |
| Q | Letter to P.S. 6 from the Parents, 5/27/08, 2 pp |
| R | Resume and Public School Teacher Certificate For: Dominique Faber, *SEIT,* Undated, 2 pp. |

Hearing Officer's Findings of Fact and Decision                                    45

Case No.: ████

| | |
|---|---|
| S | SEIT: Student Progress Report By: Dominique Faber, *SEIT* [New York Therapy Placement Services, Inc.], 5/23/08, 1 p. |
| T | Letter to P.S. 6 from the Parents, 5/23/08 2 pp. |
| U | Resume for Marianna Gersh, M.S., Ed., Undated 2 pp. |
| V | Educational Progress Report By: Marianna Gersh, M.S., Ed., 5/23/ 08, 4 pp. |
| W | ABA/Consultation Progress Report By: Mary Kutch, B.A., *ABA/Consultant* [LOVAAS Institute], 5/22/08, 2 pp. |
| X | Registration Certificate for Dana L. Rosen, OTR/L, Undated, 1 p. |
| Y | Occupational Therapy Progress Report By: Dana L. Rosen, OTR/L, 5/22/08, 2 pp. |
| Z | Resume for Ashely B. Sefecka, P.T., DPT, 8/26/08, 2 pp. |
| AA | Physical Therapy Progress Report With Annual Goals and Short-Term Objectives Sheet Attached By: Ashley B. Sefecka, P.T., DPT, 5/21/08, 8 pp. |
| BB | Resume for Jessica R. Peller, M.S., CCC-SLP,  Undated, 1 p. |
| CC | Speech and Language Therapy Report By: Jessica R. Peller, M.S., CCC-SLP, 5/21/08, 3 pp. |
| DD | Resume for Shannon Maloney, M.A., BCBA, Undated, 2 pp. |
| EE | Educational Progress Report By: Shannon Maloney, M.A., BCBA [Theracare], 5/20/08, 2 pp. |
| FF | Neuro-Developmental Report By: A. Maurine Packard, M.D., 5/15/ 08, 3 pp. |
| GG | SEIT Notes By: Dominique Faber, *SEIT*, 5/9/08, 2 pp. |
| HH | Letter to P.S. 6 from the Parents, 5/8/08, 2 pp. |
| II | Letter to P.S. 6 from the Parents With Lexi's Letter Attached, 5/7/08, 3 pp. |
| JJ | Letter from Ms. Fine and Ms. Vassari To the Parents, 5/7/08, 1 p. |
| KK | Language Evaluation By: Steven H. Blaustein, PhD, April and May 2008, 7 pp. |
| LL | SEIT Notes By: Sharifa Wiggins, *SEIT*, 4/18/08, 3 pp. |
| MM | Derogatory Caricature of 'Lixe' Drawn During Class Time By: A Class 3-209 Student, 4/18/08, 1 p. |
| NN | Developmental Evaluation with Test Scores Attached by: Cecelia McCarton, M.D. and Jennifer Susan Leach, PhD,4/17/08, 17 pp. |

Hearing Officer's Findings of Fact and Decision                                      46

Case No.: ⬛⬛⬛

| | |
|---|---|
| OO | Art Class Report [92 Street Y], 4/1/08, 1 p. |
| PP | Neuro-Developmental Evaluation By: A. Maurine Packard, M.D., 2/18/08, 4 pp. |
| QQ | Letter to P.S. 6 from the Parents, 2/5/08, 3 pp. |
| RR | Invoice Breakdown and Proof of Payment ABA/Consultation Invoices, February - June 2008, 12 pp. |
| SS | Invoice Breakdown and Proof of Payment PT, SEIT and OT Invoices, July – August 2008, 9 pp. pp. |
| TT | Program Description of The Summit School, Undated, 2 pp. |
| UU | Enrollment Contract and Proof 1st Payment [The Summit School], 2008/2009, 2 pp. |
| VV | The Summit School Calendar, July-September 2008, 3 pp. |
| WW | Letter to P.S. 6 from the Parents, 11/29/07, 1 p. |
| XX | Psychological Consultation with Appendix Sheet Attached By: David H. Salsberg, Psy.D, DABPS [P.A.L.S], 11/1/07, 8 pp. |
| YY | The Summit School Progress Report By: Nicole Brown, *Homeroom Teacher*, 12/2008, 12 pp. |
| ZZ | NYC DOE-Respect for All, Rules and Policies, Undated, 1 p. |
| AAA | NYC DOE-Anti-Harassment Initiatives to Stop Bullying and BiasRrelated Incidents in City's Public Schools, 9/3/08, 4 p. |
| BBB | Invoice Breakdown, Invoices and Proof of Payments, July 2008 – January 2009, 26 pp. |
| CCC | Documents Provided by DOE in response to our Subpoena (including incident reports), Undated, 137 pp. |
| DDD | Lauren Fontana Deposition, 10/ 20/10, 29 pp. |
| EEE | Photos – Pinching incident, 5/10/07, 2 pp. |
| FFF | Parents letter to Ms. Gutwillig and Ms. Harvilchuck, 5/11/07, 2 pp. |
| GGG | Lexi Handwritten Note with Teachers Letter to Parents, November 2007, 1 p. |
| HHH | Letter to Ms. Fontana from Parents, 2/10/08, 2 pp. |
| III | Shannon Maloney Notes, 5/6/08, 1 p. |
| JJJ | Occurrence Report (May 6, 2008) with Email from Corporation Counsel Producing Same on 3/16/11, 5/6/08, 2 pp. |
| KKK | Letter to Ms. Fine from Parents, 5/7/08, 1 p. |

Hearing Officer's Findings of Fact and Decision                                   47

Case No.: ▉▉▉

| | |
|---|---|
| LLL | Letter toPparents from Ms. Fine , 5/7/08, 1 p. |
| MMM | Letter to Parents from Ms. Fine with Lexi's Response, 5/7/08, 2 pp. |
| NNN | Letter to Ms. Fontana from Parents, 11/3/07, 1 p. |
| OOO | Letter to Parents from Ms Fine and Ms. Vassari, 10/31, 1 p. |
| PPP | Letter to Ms. Vassari and Ms. Goldberg from Parents, 8/24/07, 1 p. |
| QQQ | IEP East Williston Union Free School District, 2010-2011, 19 pp. |
| RRR | Behavior Intervention Plan, 2011-2012, 1 p. |
| SSS | Social-Emotional Profile The Summit School By: Jamie Ashley, June 11, 1 p. |
| TTT | Report of Parent/Professional Telephone Contact By: Rita Quintas, 4/1/11, 1 p. |
| UUU | Student Interview The Summit School By: Jamie Ashley, LMSW, February 2011, 3 pp. |
| VVV | Educational Staff Report The Summit School By: Gloria Ratafia, 1/22/11, 4 pp. |
| WWW | Letter to Ms. Miriam from Parents, 1/19/11, 1 p. |
| XXX | Letter to Ms. Miriam from Parents, 11/11/11, 1 p. |
| YYY | Counseling Progress Notes The Summit School By: Jamie Ashley, LMSW , January 2011, 3 pp. |
| ZZZ | Behavior Intervention Plan, October 2011, 1 p. |
| AAAA, | Mid-Year Evaluation Report The Summit School By: Jamie Ashley, LMSW, Gloria Ratafia, Joshua Bernacchio, 2010-2011, 4 pp. |
| BBBB | Recommendations The Summit School, 2010-2011, 2 pp. |
| CCCC | Mid Year Evaluation Report Testing Information The Summit School, 2010-2011, 1 p. |
| DDDD | Student Progress Report The Summit School, 2010-2011, 11 pp. |
| EEEE | Report of Parent/Professional Telephone Contact, 2009-2010, 6 pp. |
| FFFF | Social-Emotional Profile The Summit School By: Jamie Ashley, LMSW, September 10, June 10, 2 pp. |
| GGGG | Behavior Intervention Plan, 2009-2010, 1 p. |
| HHHH | Summary of Contacts The Summit School By: Jamie Ashley, LMSW, 2/3/10, 2 pp. |

Hearing Officer's Findings of Fact and Decision                                    48

Case No.: ▮▮▮▮▮

| IIII | IEP East Williston Union Free School District, 2009-2010, 6 pp. |
| JJJJ | Annual Goals and Short Term Objectives IEP East Williston Union Free School District, 2009-2010, 9 pp. |
| KKKK | Counseling Progress Notes The Summit School By: Jamie Ashley, LMSW, 2009-2010, 3 pp. |
| LLLL | Recommendations The Summit School, 2009-2010, 2 pp. |
| MMMM | Evaluation The Summit School By: Jamie Ashley, LMSW, Judy Borenstein, Lauren Barnes, 2009-2010, 1 p. |
| NNNN | Progress Report The Summit School By: Judy Borenstein, 2009-2010, 11 pp. |
| OOOO | Social-Emotional Profile The Summit School By: Jamie Ashley, LMSW, September 9, June 9, 2 pp. |
| PPPP | Progress Report The Summit School By: Diane Graff, 2008-2009, 2 pp. |
| QQQQ | Report of Parent/Professional Telephone Contact, 2008-2009, 4 pp. |
| RRRR | Teachers Report The Summit School, September 2008, 1 p. |
| SSSS | Progress Report The Summit School By: Sherri Bordoff, LCSW, January 2009, 2 pp. |
| TTTT | Progress Report The Summit School By: Nicole Brown, 2008-2009, 10 pp. |
| UUUU | Evaluation The Summit School By: Judy Borenstein, Lauren Barnes, 2009-2010, 3 pp. |
| VVVV | Evaluation The Summit School By: Judy Borenstein, Lauren Barnes, Nicole Brown, Leila Debbarh, 2008-2009, 3 pp. |
| WWWW | Social-Emotional Profile The Summit School By: Jamie Ashley, LMSW, September 8, 1 p. |
| XXXX, | Behavior Incident Observation The Summit School, 2008-2011, 28 pp. |
| YYYY | Letter to Parents from Judith Gordon, Ph.D., 3/11/08, 1 p. |
| ZZZZ | Letter to Parents from Rita Quintas and Tina Rosenbaum, Ed.D., 3/11/08, 1 p. |
| AAAAA | Application for Admission The Summit School, 2/11/08, 8 pp. |
| BBBBB | Admissions Questionnaire for Teachers and Therapists, 1/25/08, 1 p. |
| CCCCC | The Summit School Information, Undated, 1 p. |
| DDDDD | List of Teachers The Summit School, 2008-2011, 1 p. |

<u>Case No.:</u> ██████

| EEEEE | Invoices and Proof of Payment The Summit School, 2008-2009, 22 pp. |
| FFFFF | 2002-2003 P.S. 6 Agenda, 2002-2003, 32 pp. |
| GGGGG | 2005-2006 P.S. 6 Planner, 2005-2006,07 pp. |
| HHHHH | 2007-2008 P.S. 6 Planner, 2007-2008, 8 pp. |
| IIIII | P.S. 6 Family Handbook 2011-2012, 2011-2012, 44 pp. |
| JJJJJ | TLK Medical Records, 2006-2009, 5 pp. |
| KKKKK | Letter from John Buhta, Esq. Regarding the P.S.6 Handbook for the 2006-2007 and 2007-2008 School Years., 1/5/12, 14 pp. |
| LLLLL | Memorandum of Law, 6/6/11, 5 pp. |
| MMMMM | East Williston Cert./IEP , 2/10/12, 7 pp. |
| NNNNN | Summit Certificatio , 2/ 8/12, 2 pp. |
| OOOOO | Mr. Klestadt Certification, 2/10/12, 3 pp. |

<u>DEPARTMENT OF EDUCATION</u>

| 1 | Functional Behavioral Assessment, 3/26/08, 11 pp. |
| 2 | P.S. 6 Discipline Policy, 2007-2008, 5 pp. |
| 1 | Accident/Incident-Inappropriate Phone Conversation, 2/5, 3 pp. |
| 4 | New York State Testing Results for Mathematics, 2008, 2 pp. |
| 5 | Citywide Standards of Discipline and Intervention Measures, September 2008, 28 pp. |
| 6 | PS 6 Teacher's Reference Guide to Stop Bullying, Undated, 45 pp. |
| 7 | SEIT Note, 4/18/08, 2 pp. |
| 8 | SEIT Note, 10/12/07, 1 p. |
| 9 | Department of Education Memorandum of Law, 6/6/11, 12 pp. |
| 10 | Letter from ACC Buhta to IHO Kramer, 6/10/11, 2 pp. |

<u>IMPARTIAL HEARING OFFICER</u>

| I | Judge Weinstein's Order, 4/28/11, 3 pp. |
| II | Transcript of Status Conference, 4/28/11, 8 pp. |
| III | Findings of Fact and Decision, 7/21/09, 39 pp. |

Hearing Officer's Findings of Fact and Decision                    50

Case No.: 116413

IV              Disc and Index of Documents on the Disc., 5/21/12, 1 p.
                and 1 Disc.