**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

T.K. and S.K., individually and on behalf of L.K.,

      Plaintiffs-Appellants,

      - against -                     **10 Civ. 00752 (JBW)(ALC)**

New York City Department of Education,

      Defendant-Appellee.

-------------------------------------------------------------

 

**MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A MODIFIED *DE NOVO* REVIEW**
**FOLLOWING THIS COURT'S REMAND RULING**

Mayerson & Associates
Attorneys for Plaintiffs
330 West 38th Street,
Suite 600
New York, New York 10018
(212) 265-7200
www.mayerslaw.com

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

ARGUMENT............................................................................................................................1

THE SRO'S MARCH 14, 2014 DECISION SHOULD BE REVERSED AND L.K. AND HER
PARENTS SHOULD BE AWARDED TUITION REIMBURSEMENT RELIEF AND
DECLARED THE "PREVAILING PARTY" ........................................................................1

   A. The *Burlington/Carter* Test For Reimbursement Relief ....................................1

   B. This Court's Prior Rulings Are Now "Law of The Case" .................................5

   C. The IHO And The SRO Found That There Was Bullying After All....................8

   D. Principal Fontana and The Undisclosed "Fucking Incident Reports" .............10

   E. The Adverse Impact On L.K. Is Well Documented.........................................12

   F. P.S. 6 Is The Only School Site That Defendant Ever Identified And Offered to L.K.  For
     2008-2009 ..........................................................................................................17

   G. The Summit School Was "Reasonably Calculated" As An Appropriate Prong II Placement
     for L.K. And It Is Even State Approved................................................................19

   H. The SRO's Indefensible March 14, 2014 Decision Should Be Reversed ...........19

   CONCLUSION ...................................................................................................................21

## TABLE OF AUTHORITIES

### FEDERAL CASES

*B.K. v. New York City Dep't of Educ.*,
  13 Civ. 393, 2014 U.S. Dist. LEXIS 44985 (E.D.N.Y. Mar. 31, 2014) ...................................4

*B.R. ex rel. K.O. v. New York City Dep't of Educ.*,
  910 F. Supp. 2d 670 (S.D.N.Y. 2012)... ............................................................2, 3, 4

*C.B. v. New York City Dep't. of Educ.*,
  2005 U.S. Dist. LEXIS 15215 (E.D.N.Y. June 10, 2005) ...........................................3

*C.F. v. New York City Dep't of Educ.*,
  746 F.3d 68, 2014 U.S. App. LEXIS 4083 (2d Cir. 2014) ...............................3, 4, 10, 14

*C.L. v. New York City Dep't of Educ.*,
  No. 12-cv-1676, 2013 U.S. Dist. LEXIS 3474 (S.D.N.Y. Jan. 3, 2013),
  *affirmed C.L. v. New York City Dep't of Educ.*, No. 13-558-cv, 2014 U.S. App. LEXIS 1520
  (2d Cir. Jan 27, 2014) ......................................................................................2, 3

*C.L. v. Scarsdale Union Free Sch. Dist.*,
  744 F.3d 826 (2d Cir. 2014) .........................................................................3

*F.O. v. New York City Dep't of Educ.*,
  No. 11-6660-cv, 2013 U.S. Dist. LEXIS 143424 (S.D.N.Y. Oct. 2, 2013) ...................5

*Florence County School Dist. Four v. Carter*,
  510 U.S. 7 (1993) ..........................................................................................2

*Frank G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*,
  459 F. 3d 356 (2d Cir. 2005) ...........................................................................3

*G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*,
  751 F.Supp.2d 552  (S.D.N.Y.2010) .............................................................4, 5

*Lillbask v. State of Connecticut Dep't of Educ.*,
  397 F.3d 77 (2d Cir. 2005) .............................................................................4

*M.H. v. New York City Dep't of Educ.*,
  685 F.3d 217 (2d Cir. 2012) ........................................................................1, 4

*Mrs. B. v. Milford Bd. of Educ.*,
  103 F.3d 1114 (2d Cir. 1997) ..........................................................................4

*P.K. et al.  v. New York City. Dep't of Educ.*,
  526 Fed. Appx. 135 (2d Cir. 2013) (Summary Order)...............................................3,

*P.K. ex rel. S.K.  v. New York City. Dep't of Educ.*,
  Nos. 11-3525(L), 11-3633(XAP), 2013 U.S. App. LEXIS 10477 (2d Cir. May 21, 2013)
  (Summary Order)......................................................................................2, 4, 17

**Federal Cases Continued**

*R.E. v. New York City Dep't of Educ.*,
  694 F.3d 167 (2d Cir. 2012), *cert. denied, R.E. v. New York City Dep't of Educ.*, 133 S. Ct.
  2802 (2013)..................................................................................................2, 3, 4, 10, 14

*R.K. ex rel. R.K. v. New York City Dep't of Educ.*,
  No. 09-cv-4478, 2011 U.S. Dist. LEXIS 32248 (E.D.N.Y. Jan. 21, 2011), *aff'd R.E. v. New
  York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012).............................................................2

*School Comm. of Burlington v. Dep't of Educ.*,
  471 U.S. 359 (1985) .......................................................................................................1, 2

*Scott v. New York City Dep't of Educ.*,
  12 Civ. 3558, 2014 U.S. Dist. LEXIS 41283 (S.D.N.Y. Mar. 25, 2014) ...................................5

*T.K. v. New York City Dep't of Educ.*,
  779 F. Supp. 2d 289, 318 (E.D.N.Y. 2011) ..................................................................5, 6, 7, 20

*T.Y. v. N.Y.C. Dep't of Educ.*,
  584 F.3d 412 (2d Cir. 2009) ...............................................................................................17

**STATUTES AND LEGISLATIVE MATERIALS**

20 U.S.C. § 1415 ...........................................................................................................21

New York Educ. Law § 4404 ...............................................................................................2

*"Those who cannot remember the past are condemned to repeat it."*

George Santayana (1905)

*"...every fucking incident report..."*

P.S. 6 Principal Lauren Fontana's deposition reference
to a trove of "incident reports" that plaintiffs had
requested but which defendant never provided (P-DDD, p. 51)


**ARGUMENT**

**THE SRO'S MARCH 14, 2014 DECISION SHOULD BE
REVERSED AND L.K. AND HER PARENTS SHOULD
BE AWARDED TUITION REIMBURSEMENT RELIEF
AND DECLARED THE "PREVAILING PARTY"**

This memorandum of law, together with plaintiffs' Rule 56.1 Statement and the May 21, 2014 Affidavit of Gary S. Mayerson,[1] are respectfully submitted on behalf of plaintiffs T.K. and S.K., on behalf of their daughter, L.K., in connection with plaintiffs' (partial) appeal from the Impartial Hearing Officer's ("IHO") June 6, 2012 post-remand Findings of Fact and Decision and plaintiffs' (also partial) appeal from the Office of State Review's ("SRO") post-remand and grossly late March 14, 2014 decision ("SRO Decision").[2]

**A. The *Burlington/Carter* Test For Reimbursement Relief**

The Second Circuit has long followed the *Burlington/Carter* three-pronged test for awarding tuition relief. *See, e.g., School Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359,

---

[1] Plaintiffs' Rule 56.1 Statement is appended to the Mayerson Affidavit, as are the original (pre-remand) IHO and SRO decisions, the IHO and SRO decisions following this Court's remand order, and the documentary and testimonial evidence referred to on this motion.

[2] As this Court is aware, despite a statutory, 30-day period in which to render a decision, the SRO was late by more than a *year* in adjudicating plaintiffs' appeal, and we learned that there apparently are *hundreds* of appeals that are languishing undecided in the Office of State Review. It took a motion before this Court and, thereafter, the bringing of an Article 78 mandamus proceeding in the New York Supreme Court to compel the SRO to finally produce the decision that plaintiffs are now appealing from. Despite its length, the SRO's March 14, 2014 Decision was written in an atmosphere of administrative chaos and extremis and is not the careful, thorough and quality decision that might be entitled to some deference. *See, e.g., M.H. v. New York City Dep't of Educ.,* 685 F.3d 217 (2d Cir. 2012).

1

369-370 (1985); *Florence County School Dist. Four v. Carter*, 510 U.S. 7 (1993); *C.L. v. New York City Dep't of Educ.,* No. 12-cv-1676, 2013 U.S. Dist. LEXIS 3474 (S.D.N.Y. Jan. 3, 2013), *affirmed C.L. v. New York City Dep't of Educ.*, No. 13-558-cv, 2014 U.S. App. LEXIS 1520 (2d Cir. Jan 27, 2014) (Summary Order); *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012), *cert. denied, R.E. v. New York City Dep't of Educ.*, 133 S. Ct. 2802 (2013); *R.K. ex rel. R.K. v. New York City Dep't of Educ.,* No. 09-cv-4478, 2011 U.S. Dist. LEXIS 32248 (E.D.N.Y. Jan. 21, 2011), *aff'd R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012); *P.K. et al.  v. New York City. Dep't of Educ.*, 526 Fed. Appx. 135 (2d Cir. 2013) (Summary Order); *B.R. ex rel. K.O. v. New York City Dep't of Educ.*, 910 F. Supp. 2d 670 (S.D.N.Y. 2012).

In essence, plaintiffs should be awarded reimbursement relief for the tuition cost of L.K.'s 2008-2009 school year attendance at the Summit School, a state-approved school for children like L.K., who are classified as learning disabled, if the evidence shows that (a) for purposes of Prong I, procedurally and/or substantively, defendant failed to offer L.K. a "reasonably calculated" FAPE for the 2008-2009 school year;[3] (b) for purposes of Prong II, plaintiffs' choice of the Summit School was "reasonably calculated" to provide L.K. with a meaningful educational benefit; and (c) for purposes of Prong III, a balancing of the equities shows that plaintiffs acted reasonably and equitably in the IEP process.

It is thus now well settled that the courts are required to assess Prong I under a purely "prospective" standard and analysis based on what the school district's documented offer of placement and program actually says, not what some school district functionary says at trial "would have" or "could have" happened despite what the school district's documentation says.

---

[3] Pursuant to Section 4404 of the New York Education Law, defendant had the Prong I burden of proof at trial to establish that it offered L.K. a FAPE. *See*, e.g. *B.R. ex rel. K.O. v. New York City Dep't of Educ.*, 910 F. Supp. 2d 670 (S.D.N.Y. 2012). We urge that defendant continues to bear that burden.

2

The rule against a "retrospective" approach on Prong I was first established in the federal circuit in the *R.E.* case to prevent school districts from victimizing students and parents with "bait and switch" scenarios. The rule arises out of the "reliance" interests that occur when parents come to the critical juncture in time when they must use the information they have received to accept or reject the school district's offered program for the upcoming school year. *R.E.,* 694 F.3d 167; *C.L. v. New York City Dep't of Educ.,* 2014 U.S. App. LEXIS 1520; *B.R.,* 2014 U.S. Dist. LEXIS 44985.

Once Prong I is established in favor of the student, it is well settled that the Prong II test that parents have to meet is subject to a materially *less* stringent standard (than Prong I) as to the appropriateness of the unilateral school placement. See, e.g., *C.L. v. Scarsdale Union Free Sch. Dist.,* 744 F.3d 826 (2d Cir. 2014); *B.R.* On Prong II, unlike Prong I, retrospective evidence of actual progress is permissible. However, it is *not* required. *Frank G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.,* 459 F. 3d 356 (2d Cir. 2005), *R.E.,* 694 F.3d 167; *C.F. v. New York City Dep't of Educ.,* 746 F.3d 68, 2014 U.S. App. LEXIS 4083 (2d Cir. 2014). On Prong II, the "reasonably calculated" test also applies, with the caveat that the Prong II test for parents is *easier* to meet than Prong I:

> To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. See *M.S., 231 F.3d at 105* ("The test for parents' private placement is not perfection.").

*Frank G.* 459 F.3d at 365*; see also R.E.,* 694 F.3d at 187 ("However, review of the private placement at that stage of *Burlington/Carter* review is *more informal* than review of the original IEP: a private placement need not meet the IDEA requirement for a FAPE and is *not* subject to the same."). *See also C.B. v. New York City Dep't. of Educ.,* 2005 U.S. Dist. LEXIS 15215 (E.D.N.Y. June 10, 2005).

3

The Second Circuit has rendered several decisions that are now controlling as to the limits of the "due deference" doctrine when reviewing an appeal decision from the SRO. No deference is owed to questions of law or interpretations of statutes. *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997); *Lillbask v. State of Connecticut Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005); *see also B.K. v. New York City Dep't of Educ.*, 13 Civ. 393, 2014 U.S. Dist. LEXIS 44985 at *24 (E.D.N.Y. Mar. 31, 2014) (deference inapplicable to issues of law). And, even where pure fact finding is under review, the focus is on the *quality* of the SRO's decision. Not the mere length of the decision, but its quality, i.e., being complete, careful, thorough, and having grappled with the evidence. *See, e.g., M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) ("state administrative finding does not merit deference unless it is 'reasoned and supported by the record."). *See also C.F., supra,* 2014 U.S. App. LEXIS at *17-18.

In recent years, there have been numerous decisions at the district court and Second Circuit levels that have concluded that the SRO's intervening decision was not entitled to much, if any, deference. *See M.H.* 685 F.3d at 249 ("The SRO ... did no more than state summarily that the goals 'comprehensively addressed the student's needs in the areas.' ... [T]he SRO's conclusory statement does not evince thorough and well-reasoned analysis that would require deference."); *B.R.* 910 F. Supp. 2d at 675; ("the Court must determine whether the SRO's decision is 'well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court") (citing *M.H.*, 685 F.3d at 244); *P.K.* 526 Fed. Appx. 135. *See also R.E.,* 694 F.3d at 194 ("[b]ecause the SRO's conclusion was against the weight of the evidence and thus flawed, deference to it is not warranted."); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.,* 751 F.Supp.2d 552, 581–82 (S.D.N.Y.2010) (reversing SRO

decision that failed to "properly consider expert testimony"), *aff'd,* 486 F. App'x 954 (2d Cir. 2012); *F.O. v. New York City Dep't of Educ.,* No. 11-6660-cv, 2013 U.S. Dist. LEXIS 143424 at *41 (S.D.N.Y. Oct. 2, 2013) ("the SRO's treatment of various witnesses convinces the Court that the SRO erred at every juncture available and failed to support his findings with a thorough and careful evaluation of the evidence"), *Scott v. New York City Dep't of Educ.*, 12 Civ. 3558, 2014 U.S. Dist. LEXIS 41283 (S.D.N.Y. Mar. 25, 2014).

Plaintiffs urge that the SRO's March 14, 2014 Decision in the case at bar should be added to the above list of SRO decisions that warranted reversal. This Court should conclude that the SRO's grossly untimely March 14, 2014 Decision, despite its length, is neither thorough nor complete, fails to address evidence and, most importantly, fails to apply this Court's prior rulings and standards to the documented and irrefutable facts of this case.

### B. This Court's Prior Rulings Are Now "Law of The Case"

This Court's prior rulings—rulings and standards that the SRO and the IHO unfortunately failed to adhere to on remand—are "law of the case." As this Court has already ruled, "the central question raised by this case is what actions, if any, a school is required to take to stop bullying of disabled students." 779 F. Supp. 2d at 307. On that core inquiry, this Court held that students have the "right to be secure" and that "being secure involves not only freedom from physical assaults but from psychological attacks that cause young people to question their self worth and their rightful place in society." 779 F. Supp.2d at 307-308. L.K.'s "right to be secure" is inextricably intertwined with the question of whether or not defendant's 2008-2009 IEP was "reasonably calculated" to provide L.K. with a FAPE.[4]

---

[4] Here, as shown below, just like defendant's P.S. 6 Principal Lauren Fontana, who refused to talk about and address what was a *two school year* bullying saga for L.K., defendant's 2008-2009 IEP fails to even acknowledge that there was a bullying problem for L.K. at P.S. 6 that needed to be addressed and remedied. Simply offering L.K. some

This Court also has ruled that "under IDEA the question to be asked [is] whether school personnel [were] deliberately indifferent to, or failed to take reasonable steps to prevent bullying that substantially restricted a child with learning disabilities in her educational opportunities." 779 F. Supp. 2d at 314-17.  Here, defendant's repeated *refusals* to even discuss the bullying issue with L.K.'s parents during the course of two school years are even <u>more</u> egregious than a situation of (mere) deliberate indifference.

To be actionable as a FAPE deprivation under IDEA, this Court has further ruled that the bullying/harassment "conduct need not be outrageous." The conduct at issue must simply be "sufficiently severe, persistent, or pervasive that it creates a hostile environment."[5] Unfortunately, the record in this case easily meets that test.

When a school receives a complaint or allegation of harassment, "a school must take prompt and appropriate action" <u>and</u> "must take appropriate steps to prevent it in the future." Moreover, this Court held that there is an affirmative obligation on the part of the school to take appropriate action "**regardless** of whether the student has complained" or asked the school to take action. 779 F. Supp 2d. at 317.

Accordingly, while the record here is replete with plaintiffs' <u>numerous</u> documented complaints about bullying and plaintiffs' wholly unsuccessful efforts to get defendant to even talk about the bullying issue, defendant had an affirmative duty to take appropriate remedial

---

"counseling" was not going to address, much less remediate, the bullying conduct to which L.K. was repeatedly subjected.

[5] Inasmuch as this Court focused on the cumulative "hostile environment" impact of harassment conduct, we urge that the conduct does not have to have been committed by the same individual.  Indeed, where, as here, *multiple* perpetrators were involved, there is an even more compelling argument that the school district allowed a "hostile environment" to develop and worsen.

action even *without* plaintiffs' complaints. That duty arises out of the "special relationship" that this Court recognized exists between school districts and the students entrusted to their care.[6]

While this Court held that actionable bullying under IDEA requires an adverse impact and effect (to constitute a FAPE deprivation), this Court also held that evidence of the extent of L.K.'s alleged "academic progress" at P.S. 6 is not at all dispositive because "she may not be deprived of her entire educational benefit but still may suffer adverse educational effects as a result of bullying…[t]to be denied educational benefit a student need not regress, but need only have her educational benefit adversely affected." 779 F. Supp. 2d at 318. We urge that SRO misapplied this Court's test for adverse impact.

To say the least, the record is well documented that L.K.'s educational benefit and experience was adversely affected while at P.S. 6. *See, e.g.*, P-I, P-V, P-FF, P-HH, P-II, P-QQ, P-WW, T. 267, 270, 1305, 1320, 1323, 1358, 1364, 1372, 1375, 1382-83, 1412, 1416, 1472, 1473-74, 1477-78, 1482-83, 1501-02, 1503, 1530, 1534, 1600, 1614-15, 1696, 1717, 1732-33, P-D, p. 5, P-K, P-L, P-HH, P-II, P-MM, P-NN, P-GGG, P-JJJ, P-KKK, P-LLL.

Never once was L.K. ever asked by defendant whether she felt that she was being bullied, and if so, by whom. As P.S. 6 Assistant Principal, Amy Santucci, admitted on remand: "We won't ask a child if they feel they've been bullied." T. 2740, *see* also T. 2052. Accordingly, by its own variant of "don't ask, don't tell" policy, defendant's P.S. 6 intentionally and studiously avoided the "impact" issue entirely by deciding not to ask any "bullying" or "impact" questions

---

[6] Accordingly, even if this "finding" by the SRO were true and supported by the record, it is entirely irrelevant to this Court's test to the extent that the SRO contends, at the bottom of page 18 of his Decision that "many of the particular incidents of bullying of which the parents complain were not specifically disclosed." This is a puzzling finding because, in actuality, the record shows that plaintiffs wrote numerous letters of complaint. P-D, P-I, P-L, P-N, P-V, P-FF, P-HH, P-II, P-JJ, P-MM, P-NN, P-FFF, P-GGG, P-HHH, P-LLL, P-KKK, T. 1696-97, 3024-27. Moreover, defendant, whose P.S. 6 administrators repeatedly *refused* to discuss the bullying issue with plaintiffs, is estopped by its own conduct from complaining of any lack of adequate notice from plaintiffs. Here, as discussed, *infra* on page 11-12, on the heels of plaintiffs' numerous attempts to obtain information and defendant's failure to produce any of L.K.'s "incident reports," it was plaintiffs who failed to receive disclosures that were due from defendant.

of L.K.  Given plaintiffs' numerous complaints about bullying, it is astounding that defendant elected not to ask L.K. this basic question.  Ostensibly, defendant knew that if the question was asked, it would not be happy with L.K.'s response.

Plaintiffs' Rule 56.1 Statement, with citations to the record, amply documents the adverse impact of *two years'* worth of bullying, *two years'* worth of defendant's stonewalling on the bullying issue, and the fairly dramatic turnaround that L.K. experienced in 2008-2009 when L.K. left the hostile environment of P.S. 6 to attend the Summit School, a New York State approved school for students who, like L.K., are classified on their IEP as learning disabled.

### C. The IHO And The SRO Found That There Was Bullying After All

The latest round of (post-remand) administrative decisions now finally acknowledge that there was ongoing and repeated bullying of L.K. at P.S. 6 during the 2006-2007 and 2007-2008 school years.  Indeed, the record is absolutely clear that despite L.K.'s parents' multiple oral and written requests to discuss and address the bullying that L.K. was subjected to, defendant's chief administrator at P.S. 6, Principal Lauren Fontana, repeatedly *refused* at every stage to even discuss the issue and refused to acknowledge that there was any bullying of L.K.[7]

Defendant's stonewalling on the issue of L.K.'s bullying problem was evident even during the 2006-2007 school year, when L.K. was intentionally pinched, bruised and injured by another child during the lunch and recess hour.  L.K.'s father photographed the visible injury and her parents wrote to numerous teachers and administrators about the bullying problem, asking them to take appropriate action. P-FFF, T. 3030-31, 3024-27.  There was, however, no response by defendant.  Not a meeting.  Just the educational equivalent of "radio silence."

---

[7] Defendant steadfastly denied that there was *any* bullying of L.K. throughout the underlying impartial hearing, throughout the first SRO appeal, throughout the first appeal proceedings before this Court, and even through the remand proceedings directed by this Court.  It was not until after the remand hearings (and the IHO and SRO decisions ruling that there was repeated bullying) that defendant first admitted what it should have admitted at the outset -- that L.K. was bullied.

L.K. told her parents who had hurt her in that instance. T. 3031. It was "J," a student in her 2006-2007 class, and that same student was again later placed in her 2007-2008 class. *Id.* And, that same student apparently was also going to be in defendant's offered 2008-2009 class! T. 3033. While Ms. Santucci, P.S. 6's Assistant Principal, admitted that there were "incidents" with "J" and other students in the CTT class (T. 3389, 3390), and that "J" had a "long history" of problems with L.K. (T. 3402-03), she could not say if "J" was *ever* given any "consequences." P-HHHHH, P-GGGGG, T. 3398. Ms. Santucci was dismissive, claiming it was "difficult" to get in touch with "J's" parents. T. 3390.

The student who pinched and injured L.K. in the bruise photograph from the 2006-2007 school year (i.e. "J") is the very same student who the next year (2007-2008) intentionally "stomped" on L.K.'s toes. T. 3034. There is no evidence, however, that "J" was ever asked to apologize to J.K. for either of those incidents. *Id.* Yet, the offending student ("J") -- the perpetrator -- was afforded the opportunity to supply P.S. 6 with a written disclaimer! P-CCC, p. 16.[8] That disclaimer, however, was *never* provided to L.K.'s parents. T. 3036. Nor was L.K. ever afforded a similar opportunity to memorialize what had transpired in an incident report or otherwise.

The bullying of 2006-2007 continued and, in fact, demonstrably *worsened* during the 2007-2008 school year. And, apparently, L.K. was not the only victim. As defendant's witness, Rick Eisman, P.S. 6's social worker, admitted, despite P.S. 6's "zero tolerance" policy, "[w]e have a lot of kids who are being bullied who don't initially say they are and then we find out its been going on all year long." T. 2586-87.

---

[8] "J" most certainly did not run to file an "incident report" of his own accord. J.'s "report" is something that almost certainly would have had to be actively *solicited* by P.S. 6 personnel. Why wasn't L.K. given the opportunity to file her own report?

Dominique Faber, a classroom SEIT for L.K. during 2007-2008, testified that there was "constant negative interaction" between L.K. and other students on a daily basis. T. 1472. Other children would intentionally stay away from L.K. and at times physically push her away for fun. T. 1472-74. As Ms. Faber explained, "[s]he [L.K.] would be tripped, where she was walking by and they would stick out their feet just to see what would happen. And then if she fell, well, then the teachers would get upset with *her* for making a scene." T. 1477-78.

As noted above, there were numerous "incident reports" involving L.K. and other students at P.S. 6 (P-CCC, P-JJJ), but not one of them was ever provided to L.K.'s parents, despite their written request for such reports. P-L, P-N, P-Q, P-T. Indeed, according to defendant's own witnesses, not one of the incident reports was ever made available to the team that was charged with developing a behavior plan for L.K. T. 2464, 2811-12. L.K.'s parents attempted to raise the bullying issue during the meeting to develop a behavior plan for L.K. (T. 3053, 3057), but defendant refused to discuss the issue. Without the benefit of the incident reports (containing behavioral data and information), defendant had little, if any, chance to develop an appropriate behavior intervention plan (BIP) for L.K. *See R.E.,* 694 F.3d 167 and *C.F.,* 746 F. 3d 68, 2014 U.S. App. LEXIS 4083.

### D. Principal Fontana and The Undisclosed "Fucking Incident Reports"

When questioned at her court ordered deposition about the undisclosed incident reports, P.S. 6's Principal, Lauren Fontana, referred to them under oath as the "fucking incident reports" (P-DDD, p. 51). We urge that the fact that Ms. Fontana could make such a statement while under oath is indicative of Ms. Fontana's ongoing disrespect for L.K.'s parents' claims and concerns, as well as her disrespect for the court process and her utter lack of accountability to anyone.

When cornered with the irrefutable fact that plaintiffs had requested, but had never received, any of the incident reports, Ms. Fontana conveniently claimed, by way of an attempted excuse, that she had instructed her staff to provide the reports to plaintiffs. P-DDD, p. 56-57. While Ms. Fontana apparently lied, Ms. Fontana's staff *refused* to lie for her.  Ms. Fontana's staff testified under oath that they knew nothing about her alleged "instruction" to provide the incident reports to L.K.'s parents. T. 2013-15, 2483, 2663, 2718, 2813, 2849. Nor is there a shred of evidence to support Ms. Fontana's attempted excuse, as there is no bona fide explanation then as to why P.S. 6 personnel failed to respond to L.K.'s parents' written request for any "incident" reports. T. 3414.

The SRO previously held (on the first SRO appeal in this proceeding, prior to the remand) that it *was violative* for defendant to have failed to provide L.K.'s parents with the incident reports, but that such violative conduct, in and of itself, did not rise to the level of a FAPE deprivation.  Exhibit B at 17.  Here, we urge that the *cumulative impac*t of defendant's acts and omissions most certainly resulted in a Prong I FAPE deprivation.

The record shows that, in actuality, the same Principal Fontana *refused* to discuss the bullying issue in her office and threatened L.K.'s parents that if they did not leave her office, she (Fontana) would call security. T. 847-48, 2648.  It is puzzling, yet telling, that the SRO makes absolutely no reference to this incident in his Decision.  When parents who seek to discuss an ongoing bullying problem are refused that opportunity and are thrown out of the principal's office with threats to call security, this is a most significant event that goes to a number of the tests set forth by this Court. It is an event that goes far beyond mere "indifference" on Prong I.  It also goes to the Prong III "equities."

### E. The Adverse Impact On L.K. Is Well Documented

The record shows that L.K. was treated as a *pariah* in her 2007-2008 CTT[9] classroom and that L.K.'s teacher only *reinforced* that theme. T. 1556-58. L.K. complained to her parents almost daily about being bullied at school. T. 1706, P-HH, P-MM, P-WW, P-GGG. Her weight ballooned. T. 3219, 1690, 110, 1712.  L.K. did not want to go to school at P.S. 6 anymore. P-HH. L.K.'s classroom had become a "hostile environment" and L.K. was "just trying to get by each day." T. 1472, 1477-85, 1555-58, P-MM.  L.K. was bringing "dolls" to hold for comfort purposes, but she was refused by P.S. 6 even that comfort. T. 1480-82, 1495, 1528, 1698-99, 1729, P-JJ.  By the end of 2007-2008, L.K. had racked up 46 absences and latenesses and those numbers had accelerated during the second half of the school year. P-K, P-L.

Other children were observed physically backing away to avoid L.K. T. 1556-58. When the students in L.K.'s classroom complained and refused to use a pencil simply because it had been "touched" by L.K., rather than discourage that discriminatory behavior, the teacher's response to L.K. being treated as a pariah was to *label* the pencil with L.K.'s name so that no other child should "fear" having to touch it!  The teacher's stigmatizing response only reinforced the harassment of L.K. as it taught the other students that they could mistreat L.K. with impunity. T. 1556-58, 1319. The treatment of L.K. as a pariah continued when L.K. would attempt to participate in class.  When L.K. would dare to raise her hand to provide an opinion, "people laughed at her." T. 1320-21, P-MM.

The highly disparaging and degrading drawing made by a student in L.K.'s class (P-MM), a drawing that had to be rescued from the trash by L.K.'s SEIT classroom support, reflects the general hostile environment in the classroom and the lack of any real fear on the part of

---

[9] CTT stands for "Collaborative Team Teaching, and involves a hybrid, mixed classroom of students with and without IEP's.

L.K.'s classmates that they would ever get in any trouble for tormenting L.K. Once again, it is surprising, if not astounding, that the SRO makes absolutely no mention of the disparaging drawing of L.K., especially since this Court focused on the significance of the disparaging drawing in its prior decision. The multiple glaring omissions by the SRO are telling and support a finding that the SRO decision was neither careful nor thorough. This is how the SRO concluded that there was no adverse impact to support a Prong I FAPE deprivation.

The entire 2007-2008 school year passed without a single substantive discussion about the bullying problem that L.K. was experiencing at P.S. 6. Even as late as L.K.'s June 4, 2008 IEP meeting to develop an IEP for 2008-2009, Principal Fontana was seen "slamming" her hand on the table and dictating (once again) that it ostensibly was neither the time or the place to discuss the bullying issue that L.K.'s parents had wanted to discuss over the course of two consecutive school years. T. 1702-03, 1734.

Despite this attempt and plenty of other attempts by L.K.'s parents to try to get defendant to discuss and address the bullying of L.K., Principal Fontana *never* could find the time to do so. T. 3057. Just as the disparaging drawing of L.K. went into (and had to be rescued from) a trash bin, the bullying issue at P.S. 6 was just ignored and swept under the rug.[10] Accordingly, when it came time to offering L.K. a school program and placement for 2008-2009, there thus was an

---

[10] To the extent that this Court may wonder how and why a public school principal could ever "go rogue" to treat parents in such a disrespectful and outrageous manner, the answer may lie in defendant's sworn admissions, under oath, during deposition testimony elicited in an unrelated "enforcement" case. See Exhibit H to Mayerson Affidavit. In *E.B. v. New York City Dept. of Educ.*, 13-civ-6393, an IDEA enforcement action that charges defendant and the principal of P.S. 199M with failing to comply with a final and non-appealable hearing officer's decision, multiple witnesses employed by the defendant confirmed, in essence, that school principals in New York City technically fall under the administrative hierarchy of the Chancellor and several "superintendents," but that they do not actually "report" to anyone. *See* sworn admission annexed as Exhibit H to Mayerson Aff.

ongoing and two-year-old bullying problem at P.S. 6 for L.K. that was not then being acknowledged, much less discussed, addressed and remediated.[11]

This Court, in its prior decision, recognized that "the 2008-2009 plan was the first under which L.K. did not have a 1:1 aide at all time in the classroom." The bullying at P.S. 6 had taken place in 2006-2007 and 2007-2008 even with the support of a 1:1 classroom aide for L.K.  How, then, could defendant's 2008-2009 IEP (P-D) ever be reconciled with the "right to be secure?" The answer is that it could not be reconciled with L.K.'s right to be secure and for that reason, coupled with the undisclosed incident reports and defendant's repeated refusal to even discuss the bullying issue, defendant's 2008-2009 IEP was not "reasonably calculated" for purposes of Prong I.[12]

As to Prong III, the IHO and the SRO "found," contrary to the actual record and contrary to the Second Circuit's rule against "retrospective evidence" not contained in the IEP documentation (R.E., C.F.), that L.K.'s parents had "refused to consider any other public school where there was an open CTT placement."  There was, however, no such "refusal," as no other school site other than P.S. 6 was ever identified by defendant, much less ever "offered," and, as a matter of law and statute, it was defendant's duty and responsibility to identify and offer an appropriate (and safe) placement, not plaintiffs' duty to go out and find one.

When L.K.'s parents had to make a decision one way or the other whether to accept the 2008-2009 IEP, they had before them only defendant's 2008-2009 IEP (P-D) and defendant's notice placing L.K. back in the same P.S. 6 school, with the very same class, and with the very same classmates (including the classmates who had previously bullied L.K.). As a matter of law,

---

[11] Yet, at page 8 of the SRO's March 14 decision, at footnote 16, the SRO proceeds as if defendant quietly somehow remediated the bullying situation at P.S. 6. In actuality, when Principal Fontana was asked what, if anything, she ever did to investigate any claims of bullying, she could not recall. T. 851-52.

[12] This is especially so where, as here, defendant's 2008-2009 IEP *stripped* L.K. of her 1:1 classroom aide support.

plaintiffs were offered only one identified school placement for 2008-2009, namely, P.S. 6. *See R.E.*, 694 F.3d 167; *C.F.* 746 F.3d 68, 2014 U.S. App. LEXIS 4083; *R.K.,* 2011 U.S. Dist. LEXIS 32248.  The Second Circuit repeatedly has held that the offer turns on what the IEP-related documents actually and expressly provide.

On the issue of Prong III, there is conflict and confusion within the SRO's Decision. (Compare the last paragraph of the SRO's Decision, page forty three (speculating about L.K.'s parents' intent)), with the last paragraph on page twelve, which recites "the parents' testimony at the impartial hearing *confirmed* that no placement was offered at the IEP meeting. (T. 1778)) (The SRO got this evidence right only on page twelve -- no other placement was offered at the meeting.)

It is manifestly unjust and telling (as a failure to distinguish the "forest from the trees") that the SRO would speculate myopically on plaintiffs' ostensible "intent" at the June 4, 2008 IEP meeting, looking at a single moment in time in isolation, while ignoring a *two year* history of defendant's blatant stonewalling on the bullying problem.

Plaintiffs sent their "ten-day" letter (P-I) on June 6, 2008, <u>after</u> L.K.'s June 4, 2008 IEP. L.K.'s parents are not at all blameworthy to the extent that they were already at the end of their rope as at (or even before) the June 4, 2008 IEP meeting with respect to P.S. 6's unacknowledged and unaddressed bullying problem.  L.K.'s parents (and let's not forget L.K. herself) had already endured *two school years'* worth of bullying and defendant and its administrators (notably, P.S. 6 principal Lauren Fontana) had repeatedly refused to acknowledge that there was any bullying, and had *repeatedly* refused to discuss the issue.

The record shows that the June 4, 2008 IEP meeting (to develop an IEP for L.K.'s 2008-2009 school year) was no different.  Once again, Principal Fontana drew a line in the sand and

*refused* to discuss the bullying issue.  Against such circumstances, how could any responsible parent ever allow their child to return to such an openly hostile environment—one where students are allowed to repeatedly bully another student?

On this record, one party, for sure, has engaged in Prong III "inequitable" conduct but the record shows that it was <u>defendant</u>, not plaintiffs. Defendant, however, undoubtedly will continue to nit-pick at plaintiffs' conduct in an effort to divert this Court's attention from defendant's own outrageous acts and omissions.  We await defendant's papers, but the following are some of the numerous "blame the parent" themes that defendant unsuccessfully attempted to concoct at trial:

    a.   L.K.'s parents are exaggerators and perpetually "difficult" parents whose stated concerns are not worthy of being treated seriously;

    b.   Lots of parents throw the "bullying" term around without it "really" being bullying (T. 3363);

    c.   L.K. was merely "echoing" the "bully" word because her parents used the word a lot "in every note pretty much" (T. 2254);

    d.   L.K.'s parents pointed to "J" as being a bully because they are bigots or racists (T. 3375-76);

    e.   L.K. did not really put on a lot of weight between while at P.S. 6 because she was "always an overweight child" (T. 3409);

    f.   L.K. was not upset because of any bullying at P.S. 6-- in actuality, she was upset because her parents were "getting divorced" or "moving to Long Island" (T. 3119-3121, 2230);

    g.   Principal Fontana is not blameworthy on the issue of the undisclosed incident reports because she "told L.K.'s teachers" to release the reports to L.K.'s parents;

    h.   P.S. 6 is not blameworthy on the issue of the undisclosed incident reports because every parent at P.S. 6 knows or should have known from reading the "parent handbook" or by checking the P.S. 6 website "link" that the procedure is to simply show up at the school office and ask for them;[13]

---

[13] There was no such "procedure" and here, plaintiffs requested the incident reports in <u>writing</u> and could not get them.

i.   L.K.'s parents and/or their counsel are blameworthy for not timely "informing" the court or defendant that while L.K.'s <u>father's</u> Summit tuition payments have *never* been reimbursed, defendant directly paid Summit substantial tuition monies and then sought and obtained reimbursement from the State;

j.   L.K.'s parents are bad and/or neglectful parents and L.K.'s parents themselves brought harassment and ostracism upon L.K. by sending L.K. to school with unkempt hair, wearing stained and ill-fitting clothes that "smelled of urine" (T. 2631-32);

k.   L.K., who has a learning disability, simply does not have the brainpower to know if someone did something intentionally to her, or if it was accidental (T. 3228-3230);

l.   Principal Fontana and Assistant Principal Santucci *repeatedly* told L.K.'s parents what the simple procedure was to get the incident reports (T. 3273); and

m.   L.K. was late and absent so much (46 days in total) because she must have been spending a lot of time "applying to private schools." (T. 3318-19).

**F. P.S. 6 Is The Only School Site That Defendant Ever Identified And Offered to L.K. For 2008-2009**

In New York City, by policy, custom and practice, the CSE does not have the function or authority to identify, much less offer, a school placement. Only a "placement" officer from the "placement office" has that authority. *T.Y. v. N.Y.C. Dep't of Educ.,* 584 F.3d 412 (2d Cir. 2009); *P.K. ex rel. S.K. v. New York City. Dep't of Educ.*, Nos. 11-3525(L), 11-3633(XAP), 2013 U.S. App. LEXIS 10477 (2d Cir. May 21, 2013) (Summary Order). <u>L.K. had attended public school for years and L.K.'s parents were open to being offered a placement other than P.S. 6. That is precisely why plaintiffs wrote to defendant prior to the June 4, 2008 to request that a "placement" officer with authority be in attendance at L.K.'s June 4, 2008 IEP meeting. P-J, P-N.</u>

The IEP record shows, however, that defendant ***ignored*** plaintiffs' pre-IEP letter (P-N) requesting that a "placement" functionary with authority be present at L.K.'s June, 2008 IEP. Moreover, even defendant's Answer in the hearing process (P-B, p. 3) avers and thus admits that P.S. 6 was the only CTT class that was ever actually identified and offered to L.K. for purposes

17

of the 2008-2009 school year.   Defendant's CTT class at P.S. 6 also was the <u>only</u> school placement that L.K.'s parents ever "rejected" for 2008-2009. P-I.

For 2008-2009, the record shows that defendant offered L.K. placement at P.S. 6 in the *same* CTT classroom, with the *same* children who had bullied and victimized L.K. during the 2006-2007 and 2007-2008 school years, and with the *same* P.S. 6 administration who refused to acknowledge that there was any bullying and who refused to even <u>discuss</u> the issue, much less take meaningful steps to address and remediate the problem.

Had L.K. remained at P.S. 6 for 2008-2009, L.K. was "condemned" to endure yet another year of bullying <u>not</u> because defendant "forgot" the bullying that had happened during 2006-2007 and 2007-2008, but rather because defendant had never once *acknowledged* the bullying that had occurred and worse, defendant repeatedly proved to L.K. and her parents that the bullying issue was <u>never</u> going to be discussed or addressed such that L.K. could continue to attend P.S. 6 during 2008-2009 with the hope that, as to the bullying problem, that school year was going to be any different than 2006-2007 or 2007-2008.

If L.K. and her parents held any hope that the bullying problem at P.S. 6 was ever going to be addressed and remediated, defendant's repeated "stonewalling" conduct on the bullying issue—stonewalling that continued in full force even as late as the June 4, 2008 IEP meeting - told L.K. and her parents that they should abandon that hope and that therefore, they were left with no choice but to remove L.K. from P.S. 6 and send her to the Summit School, a state-approved[14] school for students who, like L.K., are classified as "learning disabled."

---

[14] By virtue of the Summit School's state approved status, a sending school district is entitled to tuition reimbursement from the State.  Upon information and belief, after L.K. began attending the Summit School, <u>defendant</u>, without any timely disclosure to plaintiffs or their counsel, apparently applied for state funding and *received* such funding! (P-EEEEE).

### G. The Summit School Was "Reasonably Calculated" As An Appropriate Prong II Placement for L.K. And It Is Even State Approved

The Summit School, which provides individual and group counseling as part of its other related services (P-KKKK), proactively prohibits acts of harassment or bullying (P-CCCCC). The evidence shows that L.K. has made very good academic, social and other progress since leaving the toxic, hostile and dismissive environment that had developed at P.S. 6. The bullying stopped (T. 3201), L.K. dropped her excessive weight gain (T. 3219), her self esteem and confidence demonstrably improved. (T. 1603, 1604, 1672, 1690, 1710, 1712, 1750), and academically, L.K. did quite well (P-KKKK, P-NNNN, P-PPPP, P-RRRR, P-SSSS, P-TTTT, P-UUUU, P-VVVV, T. 1661-62).

Summit's progress reports show that L.K. *continues* to make good and meaningful progress at the Summit School.  P-KKKK, P-LLLL, P-MMMM, P-NNNN, P-OOOO, P-PPPP, T. 1661-62.  These very same documents, by their stark contrast, go to show the negative impact that the bullying problem was having on L.K. while she was attending P.S. 6.

### H. The SRO's Indefensible March 14, 2014 Decision Should Be Reversed

Following the initial, pre-remand administrative hearings, the IHO and the SRO made no findings that L.K. was *ever* bullied, and they each ruled that even if L.K. was bullied, it was not a FAPE issue.  Following the remand trial ordered by this Court, the IHO and the SRO have now finally acknowledged that there *was* repeated bullying of L.K. over a period of two years. However, the SRO glosses over the remaining issues and a most compelling record showing that L.K. and her parents have amply satisfied the *Burlington/Carter* test and this Court's rulings and standards.

The IHO and the SRO have defied all reason, ignored or failed to properly grapple with a compelling evidentiary record, and failed to properly apply the tests and standards set forth by

this Court in its landmark[15] decision in *T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 2d 289 (E.D.N.Y. 2011).

The IHO and the SRO were adjudicated by this Court as wrong the first time around, and we urge that they have done no better on remand. The IHO and the SRO should have ruled that: (a) for purposes of Prong I, the IEP meeting process was procedurally defective where, as here, defendant continued to *refuse* to discuss the bullying issue and that L.K.'s 2008-2009 IEP, substantively, was not "reasonably calculated" to provide L.K. with a FAPE where, as here, it did not properly account for, address and reconcile L.K.'s two-year history of being bullied and her "right to be secure;" and (b) for purposes of Prong II, the state-approved Summit School that L.K. attended during 2008-2009 amply met the more relaxed and applicable reimbursement standards applicable to parental placements.

Finally, for purposes of Prong III, defendant's outrageous conduct in, *inter alia*, repeatedly stonewalling L.K.'s parents on even discussing the bullying issue, and defendant's equally outrageous failure to ever provide L.K.'s parents with any of the "incident reports" that they had requested, constitutes *grossly* inequitable conduct that easily outweighs any of defendant's efforts to cast concocted or otherwise unwarranted blame upon L.K.'s parents, or even L.K. herself.

On this appeal, based on the full record, we ask this Court to reverse the SRO's March 14, 2014 Decision and to make the foregoing findings as to Prongs I, II and III, granting leave to

---

[15] Most states, following the suicide death of Rutgers University student Tyler Clementi and other students who took their lives as a result of bullying, have now adopted anti-bullying statutes recognizing the devastating and destructive impact of bullying even for non-disabled students (such as New York's Dignity for All Students Act, or DASA). When L.K.'s bullying claims were first asserted at the administrative level, bullying in our nation was largely accepted as some kind of inevitable rite of passage. This Court's 2011 Decision was one of the very first of its kind.

plaintiffs, as a "prevailing party," to file a fee application under the fee-shifting provisions of the IDEA.

## CONCLUSION

For all the foregoing reasons, this Court should reverse the SRO's March 14, 2014 Decision, find for plaintiffs as to Prongs I, II and III of the *Burlington/Carter* test for tuition reimbursement, and grant plaintiffs leave as a "prevailing party" under the Act (20 U.S.C. § 1415) to file an application for fees and costs.

Dated: May 21, 2014
New York, New York

_____
Gary S. Mayerson (GM 8413)
Mayerson & Associates
Attorneys for Plaintiffs
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200; (212) 265-1735 (facsimile)