UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| T.K. and S.K., *individually and on behalf of* L.K. | **MEMORANDUM, ORDER & JUDGMENT** |
| Plaintiff, | 10-CV-752 |
| – against – | |
| NEW YORK CITY DEPARTMENT OF EDUCATION, | |
| Defendant. | |

**Appearances**

For Plaintiff:           Gary S. Mayerson
                         Mayerson and Associates
                         330 West 38th Street, Suite 600
                         New York, NY 10018

                         Brianne Nicole Dotts
                         Mayerson and Associates
                         330 West 38th Street, Suite 600
                         New York, NY 10018


For the Defendant:       John Michael Buhta
                         Abigail Lynne Goldenberg
                         New York City Law Department
                         100 Church Street
                         New York, NY 10007


**JACK B. WEINSTEIN, Senior United States District Judge:**

I.     Introduction ................................................................................................................ 2

II.    Facts and Procedural History ..................................................................................... 4

  A.    L.K.'s Background and Education ............................................................................ 4

  B.    June 2012 IHO Decision ......................................................................................... 8

  C.    March 2014 SRO Decision ................................................................................... 10

III.    Law ....................................................................................................................... 12

    A.    Standard of Review ....................................................................................... 12

    B.    *Burlington/Carter* Test ................................................................................. 13

    C.    FAPE Bullying Standard ............................................................................... 15

IV.    Application of Law to Facts ................................................................................. 17

    A.    Plaintiff Not Offered A FAPE ...................................................................... 17

      1.    Bullying Threatened to Severely Restrict L.K.'s Educational Opportunities ............... 17

        a.    L.K.'s Educational Opportunities Substantially Restricted ...................... 17

        b.    L.K.'s School Deliberately Indifferent ..................................... 19

      2.    IEP Team Improperly Refused to Address Bullying ................................... 20

      3.    IEP Substantively Failed to Address Bullying ........................................... 21

      4.    Abstract IEP Language Precluded Parent Participation ................................. 24

    B.    Private Placement Appropriate ...................................................................... 28

    C.    Balance of Equities Favor Plaintiffs ............................................................. 30

VI.    Conclusion ........................................................................................................... 30

I.    **Introduction**

This case deals with required procedures in reducing bullying of the educationally disabled.  The substantive scope of an appropriate anti-bullying program is set forth in *T.K. v. New York City Dep't of Educ.*, 779 F.Supp. 2d 289 (E.D.N.Y. Apr. 28, 2011).  *See infra* Part III.C.

T.K. and S.K., individually and on behalf on their daughter, L.K., sue the New York City Department of Education ("DOE") for failing to offer a free and appropriate public education ("FAPE") under the Individuals with Disabilities Education Improvement Act ("IDEA") for the 2008-2009 school year.  *See* 20 U.S.C. § 1400 *et seq.*

Plaintiffs appeal from the Impartial Hearing Officer's ("IHO") post-remand "Finding of Fact and Decision" and the State Review Officer's ("SRO") post-remand decision.  They seek a review and partial reversal of the SRO's March 14, 2014 decision, as well as a finding for

plaintiffs based upon the *Burlington/Carter* test for tuition reimbursement. *See* Pls.' Mem. Supp.

Mot. De Novo Rev. at 5, 21, May 21, 2014, ECF No. 90. No claim is made of unlawful

retroactive considerations by the IHO or SRO and none was identified by the court. *See E.M. v.*

*New York City Dep't of Educ.*, 11-cv-1427, 2014 WL 3377162 (2d Cir. July 11, 2014).

The case is a close one on the facts. Courts recognize that the added cost of providing a

private school education reduces availability of funds for children in public schools. After

giving appropriate weight to administrative expertise, the facts support plaintiff's position. They

are entitled to public payment for the private education of their child.

Appropriate procedures require the following:

FIRST, where there is a legitimate concern that bullying will severely restrict a disabled

student's educational opportunities, as a matter of law the IEP team is required to consider

evidence of bullying in developing an appropriate Individual Education Program ("IEP"). The

record shows that L.K.'s IEP team did not take evidence of bullying into account in developing

her IEP for the 2008-2009 school year. This failure prevented her parents from meaningful

participation in the IEP's development.

SECOND, where there is a substantial probability that bullying will severely restrict a

disabled student's educational opportunities, as a matter of law an anti-bullying program is

required to be included in the IEP. No such program was developed for L.K.

THIRD, if a school district purports to address bullying in an IEP, it may not, as a matter

of law, do so in abstract terms incomprehensible to lay parents, effectively preventing them from

meaningful participation in developing the IEP and from comprehending that the issue was

addressed. Language and explanations understandable to parents must be used in developing an

anti-bullying program. A lay person would not understand that in the instant case the IEP team

was attempting to provide a program to meet serious parental concerns about the bullying of L.K.

As a matter of law, L.K. was not offered a FAPE for the 2008-2009 school year. *See infra* Part IV. Her parents' decision to place her at Summit, a private school, was reasonably calculated to enable her to receive required education benefits. The law and equity favor reimbursement.

Plaintiffs' motion for summary judgment is granted.

## II.    Facts and Procedural History

### A.  L.K.'s Background and Education

L.K. is a child who was previously diagnosed with Autism Spectrum Disorder. At her parents' request, she was reclassified as learning disabled during her 2008 CSE meeting. *See* Pls.' Rule 56.1 Statement of Material Facts ("Pls.'56.1 Stmt.") ¶ 1, May 21, 2014, ECF No. 89; IHO Findings of Fact and Decision ("IHO Decision") at 5.

For the 2007-2008 school year, and several years before, L.K. had been placed in a Collaborative Team Teaching ("CTT") classroom at P.S. 6 with one-to-one Special Education Itinerant Teacher ("SEIT") support. *See* Pls.' 56.1 Stmt. ¶ 8. A CTT class is comprised of both special education students and general education students in an effort to encourage the former to move socially and academically into the main stream of their peers. *See* IHO Decision at 6 (citing IHO Hr'g Tr. 2130). L.K. also received additional special services such as speech therapy, occupational therapy and physical therapy. *See* Pls.' 56.1 Stmt. ¶ 8.

In May of 2007, towards the end of the 2006-2007 school year, L.K. was "intentionally pinched, bruised and injured" by another child in her class, "J.", during the lunch hour. *See* Pls.' 56.1 Stmt. ¶ 9. L.K.'s parents wrote to the administrators and teachers at P.S. 6 about the

incident and asked that they be informed of any action taken.  *See* Pls.' 56.1 Stmt. ¶ 10; Ex. FFF.

Although Lauren Fontana, the principal at P.S. 6, called L.K.'s father and informed him that she

would investigate, she never followed up with L.K.'s parents, there was no written response, and

no incident report was ever prepared.  *See* IHO Decision at 25 (citing IHO Hr'g Tr. 3028-3031).

In August 2007, at the beginning of the school year, L.K.'s father met with Fontana and asked

about any investigation into the pinching.  Fontana responded that she had taken care of the

incident but refused to elaborate on how it had been addressed.  *See* SRO Decision at 7-8; IHO

Decision at 25; IHO Hr'g Tr. 3432.

Around Thanksgiving of 2007, J. "stomped" on L.K.'s toes.  *See* Pls.' 56.1 Stmt.

¶ 13; IHO Decision at 25; IHO Hr'g Tr. 3034.  J. reported that he was not the perpetrator; neither

L.K. nor her parents had the opportunity to contribute to an incident report.  *See* Pls.' 56.1 Stmt.

¶ 13; IHO Decision 25-26; IHO Hr'g Tr. 3036, 3417-18.  Even though there were continuing

problems between J. and L.K., they remained in the same CTT class for the 2007-2008 year.  J.,

who is also a special needs student, would have been in L.K.'s 2008-2009 class if she had

remained at P.S. 6 because there was only one CTT class at the school.  *See* Pls.' 56.1 Stmt. ¶ 11.

Throughout the 2007-2008 school year, L.K. complained to her parents on an almost

daily basis about being bullied at school.  *See* Pls.' 56.1 Stmt. ¶ 18.  Her father stated that

bullying made L.K. "emotionally unavailable to learn."  *See* Pls.' 56.1 Stmt. ¶ 19. L.K. gained

weight, needed to bring her dolls to school for comfort, and accumulated 24 latenesses, which

her parents attributed to bullying and L.K.'s resulting reluctance to attend school.  *See* Pls.' 56.1

Stmt. ¶¶ 20, 21, 37.  Three of L.K.'s SEITs from the 2007-2008 school year indicated that she

was the subject of ridicule from other students and ostracized in the classroom.  *See* IHO Hr'g

Tr. 1477-85, 1555-66.  There was support for the conclusion that L.K.'s classroom was a "hostile

environment" and that the other students frequently avoided L.K., treated her like a "pariah," and laughed at her attempts to participate in class. *Id.*, *see also* Pls.' 56.1 Stmt. ¶¶ 24-28, 33. Ignored were her SEITs' and parents' attempts to address the bullying issue with P.S. 6 administrators. *See* Pls.' 56.1 Stmt. ¶¶ 23,42; IHO Hr'g Tr. 1556-59.

On November 1, 2007, L.K.'s parents, both well-educated professionals concerned about L.K.'s placement at P.S. 6, privately obtained a psychological consultation to review her academic functioning and look into educational options. *See* SRO Decision at 8-10. The report stated that L.K. was a social and engaging third grader who had made ongoing progress in all areas since kindergarten. *Id.* (citing Ex. XX at 1). In discussing an appropriate placement, it "indicated that a more supportive academic environment needs to be pursued" and recommended that she be placed in "a small, special education class and school for children with solid cognitive potential who need a supportive and specialized approach for learning." SRO Decision at 9-10 (citing Ex. XX at 2-4).

On February 11, 2008, L.K.'s parents completed an application to the private school Summit for admission for the 2008-2009 school year. SRO Decision at 11 (citing Ex. AAAAA at 1, 7-8). In the application her parents described L.K. as "happy, engaging and outgoing . . . able to work with a partner and in small groups at school . . . [and] motivated to learn." Ex. AAAAA at 2-4. On March 11, 2008, the Summit admissions team notified her parents that L.K. had been accepted. Ex. YYYY. They submitted a nonrefundable, one-month tuition payment and enrollment contract for the 2008-2009 school year on March 21, 2008. SRO Decision at 11; Ex. UU at 1-2.

On March 26, 2008, L.K.'s parents, two district school psychologists, a district social worker, L.K.'s third-grade regular education and special education CTT teachers, both of L.K.'s

school-based SEITs, and L.K.'s home-based OT provider met to review L.K.'s functional

behavioral assessment and to develop a behavior intervention plan ("BIP"). SRO Decision at 11.

L.K.'s parents had previously requested copies of any incident reports relating to L.K. They were

never provided; no one who attended L.K.'s BIP meeting had them. *See* Pls.' 56.1 Stmt. ¶¶ 43-

44.

On June 4, 2008, the Committee of Special Education ("CSE") met to develop L.K.'s IEP

for the 2008-2009 school year. SRO Decision at 12. Her parents expressed their disagreement

with the recommendation that L.K. be placed in a CTT classroom "in general" and specifically in

the same classroom where she had been experiencing bullying by her classmates for the previous

two years. SRO Decision at 12; IHO Hr'g Tr. 1771-79. There was no particular placement

offered at the meeting and the only available public placement that L.K.'s parents were aware of

was P.S. 6. SRO Decision at 12-13; IHO Hr'g Tr. at 1771-79.

On June 6, 2008, L.K.'s parents notified the DOE that they were rejecting the June 2008

IEP and its recommended 2008-2009 placement in a CTT classroom. Pls.' 56.1 Stmt. ¶ 77; SRO

Decision at 13. They told the district that they intended to unilaterally place L.K. at Summit for

the 2008-2009 school year and that they would be seeking reimbursement for the cost of tuition.

Pls.' 56.1 Stmt. ¶ 77; SRO Decision at 13. Later that month L.K.'s parents filed their demand

for payment. Pls.' 56.1 Stmt. ¶ 88.

In a "Findings of Fact and Decision" dated July 21, 2009, the IHO concluded that the

DOE had offered L.K. a FAPE for the 2008-2009 school year and that "bullying" was unrelated

to the provision of a FAPE. Pls.' 56.1 Stmt. ¶ 89. Her parents appealed to the SRO who issued a

decision on October 22, 2009 affirming the IHO's decision. Pls.' 56.1 Stmt. ¶¶ 90-91. L.K.'s

parents then appealed from the SRO's decision.

On April 25, 2011, this court ordered utilization of a substantive standard to determine if bullying resulted in the denial of a FAPE; it remanded the case for review. *See T.K. v. New York City Dep't of Educ.*, 779 F.Supp. 2d 289 (E.D.N.Y. Apr. 28, 2011).

**B.  June 2012 IHO Decision**

A second impartial hearing commenced on June 8, 2011.  It continued until May 21, 2012. *See* IHO Decision at 4.  L.K.'s parents maintained that the DOE denied their daughter a FAPE for the 2008-2009 school year, contending:

> 1) the child was the victim of bullying; 2) the DOE staff at P.S. 6 was aware of the incidents of bullying; 3) the DOE staff at P.S. 6 took no action to address the "bullying" and 4) the child was significantly restricted in her educational opportunities as a result.

IHO Decision at 5.

The DOE claimed that there was no denial of a FAPE, arguing:

> 1) the child was not bullied; 2) the DOE staff at P.S. 6 was not aware of the incidents in question; 3) there is and was a "Zero Tolerance" bullying policy at P.S. 6 and anti-bullying programs and training was administered at PS 5 and the staff was not deliberately indifferent to the issue of bullying, and 4) the child made academic and social progress during the 2007-2008 school year and thus, was not significantly restricted in her educational opportunities.

IHO Decision at 5.

Following a discussion of the evidence presented, the IHO concluded that there was no denial of a FAPE and denied the parents' request for tuition reimbursement.

In a comprehensive decision, the IHO began by stating that the DOE had the burden of proof to show that a FAPE was provided and thus had the burden on all four prongs of the bullying test. *See* IHO Decision at 32.

After restating the bullying standard, the IHO held that in order to find that a child was denied a FAPE it must be shown that: (1) the child was a victim of bullying; (2) the

school authorities knew or should reasonably have known about the bullying; (3) the school authorities were deliberately indifferent and failed to take the appropriate steps to fully investigate the bullying or take remedial action; and (4) the bullying reached a level where the student was "substantially restricted" in her learning opportunities. *See* IHO Decision at 33.

The IHO found that the child was a victim of bullying. IHO Decision at 33-36. It concluded that the record as a whole shows a "pattern of behavior towards the child at P.S. 6 which meets the criteria of bullying." *Id*. at 35. The behavior was ongoing, committed by more than one child in the class, and frequently intended to hurt the child. *Id*. According to the IHO, the DOE did not present any evidence contradicting the incidents in the record and "only offered alternative reasons why these behaviors took place," none of which reduced the hurtful effect the incidents had on the child. *Id.* at 36.

It was the IHO's finding that school authorities knew or should have known that the child was a victim of bullying. IHO Decision at 36-37. It noted that although some of the incidents the parents complained of may not have been disclosed to the staff at P.S. 6, they made DOE personnel aware of the physical and verbal bullying that occurred during and before the 2007-2008 school year. *Id.* at 37. The IHO further stated that because the parents were not afforded the opportunity to discuss bullying during the 2007-2008 school year, it was not reasonable for the school authorities to claim, now, that they were unaware of the problem. *Id.* at 37.

Determined by the IHO was that the staff at P.S. 6 failed to take appropriate steps to investigate the incidents of bullying or show that remedial action was taken to prevent further bullying and thus were deliberately indifferent. IHO Decision at 40.

Contradicting evidence of a zero tolerance bullying policy at P.S. 6, the teachers, the

school psychologist, and the social worker all testified that they had never received any

formal training regarding bullying. *Id*. at 38. Additionally, the IHO noted that there was

little evidence of what, if anything, the staff at P.S. 6 did in response to the bullying

L.K.'s bullying. *Id.*at 38-39. "The administration's failure to take any steps, much less

adequate steps, to address these various incidents of harassment was clearly unreasonable

in light of the known circumstances and did make the child more vulnerable to such

conduct." *Id.* at 40 (citing *D.T. v. Summer Cent. Sch. Dist.*, 2009 WL 3316419 (2d Cir.

Oct. 15, 2009)).

Despite recognizing the reality of the problem as shown by her parents, the IHO

determined that L.K.'s educational opportunities were not significantly impaired by

bullying. IHO Decision at 40-42.

### C. March 2014 SRO Decision

Plaintiffs and the district appealed from the IHO's decision. *See* SRO Decision at 1. In a

detailed analysis and decision dated March 14, 2014, the SRO dismissed the parents appeal and

sustained, in part, the school district's cross appeal. *Id.* The SRO concurred with the IHO that

the burden of proof rests on the DOE for all elements of the bullying standard. *See* SRO

Decision at 16-17.

The SRO vacated the IHO's determination that the school had been deliberately

indifferent to L.K.'s bullying. *See* SRO Decision at 19. Noted was the fact that L.K.'s parents

were upset that the steps taken to remediate the bullying were confidential. It held that the

hearing testimony of the school officials was sufficient to show that the district took appropriate

steps. *See* SRO Decision at 17-19; IHO Hr'g Tr. 888-89, 1009-11, 1079-82, 1556-58, 3073-74, 3105, 3327.

The SRO concurred with the IHO's determination that L.K. had not been substantially restricted in her learning opportunities. *See* SRO Decision at 19. Relied upon by the SRO was testimony by L.K.'s special education teacher, her parents, and SEITs that she made academic, social, and emotional progress over the year. *Id.* at 19; IHO Hr'g Tr. 2040-42, 2167-68, 2204. "The meaningful progress across the curriculum by the student during the 2007-08 school year, without evidence of how bullying or harassment hindered or stunted her gains and successes, compels the conclusion that the fourth element of the legal test is not met in this case." SRO Decision at 21.

After reviewing the evidence in the record regarding, the substance of the IEP and its recommendations for appropriate services and placement, the SRO agreed that L.K. was not denied a FAPE. *See* SRO Decision at 22-39. Because the SRO found that there was no denial of a FAPE, it was not necessary to discuss the issue of the appropriateness of the parents' unilateral placement or the equitable considerations.

Even though L.K. has shown progress at Summit, the SRO held that her parents did not meet their burden of establishing the unilateral placement was appropriate. In particular, the SRO stated that it was concerned by the number of recommended services in the IEP that are not provided at Summit and the lack of improvement or change during the 2008-2009 school year. *Id.* at 41-42.

The SRO decision agreed with the 2009 IHO determination that equitable considerations were not in the parents' favor. *Id*. at 43. It noted that the parents were intent on sending the

student to a private school before the CSE meeting, and they had rejected the CTT program

before a specific school site was identified. *Id*.

## III. Law

### A. Standard of Review

The "standard for reviewing a state's administrative decisions in IDEA cases . . . is well

established." *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412 at 417 (2d Cir. 2009). A district

court must base its decisions on the preponderance of the evidence and give due weight to the

prior administrative proceedings. *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247 (2d

Cir. 2009). "But, the due weight we ordinarily must give to the state administrative proceedings

is not implicated with respect to . . . issues of law, such as the proper interpretation of federal

statute and its requirements." *Lillibask v. Conn. Dep't of Educ.*, 397 F.3d 77 at 82 (2d Cir. 2005)

(citing *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 2005)).

Where there is a conflict between the original and appellate administrative rulings,

deference is ordinarily due to the state appellate decision. *See C.F. ex rel. R.F. v. New York City*

*Dep't of Educ.*, 746 F.3d 68 (2d Cir. 2014); *see also Karl ex rel. Karl v. Bd. of Educ. of Geneseo*

*Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984) (noting that federal courts must "defer to the

final decision of the state authorities," even if "the reviewing authority disagrees with the hearing

officer"). Deference to an SRO Decision depends on the quality and substance of the opinion.

*See R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012). Federal courts

reviewing the decision "must look to the factors that normally determine whether any particular

judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and

whether it was based on substantially greater familiarity with the evidence and the witnesses than

the reviewing court." *Id.* (quoting *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d

Cir. 2012)).  "[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  *Id.*

**B.  *Burlington/Carter* Test**

"If a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state."  *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006).  To determine whether parents are entitled to reimbursement, courts apply the *Burlington/Carter* test, "which looks to: (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."  *C.F.*, 746 F.3d at 73 (2d Cir. 2014).

A school district offers a free appropriate public education "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *Bd. of Educ. of Hedrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203 (1982).  The "FAPE is implemented through the IEP, which is the plan for providing special education and related services by the [local educational agency] to the child with a disability."  Ann Lordeman, Cong. Research Serv., *The Individuals With Disabilities Education Act (IDEA), Part B: Key Statutory and Regulatory Provisions* 8-9 (Jan. 7, 2013) (hereinafter "*IDEA, Part B*").

IDEA requires that the IEP include the following:  (I) "a statement of the child's present levels of academic achievement and functional performance," (II) "a statement of measurable annual goals, including academic and functional goals, designed to (aa) meet the child's needs

that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and (bb) meet each of the child's other educational needs that result from the child's disability"; (III) "a description of how the child's progress toward meeting the annual goals" will be measured; (IV) "a statement of the special education and related services and supplementary aids and services"; (V) "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class"; (VI) "any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child"; and (VII) "the projected date for the beginning of the services." 20 U.S.C. § 1313(d)(1)(A); *see also* Ann Lordeman, Cong. Research Serv., *IDEA, Part B,* 8-9.

Courts determining whether an IEP meets the IDEA requirements must "make a two-part inquiry that is, first, procedural, and second, substantive." *R.E.*, 694 F.3d at 190 (2d Cir. 2012). "At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." *C.F.*, 746 F.3d at 78 (2d Cir. 2014) (citing *R.E.*, 694 F.3d at 190). The second step requires courts to determine whether the IEP was "substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefit[s]." *R.E.*, 694 F.3d at 190 (citing *Cerra*, 427 F.3d at 192).

"A district is not . . . required to furnish every special service necessary to maximize each handicapped child's potential." *Cerra*, 427 F.3d at 195 (internal quotation marks omitted). It "fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student an opportunity greater than mere trivial advancement." *Id.* (internal quotation marks omitted). A "district court must examine the

record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan. Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195 (internal quotation marks and citation omitted).

To determine whether a parent has met the burden of showing that the unilateral placement is appropriate, the Court of Appeals for the Second Circuit established the following standard: "[t]o qualify for reimbursement under the IDEA, parents . . . need only demonstrate that the placement provides education instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Gagliardo v. Arlington Cent. School Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citing *Frank G.*, 459 F.3d at 264-65).

### C. FAPE Bullying Standard

A disabled student is deprived of a FAPE when school personnel are deliberately indifferent to or fail to take reasonable steps to prevent bullying that substantially restricts a child with learning disabilities in her educational opportunities. *T.K. v. New York City Dep't of Educ.*, 779 F.Supp. 2d 289 (E.D.N.Y. Apr. 28, 2011). The conduct does not need to be outrageous in order to be considered a deprivation of rights of a disabled student. It must, however, be sufficiently severe, persistent, or pervasive that it creates a hostile environment. *Id.* at 317.

> When responding to bullying incidents, which may affect the opportunities of a special education student to obtain an appropriate education, a school must take prompt and appropriate action. It must investigate if the harassment is reported to have occurred. If harassment is found to have occurred, the school must take appropriate steps to prevent it in the future. These duties of a school exist even if the misconduct is covered by its anti-bullying policy, and regardless of whether the student has complained, asked the school to take action, or identified the harassment as a form of discrimination.

*T.K.*, 779 F. Supp. 2d at 317. The rule does not require that the bullying would have prevented all opportunity for an appropriate education, only that it was likely to affect the opportunity of the student for an appropriate education. *Id.* at 317.

Where parents are requesting compensation for private education, as here, the bullying standard is a prospective test within the *Burlington/Carter* framework. *See R.E.*, 694 F.3d at 186 (adopting the majority view that the IEP must be evaluated prospectively as of the time of its drafting). The central question is whether, viewing the school district's proposed plan at the time of its drafting, there was a substantial probability bullying would deprive the student of a FAPE during the years for which reimbursement is requested.

Evidence of past bullying and its impact on the disabled student's learning opportunities is important in determining whether an educational program is reasonably calculated to provide a disabled child with a FAPE. *See T.K., 779 F.Supp. 2d at 318.* Also essential are: the school district's implementation of previous IEPs; its prior management of the harassment experienced by the student; the IEP team's plan to address future bullying; and the student's IEP for the year in issue. *See R.E.*, 694 F.3d at 186 ("testimony may be received that explains or justifies the services listed in the IEP").

Retrospective testimony that the school district would have provided additional services to address bullying beyond those listed in the IEP may not be considered. *Id.* at 186-87 (the district "may not introduce testimony that a different teaching method, not mentioned in the IEP would have been used"). "This rule reasonably protects parents who must assess a proffered IEP without the benefit of after-the-fact testimonial modifications." *E.M.*, 2014 WL 3377162, at *17.

**IV.    Application of Law to Facts**

**A.  Plaintiff Not Offered A FAPE**

Plaintiffs seek reimbursement for their unilateral placement of L.K. in a private school

for the 2008-2009 school year. Central to their claim is the contention that the district failed to

adequately address L.K.'s needs, in light of bullying, at her June 2008 CSE meeting and in her

2008 EIP, thereby failing to offer L.K. a FAPE for the 2008-2009 school year.

### 1.  Bullying Threatened to Severely Restrict L.K.'s Educational Opportunities

Pursuant to the standard established in *T.K. v. New York City Dep't of Educ.*, 779 F.Supp.

2d 289 (E.D.N.Y. Apr. 28, 2011), bullying deprived L.K. of a FAPE during the 2007-2008

school year and there was a substantial probability that it would severely restrict her educational

opportunities during the 2008-2009 school year if left unaddressed by the district.

Neither the plaintiffs nor the defendant contest the SRO and IHO findings that L.K. was

the victim of significant bullying during the 2007-2008 school year and that the school knew or

reasonably should have known of it.

### a.  L.K.'s Educational Opportunities Substantially Restricted

The SRO concluded that the bullying experienced by L.K. during 2007-2008 did not

substantially restrict L.K.'s learning opportunities. This conclusion is not supportable.

As explained by the United States Department of Education, "[s]tudents who are targets

of bullying behavior are more likely to experience lower academic achievement and aspirations,

higher truancy rates, feelings of alienation from school, poor relationships with peers, loneliness,

or depression. . . . [t]he consequences may result in students changing their patterns of school

participation." *Dear Colleague Letter*, 61 IDELR 263 (Aug. 20, 2013).  These consequences of

bullying interfere with a disabled student's educational opportunities and indicate the need to

consider modifications to the student's IEP.  *Id.*

L.K.'s experience of these and other negative effects of bullying during the 2007-2008 school year is well documented. The record shows that L.K. complained to her parents almost daily about being bullied at school. IHO Hr'g Tr. 1706; Exs. HH, WW. Her parents stated that L.K. withdrew emotionally, needed to bring dolls to school for comfort, and was more subdued during the 2007-2008 school year. IHO Hr'g Tr. 1697, 1729. The developmental pediatrician, who evaluated L.K. in 2004, 2005, 2006, and 2007, observed that when she met with L.K. in February 2008 she was "not as happy and interactive as she had been before," that she had gained a "fair amount of weight, 13 pounds" since 2007, and that her BMI was "significantly elevated." IHO Hr'g Tr. 1360:12-1361:20; SRO Decision 38 n.43; *see also* IHO Hr'g Tr. 3219. She stated that L.K. was not as involved in the classroom as she had been the year before; L.K. "seemed to have shut down, and really needed her SEIT . . . much more." IHO Hr'g Tr. 1372.

Three of L.K.'s SEITs from the 2007-2008 school year testified that she was the subject of ridicule from other students and ostracized in the classroom. *See* IHO Hr'g Tr. 1477-85, 1555-66. They stated that L.K.'s classroom was a "hostile environment," that the other students frequently avoided L.K., treated her like a "pariah," and laughed at her for trying to participate in class. *Id.*, *see also* Pls.' 56.1 Stmt. ¶¶ 24-28, 33.

During the 2007-2008 school year, L.K. was late or absent 46 times, a notably high number. IHO Hr'g Tr. 2789. Some of L.K.'s absences were due to illnesses. Her parents testified, however, that L.K. was consistently late because she did not want to go to school due to a fear of being ostracized. IHO Hr'g Tr. 3065-66, 3219-20; SRO Decision at 38.

Although L.K. improved academically and made progress on her 2007 IEP, *see* SRO Decision at 35-36, "academic growth is not an all-or-nothing proposition." *T.K. v. New York City*

*Dep't of Educ.*, 779 F.Supp. 2d 289 (E.D.N.Y. Apr. 28, 2011). It is difficult to know what academic progress L.K. would have made without these negative effects of bullying.

### b. L.K.'s School Deliberately Indifferent

The SRO vacated the IHO's finding for the plaintiffs and stated that P.S. 6 took appropriate action and was not deliberately indifferent to the bullying L.K. suffered. Although the SRO decision is given deference, the record supports the IHO's determination that the school was deliberately indifferent and did not take appropriate action.

L.K.'s parents and SEITs made numerous attempts to discuss bullying with P.S. 6 personnel; they were largely ignored. *See* Pls.' 56.1 Stmt. ¶¶ 23,42; IHO Hr'g Tr. 1556-59. When L.K.'s parents attempted to raise bullying and harassment issues with the principal of P.S. 6 during the 2007-2008 school year she rebuffed them and, in one instance, threatened to call security if they did not leave her office. IHO Hr'g Tr. 847-48, 2648. Written requests by L.K.'s parents to see incident reports were consistently denied. *See* Exs. N, Q, T.

The record shows that the school's responses to bullying within the classroom may have further alienated L.K. and given the other students in the class the impression that their behavior was appropriate. *See generally* IHO Decision. When the students in L.K.'s class refused to use a pencil because L.K. had touched it, the teacher's response was to label the pencil with L.K.'s name, reinforcing the other students' behavior. *See* IHO Hr'g Tr. 1557-58. On another occasion, J., a student with whom L.K. had experienced conflict in the past, intentionally "stomped" on L.K.'s toes. While J. was allowed to write an incident report denying the conduct, there is no evidence that he was ever asked to apologize, or that L.K. was offered the chance to file an incident report. *See* IHO Hr'g Tr. 3034.

When viewed as a whole, the evidence evinces a deliberate indifferent on the part of

P.S. 6's school personnel.

### 2. IEP Team Improperly Refused to Address Bullying

A disabled student's IEP is developed by an IEP team composed of school personnel and parents. *See* 20 U.S.C. § 1414(d)(1)(B). "In general, the IEP team must consider the strengths of the child; the concerns of the parents for enhancing the education of their child; the results of their initial evaluation (or most recent evaluation); and the academic, developmental, and functional needs of the child." Ann Lordeman, Cong. Research Serv., *IDEA, Part B,* 8-9; 20 U.S.C. § 1414(d)(3)(A).

Where, as here, there is a legitimate concern that bullying will severely restrict a disabled student's educational opportunities, it must be considered by the student's IEP team. As stated by the United States Department of Education:

> Schools have an obligation to ensure that a student with a disability who is the target of bullying behavior continues to receive FAPE in accordance with his or her IEP. The school should, as part of its appropriate response to the bullying, convene the IEP Team to determine whether, as a result of the effects of the bullying, the student's needs have changed such that the IEP is no longer designed to provide meaningful educational benefit. If the IEP is no longer designed to provide a meaningful educational benefit to the student, the IEP Team must then determine to what extent additional or different special education or related services are needed to address the student's individual needs; and revise the IEP accordingly. Additionally, parents have the right to request an IEP Team meeting at any time, and public agencies generally must grant a parental request for an IEP Team meeting where a student's needs may have changed as a result of bullying.

*Dear Colleague Letter*, 61 IDELR 263 (August 20, 2013).

Overlooked by the SRO is the fact that the IEP team refused to take bullying into account when drafting her IEP and BIP. When L.K.'s parents sought to raise the bullying problem as it related to her educational needs and opportunities during the 2008 CSE meeting they were told that it was not an appropriate topic for the meeting, which was convened to develop her 2008 IEP. *See* CSE Meeting Tr. at 45-46. The IEP team's refusal to allow L.K.'s parents to raise their

legitimate concerns about bullying as it related to her FAPE deprived them of meaningful participation in the development of her IEP for the 2008-2009 school year.

This court's earlier decision suggesting that L.K.'s parents participated fully in the IEP was inaccurate. This was revealed by the full record developed during the post-remand IHO hearing—after a substantive standard to prevent bullying had been articulated. *See T.K.*, 779 F.Supp. 2d at 319. Inadequacy of the parents' ability to participate meaningfully in the process became apparent once the question of bullying was properly addressed. The district failed to fulfilled IDEA's procedural obligations by effectively precluding all discussion of the critical issue of bullying during the June 2008 CSE meeting. *See Cerra*, 427 F.3d at 192; 20 U.S.C. § 1415(b)(1).

### 3. IEP Substantively Failed to Address Bullying

No anti-bullying plan was developed to ensure that L.K. would receive a FAPE. The IEP team's improper refusal to consider if and how bullying affected L.K.'s needs is reflected in the substance of L.K.'s 2008 IEP and BIP. Both documents are devoid of any indication that bullying was a problem for L.K. or that harassment by her peers, unless properly addressed, was substantially likely to have a severely negative impact on her educational opportunities during the 2008-2009 school year.

L.K.'s June 2008 IEP contains a section on Social/Emotional Performance that is directed only to her feelings, not to adverse actions by others. It is designed to:

> "Describe the student's strengths and weaknesses in the area of social and emotional development . . . . Consider the degree and quality of the student's relationships with peers and adults, feelings about self and social adjustment to school and community environments. Discuss how the student's disability affects his/her involvement and progress in the general curriculum . . . ."

IEP at 4. L.K.'s "Present Performance" in this area describes her as a "sensitive child." *Id*. It notes that "she is able to clearly verbalize her ideas and feelings most of the time" and is

"working on learning to use this strength to problem solve with her peers more appropriately."
*Id*. Her "Needs" in this area are described as follows:

> [L.K.] needs frequent redirection and praise from adults. She responds well to visual
> supports and verbal cues to follow directions and make transitions. [L.K.] is able to
> express her personal thoughts and feelings both verbally and in writing. Taking breaks to
> read and write help L.K. to re-group and eventually complete the task at hand.

No mention is made in this section of her difficulty with bullying, the impact it had on
her feelings about self, her ability to concentrate, or her social adjustment. Nor is bullying
addressed in any other section of her IEP. *See infra* Part IV.A.3. (quoting IEP goals). Yet
various reports about these issues were available to L.K.'s IEP team and her parents repeatedly
sought to raise bullying during the June 2008 CSE meeting. *See* SRO Decision at 23 (describing
"Evaluative Reports Available to the June 2008 CSE"); CSE Meeting Tr. at 45-46.

L.K.'s BIP was incorporated into her IEP. *See* IHO Hr'g Tr. at 101. The BIP's purpose
is to describe how the IEP team will improve difficult behavior that is inhibiting a child's
academic success. It outlines her own behaviors that interfere with learning, behavior changes
that are expected, and the strategies and support that will be employed. IEP at 38. Under the
circumstances, mention of severe bullying by others, its impact on L.K.'s behaviors and feelings,
and strategies to address it going forward was required. Her parents participated actively in the
BIP meeting and made various changes to the document. IHO Decision at 14, 16-17, 26-27. But
when L.K.'s father tried to discuss the issue of bullying, he was told that it was not appropriate
for the BIP meeting. *See* IHO Hr'g Tr. 3100, 3053. L.K.'s BIP, like her IEP, avoids any
mention of bullying. *See infra* Part IV.A.4 (quoting BIP).

The SRO's review of the "substance of the June 2008 IEP as it may be relevant to
addressing the bullying" describes, in significant detail, what *was* included in L.K.'s 2008 IEP

and BIP. SRO Decision at 22-39. It does not address the troubling omission of the bullying issue.

It relies upon, among other things, the goals in L.K.'s 2008 IEP and BIP that focus on assisting L.K. "in decreasing her interfering behaviors which, in turn, would help decrease her vulnerability to bullying by others." SRO Decision at 31. These include: learning to interpret and respond to social cues; learning to identify another person's perspective and understand why that person may have a different perspective than her own; learning to visually inference information based on watching a person's social cues; and following play transitions of her peers. *See* IEP 7-37; *see also infra* Part IV.A.3. (quoting IEP goals). The SRO also noted the addition of counseling services to L.K.'s IEP, and the progress she made on her previous IEPs with CTT services. SRO Decision at 31-35, 36-38.

While the goals and services in L.K.'s IEP and BIP may have had the secondary effect of decreasing her "vulnerability to bullying," they were not designed to ensure that bullying of her by others did not substantially restrict her educational opportunities during the 2008-2009 school year. Instead they put the burden of adjusting to bullying on L.K. The record suggests that L.K. was deemed, by her IEP team, to be herself responsible for the bullying by others and for its continuation.

Where there is a substantial probability that bullying will severely restrict a disabled student's educational opportunities, as a matter of law an anti-bullying program is required to be included in the IEP. An educational plan that fails to acknowledge a serious problem being faced by a disabled child cannot be said to have been reasonably calculated to offer her a FAPE.

L.K.'s IEP was not reasonably calculated to ensure that bullying by others did not interfere with her ability to receive a FAPE—no anti-bullying program was included. Its goals

and recommendations failed to adequately address her educational needs in light of continued bullying.

### 4. Abstract IEP Language Precluded Parent Participation

The substance of the IEP must be intellectually accessible to parents. "In order for this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012). "At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on." *Id.* The IEP itself must, therefore, address all of the disabled child's needs, including, when necessary, protection from bullying in language that can be understood by the parents.

In addition to being substantively inadequate for the reasons already described in Part IV. A.3., the IEP goals and strategies that the DOE and SRO Decision rely upon are presented at a level of educational abstraction that parents cannot be expected to appreciate. The DOE argues that the following highly abstract statements eschewing the word "bullying" adequately address the problem L.K. faced. *See* Summ. J. Tr. 16-24.

1. "[L.K.] will learn to join in a conversation already in progress with her p.eers on 90-100% of opportunities." IEP at 9; Summ. J. Tr. 18.

2. "[L.K.] will improve her ability to follow instructions, conversations or stories that contain multiple steps on 90-100% of opportunities." IEP at 11, Sum. J. Tr. 18.

3. "[L.K.] will remain on-topic in a conversation with a peer on 90-100% of appropriate opportunities." IEP at 9.

4. "[L.K.] will interpret and respond to social cues and maintain the social interaction on 90-100% of opportunities with peers." IEP at 10.

5. "[L.K.] will increase attending to age-appropriate levels on 90-100% of opportunities." IEP at 13.

6. "[L.K.] will learn to identify another person's perspective, and explain why that person may have a different perspective than her own, in books, television shows, and daily life events with 90-100% accuracy."  IEP at 14; Summ. J. Tr. 19.

7. "[L.K.] will learn to visually inference information based on watching a person's social cues 90-100% accuracy."  IEP at 18; Summ. J. Tr. 19.

8. "[L.K.] will follow the play transitions of her peers for 90-100% of opportunities."  IEP at 18.

9. "[L.K.] will respond to her peers and adults on 90-100% of opportunities."  IEP at 19.

10. "To improve pragmatic language skills by improving ability to
    a. Sustain attention span for preferred/less preferred/non-preferred activities/tasks with 90% accuracy and fading visual/verbal cues.
    b. Engage in sustained eye contact with peers/adults with 90% accuracy and fading visual/verbal cues.
    c. Maintain appropriate space when engaging in conversation with a peer/adult with 90% accuracy and fading visual/verbal/physical cues.
    d. Request/protest wants and needs with varied language with 90% accuracy and fading visual/verbal cues.
    e. Comment on a variety of topics with 90% accuracy and fading visual/verbal cues.
    f. Ask novel questions with 90% accuracy and fading visual/verbal cues."  IEP at 21; Summ. J. Tr. 21-22.

11. "To improve pragmatic language skills by improving ability to
    a. Understand and react appropriately to humor with 90% accuracy and fading visual/verbal cues
    b. Express phrases for clarification with 90% accuracy and fading visual/verbal cues
    c. Express sentences that bridge topic A to topic B when making topic changes in conversation with 90% accuracy and fading visual/verbal cues
    d. Transition and accept change with 90% accuracy and fading visual/verbal  cues
    e. Protest pragmatic errors with 90% accuracy and fading visual/verbal cues
    f. Utilize a contextual reciprocal response during discourse with 90% accuracy and fading visual/verbal cues
    g. Exclude irrelevant information and include relevant information from the conversational topic with 90% accuracy and fading visual/verbal cues
    h. Repair communication breakdowns with expressing ideas with 90% accuracy and fading visual/verbal cues . . . ." IEP at 24.

12. "To improve social and play skills by improving ability to
   a. Engage in varied play schemes with 90% accuracy and fading visual/verbal cues
   b. Initiate/sustain interest in play with peers with 90% accuracy and fading visual/verbal cues
   c. Negotiate changes in play themes with peers 90% accuracy and fading visual/verbal cues
   d. Give reasons to support changes in negotiation with 90% accuracy and fading visual/verbal cues
   e. Engage in sport games with peers with 90% accuracy and fading visual/verbal cues
   f. Engage in board games with peers with 90% accuracy and fading visual/verbal cues."  IEP at 25.

13. "[L.K.] will increase independence in her activities of daily living.
   a. Will demonstrate the ability to brush her hair independently 100%X
   b. Will demonstrate the ability to brush her hair and tie it into a ponytail using a hair "scrunchy" 90-100%X
   c. Will wash her face, hair and body independently while taking a shower and bath 100%X
   d. Will be able to complete all her self care activities in a timely manner 90-100%X." IEP at 31.

Almost no parent reading these goals would understand that they address the severe bullying of their child by others.  Nor is bullying by others and its prevention addressed in a way that parents could be expected to understand in any other section of L.K.'s IEP.  *See infra* Section IV.A.3. (discussing IEP substance).

The BIP, incorporated into L.K.'s IEP and relied upon by the DOE, also lacks a direct plan for addressing the bullying problem.  It simply lists the following:

1. "Behaviors that interfere with learning:
   a. Trouble staying on task.
   b. Difficulty consistently attending to and completing a task or activity.
   c. Social cues are sometimes misinterpreted.
   d. Difficulty following multi-step instruction and novel instruction.
   e. At times, she feels anxious and overwhelmed.
   f. Behavior sometimes disrupts learning, i.e., picking her nails."  IEP at 38; Summ. J. Tr. 19-20.

2. "Behavior changes expected:
   a. She will improve her ability to stay on task and remain focused on a task or activity.
   b. She will be able to sustain her attention for longer periods of time.
   c. She will be able to cope better when she feels anxious or overwhelmed.
   d. Ability to read other's cues in social situations with increase.
   e. Positive social interactions will increase.
   f. Fluency and processing speed will increase.
   g. Receptive and expressive language processing will increase.
   h. Touching will decrease.
   g. Calling out on the rug will decrease." IEP at 38; Summ. J. Tr. 21.

3. "Strategies to be tried to change the behavior
   a. Repetition of novel instruction will be given.
   b. Reassurance, praise, feedback, encouragement and gestures will be utilized to reduce off-task behaviors.
   c. Recognition of antecedents, i.e., physical, noticeable signs that precede off-task behavior or. distress, i.e., head down, turning away from teacher and instruction, non-contextual laughter and intervention will occur at that point by softly calling her name to redirect her.
   d. More time will be allowed, with reassurance, praise, and encouragement if necessary, to help her express her thoughts in class.
   e. Small breaks will be employed as needed if necessary.
   h. Simple, easy to understand expectations and instruction will be repeated as necessary." IEP at 38.

4. "Supports to be employed to help the student change the behavior
   a. Teacher/staff support.
   b. Regular communication and collaboration between home and school staff.
   i. Counseling in small group." IEP at 38.

Even if the goals, strategies, and services in L.K.'s IEP would have mitigated harassment if properly implemented, a lay parent would not have understood them as reasonably calculated to provide a FAPE in light of the serious problem of bullying by others.

Plaintiffs were deprived of the ability to meaningfully participate in the plan and L.K. was not offered a FAPE for the 2008-2009 school year.

**B. Private Placement Appropriate**

To receive reimbursement, a parent's unilateral placement must be at an appropriate site. The private school does not need to meet the IDEA criteria, but courts look to the same standards for guidance. *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir., 2006). "Ultimately, the issue turns on whether a placement—public or private—is reasonably calculated to enable the child to receive education benefits." *Id.* (internal quotation marks omitted).

Prior to placing her at Summit, L.K.'s parents received recommendations from L.K.'s developmental pediatrician that she be placed in a special education school that provides instruction for students with language-based learning disabilities. *See* SRO Decision at 24-25 (citing Exs. PP, FF). A report from the McCarton Center recommended that she be placed in a special education school for "bright" learning disabled students. SRO Decision at 25 (citing Ex. NN). A private speech-language pathologist recommended that she be enrolled in a "small structured classroom setting with a low student to teacher ratio" that would support her language-based difficulties. *Id.* (citing Ex. KK). A Lovaas Institute report prepared by her program consultant recommended that L.K. attend a "small, low student to teacher ratio, and supportive classroom in a special education school." *Id.* (citing Ex. W). The school-based SEITs recommended placement in a small, structured, supportive class setting with a low student to teacher ratio. *Id.* (citing Exs. S, V, EE).

Summit is a New York State-approved nonpublic special education school serving 120 students identified as having learning disabilities and emotional disturbances. IHO Hr'g Tr. 1225-26, 1230; SRO Decision at 40. According to the clinic director, Summit has a "no tolerance for bullying" mandate, supported by classroom discussions and the school's social skills curriculum. "A social worker pushes into the classrooms once a week to implement the

social skills curriculum on topics such as friendships, self-esteem, problem solving, and conflict resolution once a week." SRO Decision at 40; IHO Hr'g Tr. 1238. Speech-language therapy and individual and group counseling services are provided.

Despite the fact that L.K. made progress in social, academic, and speech language skills at Summit, the IHO and SRO concluded that it was not an appropriate placement because it did not offer enough speech-language therapy per week or any physical therapy services. *See* SRO Decision 41-42.

As the Court of Appeals for the Second Circuit has stated, "review of the private placement at this stage of *Burlington/Carter* review is more informal than review of the original IEP: a private placement need not meet the IDEA requirement for a FAPE." *R.E.*, 694 F.3d at 187. A private placement is not required to provide every service included in the IEP, nor are parents subject to the same "least restrictive environment" requirements as a school board. *See C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014). "[T]he test for the parents' private placement is that it is appropriate, and not that it is perfect." *Warren G. v. Cumberland County School Dist.*, 190 F.3d 80, 84 (3d Cir. 1999).

The record demonstrates that Summit conformed to the recommendations L.K.'s parents received from experts regarding appropriate school placement for L.K. It provided a significant number of the services included in the IEP and offered L.K. a supportive class setting with a low student to teacher ratio. L.K. made meaningful progress during the 2008-2009 school year. Under the circumstances, plaintiffs' decision to place L.K. at Summit was reasonably calculated to enable her to receive educational benefits suited to her special needs.

### C. Balance of Equities Favor Plaintiffs

Equitable considerations favor reimbursement. The parents of L.K. promptly and diligently pursued their right to participate in the student's FAPE.  They repeatedly attempted to raise their concerns about bullying with teachers and administrators during the 2007-2008 school year.  These attempts were either ignored or rebuffed by the school personnel.  Left unaddressed, the bullying continued and severely restricted L.K.'s educational opportunities during the 2007-2008 school year.  Troubled by L.K.'s difficulties with bullying and the school's inadequate response, plaintiffs applied to and accepted placement in Summit.

During the June 2008 CSE meeting concerning L.K.'s 2008 IEP, plaintiffs once again sought to raise concerns about bullying and their desire for an alternative placement. The IEP team refused to discuss bullying during the CSE meeting.  The resultant IEP for 2008 was not reasonably calculated to ensure that bullying did not interfere with L.K.'s ability to receive a FAPE.

When plaintiffs received the inadequate IEP, they mailed notice of objection and unilateral placement.  Relying on all available information, plaintiffs made a reasonable decision. They did not delay in notifying DOE.

## VI.    Conclusion

L.K. was not offered a FAPE.  Her IEP team refused to take her parents' concerns about bullying into account when drafting her IEP.  No educational plan was designed to ensure that bullying did not substantially restrict L.K.'s educational opportunities during the 2008-2009 school year.  Even if the goals, strategies, and services outlined in her IEP might have incidentally helped decrease L.K.'s vulnerability to bullying, they were not in language her parents could understand as reasonably calculated to address bullying and to provide a FAPE.

Plaintiffs' decision to place L.K. at Summit school was reasonably calculated to enable L.K. to receive an appropriate education. The equities favor reimbursement.

Plaintiffs' motion for summary judgment is granted.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: July 23, 2014
Brooklyn, New York